FILED
12/15/2021 1:23 PM
Pamela Renee Crews, District Clerk
**Tyler County, TX**
**By: Renee Crews**

**EXHIBIT**

**5**

CAUSE NO. _____

| | | |
|---|---|---|
| EX PARTE | § | IN THE 1A DISTRICT COURT |
| | § | |
| | § | OF TYLER COUNTY |
| | § | |
| NETFLIX, INC. | § | STATE OF TEXAS |

### NETFLIX, INC.'S PETITION FOR A PRETRIAL WRIT OF HABEAS CORPUS

The State's indictment of Netflix, Inc.[1] under Texas Penal Code § 43.262, for "promoting" the film *Cuties*—which contains no sexual conduct or sexually explicit material of any kind—should be dismissed because Section 43.262 is patently unconstitutional. Section 43.262's plain language, structure, and legislative purpose all confirm that Section 43.262 creates *and criminalizes* a new category of prohibited speech: "lewd visual material depicting a child." Under the statute's express terms, and those of neighboring statutes, such "visual material" does *not* depict minors engaged in "sexual conduct" and thus is *not* child pornography. Section 43.262 is therefore unenforceable—whether against Netflix or anyone else—because it is facially unconstitutional under the First, Fifth, and Fourteenth Amendments of the United States Constitution and Article I Section 8 of the Texas Constitution in several ways.

Section 43.262 is a profoundly vague and confused jumble of words and jurisprudential concepts that robs the public of the requisite notice as to what might offend its precepts. While Section 43.262 employs familiar phrases in its operative provisions: "lewd exhibition," "appeals to the prurient interest in sex," etc., when placed within Section 43.262's brave new context—and construed in harmony with related, neighboring sections—those familiar phrases are bereft of any clear meaning. How, for example, may clothed minors so lewdly exhibit their pubic area in visual material that they "appeal to the prurient interest in sex" under Section 43.262(b)(2)

---

[1] *State v. Netflix, Inc.*, Cause No. 13-731 (filed Sept. 25, 2020).

when, for almost 50 years,[2] courts have universally applied that label only to visual materials that depict only the most hard-core "sexual conduct"—a term the Legislature purposefully omitted from Section 43.262's operative provisions? Section 43.262's vagueness is especially pronounced when considering the scope and meaning the State has given Section 43.262 through its indictment of Netflix for "promoting" *Cuties*—a film that contains no sexual conduct or sexually explicit material of any kind. Section 43.262's hopelessly indeterminate provisions thus deprive all citizens of their right to know what is prohibited, and thus chills their guarantees of free speech while leaving too much room for the arbitrary exercise of state power. Section 43.262 is therefore void and unenforceable *in its entirety* under the Due Process Clause of the Fifth and Fourteenth Amendments.

But even if Section 43.262 were capable of any coherent construction, the statute would still offend—profoundly—the right to free speech under the First Amendment and the Texas Constitution because the statute is a content-based prohibition that is also vastly (and unconstitutionally) overbroad. So concluded the First Court of Appeals—correctly—in *Ex Parte Lowry*, No. 01-20-00858-CR, 2021 WL 4953918 (Tex. App.—Houston [1st Dist.] Oct. 26, 2021, no pet. h.).[3] As noted in *Lowry*, Section 43.262 is a content- and viewpoint-based restriction that grants the State broad power to make felons out of any citizen who watches proscribed "lewd visual material depicting a child" or "promotes" it—an exceedingly broad term that extends far beyond the "visual material" itself. And the State may do this under Section 43.262 without having to satisfy even the most basic constitutional thresholds, such as proof beyond a reasonable doubt that a work is "patently offensive," or that the State consider the work as a whole before indicting citizens for watching or promoting offensive "visual materials" (among many other deficiencies).

---

[2] *Miller v. California,* 413 U.S. 15 (1973).
[3] A copy of the court's decision in that case is attached in Exhibit 5 of the Appendix.

Envelope: 59161766

Section 43.262 is invalid on its face. So too is the State's indictment of Netflix. Netflix's petition for pretrial writ of habeas corpus should therefore be granted and the State's case dismissed.

## FACTUAL AND PROCEDURAL BACKGROUND



This is Amy, age 11. She is smiling because she is happy again. She is back at play, "the work of childhood."[4] *Cuties* ("Mignonnes" in its native French) is Amy's story.

The film's title derives from the "Cuties" themselves: a self-named dance group of Amy's peers who have their hearts set on trying out for and performing at a big dance competition in town. Like Amy, these girls enjoy almost no parental supervision. Unlike Amy, they also have unfettered and unmonitored access to social media and the internet, which they access through their parent-provided computers

---

[4] Jean Piaget, renowned psychologist, is credited with making this statement.

Envelope: 59161766

and smartphones.[5] The unsupervised "Cuties" wear provocative clothes and makeup intended to make them look older than they are, which they then use unsuccessfully to draw the attention of and seduce much older teenage boys using wiles their immature figures cannot yield.[6] The Cuties also listen to mature and suggestive music to match their mature and suggestive dances, which they practice and perform in the hopes of besting much older and physically more mature dancers.[7]

*Cuties* uses the vast majority of its 91-minute runtime exploring and portraying various relationships (e.g., fraternal,[8] maternal,[9] paternal (or lack thereof),[10] and platonic[11]), while vividly revealing to viewers the dangers and consequences of leaving children unrestrained from—and at the mercy of—the highly sexualized and media-driven culture in which they are now immersed. *Cuties* shows further that the consequences of a child's unfettered consumption of sexualized media will likely lead to more than innocence lost: victimization (including self-victimization), shame, and the assimilation of degrading notions about sexuality may also follow.[12]

*Cuties* forcefully explores these themes with unflinching scrutiny. For example, in one scene that lasts less than a minute, Amy is shown dancing for the Cuties' leader, Angelica, in the laundromat of the apartment where they both live—a public place. No adults are present. At one point in her routine, Amy kneels on the laundromat floor, places her right index finger in her mouth, and begins mimicking sexualized dance moves ("twerking") she had seen in music videos on the

---

[5] *Cuties* at 00:21:40 to 00:21:49, and 00:38:16 to 00:39:36. Netflix cites to *Cuties* and other "visual materials" throughout this petition by their runtime: e.g., "*Cuties* at HH:MM:SS to HH:MM:SS."
[6] *Cuties* at 00:8:20 to 00:9:12, and 00:35:35 to 00:36:06, and 00:38:16 to 00:39:36.
[7] *Cuties* at 00:43:00 to 00:44:19, and 00:50:10 to 00:51:20.
[8] *E.g., Cuties* at 00:06:01 to 00:06:43, and 00:07:42 to 00:08:01, and 00:13:30 to 00:15:11, and 01:00:38 to 1:00:59.
[9] *E.g., Cuties* at 00:02:39 to 00:04:43, and 00:09:48 to 00:13:16, and 1:27:14 to 1:29:30.
[10] *E.g., Cuties* at 00:25:24 to 00:26:23, and 00:34:02 to 00:34:40.
[11] *E.g., Cuties* at 00:13:20 to 00:15:16, and 00:17:40 to 00:18:55, and 00:20:05 to 00:21:00, and 00:40:05 to 00:41:00, and 1:02:02 to 1:03:05.
[12] *Cuties* at 1:00:00 to 1:01:50, and 1:08:30 to 01:10:48, and 1:23:10 to 1:30:00.

Envelope: 59161766

internet. Amy does this in hopes that her dance moves will impress Angelica and will thus gain Angelica's acceptance and friendship.[13] Amy succeeds, and Angelica then introduces Amy to the rest of the Cuties' dance troupe.[14]

In scenes that follow, Angelica, Amy, and the rest of the Cuties teach each other in broad daylight to dance provocatively. No adults are ever present. The girls practice their new moves by twerking and gyrating their hips in plain view, such as beneath an overpass or bridge in broad daylight (roughly 60 seconds).[15] After getting caught sneaking into a laser-tag arena,[16] the Cuties twerk in front of two adult male employees who, amused but repulsed, throw them out of the building (roughly 20 seconds).[17] The Cuties perform their suggestive routine at the try-outs for the big show in front of adults and other attendees (roughly 60 seconds).[18] After receiving notice that they made the cut, the Cuties celebrate by practicing their moves outside in broad daylight on the stairs of a building (roughly 1 minute and 30 seconds),[19] which they video and post to social media (without their parents' knowledge).[20] Then, at the big show held in a public park during daylight hours before dozens of spectators, the pre-teen Cuties perform their very adult routine: to the manifest shock and dismay of the men, women, and children in attendance—none of whom try to hide their disgust about what they see (roughly 2 minutes and 40 seconds).[21] And it is in this pivotal scene where Amy, while gyrating on stage, suddenly hears her mother's voice calling her home—back to childhood, back to innocence—and where Amy finally perceives what she has done and what her friendships and behavior have

---

[13] *Cuties* at 00:42:00 to 00:42:40.
[14] *Cuties* at 00:42:41 to 00:43:58.
[15] *Cuties* at 00:42:55 to 00:43:58.
[16] *Cuties* at 00:55:37 to 00:56:41.
[17] *Cuties* at 00:58:17 to 00:58:39.
[18] *Cuties* at 00:50:10 to 00:51:20.
[19] *Cuties* at 00:58:59 to 01:00:28.
[20] *Cuties* at 01:00:29 to 01:00:55.
[21] *Cuties* at 01:23:30 to 01:26:12.

cost her: her innocence, her family's trust, her childhood.[22] The dance scenes comprise roughly seven minutes (i.e., 7%) of this 90-minute film. There are no sexually explicit scenes involving any minors (or anyone else for that matter) within *Cuties*.

*Cuties* demands that its viewers see and perceive exactly what these pre-teen girls are doing as they emulate the highly sexualized media they consume unrestrained. The film makes this demand of its viewers through its medium, the camera. The film frames its shots to confront viewers with unmistakable comparisons between the media that Amy and her fellow Cuties romanticize daily and the Cuties' increasingly adult dance routines. No viewer of *Cuties* may remain aloof or distant from the reality of what the Cuties are becoming or where they are likely headed: toward the derision and shame that adults and their peers predictably and ultimately hurl at them while they perform at the big show, and far from the success and fame they see in the media they consume and believe they too will obtain.[23] Nor by the film's conclusion could any of *Cuties*' viewers wonder about the film's unmistakable message: fight to keep children innocent, guard them—especially young girls—against an increasingly sexualized world, teach them that they are more than their bodies and to value relationships, and arm them with the knowledge and support they will need to navigate and contextualize the adult world as it comes to them.[24]

*Cuties*' message to its viewers is timely. Concerns about the hyper-sexualization of children, primarily girls, remain as heightened here as in the world portrayed in *Cuties*.

---

[22] *Cuties* at 01:26:30 to 1:27:10.

[23] *Cuties* at 01:23:30 to 01:27:10.

[24] App'x, Ex. 2-A, Alyssa Rosenberg, "The people freaking out about 'Cuties' should try it. They might find a lot to like." WASH. POST, Sept. 11, 2020, at https://www.washingtonpost.com/opinions/2020/09/11/people-freaking-out-about-cuties-should-try-it-they-might-find-lot-like/; App'x, Ex. 2-B, Richard Brody, "'Cuties' ('Mignonnes'), the Extraordinary Netflix Début That Became the Target of a Right-Wing Campaign," THE NEW YORKER, Sept. 8, 2020, at https://www.newyorker.com/culture/the-front-row/cuties-mignonnes-the-extraordinary-netflix-debut-that-became-the-target-of-a-right-wing-campaign.

Envelope: 59161796

Reality television has long been accused of sexualizing children as young as four years old purely for entertainment and the pursuit of higher ratings.[25] *Toddlers and Tiaras*, for example, aired on The Learning Channel for several years. Full episodes of the show may be viewed on demand,[26] while dozens of its scenes may be viewed online through media outlets like YouTube.[27] Here is how one critic described one scene from one such show:

> Wearing tiny, tight hot shorts and a cut-off top bearing her midriff, Candi (short for Candace) is coached to "shake that bootie" and "work it." Everything naturally beautiful about Candi is gone. She has fake hair, a fake tan, fake eyelashes, fake nails, and fake teeth. Scantily clad and covered in makeup, she walks out on stage. They tell her she is doing this for the money, so one day she can go to college and have a better life. Candi plasters on a fake smile and waits for the curtains to rise. She has already done the sexy policewoman, cowgirl, and nurse. This time the theme is "schoolgirl." The music starts. Wink, booty pop, raised leg, and a shimmy. . . . [I]s Candi a 25-year-old stripper in Vegas or a six-year-old child in Nashville, Tennessee? Tuning in to hit television shows like The Learning Channel's *Toddlers & Tiaras* or Women's Entertainment's *Little Miss Perfect* provides the disturbing answer: Candi is a six-year-old beauty pageant princess.[28]

Once a regional phenomenon, child beauty pageants like those described above are now worldwide,[29] and have so pervaded popular culture that it has been the subject of parody in major motion pictures, some of them award-winning.[30] Anyone in Texas with access to the internet—whether by computer or the even more ubiquitous smartphone—may view and access such films and shows at almost any time and in almost any place through any number of "apps" or internet sites.[31]

---

[25] *E.g.*, Christine Tamer, Note, "Toddlers, Tiaras, and Pedophilia? The 'Borderline Child Pornography' Embraced by the American Public," 13 Tex. Rev. Ent. & Sports L. 85, 87 (2011) (hereafter "Tamer, Note, 13 Tex. Rev. Ent. & Sports L.").
[26] See, for example, https://www.directv.com/tv/Toddlers-Tiaras-SThkKzRtcWw2R2c9 (last visited November 2, 2021)
[27] App'x, Ex. 1 at Ln. 16, Scenes from *Toddlers & Tiaras*.
[28] Tamer, Note, 13 Tex. Rev. Ent. & Sports L. at 86.
[29] Tamer, Note, 13 Tex. Rev. Ent. & Sports L. at 87.
[30] App'x, Ex. 1 at Ln. 5 (Scenes from *Little Miss Sunshine*); *id.* at Ln. 4 (Scenes from *Jackass: Bad Grandpa*).
[31] App'x, Ex. 1, Lns 1–57.

Envelope: 59161766

Criticisms similar to those leveled against child beauty pageants have been leveled against a wide range of media and media outlets for how they depict children. The popular series *Dance Moms*, which began as a cable reality television series on the network Lifetime in 2011, captures the experiences of a group of young competitive dancers (all girls) and their titular mothers, and is as (in)famous for its flamboyant dance moves and costumes as it is its flamboyant personalities.

One *Dance Moms* clip available on YouTube ("FANtastic") has, for example, been viewed more than 3.2 million times.[32] The clip starts as the young dancers gather backstage in costumes that one competition judge later deems "a little naked for [her] taste."[33] These costumes consist of a sparkling, glittery bikini-style top with equally iridescent bikini-style bottoms, completed by a large pink feather headdress atop each girl's head, and billowing, pink-feathered hand-fans for each hand of each girl. Put another way, the girls look like "showgirls"—by design.[34]

As their number is called, the troupe prances and sashays out onto the stage while covering themselves with their feathered fans. As the music starts, the girls engage in what some critics described as "baby burlesque."[35] The girls rhythmically strut and sway to the music, heave their chests out and in, swing their hips from side to side, prance and high-step, purse their lips as if to blow a kiss to the judges (one of them male) or to the crowd, all while rhythmically covering and uncovering themselves—and their tiny costumes—with their feathered-fans in time with the beat, and all while the camera is filming and zooming in on the routine.

The girls, their moms, their leader are all well-aware that some may perceive the number as tawdry. As the number concludes, and in a moment intended as comic relief, one of the troupe's youngest members drops her fans and begins spinning and

---

[32] App'x, Ex. 1, Ln 8.
[33] App'x, Ex. 1, Ln 8 at 00:01:36.
[34] App'x, Ex. 1, Ln 9 at 00:01:51.
[35] App'x, Ex. 1, Ln 9.

Envelope: 59161766

tumbling across the stage. But, after a few spins and flips, the girl pulls up suddenly, and, facing the audience, glances down at her exposed frame. As she does, she instantly feigns surprise, grimaces, and throws her arms around her torso to cover herself, then flees the stage in great haste as though she is embarrassed and while many in the crowd, in on the joke, laugh.[36]

The crowd's and judges' reactions, even that of the Dance Moms, is mixed: some are visibly uncomfortable with the routine and its choice of wardrobe; some "hoot and holler" at the girls (making it even more awkward for some); others groove along to the beat in their seats as the girls dance unashamedly.[37] Whatever the crowd's reaction, the troupe's leader and proprietor is exultant, *especially* about the costumes, which she declares were "stunning on the girls" and has harsh words for anyone, including any Dance Mom, who says otherwise.[38] And there have been plenty of harsh words: this particular routine made the news, with many outlets replaying many of the routine's more exuberant moments in their coverage;[39] and many users leave comments about their reactions to the routine, calling attention to specific places in the clip that they like or to which they object.[40]

"FANtastic" is hardly *Dance Moms'* only controversial routine. Examples abound in the public record, any one of which is accessible with any computer or smartphone, many of which have been accessed literally *millions* of times, and all of which include comments from fans and detractors alike praising or condemning what is shown.[41]

Youthful, physical expressions like these are hardly rare in today's media, especially online. Content like—and beyond—that seen in *Cuties* or *Dance Moms* is

---

[36] App'x, Ex. 1, Ln 8 at 00:01:32 to 00:01:38.
[37] App'x, Ex. 1, Ln 8 at 00:01:31.
[38] App'x, Ex. 1, Ln 8 at 00:00:33.
[39] App'x, Ex. 1, Ln 9.
[40] Comments may be seen in any of the clips shown at Appendix Exhibit 1, Lines 2–19, 22–47.
[41] App'x, Ex. 1, Lns 8–15.

recreated and streamed tens of millions of times a day across multiple media outlets of more modern vintage, like YouTube and TikTok.

Many of TikTok's most popular stars are minors. Charli D'Amelio, age 17, for example, has amassed more than 100 million followers worldwide on TikTok. Ms. D'Amelio owes that following due largely to the hundreds of videos ("TikToks") she has created and posted on the platform, which often then find their way onto other online media outlets like YouTube.[42]

Like many of her fellow teen "content creators," Ms. D'Amelio's posts show her dancing to a variety of songs, including explicit ones, and in a variety of places wearing a variety of clothes, from baggy sweats in her room to bikinis by (or in) the pool (or her kitchen).[43] Other aspiring young content creators on TikTok and similar media outlets—many of them as young as or younger than the girls portrayed in *Cuties*—try to bridge off the successes of marquis stars like Ms. D'Amelio by "dueling" these bigger stars with videos of their own where they mimic the bigger stars' viral videos. These younger content creators have posted videos of themselves dancing and twerking in various places, including their bedrooms, to music with explicit or suggestive lyrics such as "34+35,"[44] "CANNIBAL,"[45] and "WAP"[46] (among many others[47]). Multiple duels by multiple content creators are often compiled into one long-play video where minors like Ms. D'Amelio may occupy a handful of clips in a much larger reel with various dueling adults.[48]

While TikTok is relatively new, visual materials capturing sensual expressions of youth are not. Similar expressions of youthful bodies and sexuality have hung in

---

[42] App'x, Ex. 1, Lns 28, 31, 33–35, 39–40, 45–47.
[43] App'x, Ex. 1, Lns 28, 31, 33–35, 39–40, 45–47.
[44] App'x, Ex. 1, Ln 40.
[45] App'x, Ex. 1, Lns 35.
[46] App'x Ex. 1, Lns 28, 46.
[47] App'x Ex. 1, Lns 28–47.
[48] App'x Ex. 1, Lns 27, 30, 33, 35, 40, 41,

Envelope: 59161766

contemporary art galleries throughout the world,[49] sold popular products,[50] and played out in films shown in name-brand movie houses for decades.[51]

Against this broad backdrop of artistic works and viral videos and photos, the State has indicted Netflix for a felony violation of Texas Penal Code § 43.262, which criminalizes the mere *knowing* possession, access (with intent to view), or "promotion" of "visual material" that "(1) depicts the lewd exhibition of the genitals or pubic area of a[] . . . partially clothed, or clothed child who is younger than 18 years of age at the time the visual material was created; (2) appeals to the prurient interest in sex; and (3) has no serious literary, artistic, political, or scientific value." Tex. Penal Code § 43.262(b). According to the State's indictment, Netflix violated all of Section 43.262's elements when "promoting" *Cuties*. For the reasons shown below, that indictment should be dismissed because Section 43.262 is facially unconstitutional.

## PRE-TRIAL HABEAS STANDARD

Netflix has standing to file its pretrial petition even though Netflix, an incorporeal person, is incapable of being arrested. Under Article 11 of the Texas Code of Criminal Procedure, pretrial habeas relief should issue "without delay," Tex. Code Crim. P. art. 11.15, especially when "the applicant alleges that the statute under which [the applicant] is prosecuted is unconstitutional on its face." *Ex parte Perry*, 483 S.W.3d 884, 902–03 (Tex. Crim. App. 2016). Article 11 provides pre-trial habeas relief to "any *person*" the State "restrains." Tex. Code Crim. Pro. art. 11.01 (emphasis added). Netflix is a "person" within the meaning of the Code of Criminal Procedure because the word "person" encompasses corporations like Netflix. *See, e.g.*, Tex. Pen. Code § 1.07(38) ("'Person' means an individual or a corporation[.]"). The charges pending against Netflix are a "restraint" under Article 11. *Ex parte Taylor*, No. 03-

---

[49] App'x Ex. 1 at Ln 1 (Therese Dreaming).
[50] App'x Ex. 1 at Lns 24–26.
[51] App'x Ex. 1 at Ln 2, 4–7.

Envelope: 59161766

18-00481-CR, 2018 WL 5945935, at *5 (Tex. App.—Austin Nov. 14, 2018, no pet.) (emphasis added). *See generally* George E. Dix & John M. Schmolesky, 43 Texas Practice: Criminal Practice and Procedure § 35:4 (3d ed. 2016) ("In the pretrial context, *the existence of pending charges* is generally sufficient to show restraint.") (emphasis added). Article 11.01 thus entitles Netflix to prompt relief on its facial challenge to Section 43.262.

## ARGUMENT

Netflix's pre-trial petition for habeas relief should be granted, and the State's indictment dismissed, because Section 43.262 is facially unconstitutional for two main reasons. First, Section 43.262 is void in its entirety because, in creating this new category of banned speech with terms wholly unmoored from their settled legal meanings, the Legislature enacted a "hopelessly indeterminate" statute incapable of any intelligible construction or of notifying the public of what exactly is prohibited. *E.g.*, *State v. Doyal*, 589 S.W.3d 136, 147 (Tex. Crim. App. 2019). And the State's decision to indict Netflix under Section 43.262 for "promoting" *Cuties* both proves and compounds the statute's impermissible ambiguities while also chilling vast amounts of protected speech.

Second, in creating a new category of banned speech, Section 43.262's text, structure, and legislative history also confirm that the statute is a content- and viewpoint-based restriction that criminalizes too much speech—speech that is neither obscene under Texas Penal Code § 43.23 or *Miller v. California*, 413 U.S. 15 (1973), nor child pornography under Texas Penal Code § 43.26 or *New York v. Ferber*, 458 U.S. 747 (1982)—and cannot survive strict scrutiny under the First Amendment. *E.g.*, *Lowry*, 2021 WL 4953918, at *9–12. As a result, neither Section 43.262 nor the State's prosecution of Netflix under that law may stand. The Court should grant Netflix's petition, dismiss all charges (i.e., "the restraint"), and bar the State from pursuing this action further.

Envelope: 59161766

I.   **Construed According to Its Plain Meaning and in Harmony with Related Penal Code Sections, Section 43.262 Bans "Lewd Visual Material Depicting a Child" that Is Neither Obscene Nor Child Pornography and That Is Thus Entitled to First Amendment Protection.**

Before this Court can reach the merits of a facial challenge to a statute's constitutionality, it must first construe the challenged statute. *E.g., Ex parte Perry*, 483 S.W.3d 884, 902 (Tex. Crim. App. 2016). Fundamental to any exercise of statutory construction is the canon that all statutes must be construed to effect the Legislature's intent in enacting them. *E.g.*, *Faulk v. State*, 608 S.W.2d 625, 631 (Tex. Crim. App. 1980) ("The cardinal rule"). Legislative intent is discerned primarily by giving statutory text its plain meaning. *E.g.*, *Ex parte Thompson*, 442 S.W.3d 325, 340 (Tex. Crim. App. 2014).

A term's "plain meaning" is informed by more than just a dictionary. Courts presume that "the Legislature chose the statute's language with care, purposefully choosing each word, while purposefully omitting words not chosen." *In re Commitment of Bluitt*, 605 S.W.3d 199, 203 (Tex. 2020). The plain meaning of statutory text must also be harmonized not only with "other provisions within the whole statutory scheme," *State v. Schunior*, 506 S.W.3d 29, 37 (Tex. Crim. App. 2016), but also with other statutes that touch on similar conduct. *E.g.*, *Ex Parte Gill*, 413 S.W.3d 425, 430 (Tex. Crim. App. 2013). With these interpretive aids in mind, courts must then favor the construction that best effectuates the *entire* statutory scheme. *Yazdchi v. State*, 428 S.W.3d 831, 837 (Tex. Crim. App. 2014). Indeed, courts presume that "the Legislature intends the entire statute to be effective, and did not intend a useless thing." *Garza v. State*, 213 S.W.3d 338, 349 (Tex. Crim. App. 2007). Courts also presume that when the Legislature enacts a statute, the Legislature is aware of laws that already exist and any existing judicial decisions that construe such laws. *E.g.*, *Miller v. State*, 33 S.W.3d 257, 260 (Tex. Crim. App. 2000) ("[I]t is presumed that the legislature is aware of case law affecting *or relating to* the statute."

Envelope: 59161766

(emphasis added)). Within the specific context of a facial challenge like this one, where First Amendment rights are implicated, courts must also consider the challenged statute's legislative purpose because that purpose informs the statute's breadth and which materials fall within its scope. *E.g.*, *Ex parte Lo*, 424 S.W.3d 10, 17 (Tex. Crim. App. 2013).

These basic canons of construction reveal two key conclusions about Section 43.262's scope and meaning, which bear directly on the statute's (un)constitutionality: (1) Section 43.262 criminalizes a new and distinct form of "visual material" that is neither obscene nor depicts sexual conduct involving a minor (i.e., "child pornography"); and (2) the Legislature used broad terms within the statute (e.g. "promote") to give Section 43.262 a broad sweep but left conspicuous interpretive gaps in Section 43.262's operative provisions. These two conclusions, taken together, show why neither Section 43.262 nor Netflix's prosecution can withstand constitutional scrutiny.

A.    **As Its Text, Structure, and History Confirm, Section 43.262 Exists to Fill a Perceived Gap in the Law and Criminalize Materials That Are Neither Obscene Nor Child Pornography.**

Prior to Section 43.262's enactment, Texas law banned—consistent with the federal and state constitutions—two general categories of "visual material": those that are obscene within the meaning of *Miller v. California*, e.g., Tex. Penal Code § 43.21; and "visual materials that visually depict a [minor] . . . who is engaging in sexual conduct"—i.e., "child pornography." Tex. Penal Code § 43.26(a).

Texas's ban on "obscene" visual material incorporates *all* of the constitutionally required *Miller* elements, which are the constitutional threshold for criminalizing all visual materials that are not child pornography:

(A)   the average person, applying contemporary community standards, would find that taken as a whole appeals to the prurient interest in sex;

Envelope: 59161766

(B)  depicts or describes:

  (i)  patently offensive representations or descriptions of ultimate sexual acts, normal or perverted, actual or simulated, including sexual intercourse, sodomy, and sexual bestiality; or

  (ii) patently offensive representations or descriptions of masturbation, excretory functions, sadism, masochism, lewd exhibition of the genitals, the male or female genitals in a state of sexual stimulation or arousal, covered male genitals in a discernibly turgid state or a device designed and marketed as useful primarily for stimulation of the human genital organs; *and*

(C)  taken as a whole, lacks serious literary, artistic, political, and scientific value.

Tex. Penal Code § 43.21(a)(1) ("obscene"); *see also Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 246 (2002) (reaffirming *Miller's* elements as the constitutional threshold for criminalizing most visual materials). A person thus violates Texas's obscenity laws if, "*knowing its content and character*," that person promotes or possesses with intent to promote any "obscene material." *E.g.*, Tex. Penal Code § 43.23(a), (c) (emphasis added).

Although child pornography may be criminalized even if not "obscene" under *Miller*, such material must actually be "child pornography," i.e., visual material that depicts children engaging in "sexual conduct." *E.g.*, *Ferber*, 458 U.S. at 763–66 (1982). States may therefore criminalize the creation, possession, transmission, etc. of visual material depicting minors engaged in "sexual conduct," including "the lewd exhibition of the genitals," without having to satisfy *Miller's* elements and consistent with the First Amendment. 458 U.S. at 774.

As *Ferber* was quick to recognize, however, "there are limits on the category of child pornography which, like obscenity, is unprotected by the First Amendment." *Id.* at 764. This why *Ferber* admonished states that, in enacting child pornography laws, "the [sexual] conduct to be prohibited must be adequately defined by the applicable state law, as written or authoritatively construed" and "suitably limited and described" to ensure such laws do not "widen the possibly invalid reach of [a child

Envelope: 59161766

pornography] statute," such as "by giving an expansive construction to the proscription on 'lewd exhibition of the genitals.'" *Id.* at 764, 773–74.

Following *Ferber*, Texas enacted three statutes prohibiting the possession and distribution of child pornography: Texas Penal Code Sections 43.25, 43.26, and 43.261. Section 43.25 criminalizes "sexual conduct" involving a minor, *id.* § 43.25(b), while Sections 43.26 and 43.261 criminalize "visual materials" that depict "sexual conduct" involving minors. Tex. Penal Code § 43.25(b), (d); *id.* § 43.26(a)(1), (e); *id.* § 43.261(b). To obtain a felony conviction under Sections 43.25 and 43.26 (Section 43.261 is merely a misdemeanor), the State must prove beyond a reasonable doubt a culpable mental state: that the accused "know[s] the character and content of the material," or that the material actually depicts a child engaged in "sexual conduct." Tex. Penal Code § 43.25(b), (d); *id.* § 43.26(a)(1), (e). Each statute also requires proof beyond a reasonable doubt of "sexual conduct," a term that encompasses a laundry-list of prohibited sex acts—"sexual contact, actual or simulated sexual intercourse, deviate sexual intercourse, sexual bestiality, masturbation, [and] sado-masochistic abuse"—and ends with the same catchall used in *Ferber* (i.e., "the lewd exhibition of the genitals"). Tex. Penal Code § 43.25(a)(2), *incorporated by reference in id.* §§ 43.26, 43.261.

"It is . . . a familiar canon of statutory construction that [catchall] clauses are to be read as bringing within a statute categories similar in type to those specifically enumerated." *Paroline v. United States*, 572 U.S. 434, 447 (2014) (cleaned up); *see also United States v. Clark*, 990 F.3d 404, 408 (5th Cir. 2021) ("When confronted with a list of specific terms that ends with a catchall phrase, courts should often limit the catchall phrase to things of the same general kind or class specifically mentioned." (quoting Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 199 (2012)). To ensure that sexual conduct's "lewd exhibition" catchall meets *Ferber*'s expectations and is interpreted and applied consistent with the illicit

company that it keeps—and by which child pornography is known—Texas courts apply specific *narrowing* factors known commonly as "the *Dost* factors."[52] *E.g.*, *State v. Bolles*, 541 S.W.3d 128, 141–42 (Tex. Crim. App. 2017) (summarizing the history of Texas courts applying the *Dost* factors before 2017).

Determining whether an exhibition of the genitals is sufficiently lewd to equate to "sexual conduct" under the *Dost* factors requires courts to examine several factors, including, for purposes relevant here, whether the child is fully or partially clothed (or nude). *Id.* at 141 (the fourth *Dost* factor). These factors are not exhaustive, and no single factor is determinative. *Id.*

Construed in harmony with this legal backdrop, and according to Section 43.262's own text, structure, purpose, and history, it is clear that—as the First Court of Appeals recently held—the "lewd" visual material that Section 43.262 criminalizes is *not* the visual material already criminalized under Section 43.21 (i.e., obscenity) or under Section 43.26 (i.e., child pornography). *Lowry*, 2021 WL 4953918, *6–*8. And that *correct* conclusion is well supported on the statute's face in three main ways.

First, through its partial incorporation of *Miller*'s elements in its operative provisions, Section 43.262's plain text shows *conclusively* that Section 43.262 criminalizes a distinct category of visual materials that are not child pornography. Section 43.262's text plainly requires the State to prove two *Miller* elements beyond a reasonable doubt: "appeals to prurient interest in sex" and serious artistic or other value. *Id.* § 43.262(b)(2)–(3). But as shown above, no such requirement exists for

---

[52] The *Dost* factors derive their name from the oft-maligned case of the same name: *United States v. Dost*, 636 F. Supp. 828 (S.D. Cal. 1986). *But see, e.g., United States v. Steen*, 634 F.3d 822, 829 (5th Cir. 2011) (Higginbotham, J. concurring) (doubting the wisdom of applying *Dost* because "these factors often create more confusion than clarity"); *United States v. Hillie*, No. 19-3027, 2021 WL 4228187, at *8 (D.C. Cir. Sept. 17, 2021) (refusing to apply *Dost* because, among several other reasons, *Dost* requires an atextual construction of federal law that has been rejected by the United States Supreme Court); *United States v. Batchu*, 724 F.3d 1, 9 (1st Cir. 2013) ("[T]he *Dost* factors are problematic."); *State v. Whited*, 506 S.W.3d 416, 436 (Tenn. 2016) ("The limited value of the *Dost* factors becomes apparent when the material at issue is not a photograph. A video, for example, can include properties that photographs do not have, such as action, change of lighting or setting, time lapse, voices and other sounds, and depictions of different persons or objects appearing at different times during the course of the video.").

Envelope: 59161766

visual materials depicting minors engaged in "sexual conduct" (which includes *Ferber*'s "lewd exhibition" catchall). *E.g.*, 458 U.S. at 755. *Miller*'s elements are required only when the materials at issue are *not* child pornography and are therefore presumptively entitled to First Amendment protection until the State proves *all Miller* elements beyond a reasonable doubt. *E.g.*, *Free Speech Coal.*, 535 U.S. at 246. That is why the Legislature omitted *any* mention of *Miller*'s elements from Texas's child pornography statutes (i.e., Sections 43.25, 43.26, and 43.26). Given this legal backdrop—which the Legislature is presumed to know (*State v. Miller*, 33 S.W.3d at 260)—it is entirely unreasonable to think that when the Legislature enacted Section 43.262 in 2017, it intended the absurd result of requiring the State to prove more than what *Ferber* and existing law already required when prosecuting those charged with promoting *actual* child pornography. It is eminently reasonable, however, for the Legislature to require prosecutors to prove more than *Ferber* requires when what the Legislature intended to criminalize *is* subject to *Miller*'s elements—i.e., because it is not "child pornography." *Cf. United States v. Various Articles of Merch., Schedule No. 287*, 230 F.3d 649, 654 (3d Cir. 2000) (refusing to analyze magazines that depicted nude children and portrayed their nudist lifestyles as child pornography subject to *Ferber* and applying *Miller* instead because "[i]t is for the prosecutors, not the courts, to select those laws under which the Government brings actions," and the government did not indict under the federal child pornography statute).

Second, by purposely omitting "sexual conduct" from Section 43.262's operative provisions, the Legislature sent a clear textual signal that Section 43.262 is aimed at something other than child pornography. What makes child pornography "child pornography" is its depictions of "sexual conduct," as Section 43.26 expressly notes. *See, e.g., United States v. Williams*, 553 U.S. 285, 297 (2008). But the Legislature expressly eschewed any such requirement in Section 43.262, despite making express

Envelope: 59161766

reference to Section 43.25's definition of "sexual conduct" in the statute's prefatory subsection. *Id*. § 43.262(a). Not one of Section 43.262's operative provisions requires proof of "sexual conduct." *Id*. § 43.262(b). And that omission had an express textual purpose: to criminalize visual materials under Section 43.262 that do not amount to child pornography. *Cf. In re Commitment of Bluitt*, 605 S.W.3d at 203 (holding that the purposeful omission of words from a statute must be given meaning and effect).

Third, Section 43.262's "lewd exhibition" provision is a further textual reason that Section 43.262 reaches a broader and distinct set of visual materials that are not child pornography. Although Section 43.262 and Section 43.26 (and Section 43.261) each criminalize visual materials that depict "the lewd exhibition of the genitals," that fact, without more, does not make each statute's use of that phrase synonymous. Far from it. While similar words in different statutes are *sometimes* assigned similar meanings, *e.g.*, *RSUI Indem. Co. v. The Lynd Co.*, 466 S.W.3d 113, 126 (Tex. 2015), placed in context "[i]dentical language may convey varying content when used in different statutes, sometimes *even in different provisions of the same statute.*" *Yates v. United States*, 574 U.S. 528, 537 (2015) (cleaned up, emphasis added); *Return Mail, Inc. v. United States Postal Serv.*, 139 S. Ct. 1853, 1863–64 (2019) (construing "person" differently across the same statute given Congress's conflicting use of that term). Similar terms are thus often ascribed *different* meanings when, as here, those terms appear in different statutes that have different purposes, use similar terms differently, appear in statutes enacted years apart, *or* are used in conflicting ways within the same or different statutes (among still other reasons). *E.g.*, *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 185 (5th Cir. 2020), *cert. denied*, 141 S. Ct. 1124 (2021) (assigning similar terms different meanings given, among other things, "large gaps in time between the adoption of different amendments that use language similar to each other"); *United States v. Thomas*, 877 F.3d 591, 597 (5th Cir. 2017) (assigning different meanings to "damage without authorization" and "access without

Envelope: 59161766

authorization" under 18 U.S.C. § 1030 given their differing purposes and factual applications); *cf.* Antonin Scalia & Bryan A. Garner, *Reading Law* 171 (2012) ("Because it is so often disregarded, this canon [of consistent usage] is particularly defeasible by context.").

The context in which Section 43.262 uses "lewd exhibition" is markedly different from that term's use in neighboring statutes. Because "lewd exhibition" is merely a catchall for "sexual conduct" under Section 43.26, the Legislature's purposeful omission of "sexual conduct" from Section 43.262's operative provisions precludes grafting Section 43.26's use of "lewd exhibition" onto Section 43.262 by judicial fiat. *Id.* § 43.262(a)–(b). Words the Legislature purposely chose to omit cannot be read back into the statute without violating the Legislature's intent—something no construction may do. *E.g.*, *Leming v. State*, 493 S.W.3d 552, 558 (Tex. Crim. App. 2016).

Indeed, the Legislature altered Section 43.262's phrasing of "lewd exhibition" so materially that it bears little resemblance to its uses in prior sections (e.g., Sections 43.25 or 43.26). The Legislature *excluded* from Section 43.262 *all* of Section 43.25's laundry-list of explicit sexual acts and nearly every anatomical part that follows "lewd exhibition" in its prior enactments. *Cf.* Tex. Penal Code § 43.25. The Legislature then added a number of terms found nowhere in Section 43.25's definition of "sexual conduct": "the lewd exhibition of the genitals *or pubic area of an unclothed, partially clothed, or clothed child* who is younger than 18 years of age at the time the visual material was created"—whether such exhibition amounts to "sexual conduct" or not. *Id.* § 43.262(b)(1) (emphasis added). "The lewd exhibition of the genitals" are thus the only words these competing provisions share. But those common words actually prove that the Legislature never intended "lewd exhibition" to carry Section 43.25's meaning in Section 43.262.

Envelope: 59161766

As Section 43.262's elements plainly show, the presence of clothing on a child who lewdly exhibits her pubic area is no defense for any purpose under Section 43.262; clothing incriminates not mitigates.[53] *See id.* § 43.262(c). That fact stands in stark contrast, however, to how "lewd exhibition" is understood and applied under Sections 43.25 and 43.26. Under the fourth *Dost* factor (i.e., whether the child is fully or partially clothed, or nude), the presence of clothing *is* a mitigating factor in determining whether the accused material amounts to a "lewd exhibition." *Bolles*, 541 S.W.3d at 141; *see also United States v. Boudreau*, 250 F.3d 279, 283 (5th Cir. 2001) (affirming the district court's finding that image depicting 16-year-old boy's pubic area was insufficiently "lascivious" to violate the federal child pornography laws where, among other reasons, the boy's genitalia were completely covered by his underwear and partially by his shorts); *cf. United States v. Perkins*, 850 F.3d 1109, 1122 (9th Cir. 2017) ("[I]f the subject were clothed, this would be a completely unremarkable photo [under *Dost*]."). To construe Section 43.262's use of "lewd exhibition" as synonymous with Section 43.25's "lewd exhibition" catchall is thus to contradict the statute's plain text and the Legislature's manifest intent. Through the words it chose and the words it omitted, the Legislature clearly intended Section 43.262's "lewd exhibition" provision to carry a meaning distinct from—and broader than—that phrase's use as a catchall for "sexual conduct" in child pornography statutes. Section 43.262's text therefore betrays any notion of its being another "child pornography" statute.

Any lingering doubts on this score are dispelled entirely by the Legislature's stated purpose in enacting Section 43.262. *See Lo*, 424 S.W.3d at 17. Cognizant of laws already criminalizing child pornography (e.g., Section 43.26), Section 43.262's sponsors introduced this legislation ("H.B. 1810") because "[c]urrent state law does

---

[53] There are, in fact, *no* defenses to Section 43.262—another factor distinguishing this section from all of its neighbors.

not contain statutes that criminalize the possession or promotion of *child erotica images*," i.e., "images portray[ing] an unclothed, partially clothed, or clothed child depicted in a sexually explicit manner indicating the child has a *willingness* to engage in sexual activity"—whether they engaged in such activity or not. Senate Research Ctr., Bill Analysis, Tex. H.B. 1810, 85th Leg., R.S. (2017) (emphasis added).[54] The distinct lack of "sexual conduct" in "child erotica images" is thus what drove H.B. 1810's introduction in the first place: "[i]n some cases, only child erotica images are discovered [when arresting a suspect]," H.B. 1810's sponsors lamented, meaning that "charges [under Section 43.26] *cannot be pursued*." *Id.* (emphasis added). Conspicuously absent from the legislative record are any legislative findings indicating what exactly is encompassed by "child erotica," or that possession of these visual materials results in the sexual abuse or manipulation of children—the harm laws criminalizing child pornography under *Ferber* exist to prevent. *Cf. Ferber*, 458 U.S. at 757 (citing the New York legislature's legislative findings in construing and upholding its laws against child pornography).

The legislative record also confirms Section 43.262's *purposeful* break from the *Dost* factors and Section 43.25's use of "lewd exhibition." In its earliest iteration, Section 43.262 expressly incorporated *most* of the *Dost* factors (the factor that made the presence of clothing a mitigating factor was omitted consistent with its now enacted text). Tex. H.B. 1810, 85th Leg., R.S. (2017) (as introduced Feb. 23, 2017).[55] The Legislature then jettisoned even that diminished version of *Dost* in favor of including new elements wholly anathema to any *Dost* inquiry (e.g., the omission of "sexual conduct," the criminalization of materials depicting clothed children, the requirement of proof of a prurient interest in sex, etc.). Tex. H.B. 1810, 85th Leg.,

---

[54] H.B. 1810, as introduced and related materials, are included within the Appendix attached to Netflix's Petition as Exhibits 3-A to 3-C. It is also available at https://capitol.texas.gov/BillLookup/Text.aspx?LegSess=85R&Bill=HB1810.
[55] App'x, Exhibit 3-A.

Envelope: 59161766

R.S. (2017) (engrossed version).[56] Section 43.262's text, structure, legislative purpose, and legislative history thus all confirm that Section 43.262 does not criminalize the same "visual materials" or the same "lewd exhibition" as its predecessors (Sections 43.25, 43.26, or 43.261) and thus means something different—something much broader.

## B.   Where It May Be Construed According to Its Plain Meaning, Section 43.262 Is a Broad Content-Based Restriction on Protected Speech.

Put in its proper context, and with its text, structure, and legislative purpose and history in plain view, *some* elements of Section 43.262 can be construed according to their plain and harmonized meaning. Many of the statute's operative terms— "possess," "access," "promote," "visual material," "pubic area," "partially clothed or clothed child"—are easily construed. Not so for others, however. Critical terms such as "lewd exhibition" and "appeals to the prurient interest" yield multiple, and sometimes diametrically opposed, meanings.

The Legislature defined terms like "promote" and "visual material" in Section 43.262. The Legislature gave "promote" a vast scope: "to procure, manufacture, issue, sell, give, provide, lend, mail, deliver, transfer, transmit, publish, distribute, circulate, disseminate, present, exhibit, or advertise or to offer or agree to do *any* of the above." Tex. Pen. Code § 43.25 (emphasis added), *incorporated by reference in id*. § 43.262(a)(1). Each means of "promotion" encompasses a broad array of conduct even when limited to their respective plain meanings. "Advertise," for example, is itself a capacious term. Despite its typical connotations, the term's plain meaning is not limited to commercial endeavors, *e.g.*, *United States v. Williams*, 553 U.S. 285, 298– 99 (2008); it refers simply to describing or making something known to someone else. *E.g.*, *id.*; New Oxford American Dictionary 24 (2010).

---

[56] App'x, Exhibit 3-C.

Envelope: 59161766

The Legislature also ascribed broad meaning to "visual material": "any film, photograph, videotape, negative, or slide or any photographic reproduction that contains or incorporates in any manner any film, photograph, videotape, negative, or slide," as well as "any disk, diskette, or other physical medium [(e.g., any smartphone)] that allows an image to be displayed on a computer or other video screen and any image transmitted to a computer or other video screen by telephone line, cable, satellite transmission, or other method." Tex. Pen. Code § 43.26(b)(3), *incorporated by reference in id.* § 43.262(a)(2). Taken as a whole, Section 43.262 thus imbues the State with power to indict any citizen who, say, posts to social media a film review (i.e., "advertises visual material") endorsing any material that the State has probable cause to believe violates Section 43.262.[57]

Although Section 43.262 lacks definitions for "possess" or "access," their plain meaning is well-established. "Possession" means actual care, custody, control, or management. *E.g.*, Tex. Penal Code § 1.07(39). "Access" means to obtain, examine, or retrieve. *E.g.*, New Oxford American Dictionary 8 (3d ed. 2010).

The meaning of other undefined terms like "pubic area" or "partially clothed or clothed child" is also plain. "Pubic area" refers to the human pelvis and the areas related to it. New Oxford American Dictionary 1411 (3d ed. 2010). The meaning of "partially clothed or clothed" is too obvious to require construction. The important feature of those two terms in Section 43.262 is the word those terms describe: the word "child" and *not* "genitals or pubic area." Tex. Penal Code § 43.262(b)(1). It is therefore a partially clothed or clothed *child* and not "a partially clothed or clothed pubic area" that offends the statute (assuming its other elements are met).

Because "lewd exhibition" cannot carry the narrower meaning as a catchall for "sexual conduct" (as in Sections 43.25 and 43.26), and as the Legislature did not

---

[57] For examples of such materials see Appendix, Exhibit 2-A through 2-B.

define "lewd exhibition" for purposes of Section 43.262, the phrase must be construed according to its plain meaning. *E.g.*, *Thompson*, 442 S.W.3d at 340. And, as *Ferber* openly cautioned (458 U.S. at 773–74), the scope and meaning of "lewd exhibition" is quite broad when severed from its catchall status. In its plain sense, "lewd" means simply "crude and offensive in a sexual way: *she began to gyrate to the music and sing a lewd song.*" New Oxford American Dictionary 1005 (3d ed. 2010). "Exhibition" means a public display or demonstration. New Oxford American Dictionary 607 (3d ed. 2010). Visual material therefore violates Section 43.262's first element whenever such material contains the dictionary's example of "lewd": a child gyrating to music in a crude or offensive and sexual way. "Lewd exhibition" are words many people would use—and have used—to describe what is depicted in works of visual art,[58] or in shows like *Dance Moms*,[59] *Toddlers & Tiaras*,[60] and thousands of other "visual materials" posted daily to YouTube,[61] TikTok,[62] or Instagram.[63]

But offensive to whom and by whose standards? And just how offensive must the exhibition be? And just how much of the visual material must be considered before *all* of it qualifies not only as "lewd" but also as a felony? Does Section 43.262 grant the State power, for example, to indict citizens who knowingly access a two-hour movie online merely because the State has probable cause to believe that a few seconds of a single scene falls within Section 43.262's meaning?[64] The Legislature answered none of these questions in Section 43.262's text. And, within the context of

---

[58] App'x, Ex. 1 Ln 1 (noting recent controversy about the exhibition of *Therese Dreaming*'s young subject in a world-renowned art museum).

[59] App'x, Ex. 1 Ln 9 ([https://youtu.be/-bFh2422VNg](https://youtu.be/-bFh2422VNg)). The broadcast shown in this link heavily criticizes the *Dance Moms* "FANtastic" routine and other reality shows.

[60] Tamer, Note, 13 Tex. Rev. Ent. & Sports L. at 86; *see also* App'x, Ex. 1 Ln 16.

[61] App'x, Ex. 1 Lns 27–28, 30–36, 39–43, 45–46.

[62] App'x, Ex. 1 Lns 29, 37–38, 47–49.

[63] App'x Ex. 1 Lns 44, 50–57.

[64] Consider, for example, the less-than-10-seconds of film in *Major Payne*, a 90-minute movie available for rent on YouTube, capturing a young drill leader's vigorous and clothed pelvic thrusting, complete with closeups, as he dances to victory with his "men" in the military games. App'x, Ex. 1 Ln. 2 at 00:02:31 to 00:02:47.

Envelope: 59161766

laws that criminalize possession or promotion of "visual materials" that are not child pornography, these gaps are conspicuous. *E.g.*, *Free Speech Coal.*, 535 U.S. at 246 ("[T]he Government must prove that the work, *taken as a whole*, . . . is *patently offensive in light of community standards*[.]" (emphasis added)).

The Legislature also left a massive gap as to scienter. Taking the text as it is found, Section 43.262—a felony provision—does not require the State to prove beyond a reasonable doubt that when the accused possessed, accessed, or promoted the visual material in question, the accused *knew* that such material depicted the lewd exhibition of a child's pubic area, or that the child engaged in such lewd activity was, in fact, a child. *Id*. Section 43.262 requires proof merely that a "person *knowingly* possesses, accesses with intent to view, or promotes visual material" that meets the statute's other elements. *Id*. § 43.262(b)(1) (emphasis added).

The Legislature's limiting Section 43.262 to a mere "knowing" mental state was purposeful, and not merely because canons of construction presume as much. When the Legislature wants to impose a culpable mental state, it knows how to do it. The Legislature has already enacted laws requiring proof of a culpable mental state for other banned visual materials. *Id*. § 43.23(a) ("knowing its content and character"); *id*. § 43.26(a)(2) ("[T]he person knows that the material depicts the child *as described by* Subdivision (1)" (emphasis added)). Had the Legislature enacted Section 43.262 in its original form, the statute would have required the same culpable mental state as Section 43.26. *See* H.B. No. 1810 at 2:5–6 (proposing to require proof the accused "knows that the material depicts the child as described by Subdivision [(b)(1)].").[65] This the Legislature did not do. Instead, the Legislature removed the usual scienter requirement from H.B. 1810 in favor of the enacted requirement that criminalizes mere knowing possession, promotion, etc. Tex. Penal Code

---

[65] App'x, Exhibit 3-A.

Envelope: 59161766

§ 43.262(b)(1). It therefore appears the Legislature intended to make this state jail felony a matter of strict liability. *E.g.*, *Byrne v. State*, 358 S.W.3d 745, 749 (Tex. App.–San Antonio 2011, no pet.) (holding that the Texas statutory rape statute imposed "strict liability" where it required proof merely that the defendant "intentionally or knowingly cause[d] the penetration of the anus or sexual organ of a child").

Because giving Section 43.262 such a minimal scienter requirement would raise *serious* doubts about its constitutionality (if not doom the statute entirely), the canons of construction counsel against such an interpretation. *See*, *e.g.*, *Doyal*, 589 S.W.3d at 152. But how a more culpable standard may be applied is wholly unclear given the Legislature's express rejection of the typical scienter standard once present in H.B. 1810 in favor of the existing mere "knowing" standard. *Cf. Long v. State*, 931 S.W.2d 285, 291 (Tex. Crim. App. 1996) (refusing to read a culpable mental state into a stalking statute where the Legislature already prescribed the mental state of mere "intent to harass, annoy, alarm" etc.). The cannons of construction thus point in opposite directions.

Yet *another* conspicuous interpretive gap exists in the operative language of Section 43.262(b)(2), which requires proof beyond a reasonable doubt that accused visual material "appeals to the prurient interest in sex." That phrase has enjoyed an established legal meaning in First Amendment jurisprudence for almost 50 years under *Miller*—a meaning understood better by its *application* in case law than by the sum of its obscure parts. Specifically, *Miller*'s "prurient interest" element applies only to materials depicting "the public portrayal of ***hard core sexual conduct** for its own sake.*" *Jenkins v. Georgia*, 418 U.S. 153, 161 (1974) (cleaned up, emphasis added). And to qualify as "hard core sexual conduct," it must be *very* hard core indeed.[66] How a

---

[66] *Compare Jenkins*, 418 at 159–61 (holding that scenes from a film that showed several scenes of nudity and sex acts—but not "ultimate sexual acts"—did not appeal to the prurient interest in sex as a matter of law and therefore could not support the defendant's conviction under state law), *and United States v. Various Articles of Merch., Schedule No. 287*, 230 F.3d 649, 654–55 (3d Cir. 2000) (rejecting the district court's conclusion that magazines depicting naked children engaged in various non-sexual

Envelope: 59161766

standard used to discern that kind of "hard core sexual conduct" even applies here—to a statute that, on its face, eschews any requirement of "sexual conduct"—is anyone's guess. Here again, the canons of construction are in conflict.

Two canons of construction provide compelling reasons to think that the Legislature intended to apply *Miller*'s narrow meaning of "prurient interest." First, courts are required to construe statutes consistent with the Constitution (state or federal). *E.g.*, Tex. Gov't Code § 311.021 ("In enacting a statute, it is presumed that . . . compliance with the constitutions of this state and the United States is intended"); *see also Proctor v. Andrews*, 972 S.W.2d 729, 735 (Tex. 1998) ("Statutes are given a construction consistent with constitutional requirements, when possible, because the legislature is presumed to have intended compliance with [the constitution]") (citation omitted); *Ely v. State*, 582 S.W.2d 416, 419 (Tex. Crim. App. 1979) (en banc) ("[T]his Court is duty bound to construe [all] statutes in such a way as to uphold their constitutionality."). And, as any number of cases will confirm, statutes criminalizing the possession or promotion of visual material that is *not* child pornography (as here) must satisfy *Miller* and its "prurient interest" test or be declared unconstitutional. *E.g.*, *Free Speech Coal.*, 535 U.S. at 246.

---

activities (e.g., playing on jungle gyms, swimming, horseback riding, etc.) appealed to the prurient interest in sex and holding instead that such materials were entitled to First Amendment protection as a matter of law), *and United States v. M-K Enters., Inc.*, 719 F. Supp. 871, 878 (D. Neb. 1989) (holding that although the pornographic film "The Event" showed "the eager, unabashed, no-holds-barred doing of raw sex—oral, manual, vaginal, anal, heterosexual and homosexual—in multiple positions and in wearisome repetition," it did not appeal to the prurient interest because it didn't show any ultimate sex acts and therefore could not support a conviction under federal obscenity law), *with Andrews v. State*, 652 S.W.2d 370, 384 (Tex. Crim. App. 1983) (holding that Swedish magazine appealed to the prurient interest because it contained "the most vivid portrayal of actual or simulated *ultimate sexual acts* which can be contemporaneously engaged in between one male and one female or between one male and two females," which left nothing to the "imagination as to what anatomical positions human beings may assume when engaging in . . . sexual behavior"), *and United States v. Adams*, 337 Fed. Appx. 336, 338–39 (4th Cir. 2009) (finding that videos that depicted extreme and explicit sex acts like "fisting" appealed to the prurient interest in sex), *and United States v. Ragsdale*, 426 F.3d 765, 780–81 (5th Cir. 2005) (holding that videos depicting exceedingly graphic depictions of a motley of different sexual acts, including simulated sexual violence, with camera angles and prolonged close up shots of ultimate and other extreme sex acts all appealed to the prurient interest in sex).

---

Envelope: 59161766

Second, the Legislature's grafting of *Miller*'s "prurient interest" element onto Section 43.262 is itself sufficient reason to apply *Miller's* meaning. "Words and phrases possessing a technical meaning are generally to be considered as having been used in their technical sense," especially where, as here, the terms at issue "have a known and established *legal meaning*, or have acquired a peculiar and appropriate meaning in the law[.]" *Medford v. State*, 13 S.W.3d 769, 772 (Tex. Crim. App. 2000) (cleaned up, emphasis added). Few terms have a more peculiar or well-established legal meaning—"in and outside the legal community"—than the phrase "appeals to the prurient interest in sex." *Andrews*, 652 S.W.2d at 375. *Miller*'s meaning of "prurient interest" would therefore seem to apply.

Other canons of construction provide equally compelling reasons to believe that the Legislature could not possibly have intended such a construction of Section 43.262's "prurient interest" element. Foremost among them is the canon that precludes a construction that leads to something the Legislature is presumed *never* to intend: absurd or futile results. *E.g.*, *Thompson*, 442 S.W.3d at 340. Applying *Miller* to the kinds of visual materials that Section 43.262 criminalizes would lead to absurd or futile results.

As discussed above, the established legal meaning of Section 43.262's "prurient interest" element has no discernible application to a statute criminalizing visual materials that depict partially or fully clothed children, even those who "lewdly exhibit" their pubic areas within Section 43.262's plain meaning (e.g., who dance lewdly to lewd music). Netflix searched for, but could not find, a single case where any court ever concluded that "visual materials" bereft of any "sexual conduct" ever "appealed to the prurient interest," or where a clothed person exhibited their clothed pubic area so lewdly that they satisfied the established meaning of that element under *Miller*. What Netflix found instead were cases like those cited above: where courts concluded that materials far more explicit than anything shown in materials

like *Cuties* failed, as a matter of law, to appeal to the prurient interest under *Miller*.[67] The Legislature is thus just as likely to have intended Section 43.262's prurient interest element to carry its plain and *not* its technical meaning.

Construed according to its plain meaning, "appeals to the prurient interest in sex" may refer simply to visual material intended to excite lasciviousness (i.e., sexual desire) in a person. *See* Webster's Third New Int'l Dictionary 1274 (2002). That meaning is, of course, *far* broader than, and vastly different from, *Miller*'s narrow meaning, which requires not only actual sexual conduct but also the display of visceral, explicit, and *ultimate* sex acts during such conduct (e.g., "excretion"). *Miller*, 413 U.S. at 18 n.1 (cleaned up). Even that reading should be avoided, however, because it makes the "prurient interest" element redundant of Section 43.262's "lewd exhibition" requirement; so construed, both elements would require proof simply of material exciting sexual desire. *Cf. Badgett v. State*, 42 S.W.3d 136, 139 (Tex. Crim. App. 2001) ("No part of [a statute] is to be construed as void or redundant." (cleaned up)). Applying *Miller*'s meaning of "prurient interest" would, of course, solve the redundancy issue—only to lead right back to the futility issue (i.e., clothed kids depicted in visual material bereft of sexual conduct don't appeal to the prurient interest in sex as a matter of law).[68]

So which of these competing constructions did the Legislature intend? It didn't say. Worse still, there are neither textual clues nor canons of construction that will break the stalemate. The canons of construction instead point in equally forceful but completely opposite directions. What to do?

---

[67] *See supra* n.65 (citing *Jenkins*, etc.).

[68] That said, the meaning of this element is no clearer if the accused visual material depicts unclothed children lewdly exhibiting their genitals. As a standalone element, the statute's prurient interest requirement applies equally to visual materials depicting clothed or partially clothed children and thus necessarily carries the same meaning in all of those cases.

Envelope: 59161766

Resorting to legislative history is the only remaining option. *E.g.*, *Prichard v. State*, 533 S.W.3d 315, 320 (Tex. Crim. App. 2017). But the legislative history does not help.

While Section 43.262's legislative purpose (already discussed above) is clear, little else about Section 43.262's history is. Sometime between H.B. 1810's introduction and Section 43.262's enactment, the initial and incomplete listing of the *Dost* factors was dropped entirely and in favor of incorporating *Miller's* "prurient interest" element. *Compare* Tex. H.B. 1810, 85th Leg., R.S. (2017) (as introduced Feb. 23, 2017), *with* Tex. H.B. 1810, 85th Leg., R.S. (2017) (engrossed version).[69] There is, however, no reported commentary nor any analysis or floor debates that might explain why, or to what end, the Legislature adopted (part of) *Miller*. The question therefore remains: did the Legislature intend the "prurient interest" element to carry *Miller*'s technical meaning, and thus enact an instant nullity, or did the Legislature intend to apply the phrase's broader and plain meaning, and thus offend *Miller* and also nullify the statute on First Amendment grounds? The answer doesn't matter. Under either reading—indeed, *any* reading—Section 43.262 is profoundly unconstitutional.

## II. Section 43.262 Is Unconstitutionally Vague in Its Entirety Because It Fails to Incorporate All *Miller* Elements While Chilling Protected Expression Through Use of Indiscernible Terms that Deprive the Public and Law Enforcement of Determinate Guidelines on What Conduct Violates the Statute.

The canons of construction outlined above are intended to benefit more than judges and lawyers. The public too is entitled to rely on them to discern what conduct the State has made criminal and what may be done to avoid prosecution for such conduct. *E.g.*, *Doyal*, 589 S.W.3d at 147. The State is therefore prohibited under the due process clauses of the constitutions of Texas and the United States from enforcing

---

[69] App'x, Exs. 3-A and 3-C.

vague criminal laws because "vague laws invite the exercise of arbitrary power by leaving the people in the dark about what the law demands and allowing prosecutors and courts to make it up." *Id.* (cleaned up). Put another way, vague laws violate every citizen's right to due process. *Id.* Furthermore, when, as here, a statute implicates free-speech rights, that statute is subject to special and exacting constitutional scrutiny under the vagueness doctrine: (1) it must give a person of ordinary intelligence a reasonable opportunity to know what is prohibited; (2) it must establish determinate guidelines for law enforcement; and (3) it "must be sufficiently definite to avoid chilling protected expression." *Long v. State*, 931 S.W.2d 285, 287–88 (Tex. Crim. App. 1996). Section 43.262 fails all of these tests and should therefore be declared unconstitutionally vague.

### 1. Through its incomplete incorporation of *Miller*'s elements and its use of indecipherable terms, Section 43.262 deprives people of ordinary intelligence of a reasonable opportunity to know what the statute even prohibits.

No person of ordinary intelligence who read Section 43.262 could know what its terms prohibit, for several reasons. First, although the State cannot criminalize visual materials like *Cuties* consistent with the First Amendment without establishing that they are obscene under *Miller*, *Free Speech Coal.*, 535 U.S. at 240, Section 43.262 requires only some of what *Miller* requires (prurient interest and lack of serious public value). The Legislature purposely omitted all other *Miller* elements: *Miller*'s "average person" requirement; *any* standard by which to measure the accused visual materials (i.e., *Miller*'s "contemporary community standards"); proof beyond a reasonable doubt that the accused visual materials are "patently offensive"; and *Miller*'s requirement that all accused materials be "taken as a whole" and not on isolated portions when considering whether such materials appeal to the prurient interest in sex or lack serious public value (e.g., literary, artistic, political, etc.). *Id.* at 246. As such, Section 43.262 cannot now include all *Miller* elements—and thus

Envelope: 59161766

survive First Amendment scrutiny—unless the courts supply all of these missing elements by judicial fiat, which Texas courts cannot lawfully do. *See Doyal*, 589 S.W.3d at 151–52.

Courts may, of course, supply a *reasonable* narrowing construction of a statute to avoid a constitutional violation, but only if the statute is readily susceptible to one. *Doyal*, 589 S.W.3d at 151–52. That rule has no application here.

There is nothing "reasonable" about rewriting the law to include multiple material elements that the Legislature purposefully omitted. "Adding language to a statute is legislating from the bench," and "constitutes a *serious* invasion of the legislative domain." *Doyal*, 589 S.W.3d at 152 (cleaned up). Nor is Section 43.262 "readily susceptible" to an overhaul by judicial fiat. The Legislature plainly knew about *Miller*'s other elements. Indeed, the Legislature is *presumed* to know them. *State v. Miller*, 33 S.W.3d at 260. No court may override the Legislature's purposeful omission of these missing elements in the name of a "narrowing construction." *Doyal*, 589 S.W.3d at 152; *In re Commitment of Bluitt*, 605 S.W.3d at 203. Section 43.262 is therefore incapable of any "narrowing construction," which makes Section 43.262 unconstitutionally vague for this reason alone. *Cf. Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 873–74 (1997) (rejecting the prosecution's arguments that a federal obscenity statute was not unconstitutionally vague where the statute at issue incorporated only some of *Miller*'s elements and therefore "unquestionably silences some speakers whose messages would be entitled to constitutional protection").

Even where the Legislature did include *Miller*'s elements, they only make Section 43.262 more profoundly and unconstitutionally vague. Reading Section 43.262(b)(2), a person of ordinary intelligence would understand "appeals to the prurient interest in sex" the same way a court would: "as having been used in [its] technical sense." *Medford*, 13 S.W.3d at 772; *Andrews*, 652 S.W.2d at 375. But for all the reasons already shown above, no person of ordinary intelligence would read that

Envelope: 59161766

phrase and understand that "visual materials" that, per Section 43.262's plain language, lack any "sexual conduct" somehow fall within *Miller*'s venerable meaning. There is simply—and literally—no precedent by which a person could reach such a conclusion, thus leaving the public to guess at what "prurient interest" *really* means.

The Legislature's failure to define "lewd exhibition" is yet another reason Section 43.262 deprives people of ordinary intelligence of notice about what they may do to avoid prosecution. "Statutes have been struck down as vague when they tied the defendant's criminal culpability to conduct that was 'annoying' or 'indecent' because those terms encompassed wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings." *Doyal*, 589 S.W.3d at 146 (cleaned up). Here, the Legislature's use of "lewd exhibition" in Section 43.262 lacks all of these narrowing features.

The term "lewd" is no less subjective than the Legislature's prior unconstitutional uses of "annoying" or "indecent." *See id.* Despite this fact, the Legislature purposely severed "lewd exhibition" from its typical "narrowing context" as a catchall form of "sexual conduct," and then, despite *Ferber*'s admonition, refused to define the term all together—a term that, on its own, has no "settled legal meaning." Indeed, if "lewd exhibition" has a settled legal meaning, it is the one understood through application of the very *Dost* factors that the Legislature expressly and purposely eschewed when enacting Section 43.262 (e.g., by omitting "sexual conduct" and making clothing an incriminating rather than mitigating factor). As such, whether a child's exhibition of her pubic area is sufficiently "lewd" within Section 43.262's plain meaning is entirely in the eye of the beholder, *especially* when considering the Legislature's purposeful omission of *Miller*'s "average person" and "contemporary community standard" elements. Under *Doyal* (and the cases cited there), this one defect is reason enough to strike the statute as unconstitutionally vague. 589 S.W.3d at 146–48 (collecting cases).

Envelope: 59161766

The State's enforcement of Section 43.262 in this case only serves to further compound the public's confusion surrounding Section 43.262's scope and meaning, and only further cements why Section 43.262 is unconstitutional. *E.g.*, *Penny Saver Publ'ns, Inc. v. Vill. of Hazel Crest*, 905 F.2d 150, 155 (7th Cir. 1990) (holding that the unconstitutional vagueness of a local advertising ordinance that failed to clearly define its boundaries was compounded by the government's enforcement practices). A person of ordinary intelligence would read "prurient interest" in its technical sense. The State clearly does not. To the contrary, in claiming that *Cuties* violates Section 43.262, the State ostensibly adopted the view that Section 43.262's "prurient interest" element should be construed according to its plain and not its legal meaning. That view profoundly compounds Section 43.262's vagueness problem because it forces private citizens to speculate about Section 43.262's actual meaning: whether the technical meaning plain on the statute's face, or the meaning implicitly and suddenly expressed in the State's felony indictment but without prior notice or authoritative interpretations from any court or legislature. *Id.*; *Long*, 931 S.W.2d at 289. The public is entitled to more and better notice than what Section 43.262 or the State has provided. Section 43.262 should therefore be struck as unconstitutional in all its applications for this reason alone.

### 2. Section 43.262 lacks determinate guidelines that confine law enforcement's discretion to indict citizens for its violation.

Besides using "hopelessly indeterminate" language, *Doyal*, 589 S.W.3d at 147, Section 43.262 also "invites the exercise of arbitrary power" and thus lacks the kinds of determinate guidelines due process demands. The Texas District and County Attorneys Association ("the TDCA") has already highlighted this very problem to its members in the 2017–2019 edition of its *Texas Penal Code Annotated*. In the portion of its manual discussing Section 43.262, the TDCA admonishes its members "to proceed with caution" when considering whether to indict citizens under

Section 43.262 for two reasons—both of which highlight how Section 43.262 invites arbitrary and unconstitutional exercises of power. TDCA, *Texas Penal Code Annotated* § 43.262, 2017 Legislative Note.[70]

TDCA first cautions that Section 43.262 conspicuously fails to require all that *Miller* requires—a deficiency that TDCA admits "seems fraught with constitutional problems." *Id.* One of those constitutional problems is Section 43.262's failure to give law enforcement any determinate guidelines for enforcing its provisions. While *Miller* would prohibit the State from indicting citizens without probable cause that a film like *Cuties* appeals to the prurient interest when "taken as a whole," Section 43.262's conspicuous lack of any such requirement leaves law enforcement free to subject citizens to felony indictment for even the most fleeting or immaterial "lewd exhibition"—something impermissible to any other kind of non-obscene visual material. *E.g.*, *Jacobellis v. Ohio*, 378 U.S. 184, 195–97 (1964).

The TDCA's second reason for admonishing its members (i.e. the State's prosecutors) to proceed with caution—the potential for overlapping statutes—typifies the arbitrary power that law enforcement wields under Section 43.262's indeterminate provisions. According to the TDCA, Section 43.262 criminalizes some of the same conduct Section 43.261 already criminalized—"sexting images exchanged between consenting teens"—which Section 43.261 makes a class C misdemeanor punishable only by a fine (subject to certain enhancements).[71] *Id.*; *see also* Tex. Penal Code § 43.261(b)–(c). The TDCA then openly encourages the State's prosecutors to consider using Section 43.262 instead of Section 43.261 when charging teens who exchange consensual sexting images because, "**this new, more serious crime has**

---

[70] Relevant excerpts of the TDCA's handbook are included in the Appendix as Exhibit 4.

[71] The TDCA's view is flawed, however: Section 43.261 applies only to visual materials containing "sexual conduct," while Section 43.262's lacks any such requirement. But that flawed view, expressed by an association of prosecutors, only further proves why Section 43.262's own flaws violate the Constitution: if Section 43.262's broad use of "lewd exhibition" trips up the State's prosecutors, how can more be expected of its citizens?

Envelope: 59161766

**none of the defenses found in the sexting offense** for teen dating, spousal relationships, and the like," and "nothing appears to prevent the use of *this new tool* [(i.e., Section 43.262)] in those cases." *Id.* In other words, according to an association of the State's prosecutors, the same conduct that the Legislature made a misdemeanor under Section 43.261 and subject to several legitimate defenses may be charged as felony to which there are no defenses nor any requirement of a culpable mental state.[72] Put another way, the only discernible limit between conduct that makes one a misdemeanant and conduct that makes one a felon is an unwritten one— a local prosecutor's almost limitless discretion. That is the very definition of arbitrary and indiscriminate use of power. *E.g.*, *Doyal*, 589 S.W.3d at 152. And the cumulative effect of the State's exercise of such power under Section 43.262 is obvious: the chilling of protected expression. Section 43.262 is thus unconstitutional on its face.

### 3. Because Section 43.262 is so hopelessly indeterminate, it chills far more speech than just "visual materials."

"Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden areas are clearly marked." *Doyal*, 589 S.W.3d at 146 (cleaned up). Given Section 43.262's broad and indeterminate sweep, citizens would be wise to steer wide of vast amounts of otherwise protected speech to avoid being prosecuted by the State as felons under Section 43.262.

The Supreme Court has expressly recognized—twice—that a statute's use of "lewd exhibition" avoids impermissibly chilling speech only when narrowly defined, such as when serving as a catchall. *Williams*, 553 U.S. at 296; *Ferber*, 458 U.S. at 764, 773–74. But Section 43.262's use of "lewd exhibition" lacks *any* of those narrowing features and carries instead its broadest meaning.

---

[72] For reasons noted in *Williams*, 355 U.S. at 294, the omission of a culpable mental state is an especially weighty flaw; a culpable mental state is a feature courts often cite as *the* reason a challenged statute is (or isn't) specific and narrow enough to pass constitutional muster on vagueness grounds. *E.g.*, *Long*, 931 S.W.2d at 290–91.

Envelope: 59161766

That fact coupled with the *vast* amount of conduct that may violate the statute shows conclusively why Section 43.262 chills substantial amounts of protected speech. The State's conclusion that it had probable cause to believe that *Cuties* offends Section 43.262 means also that the State believes it has probable cause to indict every citizen who watched the film (i.e., "accessed with intent to view"), and every citizen who speaks favorably about the film and urges others watch it through Netflix's service (i.e., "promotes" the film).[73] *Lowry*, 2021 WL 4953918, at *12; *cf. Williams*, 553 U.S. at 295 (holding that speech intended to induce the viewing and transmission of child pornography may be criminalized under federal child pornography laws). Even the harshest critics of visual materials like *Cuties* or any number of other visual materials (e.g., routines from *Dance Moms*) should take note of the State's reading of Section 43.262, as they too could be indicted for violating Section 43.262, given the self-incriminating content of their critiques.[74]

Section 43.262 thus puts citizens to a Hobson's choice: either cease *all* of these expressive and otherwise protected activities, and thus steer clear of the vast zone of unlawful activity Section 43.262 creates in the modern marketplace of ideas; or continue such activity under Section 43.262's long shadow and the disquieting threat of the State's broad power to prosecute them under the statute's nebulous terms and without any defenses to such charges and based solely on their "knowing" acts. Section 43.262 is therefore unconstitutionally vague on its face and in *all* of its

---

[73] App'x, Ex. 2-A to 2-B.

[74] For example, one critic who railed against *Cuties* online included in his critique several strategically pixelated images taken from the film that he found offensive. App'x, Ex. 2-C, John Nolte, "Elite Media Defend 'Cuties' While Covering Up Most Salacious Content from Readers," Breitbart.com (Sept. 18, 2020) (available at www.breitbart.com/entertainment/2020/09/18/nolte-elite-media-defend-cuties-covering-most-salacious-content/). That self-incriminating conduct renders Mr. Nolte at risk not merely of *indictment* under Section 43.262 but of *conviction* because his incriminating postproduction alterations of those images are no defense. *Cf. United States v. Grimes*, 244 F.3d 375, 380 (5th Cir. 2001) (holding that placing postproduction pixel blocks over the genitals shown in defendant's pictures rendered the defendant subject to prosecution under federal child pornography laws where the original material depicted minors engaged in sexually explicit conduct and thus remained a "lascivious exhibition" of the genitals). So too with Headline News Network's critique of *Dance Moms* and its "FANtastic" routine. *See* App'x Ln 9. A bona fide journalistic purpose is no defense to airing visual materials that offend the statute. *E.g. United States v. Matthews*, 209 F.3d 338, 345 (4th Cir. 2000).

---

Envelope: 59161766

applications. The Court should therefore strike the *entire* statute as unconstitutional and dismiss the State's indictment against Netflix.

## IV.  Section 43.262's Criminalization of Vast Amounts of Conduct Related to Visual Materials That Are Neither Obscene Nor Child Pornography Renders the Statute a Content- and Viewpoint-Based Restriction that Offends the First Amendment and Is Vastly Overbroad.

Aside from depriving citizens of due process through hopelessly indeterminate terms, Section 43.262 also deprives citizens of their free speech rights under the First Amendment, for two main reasons. First, Section 43.262 is an impermissible content- and viewpoint-based restriction that is not narrowly tailored to serve a compelling state interest. *Lowry*, 2021 WL 4953918, at *9–*11. Second, Section 43.262 is a "criminal prohibition of alarming breadth that is real and substantial" and that offends the First Amendment. *Id.* *12 (cleaned up).[75]

## A.  Section 43.262 Is Facially Unconstitutional Because the State Cannot Justify Section 43.262's Content- and Viewpoint-Based Restrictions.

Because Section 43.262 criminalizes activity based not only on the content of "visual material," but also the viewpoints expressed when "promoting" such material, the statute must fall. While in most cases, the party challenging the constitutionality of a statute bears the burden of proof, "[c]ontent-based regulations (those laws that distinguish favored from disfavored speech based on the ideas expressed) are presumptively invalid, and the government bears the burden to rebut that presumption," through proof of narrow tailoring and a compelling government interest. *Ex parte Lo*, 424 S.W.3d 10, 15 (Tex. Crim. App. 2013). And where a statute discriminates on the basis of viewpoint, the government is *incapable* of rebutting the presumption because the government is always barred from engaging in viewpoint discrimination. *E.g.*, *Iancu v. Brunetti*, 139 S. Ct. 2294, 2299 (2019); *see also R.A.V.*

---

[75] For reasons noted in *Lowry*, because the State's indictment of Netflix is limited to the promotion of visual material depicting clothed or partially clothed children, this portion of Netflix's challenge is limited to the charged portion of the statute only. 2021 WL 4953918, at *5. Netflix's vagueness challenge, however, extends to the entire statute and in all of its applications.

Envelope: 59161766

*v. City of St. Paul, Minn.*, 505 U.S. 377, 383–84 (1992). Applying these principles, Section 43.262 is facially unconstitutional because (1) its prohibition on the "promotion" of visual materials that are neither obscene nor child pornography amounts to viewpoint discrimination, and (2) applied more broadly, the statute is a content-based restriction that the State cannot justify under strict scrutiny.

First, by criminalizing the "promotion" of visual material that is neither obscene nor child pornography—and is thus presumptively entitled to First Amendment protection—Section 43.262 is a viewpoint-based restriction. "If there is a bedrock principle underlying the First Amendment, it is that the Government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989). "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995). By criminalizing the "promotion" of accused visual materials, Section 43.262 is that kind of blatant First Amendment violation because it makes felons only of those who advocate in favor of accessing (i.e., "advertise" or "promote") "visual materials" that fall within its vast scope. Tex. Penal Code § 43.262(b).

As noted in *Williams*, it is only speech that recommends accused visual material to another person for viewing that "promotes" such material. 553 U.S. at 295. Thus, a citizen who posts on Facebook a message like "Everyone should watch *Cuties* on Netflix because it has a great message. You can find the film here: [link]," is subject to felony indictment for "promotion," while a critical post—"Netflix has *Cuties* but no one should watch it because of its lewd dancing."—is not. *See, e.g.*, *Brunetti*, 139 S. Ct. at 2299 (holding that the government engaged in viewpoint-based discrimination where it penalized citizens who sought trademarks that used

Envelope: 59161766

objectionable terms or expressed "immoral" ideas but granted such rights to citizens who sought trademarks with positive messages and "moral" ideas).

This is not to suggest that laws criminalizing the promotion of *actual* child pornography are inconsistent with the First Amendment. Such prohibitions are based "on the principle that offers to give or receive what it is unlawful to possess have no social value and thus, like obscenity, enjoy no First Amendment protection." *Williams*, 553 U.S. at 298. But where, as here, the material at issue is neither obscene nor child pornography, that principle simply does not apply. *E.g.*, *Brunetti*, 139 S. Ct. at 2299. Section 43.262's prohibition on "promotion" is therefore a viewpoint-based restriction that the State is prohibited from enforcing and should be struck.

Second, "[b]y limiting [Section 43.262's] prohibition to visual material depicting the lewd exhibition of the pubic area of a clothed [or partially clothed] child, the statute is a content-based restriction" that is invalid unless the State can prove that the statute is narrowly tailored to serve a compelling state interest. *Lowry*, 2021 WL 4953918, at *9 (cleaned up). And, for all of the reasons *Lowry* identified, the State cannot meet its burden.

Section 43.262 lacks any legislative findings about the risks associated with so-called "child erotica images" (if any). And the State has no "evidence or studies to show that the prohibited visual material in section 43.262, which neither encompasses obscenity nor child pornography, has a direct causal link to the State's compelling interest of preventing the sexual abuse or sexual exploitation of children," or that "child erotica images cause sexual exploitation and sexual abuse of children." *Id*. at *11. Section 43.262 is thus facially unconstitutional under the First Amendment.

**B.**   **Besides Being a Content-Based Restriction that Fails Strict Scrutiny, Section 43.262 Criminalizes Substantially More Speech than the First Amendment Tolerates.**

A statute that does not use the least restrictive means and, as a consequence, prohibits a substantial amount of protected speech "judged in relation to the statute's plainly legitimate sweep," is unconstitutionally overbroad. *Virginia v. Hicks*, 539 U.S. 113, 118 (2003). The State may not justify restrictions on constitutionally *protected* speech on the basis that such restrictions are necessary to effectively suppress constitutionally *unprotected* speech, such as obscenity, child pornography, or the solicitation of minors. *Free Speech Coalition,* 535 U.S. at 355. This rule reflects the judgment that "[t]he possible harm to society in permitting some unprotected speech to go unpunished is outweighed by the possibility that protected speech of others may be muted[.]" *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973).

Overbroad restrictions on speech offend the constitution by fostering self-censorship. *See Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392–93 (1988). "Where a prosecution is a likely possibility . . . speakers may self-censor rather than risk the perils of trial. There is a potential for extraordinary harm and a serious chill upon protected speech." *Ashcroft v. ACLU*, 542 U.S. 656, 670–71 (2004). That "chill" is especially concerning here, as Section 43.262 prohibits vast amounts of conduct merely incidental to such material (e.g., advertising, promotion, etc.).

As the materials included in Netflix's Appendix show, and as *Lowry* already concluded, "it is not difficult to imagine the overbreadth of this statute":

> The statute applies to any person—man, woman, teenager, law enforcement, judiciary, or school administrator—as long as the person knowingly possesses visual material depicting the lewd exhibition of the pubic area of a clothed child younger than 18. The statute does not differentiate if a teenager takes the offending photo of themselves, commonly referred to as a "selfie," and posts it publicly for anyone to see. In that instance, and based on the State's proffered compelling interest, if the visual material violates the statute, the teenager is both the victim (of sexual exploitation and sexual abuse) and the offender. And, any other person, whether that person is a collector of child erotica, parent, law enforcement, or educator, who knowingly possesses the visual material posted by the teenager, could also violate the statute.

Envelope: 59161766

2021 WL 4953918, at *12.

*Lowry*'s point about "selfies" is hardly academic. Section 43.262 makes a felon out of anyone who accesses with intent to view, or shares with friends via text or social media posts (i.e. "promotes"), the tens of thousands of photographs[76] and videos[77] *voluntarily* created by teens and tweens with no coercion or abuse of any kind, and which have enjoyed *millions* of views on multiple online media outlets (e.g., YouTube, TikTok, Instagram, etc.). So too with anyone who accesses or promotes *numerous* paintings,[78] films,[79] or television shows[80] that depict young bodies in ways some may view as provocative (i.e., "lewd").

"Although the savings clause [in Section 43.262(b)(3)] exempts visual material having *serious* literary, artistic, political, or scientific value, such exemptions matter little when a substantial amount of protected speech is still chilled in the process." *Lowry*, 2021 WL 4953918, at *12. Indeed, *Lowry* itself is proof of how little the savings clause actually matters. In *Lowry*, **the State conceded that it "believed Netflix's movie *had* political, literary, and artistic value**," *id.* at *11, while, in *this* case, the State's indictment contends *Cuties* lacks any such value.[81]

Moreover, when "the text says 'serious' value, 'serious' should be taken seriously." *United States v. Stevens*, 559 U.S. 460, 479 (2010). "Serious" means to be of "significant and of great import." *Id*. It is difficult to understand how, for example, any single 20-second clip of minors dancing vigorously in bikinis (or, for many boys, shirtless) to lewd music would *ever* be of "significant and of great import" to literature, the arts, politics, or science.[82] But "the protection of the First Amendment

---

[76] App'x, Ex. 1 Lns 50–57.
[77] App'x, Ex. 1 Lns 27–49.
[78] App'x, Ex. 1 Ln 1.
[79] App'x, Ex. 1 Lns 2, 4–7.
[80] App'x, Ex. 1 Lns 3, 8–19.
[81] Indictment (filed Sept. 25, 2020)
[82] *See* App'x, Ex. 1 Lns 29, 37–38, 44, 47–49.

Envelope: 59161766

presumptively extends to many forms of speech that do not qualify for the serious-value exception of [Section 43.262(b)], but nonetheless fall within the broad reach of [Section 43.262]." *Id.* at 480. Section 43.262 is therefore substantially overbroad and invalid under the First Amendment for this additional reason and should be declared unconstitutional. The State is therefore powerless to prosecute Netflix under its terms.

## PRAYER

By criminalizing non-obscene visual materials that are not child pornography, Section 43.262 is facially unconstitutional and cannot stand. Through its use of hopelessly indeterminate terms (e.g., "lewd exhibition" and "prurient interest"), the statute is facially and unconstitutionally vague *in all of its applications* because it deprives ordinary people of notice about what it even prohibits while imbuing the State's prosecutors with arbitrary discretion in its enforcement and in ways that chill protected speech. Even if limited merely to those provisions on which the State indicted Netflix (i.e., promoting visual material depicting fully or partially clothed children lewdly exhibiting their pubic areas), Section 43.262 is a content- and viewpoint-based restriction that the State cannot justify and that is vastly and substantially overbroad. The Court should therefore grant Netflix's petition and dismiss the State's indictment because that indictment cannot withstand constitutional scrutiny.

Envelope: 59161766

Date: November 15, 2021

Respectfully submitted,

/s/ Joshua J. Bennett
E. Leon Carter
Texas Bar No. 03914300
lcarter@carterarnett.com
Joshua J. Bennett
Texas Bar No. 24059444
jbennett@carterarnett.com
**CARTER ARNETT PLLC**
8150 N. Central Expy, Ste. 500
Dallas, Texas 75206
214-550-8188 (Telephone)
214-550-8185 (Facsimile)

**ATTORNEYS FOR DEFENDANT**

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on November 15, 2021, a true and correct copy of the foregoing instrument was delivered to all counsel of record through a court-approved electronic filing system.

/s/ Joshua J. Bennett
Joshua J. Bennett

Envelope: 59161766

## <u>VERIFICATION</u>

STATE OF TEXAS          §
                        §
DALLAS COUNTY           §

BEFORE ME, the undersigned authority, on this day personally appeared Joshua J. Bennett, who, being known to me and duly sworn, state on his oath the following:

"My name is Joshua J. Bennett. I am over twenty-one years of age, am of sound mind, and am competent to make this verification and to testify to the facts stated here. I am one of the lawyers assisting in the representation of Netflix, Inc."

"I hereby certify under Texas Code of Criminal Procedure Article 11.14(5) that I have reviewed the petition and concluded that every factual statement in the petition is true and is supported by competent evidence in the Appendix, and 'according to the belief of the petitioner.' The materials included in the Appendix are true and correct copies of each exhibit and are what they purport to be."


_____
Joshua J. Bennett


SWORN TO AND SUBSCRIBED before me on November 12, 2021, to certify which, witness my hand and seal of office.


_____
Notary Public for the State of Texas

Envelope: 59161766

# APPENDIX

<u>EXHIBIT 1</u>

**VISUAL MATERIALS DEPICTING CLOTHED**
**AND PARTIALLY CLOTHED CHILDREN**

***Paintings/Artwork***

| Ln | TITLE | DESCRIPTION | SOURCE |
|----|-------|-------------|--------|
| 1. | *Therese Dreaming* | From the website:<br><br>Balthus's model, Thérèse Blanchard, appears—as the title of this work suggests—unaware of her surroundings and lost in thought. Blanchard was about twelve or thirteen when the artist painted this canvas. She would figure in at least nine other compositions, either alone or with her cat or her brother. Balthus, like countless modern artists, believed the subject of the child to be a source of raw spirit, not yet molded by societal expectations. Many early twentieth-century avant-garde artists, from Paul Gauguin to Edvard Munch to Pablo Picasso, also viewed adolescent sexuality as a potent site of psychological vulnerability as well as lack of inhibition, and they projected these subjective interpretations into their work. While it may be unsettling to our eyes today, Thérèse Dreaming draws on this history. | To the work:<br>www.metmuseum.org/art/collection/search/489977<br><br>For controversy surrounding it:<br>www.widewalls.ch/magazine/balthus-therese-dreaming-girl-met |

**_Film/Broadcast Materials_**

| | | | |
|---|---|---|---|
| 2. | Scene from *Major Payne* | At the Military Games, the boys from Madison Preparatory School perform an unorthodox routine, led by Tiger, their youngest member (see, in particular, starting at 2:24). | https://youtu.be/9Tovv9Ir1lY<br>3.5 million views reported as of November 11, 2021 |
| 3. | Scene from *Glee* | A teenage boy sings and dances suggestively to the song "Baby Boy" while trying out for the school's glee club. | https://youtu.be/0ctC4eyEvF0<br>170,000-plus views reported as of October 29, 2021 |
| 4. | Scene from *Jackass Presents: Bad Grandpa* | Posing as an 86-year-old grandfather, a man registers an 8-year-old boy (posing as the man's "granddaughter") for a girls beauty pageant. At the pageant, the boy dances to "Cherry Pie" by Warrant for the talent portion of the competition, shocking many of the participants and their parents with his moves. | https://youtu.be/DoqPEhVHdBM<br>2.3 million views reported as of October 29, 2021 |
| 5. | Scenes from *Little Miss Sunshine*, winner of two Academy Awards (2007) | A family determined to get their young daughter into the finals of a beauty pageant take a cross-country trip in their VW bus. At the pageant, their daughter competes in the swimsuit competition, and dances to the disco anthem "Super Freak" by Rick James to the dismay and disgust of many in attendance. | "Catwalking": https://youtu.be/WYMRLleE9Qo<br>176,000-plus views reported as of October 29, 2021<br><br>Talent Competition:<br>https://youtu.be/xtVmfXnJM80<br>223,000-plus views reported as of October 29, 2021 |

| | | | |
|---|---|---|---|
| 6. | Scene from *Lolita* (1997) | A man stares longingly at a young girl laying on the grass beneath a sprinkler on a hot summer day, clothes drenched and see through but her body well covered. | https://youtu.be/672bYBQRQcQ |
| 7. | Scene from *Stand-In* (1937) | A young girl sings and dances in abbreviated clothing for a Hollywood executive as he watches uncomfortably and disapprovingly. | https://youtu.be/fPQtFAMbQ9Y 264,000 views reported as of November 1, 2021 |
| 8. | Scene from *Dance Moms* "FANtastic" | Young girls from Abby Lee Dance Company pretend to be "showgirls" as they perform their routine in competition. | https://youtu.be/pZNFFTrDN8E 3.3 million views reported as of November 10, 2021 |
| 9. | Segment from Headline News Network's *Jane Velez Mitchell Show* "Baby Burlesque?" | Pundits and contributors discuss the controversy surrounding a *Dance Moms* routine and review footage from the show and other shows. | https://youtu.be/-bFh2422VNg |
| 10. | Scene from *Dance Moms* "Electricity" | Young girls from Abby Lee Dance Company perform a high-energy routine to "Electricity." | https://youtu.be/-Hbwed_7o20 4 million views reported as of October 29, 2021 |
| 11. | Scene from *Dance Moms* "The Last Dance" | The older girls from Abby Lee Dance Company perform a routine that their leader regards as too adult and refuses to watch. | https://youtu.be/OFWUcUS0M0E 20 million views reported as of October 29, 2021 |
| 12. | Scene from *Dance Moms* "Hurt Them First" | Young girls from Abby Lee Dance Company pose as jail inmates and perform a routine based on music and scenes from the musical *Chicago*. | https://youtu.be/spAQGWlMtus 2.6 million views reported as of October 29, 2021<br><br>Also available at https://youtu.be/--Uo0uorDpM (FULL VERSION) |

| 13. | Scene from *Dance Moms* "Boss Ladies" | Young girls from Abby Lee Dance Company perform an energetic hip-hop routine in competition (esp. beginning at 2:23). | https://youtu.be/yFbd6nfZ3VI<br>12 million views reported as of November 11, 2021 |
|---|---|---|---|
| 14. | Scene from *Dance Moms* "Country Cuties" | Young girls from Abby Lee Dance Company perform a ho-down themed dance. | https://youtu.be/LjLXl9TJVdE<br>17 million views reported as of October 29, 2021 |
| 15. | Scene from *Dance Moms* "Kinky Boots" | Young girls from Abby Lee Dance Company perform a tribute to the Broadway play *Kinky Boots*. | https://youtu.be/XudD1IpJgZk<br>4.7 million views reported as of October 29, 2021 |
| 16. | Scene from *Toddlers and Tiaras* | "Mini Dolly Parton Wows Judges At The Hearts And Crowns Pageant." | https://youtu.be/I0keCRE3iik<br>3.8 million views reported as of November 10, 2021 |
| 17. | Lifetime's *Bring It!* "Don't Do It Neva" | Young girls face off in a spirited dance competition steeped in culture and tradition, especially at 13:00, 20:00, 22:00, and the 30:00-minute marks. | https://youtu.be/FijLAJ8HabE<br>4.3 million views reported as of October 29, 2021 |
| 18. | Lifetime's *Bring It!* "Be Ready!" | "Baby dancing dolls" vigorously perform choreographed routines and compete against each other, especially at the 1:20 through 4:00, 15:20, and 18:30 minute marks. | https://youtu.be/lVhTSVawLF4<br>1.6 million views reported as of November 11, 2021 |
| 19. | "Elastic Heart" by Sia | An emotionally charged music video where a grown man wearing dingy tight trunks engages in interpretive dance with a young girl wearing dingy dancing attire. | https://youtu.be/KWZGAExj-es<br>1.1 *billion* views reported as of October 29, 2021<br><br>For controversy surrounding the video, see https://www.cnn.com/2015/01/08/showbiz/feat-sia-shia-labeouf-maddie-ziegler-elastic-heart/index.html |

## *Live Performances*

| 20. | Minis 5 Way Stand Battle | Video of an energetic live dance off among troupes of girls. | https://youtu.be/OQxP0P3I6-w |
|---|---|---|---|
| 21. | Booty- Canyon High School Song Team | Canyon High School Cheer Squad perform lively routine to the song "Booty." | https://youtu.be/pLFIUUIbZUY |
| 22. | MADD Cheer Showcase 2017 | The young girls of MADD CHEER ALL STARS of Mesquite, Texas perform in competition. | https://youtu.be/8blOlDPS4dM<br>Notable "exhibitions" beginning at the 2:00 minute mark |
| 23. | Cheer Extreme 2015 Showcase | The "Tiny Turtles" of Raleigh exhibit themselves in competition. | https://youtu.be/b3Wg-oKNToA |

## *Television and Print Advertisements*

| 24. | Calvin Klein Jeans (1980) | After the camera pans slowly across her Calvin-Klein clad pubic area, Brooke Shields, then age 15, tells the world that nothing comes between her and her "Calvins." | https://youtu.be/YK2VZgJ4AoM<br>1.5 million views reported as of November 4, 2021 |
|---|---|---|---|
| 25. | Calvin Klein Jeans (1980) | Brooke Shields, then age 15, worms her way into tight fitting "Calvins" as she explains about how "jeans" (or "genes") are made stronger, including through "selective mating." | https://youtu.be/AXzR5b6HoIA<br>600,000 views reported as of November 4, 2021 |

| 26. | Marc Jacobs "Oh, Lola" (2011) | Dakota Fanning (then 17) poses for the Marc Jacobs fragrance "Oh, Lola," bearing a flower-topped pink bottle which she cradles between her thighs near her pubic area. | https://dakota-fanning.com/visuals/displayimage.php?album=1599&pid=46937#top_display_media<br><br>For controversy surrounding the ad, see https://www.nydailynews.com/life-style/fashion/dakota-fanning-ad-marc-jacobs-lola-perfume-banned-uk-authorities-ad-sexualized-children-article-1.974931 |

### *Social Media Videos*

| 27. | Here Comes Santa Claus TikTok Dance Challenge Compilation (Nov. 12, 2020) | Various teens, including Pressley Hosbach (b. 2006), and various adults dance the same provocative routine set to "Here Comes Santa Claus." | https://youtu.be/Q4tQiKW99mk<br>1.8 million views reported as of October 29, 2021 |
| 28. | Charli D'amelio Vs Luara TikTok Dances Compilation (November 2020) | Two teens square off in various dance challenges to various songs, many of them explicit, including "WAP." | https://youtu.be/z4o0-l82Fsc<br>Nearly 800,000 views reported as of October 29, 2021 |
| 29. | @itssissysheridan – Lake Day | A 16-year-old girl and her friend dance in short shorts and bikini tops to "TKN – ROSALIA & Travis Scott." | www.tiktok.com/@itssissysheridan/video/6844671010847935750?<br>381,000 likes reported as of November 11, 2021 |
| 30. | Craziest Twerk It For Me TikTok Compilation - Best Darling Twerk Dance Challenge | Children and adults alike dance and then twerk to music. | https://youtu.be/ho5JCYsReGQ<br>5.4 million reported views as of October 29, 2021 |

| 31. | Ultimate Charli D'Amelio Tiktok Dance Compilation of July 2020 | A 17-year-old girl dances to various clips of various songs, many explicit, in various forms of dress, from baggy sweats to bikinis. | https://youtu.be/O9-oF-UwpsU |
|---|---|---|---|
| 32. | Best Of Lilly Ketchman TikTok Dances Compilation 2020 | A 12-year-old girl dances in various places, including her bedroom, to various songs, many with explicit themes, mostly in shorts and midriff-bearing shirts. | https://youtu.be/_wL0oOI2d64<br>926,000 reported views as of October 29, 2021 |
| 33. | Tap In x TKN TikTok Dance Challenge Compilation (Aug. 7, 2020) | Various teens, including Pressley Hosbach (b. 2006) and Charlie D'Amelio (b.2004) and Nick Bencivengo (b.2003), and various adults dance the same provocative routine set to "Tap In x TKN." | https://youtu.be/dn513Z06BJE<br>3.3 million reported views as of October 29, 2021 |
| 34. | Charli D'amelio Vs Piper Rockelle TikTok Dances Compilation (November 2020) | Two teens square off in various dance challenges to various songs, many of them explicit, such as "Promiscuous." | https://youtu.be/Q9lTpA7E-lk<br>3.1 million reported views as of October 29, 2021 |
| 35. | KESHA - CANNIBAL TIK TOK REMIX COMPILATION | Various teens, including Sissy Sheridan (b. 2005) and Charlie D'Amelio (b. 2004), and various adults dance the same provocative routine set to "Cannibal" by the artist Kesha. | https://youtu.be/3L4ZFVuRscU |

| 36. | Piper Rockelle Vs Pressley Hosbach TikTok Dances Compilation (October 2020) | Two teens square off in various dance challenges to various songs, many of them explicit, such as "Promiscuous." | https://youtu.be/NmqxKJbFEbQ <br> 1.1 million reported views as of October 29, 2021 |
| 37. | Happy Halloween! (Oct. 31, 2020) | A 16-year-old girl lip-synchs to a song about "switching positions" while laying on a bed dressed as a "bunny" for Halloween. | www.tiktok.com/@itssissysheridan/video/6889916994 821377286 <br> 1.6 million reported "likes" |
| 38. | The Pitman Sisters – Summer Starter Mashup | Three sisters—ages 15, 17, and 23—dance in their bikinis to a popular "summer starter mashup" (i.e., several songs combined in one). | www.tiktok.com/@thepitmansisters/video/69811700503 80221701 <br><br> Other teens, such as Lilly Ketchman, may be seen dancing to this same mashup here: www.tiktok.com/music/SUMMER-STARTER-MASHUP-6975539572134415109 |
| 39. | Charli D'Amelio Vs Ellie Zeiler TikTok Dances Compilation (October 2020) | Two teens square off in various dance challenges to various songs, many of them explicit. | https://youtu.be/VKy41bQmGQg <br> 1.5 million reported views as of October 29, 2021 |
| 40. | 34+35 (Ariana Grande) - TikTok Dance Challenge Compilation | Various teens, Charlie D'Amelio (b.2004) and Mackenzie Ziegler (b.2004), and various adults perform the same routine set to "34+35" by the artist Ariana Grande. | https://youtu.be/cbKvGsY9-6k <br> 2.5 million reported views as of October 29, 2021 |
| 41. | From Tha Back x Miss The Rage - New Dance TikTok Compilation Part 4 | Gabi Mora (b.2004) and other teens perform the same routine to a popular song. | https://youtu.be/4bjWffVnfkU |

| 42. | Addison Rae Vs Mackenzie Ziegler TikTok Dances Compilation 2020 | Mackenzie Ziegler (b.2004) squares off against Addison Rae, an adult, in various dance challenges to various explicit songs. | https://youtu.be/9dM4AoZ3FF8 |
|---|---|---|---|
| 43. | Elliana Walmsley Vs Lilly Ketchman TikTok Dances Compilation (October 2021) | Two minors, Elliana Walmsley (b.2007) and Lilly Ketchman (b.2008), are pitted against each other as they dance to music containing explicit lyrics and suggestive themes. | https://youtu.be/vHUVQzbe07U 138,000 reported views as of November 1, 2021 |
| 44. | "Workin on my quaran-tan" | Marley Arnold (b.2005) dances in her swimwear to the song "Savage" by artist Megan Thee Stallion. | https://www.instagram.com/p/B-AQvW7Hr2q |
| 45. | Charli D'amelio Vs SJ Bleau TikTok Dances Compilation | Charli D'Amelio (b.2004) faces off against another popular TikTok creator, an adult, in dances to various explicit songs. | https://youtu.be/gJSusJmeElk |
| 46. | Charli D'Amelio New TikTok Dance Compilation August 2020 | Charli D'Amelio (b. 2004) dances and lip syncs to "WAP," "No Guidance," and other explicit songs. | https://youtu.be/ItMQya-3bWM 1.25 million reported views as of November 5, 2021 |
| 47. | Charli D'Amelio 2020-6-16 | Charli D'Amelio (b.2004) dances in swimwear to "Freak" by artist Doja Cat. | https://www.tiktok.com/@charlidamelio/video/6839090350674480390 9.6 million reported "likes"; more than 160,000 reported "shares" as of November 11, 2021 |
| 48. | Charlie D'Amelio 2020-6-23 | Charli D'Amelio (b.2004) dances in swimwear to "Gracie." | https://www.tiktok.com/@charlidamelio/video/6841653014046985478 9.9 million reported "likes"; more than 100,000 reported "shares" as of November 11, 2021 |

| 49. | Wet (She Got That…) [Slowed & Reverbed] | Adults and teens, including Charli D'Amelio (b.2004) and Mackenzie Ziegler (b.2004), post their performances to the song "Wet (She Got That)." | https://www.tiktok.com/music/Wet-She-Got-That-6828238914092944133?<br><br>Given her immense popularity, Ms. D'Amelio's particular videos (there are several) have millions of reported "likes" and hundreds of thousands of reported "shares." (https://www.tiktok.com/@charlidamelio/video/6842718163252169989?) |

### *Social Media Stills*

| 50. | Summertime 2021 | Ellie Zeiller (b. 2004) posts photos of herself in the pool. | https://www.instagram.com/p/CRUJzUTn_Rr |
| 51. | Instagram @gabimfmoura | Brazilian teen influencer, Gabriela Moura (b. 2004), posts various photos of herself modeling various styles of clothes, including swimwear. | https://www.instagram.com/gabimfmoura/ |
| 52. | Go ahead and send this to your group chat too 🫶 | Marley Arnold (b. 2005) posts photos of herself on the beach in her swimwear. | https://www.instagram.com/p/CKkHDvXnwNC/ |
| 53. | tag your friend that you would bring to @kuramathiisland 🏝 #kuramathi | Kristina Pimenova (b. 2005) posts photos of herself in swimwear on the beach. | https://www.instagram.com/p/CISUkV5FjHw/ |
| 54. | Instagram @daniellecohn | Teen influencer, Danielle Cohn (b.2004), posts various photos herself modeling various articles of clothing, including swimwear. | https://www.instagram.com/daniellecohn/ <br> 4.4 million followers |
| 55. | beach day n yerbbbb | Sophia Birlem (b.2004) posts close-up photos of herself in swimwear. | https://www.instagram.com/p/CRAaeg9r9Zi/ |

| 56. | Dancing my way to Christmas♡▯ | Everleigh Rose (b.2012) posts photos from a dance performance. | https://www.instagram.com/p/CIj2Bx6jQCg/ 4.9 million followers; 674,850 likes; 3,228 comments |
| 57. | Enjoying the summer weather ⚙▯ | Child cheerleader, Rosie Harper, posts photos by the pool dressed in swimwear. | https://www.instagram.com/p/CPbVJSxh3sC/ |

# Criticism of Netflix's 'Cuties' isn't about the movie. It's a cynical ploy in the culture war.

Sept. 15, 2020, 5:25 PM CDT

EXHIBIT
2-A

On Aug. 18, Netflix accidentally fired the first shot in what may be the single dumbest battle of the culture wars, this one over "Cuties," Maïmouna Doucouré's sweet-spirited French coming-of-age drama about Amy, an 11-year-old Muslim girl in Paris looking for friendship among the competitive dancers in her class at school.

Netflix briefly promoted the film, a Sundance directing prize winner, with a digital "poster" that made it look a bit like a horrible American reality TV series — the notorious "Dance Moms," perhaps, which ran for eight seasons on Lifetime, or Netflix's own "Dancing Queen," or "Bring It," which had five seasons on Lifetime, or its companion show "Step It Up," which got only one season, all of which came and went without protracted public objection. Within hours of that first trailer for "Cuties," the pedophile-obsessed American right, driven by QAnon, had a new target.

It's legitimately upsetting to see this movie so cynically hijacked. It's a very witty indie film — impeccably framed and shot — about the tug-of-war between Amy's Sengalese Muslim heritage (which is brutally subjugating her mother) and her new French friends' brazenness as they compete with older girls in dance competitions where they borrow choreography from sexy American music videos.

As rebelling conservative kids have done from time immemorial, Amy overcommits: She's more dedicated than any of her friends to the dance

group, she's willing to steal, try (and repeatedly fail) to use her not-yet-available feminine wiles on men and attack another girl who threatens to take her place on the team. Much of this is very funny — Fathia Youssouf, who plays Amy, is wonderful — and the focus is fully on Amy's inner life and on her decision about which of the apparently mutually exclusive cultures she will ultimately embrace.



It is, annoyingly, important to state plainly that "Cuties" does not portray child abuse, it does not glorify or countenance pedophilia in any way, and it does not "sexualize" its characters — which is, to put it plainly, a favorite description of people so disturbed by their own reaction to a piece of art that they have to quickly plant the blame for that reaction on the artist before anyone notices. Doucouré's movie is about platonic relationships between women and girls; there is no sexuality to be had anywhere in this movie, which makes the outrage over it seem all the more extraterrestrial.

The backlash to the film has, however, twisted the deliberately provocative

choreography these girls perform into a problem, if not an international crisis — again, a little strangely, since people who take the time to actually watch the film are shown again and again that the characters are dancing to impress one another with their skill, and with how daringly they're willing to imitate the scary and mean older girls, not for the benefit of perverts onscreen or off.

It's probably worth observing, at this juncture, that if you see an adult woman perform similar dances in a music video on YouTube (or on a stage) you can safely bet that she learned the basic mechanics when she was at least as young as the actresses in "Cuties" — if you'd like to check that fact, please refer to any of the reality shows in the second paragraph. Doing body isolations and making your butt cheeks clap is hard; as a longtime theater nerd, I know quite a few professional dancers, and they can do stuff with their bodies I will never be able to do simply because I didn't start dancing as a child. (As an adult, I have tried, and I will never be allowed back in that Taco Bell.)

But, of course, culture warriors love to hate the movies; that's where the secret seat of political power is, according to the patron saint of right-wing media, Andrew Breitbart, who [often said](#) that "politics is downstream of culture." The question of personal creative expression — and this is a very personal film, a coming-of-age story about a Senegalese-French girl much like the filmmaker's younger self — isn't even a tertiary concern once you've decided to engage with art this way.

And, at the moment, the culture upstream of conservative politics is a hodgepodge of insane far-right conspiracy theories called QAnon, a movement that posits that senior Democrats, Hollywood executives and media barons feast, quite literally, on children, whom they also molest. It is a worryingly popular delusion and contains a lot of other credulity-straining

canon, such as the classic antisemitic blood libel (which is related to the aforementioned cannibalism), the theory that the late John F. Kennedy Jr. is still alive, and the belief that common vaccines cause autism.

Right-wing news sites — now monstrously popular on Facebook in part because of systematic and deliberately overlooked violations of that company's rules — have helped to spread these and other fictions by mixing in with it news about actual sexual predators like Jeffrey Epstein and Harvey Weinstein. They have now leapt aboard the "Cuties" conspiracy train, declaring it evidence that supports all of their most depraved fantasies about liberal elites.

And as their own political movement loses steam amid the malicious bungling of the Covid-19 pandemic, Republican politicians and their allies have rushed to embrace this distraction, secure in the knowledge that some of them are probably slightly more popular than pedophiles.

"I find @netflix decision to peddle child pornography disgusting," wrote Sen.Tom Cotton, R-Ark., attaching an article with a screenshot of the material — the movie's girls, in typical competitive dance attire, posing on stage — that had so deeply offended him. Sen. Josh Hawley, R-Mo.,, sent a letter to Attorney General William Barr, bizarrely claiming that "Cuties" depicts "children being coached to engage in simulated sexual acts." (Again: It does not.)

Their fellow senator and presidential candidate Ted Cruz, R-Texas, joined Cotton in deploring the film, tweeting out an image of his own letter to Barr in which he exhorted the DOJ to begin "investigating and prosecuting offenders who possess and distribute images and video sexually depicting minors." (Perhaps Cotton, having tweeted an image from the film, will qualify for work-release.)

Cruz and Cotton also inventively placed the blame for its invented offenses at the feet of Barack Obama, the most famous black person in America, who has a completely separate development deal with Netflix. Clearly, this is the work of Joe Biden.

Works of art are press-ganged into duty in the culture wars fairly often — some hapless filmmaker or novelist gets caught up in a tornado of bad faith and stupidity — and it's easy to throw up our hands and declare that there's no rhyme or reason to it. But I don't think that's quite the case here: This isn't a provocative movie at all. It's a funny coming-of-age story about friendship and dancing, of which there are many on the market, from "Fame" to "Step Up" to "Save the Last Dance."

But "Cuties" is daring in that it aspires to both show the reality of the modern competitive dance scene and transcend exactly the kind of tiresome argument that conservatives are now having about its content — to dramatize the conflict a single person feels about two cultures that both insist on commodifying her as a teen girl in ways that erase her individuality. At the end of the film, Doucouré suggests that there is a middle way. I hope she's right.

Subscribe to the THINK newsletter

ReTHINK the news cycle with timely op-eds, in-depth analyses and personal essays delivered weekly to your inbox.

THE FRONT ROW

# "CUTIES," THE EXTRAORDINARY NETFLIX DÉBUT THAT BECAME THE TARGET OF A RIGHT-WING CAMPAIGN





**By Richard Brody**
September 8, 2020



*The subject of "Cuties" isn't twerking; it's children who are deprived of the education and the emotional support to put sexualized media and pop culture into perspective.* **Photograph courtesy Netflix**

On Wednesday, Netflix releases "Cuties" ("Mignonnes"), the remarkable first feature from the French filmmaker Maïmouna Doucouré. Unfortunately, the platform's misleading advertising has given rise to a scurrilous campaign against the film itself. The promotional image, showing young girls in bikini-like clothing dancing in provocative ways, matched with an inaccurate description, has been taken to suggest that the film celebrates children's sexualized behavior. In fact, the subject of the film is exactly the opposite: it dramatizes the difficulties of growing up female in a sexualized and commercialized media culture. I doubt that the scandal-mongers (who include some well-known figures of the far right) have actually seen "Cuties," but some elements of the film that weren't presented in the advertising would surely prove irritating to them: it's the story of a girl's outrage at, and defiance of, a patriarchal order.

The girl is Amy Diop (Fathia Youssouf), an eleven-year-old of Senegalese descent, who lives in France with her

observant Muslim family. At the film's beginning, she moves with her mother, Mariam (Maïmouna Gueye), and her two younger brothers into a new apartment in a Parisian housing project. The apartment has a secret: a room, kept locked, that Amy is ordered to avoid. Amy (short for Aminata, and pronounced with a short "a," like the French word *ami*) is a dutiful child, kept in line lovingly but sternly by Mariam and by "Auntie," her great-aunt (Mbissine Thérèse Diop), who's steeped in traditions that she passes along to her niece. Amy, who's quiet and shy, is also socially isolated— she has no cell phone, knows no one at school, and isn't inclined to express herself or introduce herself. As for her father, he's away, visiting the family's homeland. Much is being made of the festive plans for his return—but Amy learns, accidentally, that the point of his trip is to take a second wife, and that he'll soon be returning to Paris with her. The sealed room in the family's apartment will be the new wife's bridal chamber.

Amy takes this news as a betrayal of her mother—especially after she discovers that Mariam, who is made miserable by the news, is being coerced, by Auntie and by the entire social structure of their community, into celebrating her husband's polygamy and welcoming the new bride into her home. At an all-female prayer meeting that Amy and Mariam attend in the building's common room, the preacher, a woman, decrees, "We must remain modest. We must obey our husbands." Auntie tells Amy, "Do everything you can to please your mother." Now that order of modesty strikes Amy as part of a system that subjugates women, and pleasing her mother means deferring to that system. Instantly, Amy enters a state of revolt, which is all the more emotionally wrenching for her lack of a vocabulary to discuss her feelings and her lack of friends to discuss them with. She associates modesty with misogyny and obedience with oppression, and so she acts out, overthrowing both in a series of increasingly reckless actions.

Soon after moving in, Amy sees a neighbor and classmate, Angelica (Médina El Aidi-Azouni), doing a hip-hop dance while doing laundry in the building's basement. Soon thereafter, Amy sees Angelica similarly dancing with three other girls near an abandoned train yard. At first, they insult her and throw rocks at her. When she approaches them at school, they tell her that they're preparing for a dance competition (the group's name is the Cuties, *les Mignonnes*). Amy knows that the girls are trouble—she sees them defying teachers and getting disciplined in the schoolyard and running wild in a supermarket—but she resolves to join them. She soon finds that their dancing is inseparable from their sexual curiosity and brazen provocations, which are matched by their ignorance about sex. Angelica, in particular, is a gleeful troublemaker, at times seeming nearly sociopathic, as when she steals her older brother's work shirt, slams another girl's computer to the floor, and assaults another member of the group. As a sort of virtual hazing at school, the Cuties push Amy into the boys' bathroom to video-record a boy's genitals. Her membership in the group involves her self-aware misconduct, transgressions that she undertakes quickly and coldly: stealing a cell phone from a cousin, stealing money from her mother, fighting with another girl, making herself an object of social-media scandal, even several acts of potentially grave violence. For Amy, belonging to the Cuties means more than a new activity or a new set of friends—it means forging for herself a new, self-chosen identity, which she clings to desperately, at great risk and great cost.

Before becoming a filmmaker, Doucouré was in the sciences (she has a degree in biology), and there's something admirably analytical about her cinematic methods. Though "Cuties" is a sharply dramatic film that sticks closely to Amy throughout and observes her actions in detail, Doucouré brings background ideas to the foreground, inviting sociological and abstract considerations alongside the sharp delineation of character. She shows Amy undergoing the

many tribulations of maturing—and, in each of these anecdotally depicted events, extracts from them an element of cultural context. (For instance, when Amy gets her period, Auntie says that, at Amy's age, she was engaged and was married a few years later—a fortune that she wishes on Amy, too.)

The subject of "Cuties" isn't twerking; it's children, especially poor and nonwhite children, who are deprived of the resources—the education, the emotional support, the open family discussion—to put sexualized media and pop culture into perspective. Left on their own—Angelica, for instance, is virtually unsupervised by parents who are working very hard to keep their restaurant afloat—they're unable to find or even to seek the line between liberation and exploitation, between independence and imitation. "Cuties" is about the absence of knowledge and absence of reasonable discourse about sex and sexuality, power and desire, that help young people to avow and confront these drives constructively—or, at least, not too destructively. Lacking those things, Amy latches on to a mode of revolt that is itself a trope of a misogynistic order.

"Cuties" is a film of the center, and it's aesthetically of the center—it depicts the unconsidered without advancing to the realm of the subjective, and it doesn't allow its young protagonists much discourse, outer or inner. It's not a movie of introspection and self-consideration; it's more a story of the rule than of the exception, of what's unduly extraordinary about the effort to live an ordinary life. As such, it's a story of French society at large—its exclusions and the exertions demanded to overcome them. Though many of Amy's actions are dubious, her spirit of revolt is nonetheless sublime and heroic. "Cuties" dramatizes what people of color and immigrants endure as a result of isolation and ghettoization, of not being represented culturally and politically—and of not being represented in French national mythology. Its underlying subject is the connection of personal identity to public identity—and the urgency of transforming the very notion of French identity, of changing the idea of who's considered the representative face of France. That idea is brought to the fore in an extraordinary, brief, symbolic ending; it's enough to give a right-winger a conniption.

 _Richard Brody_ began writing for The New Yorker in 1999. He writes about movies in his blog, _The Front Row_. He is the author of "_Everything Is Cinema: The Working Life of Jean-Luc Godard_."

**More:**      Review      Films      French Cinema      Senegal      Sexuality

# Nolte: Elite Media Defend 'Cuties' While Covering Up Most Salacious Content from Readers

EXHIBIT
2-C

John Nolte   18 Sep 2020



*Netflix*

7:40

The child porn-loving media are doing two underhanded things to defend Netflix's *Cuties:* 1) claim only conspiracy theorists are attacking the movie, and 2) refuse to accurately and completely describe the actual content in *Cuties.*

The conspiracy theory trope, which I addressed this week, is especially dumb and disingenuous. Apparently, the right-wing conspiracy works like this: America's political, media, and Hollywood elites are all kid diddlers.

Now I don't believe that any more than I believe all Catholic priests are kid diddlers. What's more, my mind — what's left of it — is an open book on these here Inter-Web-Dot-Nets, and you won't find me anywhere furthering those conspiracies.

What I do know is that if I were worried about conspiracy theories attacking my elite tribe as a mob of child diddlers, I would maybe not have my elite tribe fire off countless hot takes defending a movie that will serve forevermore as yankity-yank material for every child diddler with access to the Internet.

But if you think about it, that's really all part of the left's plan...

Step 1: Produce indefensible soft-core child porn.

Step 2: Defend indefensible soft-core child porn.

Step 3: Attack TrumpTards opposed to soft-core child porn as conspiracy theorists.

See, we're in a no-win situation. The trap set is so that we either say nothing and burn in Hell for eternity for enabling evil against children, or we're attacked as conspiracy theorists.

Personally, I'd rather be smeared as a conspiracy theorist than defend child porn. But that's just me and my bourgeois value system.

What's so fascinating and revealing about this is how the media are forced to lie in order to defend *Cuties*. A lie of omission is still a lie, and almost all of these oh-so-sophisticated defenses of *Cuties* refuse to inform readers of just what these 11-yeard-old characters do and what the camera does to

them.

Hey, if you're going to defend *Cuties*, you not only have to detail and defend all the wide-open, 11-year-old crotch shots, you haveto  defend the motive for including those shots looooong after the point's been made.

An honest person would say to their readers: here's all the disturbing content; here's how the director exploited a group of 12- and 13-year-old actresses; here are all the sophisticated reasons that make it okay to do that.

But no one's willing to detail the truth because they know if they do, everyone will know they're defending the indefensible.

Oh, sure, some allude to the content — how it's "[daring](#)" and "provocative." But that means nothing.

Let me give you a perfect [example](#) from far-left NBC News:

> It is, annoyingly, important to state plainly that "Cuties" does not portray child abuse, it does not glorify or countenance pedophilia in any way, and it does not "sexualize" its characters[.]
>
> [...]
>
> The backlash to the film has, however, twisted the deliberately provocative choreography these girls perform into a problem[.]

*Does not sexualize....*

*Deliberately provocative choreography...*

That's it... That's all whoever's dumb enough to get their news from NBC is allowed to know about what the little girls do in *Cuties.*

Why not lay out the facts?

I'll tell you why not. Because the facts are this…

On countless occasions, the camera in *Cuties* lingers on 11-year-olds shaking their moneymakers in tighter-than-tight short shorts. On countless occasions, the camera in *Cuties* reveals 11-year-olds in short shorts spreading their legs wide open. On countless occasions, 11-years-olds dry hump the floor, put their fingers in their mouths, and pout while sticking their backsides all the way out in a pair of Daisy Dukes.

Why not inform your readers of that truth and then fire off your bullshit about how *Cuties* "does not sexualize," how all of that only adds up to "deliberately provocative choreography."

You can't.

Which is why these liars won't.

Get a load of the far-left Slate, which attacked little ol' yours truly for reporting the facts:

> [T]he diligence with which Nolte jotted down every purported crotch shot, at least until he "lost count after five," speaks to its own kind of not-entirely-uncreepy obsession.

Sorry to offend. Just figured that if I were going to publicly report and criticize something, I had a responsibility to explain why.

Slate isn't angry because I lied or exaggerated.

Slate is angry because I told the truth.

The far-left *Washington Post*, the same *Washington Post* that handed its religion coverage to an occultist without telling us, has defended *Cuties* more times than I can count. It's like a cottage industry over there.

Here's one *WaPo* description:

> Critics of "Cuties" are zeroing in on images from the trailer and the poster, which show a group of 11-year-olds in blue costumes, shorts, dancing suggestively.

Here's [another](#), the closest I could find to the truth:

> The dance routines become progressively more explicit and the camera filming them is unflinching. One minute-long sequence, set to upbeat music as the girls finalize their routine, includes a series of closeups on the girls' gyrating thighs, butts and stomachs.

Weird how there's no mention of at least a half-dozen open-wide crotch shots.

Here's a [third](#):

> I can see how viewers might be turned off by the way Doucouré shoots the dance routines, using close-ups of her young actors' bodies both to show us their abilities as dancers and to make us deliberately queasy.

Here's the [fourth](#) but by no means last *WaPo* defense afraid to spill the details:

> [D]irector Maïmouna Doucouré focuses her camera on the girls' posteriors a bit too much for my taste as they learn their provocative dance moves.

> That said, however, it requires a willful ignorance of the film itself to claim that these scenes sexualize the girls involved.

Oh yeah, cuz we rubes are totally missing the nuance found in more than a half-dozen wide-open crotch shots.

Here's the far-left *New Yorker,* which doesn't bother to offer readers any details, but there is plenty of this:

> "Cuties" is a film of the center, and it's aesthetically of the center—it depicts the unconsidered without advancing to the realm of the subjective, and it doesn't allow its young protagonists much discourse, outer or inner. It's not a movie of introspection and self-consideration; it's more a story of the rule than of the exception, of what's unduly extraordinary about the effort to live an ordinary life.
>
> […]
>
> Its underlying subject is the connection of personal identity to public identity—and the urgency of transforming the very notion of French identity, of changing the idea of who's considered the representative face of France.

My Pompous Ass Translator needs new batteries, so I have no idea what any of that means.

[RogerEbert.com](RogerEbert.com):

> …watching the younger generation gyrate and twerk, biting their lips or their nail in a suggestive way.

I think you get the point, and my point is this…

If you're going to defend *Cuties*, defend it.

Don't water the truth down. Tell your readers the truth and defend it.

If you want to launch a defense of countless shots of barely-clothed 11-year-olds spreading their legs wide open, I'll hear you out.

But when you hide the truth, when you refuse to acknowledge and directly address the facts and truth, it tells me you can't defend the movie but still are — which makes me wonder why.

*Follow John Nolte on Twitter [@NolteNC](@NolteNC). Follow his Facebook Page [here](here).*



By:  Dale                                                              H.B. No. 1810

A BILL TO BE ENTITLED

1                                  AN ACT

2    relating to the creation of the offense of possession or promotion

3    of obscene visual material depicting a child.

4          BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

5          SECTION 1.   Subchapter B, Chapter 43, Penal Code, is amended

6    by adding Section 43.262 to read as follows:

7          Sec. 43.262.   POSSESSION  OR  PROMOTION  OF  OBSCENE  VISUAL

8    MATERIAL DEPICTING A CHILD.  (a) In this section:

9               (1)   "Promote" and "sexual conduct" have the meanings

10   assigned by Section 43.25.

11              (2)   "Visual  material"  has  the  meaning  assigned  by

12   Section 43.26.

13         (b)   A person commits an offense if the person:

14              (1)   knowingly possesses, accesses with intent to view,

15   or  promotes  obscene  visual  material  that  depicts  the  lewd

16   exhibition of the genitals or pubic area of a child who is younger

17   than 18 years of age at the time the visual material was created,

18   and who is partially clothed or clothed in inappropriate attire,

19   considering the age of the child, and:

20                   (A)   the focal point of the visual material is the

21   child's genitalia or pubic area;

22                   (B)   the setting or pose of the child is sexually

23   suggestive or generally associated with sexual conduct;

24                   (C)   the child is depicted in an unnatural pose;

85R5907 MEW-F                          1

H.B. No. 1810

1        (D)  the visual material suggests sexual coyness

2  or a willingness to engage in sexual conduct; or

3        (E)  the visual material is intended or designed

4  to elicit a sexual response from the viewer; and

5        (2)  knows that the material depicts the child as

6  described by Subdivision (1).

7     (c)  An offense under this section is a state jail felony,

8  except that the offense is:

9        (1)  a felony of the third degree if it is shown on the

10  trial of the offense that the person has been previously convicted

11  one time of an offense under this section or Section 43.26; and

12        (2)  a felony of the second degree if it is shown on the

13  trial of the offense that the person has been previously convicted

14  two or more times of an offense under this section or Section 43.26.

15     (d)  It is not a defense to prosecution under this section

16  that the depicted child consented to the creation of the visual

17  material.

18     SECTION 2.  This Act takes effect September 1, 2017.

Case 9:22-cv-00031-MJT   Document 1-4   Filed 03/03/22   Page 76 of 99 PageID #:  108

Texas Bill Analysis, H.B. 1810, 6/29/2017, Texas Bill Analysis, H.B. 1810, 6/29/2017...

TX B. An., H.B. 1810, 6/29/2017



Image 1 within document in PDF format.

Texas Bill Analysis, 2017 Regular Session, House Bill 1810

June 29, 2017
Texas Senate Research Center
85th Legislature, 2017 Regular Session

Senate Research Center

H.B. 1810

By: Dale et al. (Buckingham)

Criminal Justice

6/29/2017

Enrolled

## AUTHOR'S / SPONSOR'S STATEMENT OF INTENT

Interested parties contend that there is currently no disincentive for some criminals to possess or promote certain images portraying children depicted in a sexually suggestive manner.

Current state law does not contain statutes that criminalize the possession or promotion of child erotica images. Child erotica images portray an unclothed, partially clothed, or clothed child depicted in a sexually explicit manner indicating the child has a willingness to engage in sexual activity. Investigations of child pornography cases have revealed many child pornography collections also include child erotica images. In some cases, only child erotica images are discovered. In such instances, state charges cannot be pursued.

H.B. 1810 addresses this issue by creating the offense of possession or promotion of lewd visual material depicting a child. An offense under this bill is a state jail felony; a state jail felony of the third degree if a person has been convicted of this crime once before; and a state jail felony of the second degree if the person has been convicted of this crime more than two times. (Original Author's / Sponsor's Statement of Intent)

H.B. 1810 amends current law relating to the creation of the offense of possession or promotion of lewd visual material depicting a child.

## RULEMAKING AUTHORITY

This bill does not expressly grant any additional rulemaking authority to a state officer, institution, or agency.

## SECTION BY SECTION ANALYSIS

SECTION 1. Amends Subchapter B, Chapter 43, Penal Code, by adding Section 43.262, as follows:

Sec. 43.262. POSSESSION OR PROMOTION OF LEWD VISUAL MATERIAL DEPICTING CHILD. (a) Defines "promote," "sexual conduct," and "visual material."

(b) Provides that a person commits an offense if the person knowingly possesses, accesses with intent to view, or promotes visual material that:

Case 9:22-cv-00031-MJT   Document 1-4   Filed 03/03/22   Page 77 of 99 PageID #:  109

Texas Bill Analysis, H.B. 1810, 6/29/2017, Texas Bill Analysis, H.B. 1810, 6/29/2017...

(1) depicts the lewd exhibition of the genitals or pubic area of an unclothed, partially clothed, or clothed child who is younger than 18 years of age at the time the visual material was created;

(2) appeals to the prurient interest in sex; and

(3) has no serious literary, artistic, political, or scientific value.

(c) Provides that an offense under this section is a state jail felony, except that the offense is a felony of the third degree if it is shown on the trial of the offense that the person has been previously convicted one time of an offense under this section or Section 43.26 (Possession or Promotion of Child Pornography) and a felony of the second degree if it is shown on the trial of the offense that the person has been previously convicted two or more times of an offense under this section or Section 43.26.

(d) Provides that it is not a defense to prosecution under this section that the depicted child consented to the creation of the visual material.

SECTION 2. Effective date: September 1, 2017.

TX B. An., H.B. 1810, 6/29/2017

---

**End of Document**                                                                          © 2020 Thomson Reuters. No claim to original U.S. Government Works.

EXHIBIT
**3-C**

By:  Dale, Moody, Fallon                                      H.B. No. 1810

A BILL TO BE ENTITLED

1                                    AN ACT

2     relating to the creation of the offense of possession or promotion

3     of lewd visual material depicting a child.

4          BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

5          SECTION 1.  Subchapter B, Chapter 43, Penal Code, is amended

6     by adding Section 43.262 to read as follows:

7          Sec. 43.262.  POSSESSION   OR   PROMOTION   OF   LEWD   VISUAL

8     MATERIAL DEPICTING CHILD.  (a) In this section:

9               (1)  "Promote" and "sexual conduct" have the meanings

10    assigned by Section 43.25.

11              (2)  "Visual  material"  has  the  meaning  assigned  by

12    Section 43.26.

13         (b)  A person  commits  an  offense  if  the  person  knowingly

14    possesses,  accesses  with  intent  to  view,  or  promotes  visual

15    material that:

16              (1)  depicts  the  lewd  exhibition  of  the  genitals  or

17    pubic area of an unclothed, partially clothed, or clothed child who

18    is younger than 18 years of age at the time the visual material was

19    created;

20              (2)  appeals to the prurient interest in sex; and

21              (3)  has  no  serious  literary,  artistic,  political,  or

22    scientific value.

23         (c)  An offense  under  this  section  is  a  state  jail  felony,

24    except that the offense is:

H.B. No. 1810

1          (1)  a felony of the third degree if it is shown on the

2  trial of the offense that the person has been previously convicted

3  one time of an offense under this section or Section 43.26; and

4          (2)  a felony of the second degree if it is shown on the

5  trial of the offense that the person has been previously convicted

6  two or more times of an offense under this section or Section 43.26.

7      (d)  It is not a defense to prosecution under this section

8  that the depicted child consented to the creation of the visual

9  material.

10      SECTION 2.  This Act takes effect September 1, 2017.

2



**EXHIBIT
4**

TEXAS DISTRICT & COUNTY ATTORNEYS ASSOCIATION

T D C A A

## 2017 2019

# TEXAS PENAL CODE

*ANNOTATED*

E-BOOK EDITION



DIANE BURCH BECKHAM

TEXAS PENAL CODE 2017–2019 EBOOK



TEXAS DISTRICT & COUNTY ATTORNEYS ASSOCIATION

Texas Penal Code

Annotated

2017 | 2019
E-Book Edition

by

DIANE BURCH BECKHAM
Senior Staff Counsel
TDCAA

Legislative Notes by Shannon Edmonds,

Texas District & County
Attorneys Association

The Texas District & County Attorneys Association
provides training and technical assistance to more than
5,800 state prosecutors and their staff members through
regular training seminars and conferences. It hosts the
largest annual gathering of prosecutors in the nation,
provides technical assistance to the law enforcement
community, and serves as a legislative resource in
criminal law matters.

The Texas District & County Attorneys Association is
committed to service and invites input from its members
regarding better ways to serve the offices it represents
and the people of the State of Texas.

Copyright © 2017
Texas District & County
Attorneys Association

ISBN Number: 978-1-934973-45-5

All rights reserved.
No part of this work may be reproduced
or copied in any form or by any means—
graphic, electronic or mechanical,
including photocopying, recording, taping, or information
and retrieval systems—
without prior written permission
of the publisher.

**Caveat**
This book is intended to be a guide and is intended to provide
accurate and current information about criminal law. It is, however,

TEXAS PENAL CODE 2017–2019 EBOOK

sold with the intention that TDCAA is not engaged in rendering legal or other professional advice. Each reader must be responsible for his or her own legal research. Because lawyers must be responsible for their own research and because the law is constantly changing, Diane Beckham, TDCAA and its employees do not warrant, either expressly or impliedly, that the information in this volume has not been subject to change, amendment, reversal, or revision. Additionally, this guidebook is not a definitive collection of field operations directives; therefore, a peace officer confronted with a question of law should consult his/her available counsel (whether the city attorney, police advisor, or the local district or county attorney's office). Officers must abide by policies and procedures of their own departments, notwithstanding advice that may appear in the book to run counter to those policies or procedures. This book is not maintained, produced, or distributed at state expense.

⋯

(2) possessed the visual material only after receiving the material from another minor; and

(3) destroyed the visual material within a reasonable amount of time after receiving the material from another minor.

(g) If conduct that constitutes an offense under this section also constitutes an offense under another law, the defendant may be prosecuted under this section, the other law, or both.

(h) Notwithstanding Section 51.13, Family Code, a finding that a person has engaged in conduct in violation of this section is considered a conviction for the purposes of Subsections (c) and (d).

### In Pari Materia Clauses

See a note about provisions like §43.261(g) under §20.05.

### Sec. 43.262. Possession or Promotion of Lewd Visual Material Depicting Child

(a) In this section:

(1) "Promote" and "sexual conduct" have the meanings assigned by Section 43.25.

(2) "Visual material" has the meaning assigned by Section 43.26.

(b) A person commits an offense if the person knowingly possesses, accesses with intent to view, or promotes visual material that:

(1) depicts the lewd exhibition of the genitals or pubic area of an unclothed, partially clothed, or clothed child who is younger than 18 years of age at the time the visual material was created;

(2) appeals to the prurient interest in sex; and

(3) has no serious literary, artistic, political, or scientific value.

(c) An offense under this section is a state jail felony, except that the offense is:

(1) a felony of the third degree if it is shown on the trial of the offense that the person has been previously convicted one time of an offense under this section or Section 43.26; and

(2) a felony of the second degree if it is shown on the trial of the offense that the person has been previously convicted two or more times of an offense under this section or Section 43.26.

(d) It is not a defense to prosecution under this section that the depicted child consented to the creation of the visual material.

Enacted effective Sept. 1, 2017 (HB 1810, §1).

• 2017 LEGISLATIVE NOTE

HB 1810 creates this offense to criminalize the possession, access, or promotion of what some might call "almost kiddie porn"—erotica or other sexually suggestive images of children that don't rise to the level of full-blown child pornography under §43.26 because the depicted children are not actually engaging in sexual conduct. Although this new offense may be a well-intentioned attempt to authorize the prosecution of what some may think of as perverts-in-training before they graduate to possessing full-blown child pornography (or who are smart enough not to get caught with the real thing), there are two reasons to proceed with caution here.

First, the elements of this new crime fail to track the same three elements of §43.21 that have passed muster under Miller v. California, 413 U.S. 15 (1973), which remains the measuring stick for most First Amendment analyses of these kinds of images. While similar to the Miller test, this offense appears to replace the "patently offensive" prong with a lower standard applicable to even merely "lewd" images of a clothed 17-year old—who, by the way, would meet the legal age of consent to have sex in Texas. That seems fraught with constitutional problems, doesn't it?

Second, this new felony could apply to many sexting images exchanged between consenting teens. Under §43.261, those sexting offenses are generally a Class C misdemeanor, but now it may be a state jail felony because §43.261(g) specifically allows overlapping conduct to be prosecuted under statutes like this one. Furthermore, this new, more serious crime has none of the defenses found

in the sexting offense for teen dating, spousal relationships, and the like. Thus, if this new law is constitutional, it may be most applicable to sexting crimes that the Legislature previously deemed more suitably prosecuted as a fine-only offense—but nothing appears to prevent the use of this new tool in those cases.

### Sec. 43.27. Duty to Report

(a) For purposes of this section, "visual material" has the meaning assigned by Section 43.26.

(b) A business that develops or processes visual material and determines that the material may be evidence of a criminal offense under this subchapter shall report the existence of the visual material to a local law enforcement agency.

# TITLE 10. OFFENSES AGAINST PUBLIC HEALTH, SAFETY, AND MORALS

## CHAPTER 46. WEAPONS

### Sec. 46.01. Definitions

In this chapter:

(1) "Club" means an instrument that is specially designed, made, or adapted for the purpose of inflicting serious bodily injury or death by striking a person with the instrument, and includes but is not limited to the following:

(A) blackjack;

(B) nightstick;

(C) mace;

(D) tomahawk.

(2) "Explosive weapon" means any explosive or incendiary bomb, grenade, rocket, or mine, that is designed, made, or adapted for the purpose of inflicting serious bodily injury, death, or substantial property damage, or for the principal purpose of causing

EXHIBIT
**5**

2021 WL 4953918

Only the Westlaw citation is currently available.

NOTICE: THIS OPINION HAS NOT BEEN
RELEASED FOR PUBLICATION IN THE
PERMANENT LAW REPORTS. UNTIL RELEASED,
IT IS SUBJECT TO REVISION OR WITHDRAWAL.

Court of Appeals of Texas, Houston (1st Dist.).

EX PARTE MICHAEL LOWRY, Appellant

NO. 01-20-00858-CR, NO. 01-20-00859-CR
|
Opinion issued October 26, 2021

**On Appeal from the 230th District Court**

**Harris County, Texas**

**Trial Court Case No. 1623191 & 1685846**

Panel consists of Chief Justice Radack and Justices Landau
and Countiss.

## OPINION

Sherry Radack Chief Justice

**\*1**  Appellant, Michael Lowry, challenges the trial court's
order denying his pretrial writ of habeas corpus application.[1]

In two issues on appeal, appellant argues that section
43.262 of the Texas Penal Code is facially unconstitutional,
overbroad, and void for vagueness.

We reverse and remand.

## Background

Based on investigations by the Montgomery County District
Attorney's Internet Crimes against Children Task Force,
the Department of Homeland Security, and the Texas
Department of Public Safety, law enforcement discovered
child pornography and child erotica on appellant's phone.[2]
On March 1, 2019, the State charged appellant with
possession of child pornography.[3]  Later, on July 11, 2019,

the State charged appellant in trial court cause number
1623191 with possession of lewd visual material of a child.[4]

Appellant filed an application for a pretrial writ of habeas
corpus, arguing that section 43.262 is unconstitutional on
its face[5] and violates the First and Fourteenth Amendments
to the U.S. Constitution because it "(1) regulates a substantial
amount of protected speech (speech which is neither obscene
nor child pornography), and (2) is unconstitutionally vague."
Appellant further argued,

> Fatal to § 43.262 is the fact that
> it outlaws speech which is neither
> child pornography nor obscene. For
> example, the law makes criminals of
> most Instagram 'social influencers'
> under the age of 18, who in
> reality do nothing more than post
> provocative, but clothed, pictures of
> themselves online for their millions
> of followers. Their promoters, from
> anyone establishing platforms for
> these images, to people who possess
> or even access these images are also
> guilty under § 43.262. And that
> is just one of many examples of the
> overly-broad sweep.

Appellant noted that section 43.262 would "punish, as a
state jail felony" numerous Instagram "social influencers" and
that that he could not visit the listed Instagram accounts for
fear of "possibly committing a felony." Appellant broadly
stated that "[t]he law potentially ... outlaws ... almost every
teenage Instagram user in the United States in spite of the fact
that the children ... are in no way being harmed by posting
their pictures on Instagram."

Appellant asserted that section 43.262's regulation of
"visual material" is a content-based regulation. Although
appellant acknowledged that obscenity is unprotected by
the First Amendment, he asserted that the "obscenity
carve out should not apply to ... § 43.262 because it
outlaws non-pornographic images." Appellant maintained
that the "Texas legislature included the first and third

limitations in § 43.262(b)(2)-(3), but *completely omitted* the second limitation that 'the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law.' " Appellant noted that the statute's omission conflicts with the supreme court's requirement that prohibited obscene speech be patently offensive. Appellant continued, "By omitting the 'patently offensive' requirement from [section] 43.262, the statute specifically permits prosecution for materials which certainly cannot be considered 'hard core sexual conduct.' "

**\*2**  To bolster his argument that the statute cannot be upheld, appellant asserted that the statute does not include a scienter requirement and that the State could not show that the law employed the least restrictive means to achieve its goals. Finally, appellant argued that section 43.262 is void for vagueness "because a person of ordinary intelligence is not on notice of what, exactly, subjects them to punishment."

On November 10, 2020, appellant filed a "Notice of Additional Evidence" to support his pretrial habeas application. Appellant asked the trial court to take judicial notice of a pending suit in Tyler County, Texas, in which a grand jury indicted Netflix for the promotion of lewd visual material depicting children [6] and that the prosecution of Netflix showed that section 43.262 is overbroad and unconstitutionally vague because "it overly chills protected speech and does not provide ordinary citizens fair notice of what the statute proscribes."

The State responded to appellant's application for writ of habeas corpus, [7] arguing that "Section 43.26 satisfies the State's compelling interest in protecting *all* children from sexual exploitation and the long-lasting harm that results from their depiction in child pornography."

During a Zoom hearing on the writ, appellant argued that section 43.262 regulates protected speech, it did not regulate obscenity because it lacked the patently offensive prong, and the section did not apply to regulate child pornography. Appellant contended that because the statute regulates protected speech and is a content-based restriction, strict scrutiny would apply. Appellant argued that the State had the burden to meet strict scrutiny and that it had failed to show that the statute was the least restrictive means to regulate speech. In arguing that the statute was not narrowly tailored, appellant pointed out that the introductory version

of the statute applied to obscenity and contained a scienter requirement, but that upon the law's enactment, the obscenity and scienter requirements were removed. As an example of the overbroad reach of the statute, appellant informed the trial court of the prosecution of Netflix for showing a film "designed to actually protect children and to protest the oversexualization of children in our society." Appellant also argued that the statute was void for vagueness and that the statute overly chilled speech and "leaves too many people open to prosecution." By way of example, appellant argued that "anybody in Texas who watched that Cuties movie, would be open to prosecution including the DA of the county who brought the charges who admits he's watched that movie."

The State responded that section 43.262 was an additional child pornography prohibition statute that "works to prevent the sexual abuse or exploitation of children, which is a compelling interest and permits the State to have more leeway in drafting child porn statutes in order to protect children." The State further argued that the "statute's scope is limited to the depictions involving child sexual exploitation and/or abuse and a legitimate application under the First Amendment." In responding to appellant's vagueness argument, the State explained that perfect clarity is not required and that the "statute language is clear enough and sufficient to put anyone on notice on what is prohibited." Finally, the State argued that the statute is not overbroad and "is not protected by the First Amendment because this is obscene material."

**\*3**  Appellant responded by agreeing that "there's a compelling interest in protecting children" but "the problem is that this law is not narrowly drawn" and "it's not the least restrictive way to protect children." [8]

The trial court found that section 43.262 was a content-based regulation of speech requiring strict scrutiny review. The trial court noted that the State has a compelling interest in the protection of minors from sexual exploitation and believed that, even though the statute did not specifically state that it applied to patently offensive conduct, the language used in the statute—imagery of the genitalia or pubic area, whether clothed, unclothed or partially clothed—lays out patently offensive conduct. The trial court also noted that the public debate seems to be on whether the imagery "lacks serious literary, artistic or scientific value." The court also found that, taking the statute as a whole, the statute had a

scienter requirement in subsection B that applied to the rest of the statutory text under B. Because the trial court found that the statute was narrowly construed and necessary to serve a compelling interest, the trial court denied the requested habeas relief. [9]

Appellant appealed "from the order denying the pre-trial writ of habeas corpus in cause number 1685846 challenging the constitutionality of the charge pending in cause number 1623191."

### Constitutionality of Section 43.262

#### A. Standard of Review

"[P]retrial habeas, followed by an interlocutory appeal, is an 'extraordinary remedy,' and 'appellate courts have been careful to ensure that a pretrial writ is not misused to secure pretrial appellate review of matters that in actual fact should not be put before appellate courts at the pretrial stage.' "

*Ex parte Ellis*, 309 S.W.3d 71, 79 (Tex. Crim. App. 2010) (quoting *Ex parte Doster*, 303 S.W.3d 720, 724 (Tex. Crim. App. 2010)). "Pretrial habeas can be used to bring a facial challenge to the constitutionality of the statute that defines the offense but may not be used to advance an 'as applied' challenge." *Id.*

"Whether a statute is facially constitutional is a question of law that we review de novo." *Ex parte Lo*, 424 S.W.3d 10, 14 (Tex. Crim. App. 2013). When the constitutionality of a statute is attacked, we usually begin with the presumption that the statute is valid and that the legislature has not acted unreasonably or arbitrarily. *Id.* at 15. The burden normally rests upon the person challenging the statute to establish its unconstitutionality. *Id.* However, when the government seeks to restrict and punish speech based on its content, the usual presumption of constitutionality is reversed. *Id.* "Content-based regulations (those laws that distinguish favored from disfavored speech based on the ideas expressed) are presumptively invalid, and the government bears the burden to rebut that presumption." *Id.* (citing *Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656, 660 (2004)). We apply strict scrutiny to regulations that suppress, disadvantage, or impose differential burdens upon speech because of its content, and such regulations may be upheld only if it is necessary to serve a compelling state interest and

employs the least speech-restrictive means to achieve its goal. *Ex parte Flores*, 483 S.W.3d 632, 639 (Tex. App.—Houston [14th Dist.] 2015, pet. ref'd) (citing *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 642 (1994) and *Lo*, 424 S.W.3d at 15).

**\*4** "Other types of regulations receive intermediate scrutiny, including content-neutral regulations of the time, place, and manner of speech, as well as regulations of speech that can be justified without reference to its content." *Id.* (citing *Turner Broad. Sys.*, 512 U.S. at 642 and *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). "These regulations are permissible if they promote a significant governmental interest and do not burden substantially more speech than necessary to further that interest." *Id.* (citing *McCullen v. Coakley*, 573 U.S. 464 (2014) and *Ex parte Thompson*, 442 S.W.3d 325, 344 (Tex. Crim. App. 2014)).

As part of the constitutional analysis, we must first construe section 43.262 to determine what type of content it covers. *See Thompson*, 442 S.W.3d at 334; *Martinez v. State*, 323 S.W.3d 493, 504–05 (Tex. Crim. App. 2010); *see also Wagner v. State*, 539 S.W.3d 298, 306 (Tex. Crim. App. 2018) ("The first step in overbreadth analysis is to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers.") (citing *United States v. Williams*, 553 U.S. 285, 293 (2008)).

To determine the meaning of the statute, we apply rules of statutory construction to the statutory text. *Wagner*, 539 S.W.3d at 306. We interpret the statute "in accordance with the plain meaning of its language unless the language is ambiguous or the plain meaning leads to absurd results that the Legislature could not possibly have intended." *Id.* (citing *Sanchez v. State*, 995 S.W.2d 677, 683 (Tex. Crim. App. 1999)). We must read words and phrases in context and construe them according to the rules of grammar and usage. *Id.*; *see* TEX. GOV'T CODE § 311.011(a) ("Words and phrases shall be read in context and construed according to the rules of grammar and common usage."). "We presume that every word has been used for a purpose and that each word, phrase, clause, and sentence should be given effect if reasonably possible." *Wagner*, 539 S.W.3d at 306; *Arteaga v. State*, 521 S.W.3d 329, 334 (Tex. Crim. App. 2017). "If the

language of the statute is plain, we will effectuate that plain language without resort to extra-textual sources." *Wagner,* 539 S.W.3d at 306; *Cary v. State,* 507 S.W.3d 750, 756 (Tex. Crim. App. 2016).

We look beyond the statute's text and context to discern its meaning only if the text does not bear a plain contextual meaning or if the text's unambiguous meaning would lead to " 'absurd consequences that the legislature could not possibly have intended.' " *Timmins v. State,* 601 S.W.3d 345, 348 (Tex. Crim. App. 2020) (quoting ▨ *Boykin v. State,* 818 S.W.2d 782, 785 (Tex. Crim. App. 1991)). In those events, a court may consider extra-textual factors like (1) the object sought to be attained by the Legislature; (2) the circumstances under which the statute was enacted; (3) the legislative history; (4) the common law or former statutory provisions, including laws on the same or similar subjects; (5) the consequences of a particular construction; (6) the administrative construction of the statute; and (7) the title or caption, preamble, and any emergency provision. ▨ TEX. GOV'T CODE § 311.023; ⚑ *Arteaga,* 521 S.W.3d at 334. When construing a statute in the face of a First Amendment challenge, courts have a duty to employ a reasonable, narrowing construction of a statute to avoid a constitutional violation if the statute at issue is readily susceptible to one. ▨ *Ex parte Perry,* 483 S.W.3d 884, 903 (Tex. Crim. App. 2016). Statutory construction is a question of law that we review de novo. *Ramos v. State,* 303 S.W.3d 302, 306 (Tex. Crim. App. 2009).

**B. Construction of** ▨ **Penal Code Section 43.262**

 **\*5**  Enacted by the Texas Legislature in 2017, ▨ section 43.262, titled "Possession or Promotion of Lewd Visual Material Depicting Child," provides:

(a) In this section:

   (1) 'Promote' and 'sexual conduct' [10] have the meanings assigned by Section 43.25.

   (2) 'Visual material' has the meaning assigned by ▨ Section 43.26.

(b) A person commits an offense if the person knowingly possesses, accesses with intent to view, or promotes visual material that:

   (1) depicts the lewd exhibition of the genitals or pubic area of an unclothed, partially clothed, or clothed child who is younger than 18 years of age at the time the visual material was created;

   (2) appeals to the prurient interest in sex; and

   (3) has no serious literary, artistic, political, or scientific value.

...

(d) It is not a defense to prosecution under this section that the depicted child consented to the creation of the visual material.

▨ TEX. PENAL CODE § 43.262(a)(b), ▨ (d).

Visual material "means any film, photograph, videotape, negative, or slide or any photographic reproduction that contains or incorporates in any manner any film, photograph, videotape, negative, or slide; or any disk, diskette, or other physical medium that allows an image to be displayed on a computer or other video screen and any image transmitted to a computer or other video screen by telephone line, cable, satellite transmission, or other method. *Id.* ▨ § 43.26(b)(3). "A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist." *Id.* § 6.03(b).

Here, the State charged appellant with "knowingly possess[ing] visual material, namely, a photograph, that depicts the lewd exhibition of the pubic area of a clothed child who is younger than 18 years of age at the time the visual material was created, to wit: the visual material appeals to the prurient interest in sex, and the visual material has no serious literary, artistic, or scientific value." Thus, we confine our analysis to the portion of ▨ section 43.262 that prohibits a person from knowingly possessing visual material that depicts the "lewd exhibition of the ... pubic area of a[ ] ... clothed child, who is younger than 18 years of age at the time the visual material was created," that appeals to the prurient interest in sex, and has no serious literary, artistic, political, or scientific value. *See United States v. Grace,* 461 U.S. 171, 175 (1983) (limiting review of statute's constitutionality under First Amendment to part of statute under which defendants were charged).

## C. Does the First Amendment Apply to 📑 Section 43.26?

**\*6** The First Amendment provides "Congress shall make no law … abridging the freedom of speech." U.S. CONST. amend. I. The First Amendment right to freedom of speech applies to the states by virtue of the Fourteenth Amendment. 📑 *Board of Educ. v. Barnette*, 319 U.S. 624, 638–39 (1943). "[A]s a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." 📑 *United States v. Stevens*, 559 U.S. 460, 468 (2010) (quoting 📑 *Ashcroft v. Am. Civil Liberties Union*, 535 U.S. 564, 573, (2002)). However, there are some "well-defined and narrowly limited classes of speech" that have been recognized as falling outside the protection of the First Amendment. *Stevens*, 559 U.S. at 468–72. These include child pornography, obscenity, defamation, fighting words, incitement, true threats of violence, fraud, and speech integral to criminal conduct. *See id.* Speech not within one of these narrowly defined categories is protected under the First Amendment, even if a legislature "concludes certain speech is too harmful to be tolerated." 📑 *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 791 (2011).

The State argues that the speech or conduct prohibited by 📑 section 43.262 does not fall within First Amendment protection. Instead, the State contends that 📑 section 43.262 prohibits obscenity and child pornography, [11] both of which are unprotected by the First Amendment. *See* *Stevens*, 559 U.S. at 468–72.

Generally, both the creation and dissemination of visual images are protected expression under the First Amendment. *See* 📑 *Brown*, 564 U.S. at 799–802 (holding law that imposed civil fines for the sale or rental of violent video games to minors impermissibly restricted protected speech); 📑 *Stevens*, 559 U.S. at 468–82 (holding statute criminalizing the knowing creation, selling, or possession of certain depictions of animal cruelty with intent to place it in commerce for commercial gain punished protected speech); 📑 *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 244–58 (2002) (holding statutory prohibition on possessing or distributing "virtual child pornography," non-obscene sexually explicit images that appear to depict minors but which were produced using youthful adults or computer imaging technology, violated First Amendment); 📑 *Thompson*, 442 S.W.3d at 336–37 (holding that photographs and visual recordings, as well as purposeful creation of them, are inherently expressive and are protected by First Amendment).

Although 📑 section 43.262 is located in Chapter 43 titled "Public Indecency" and specifically under subchapter B, titled "Obscenity," we observe that 📑 section 43.262 does not prohibit obscenity. In *Miller v. California*, the supreme court defined obscenity as "(a) whether the average person, applying contemporary community standards would find that the work, taken as a whole, appeals to the prurient interest; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (a) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value. 📑 413 U.S. 15, 24 (1973) (internal quotation marks and citations omitted). In accordance with *Miller*, 🚩 section 43.21 of the Texas Penal Code defines obscene as material that the average person, applying contemporary standards, would find that taken as a whole appeals to the prurient interest in sex; taken as a whole, lacks serious literary, artistic, political, and scientific value, and depicts or describes (i) patently offensive representations or descriptions of ultimate sexual acts or (ii) patently offensive representations or descriptions of "lewd exhibition of the genitals." *See* 🚩 TEX. PENAL CODE § 43.21(1).

**\*7** While it contains elements one and three of *Miller's* obscenity definition, 📑 section 43.262 omits element two —patently offensive conduct. *See* 📑 *Miller*, 413 U.S. at 24; *see also* 📑 *Free Speech Coalition*, 535 U.S. at 249 (stating that Child Pornography Prevention Act of 1996 ("CPPA") cannot be read to prohibit obscenity because it lacks required link between prohibitions and affront to community standards prohibited by definition of obscenity).

Our conclusion that 📑 section 43.262 does not prohibit obscenity is also supported by the legislature's separate statutes that already prohibit obscenity. *See* TEX. PENAL CODE §§ 43.22 (prohibiting person from displaying or distributing obscene photograph), 43.23 (prohibiting person

from possessing with intent to wholesale promote any obscene material), 43.21(a) (defining obscene, *inter alia*, to depict or describe patently offensive representations or depictions); *see also* 🔖 *Free Speech Coalition*, 535 U.S. at 240 (noting that CPPA not directed at obscene speech because Congress proscribed those materials in separate statute). Had the legislature wanted to prohibit obscene visual material depicting children, the legislature knew how to accomplish that purpose. *See* 🔖 TEX. PENAL CODE § 43.24 (in statute for "Sale, Distribution, or Display of Harmful Material to Minor," defining harmful material when dominant theme appeals to prurient interest of minor, in sex, nudity, or excretion, is patently offensive, and is utterly without redeeming social value for minors).

We next determine whether the relevant language in 🔖 section 43.262 criminalizes child pornography. [12] 🔖 Section 43.262 does not state anywhere within the text that it prohibits child pornography. *Compare* 🔖 TEX. PENAL CODE § 43.262 (prohibiting possession of visual material depicting lewd exhibition of pubic area of child), *with* 🔖 TEX. PENAL CODE § 43.26 (prohibiting possession of child pornography). Instead, 🔖 section 43.262 prohibits a person from possessing visual material that depicts the lewd exhibition of the pubic area of a clothed child, that appeals to the prurient interest in sex and has no serious literary, artistic, politically, or scientific value. *See* 🔖 TEX. PENAL CODE § 43.262.

Because the statutory text does not indicate whether 🔖 section 43.262 applies to child pornography, we turn to the legislative history. House bill 1810's statement of intent provides, "Interested parties contend there is currently no disincentive for some criminals to possess or promote certain images portraying children depicted in a sexually suggestive manner." *See* SENATE RESEARCH CTR., *Bill Analysis*, Tex. H.B. 1810, 85th Leg., R.S. (2017). The statement of intent further provides,

Current state law does not contain statutes that criminalize the possession or promotion of child erotica images. Child erotica images portray an unclothed, partially[ ] clothed, or

clothed child depicted in a sexually explicit manner indicating the child has a willingness to engage in sexual activity. Investigations of child pornography cases have revealed many child pornography collections also include child erotica images. In some cases, only child erotica images are discovered. In such instances, state charges cannot be pursued.

*Id.*

As explained by the legislative history, the visual material prohibited in 🔖 section 43.262 does not fall within the current definition of sexual conduct for purposes of child pornography as found in 🔖 section 43.26. Absent from the legislative history above is any reference that the visual material constitutes child pornography. The statutory text of 🔖 section 43.262 prohibits a (1) a person; (2) from knowingly possessing; (3) visual material; (4) that depicts the lewd exhibition; (5) of the pubic area (6) of a clothed child; (7) which appeals to the prurient interest in sex; and (7) has no serious literary, artistic, political, or scientific value. *See* 🔖 TEX. PENAL CODE § 43.262. Whereas, 🔖 section 43.26 prohibits (1) a person; (2) from knowingly or intentionally possessing; (3) visual material that; (4) visually depicts a child younger than 18 years of age; (5) who is engaging in sexual conduct. For purposes of 🔖 section 43.26, sexual conduct is defined as "sexual contact, actual or simulated sexual intercourse, deviate sexual intercourse, sexual bestiality, masturbation, sado-masochistic abuse, or lewd exhibition of the genitals, the anus, or any portion of the female breast below the top of the areola." 🔖 TEX. PENAL CODE § 43.25(a)(2). Notably, the definition of sexual conduct in 🔖 section 43.25, as applied to child pornography in 🔖 section 43.26, does not include the "lewd exhibition of the pubic area of a clothed child."

**\*8** Before the passage of 🔖 section 43.262, Texas laws did not criminalize the possession of visual material depicting the lewd exhibition of the pubic area of a child, commonly referred to as child erotica images. *See* 🔖 *Wise v. State*, 364 S.W.3d 900, 907 n.6 (Tex. Crim. App. 2012) (noting that

state's expert defined child erotica as "a picture of a child either partially clothed or nude" that is not illegal); *Bolles v. State*, No. 07-08-0304-CR, 2010 WL 539684, at *2 (Tex. App.—Amarillo Feb. 16, 2010, pet. ref'd) (mem. op., not designated for publication) (noting that computer generated pictures depicting children in various sexual acts was termed "child erotica" and "child anime"); SENATE RESEARCH CTR., *Bill Analysis*, Tex. H.B. 1810, 85th Leg., R.S. (2017) (stating that charges for child erotica images could not be pursued). The legislative history, caselaw, and statutes demonstrate that the visual material—child erotica images —prohibited by 📒 section 43.262 is distinct from child pornography and that the legislature sought to create a new statute to prohibit child erotica—visual material depicting the lewd exhibition of the pubic area of a clothed child. Because 📒 section 43.262 prohibits visual material that is distinct from the sexual conduct defined in 📒 section 43.25 and prohibited in 📒 section 43.26, and the legislative history indicates that the legislature wanted to prohibit child erotica, which was previously not illegal, we conclude that the visual material prohibited in 📒 section 43.262 is not child pornography and is therefore subject to First Amendment protection.

Were we to agree with the State that 📒 section 43.262 regulates child pornography, we would thus have to ignore the specific legislative history indicating that the present statute attempts to prohibit material that did not otherwise fall within existing statutes, i.e. 📒 section 43.26 prohibiting possession of child pornography. Furthermore, the State has not provided any authority that 📒 section 43.262 prohibits child pornography or obscenity. [13]

In sum, the legislature created a new statute to prohibit the knowing possession of visual material depicting the lewd exhibition of the pubic area of a clothed child that is neither obscene nor child pornography. Because the visual material prohibited by 📒 section 43.262 includes visual material that may be lewd but not within *Miller's* definition of obscenity or considered child pornography, we therefore conclude that 📒 section 43.262 attempts to regulate visual material that is inherently expressive and that is protected by the First Amendment. *See* 📒 *Thompson*, 442 S.W.3d at 336–37 (holding that photographs and visual recordings, as well as

purposeful creation of them, are inherently expressive and are protected by First Amendment); *see also* 📒 *Free Speech Coalition*, 535 U.S. at 251 (noting that *Ferber* "reaffirmed that where the speech is neither obscene nor the product of sexual abuse, it does not fall outside the protection of the First Amendment"); 📒 *Kaplan v. California*, 413 U.S. 115, 119–20 (1973) ("As with pictures, films, paintings, drawings, and engravings, both oral utterance and the printed word have First Amendment protection until they collide with the long-settled position of this Court that obscenity is not protected by the Constitution."); 📒 *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213–14 (1975) (stating that "[s]peech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them").

### D. Is the Statute Content Based?

**\*9** Because 📒 section 43.262 regulates expressive content protected by the First Amendment, we must next determine whether the statutory restrictions are content based or content neutral. A law is content-based if it "targets speech based on its communicative content." 📒 *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015). "If it is necessary to look at the content of the speech in question to decide if the speaker violated the law, the regulation is content-based." ⚠️ *Lo*, 424 S.W.3d at 15 n.12. Laws that confer benefits or impose burdens on speech without reference to the ideas or views expressed are content neutral. *See* 📒 *Turner Broad. Sys.*, 512 U.S. at 642.

Here, the statute in question prohibits a person from knowingly possessing visual material that depicts the lewd exhibition of the pubic area of a clothed child that appeals to the prurient interest in sex and has no serious literary, artistic, political, or scientific value. *See* 📒 TEX. PENAL CODE § 43.262(b). It is the sexually-related nature and subject matter of the visual material sought to be proscribed that renders the statute content based. *See* 📒 *Thompson*, 442 S.W.3d at 348 (former subsection (b)(1) sought to prevent sexual content); *see also* ⚠️ *Lo*, 424 S.W.3d at 22–24 (discussing First Amendment protection of indecent sexual expression) (citing 📒 *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 874 (1997)). The statute neither applies to visual

material that depicts only a person's arm, foot, neck or face, nor does it apply if the visual material does not appeal to the prurient interest in sex or has serious literary, artistic, political, or scientific value. *Ex parte Metzger*, 610 S.W.3d 86, 96 (Tex. App.—San Antonio 2020, pet. ref'd). By limiting the statute's prohibition to visual material depicting the lewd exhibition of the pubic area of a clothed child, appealing to the prurient interest in sex and not having serious literary, artistic, political, or scientific value, we conclude the statute is a content-based restriction. *See* Thompson, 442 S.W.3d at 344–48.

### E. Does the Statute Satisfy Strict Scrutiny?

Because section 43.262 is a content-based restriction on protected speech, it is subject to strict-scrutiny review to determine if the State has overcome the presumption of invalidity. [14] *See id.* at 344 (citing Entm't Merchs. Ass'n, 564 U.S. at 799); *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000) ("a content-based speech restriction" may stand "only if it satisfies strict scrutiny").

To satisfy strict scrutiny, content-based laws that regulate expression "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." Reed, 576 U.S. at 163. In this context, a regulation is "narrowly drawn" if it uses the least restrictive means of achieving the government interest. *Playboy Entm't Grp.*, 529 U.S. at 813. "If a less restrictive means of meeting the compelling interest could be at least as effective in achieving the legitimate purpose that the statute was enacted to serve, then the law in question does not satisfy strict scrutiny." Lo, 424 S.W.3d at 15–16. The strict scrutiny analysis requires the State to identify "an actual problem in need of solving," and to show that it is important enough to justify suppressing speech. *See* Brown, 564 U.S. at 799. If the State has a compelling interest and has narrowly tailored its statute, the statute will be invalidated for overbreadth only if the challenger can show the statute continues to reach a real and substantial amount of protected speech, "judged in relation to its legitimate sweep." New York v. Ferber, 458 U.S. 747, 769 (1982).

**\*10** In its response to appellant's application for writ of habeas corpus, the State argued that it has a compelling interest "in protecting all children from sexual exploitation

and the long-lasting harm that results from their depiction in child pornography." In its appellate brief, the State asserts the problem it is seeking to address is "protecting children from sexual abuse and exploitation" and that "Section 43.262 is necessary to close a loophole of child sexual exploitation that is currently left open by the existing child pornography statute."

No rational person will disagree that protecting children from sexual exploitation and their depiction in child pornography is a compelling government interest. *See* Lo, 424 S.W.3d at 20–21 ("The prevention of sexual exploitation and abuse of children constitutes a government objection of surpassing importance."). But, we observe that the State's compelling interest of protecting sexual abuse and exploitation is not supported by the statute's legislative history. The legislative history of section 43.262 provides, "there is currently no disincentive for some criminals to possess or promote certain images portraying children depicted in a sexually suggestive manner" and the bill "seeks to address this issue by creating the offense of possession or promotion of lewd visual material depicting a child." HOUSE CRIM. JURISPRUDENCE COMM., *Bill Analysis*, Tex. H.B. 1810, 85th Leg., R.S. (2017). From the senate research center, the bill analysis states,

> Current state law does not contain statutes that criminalize the possession or promotion of child erotica images. Child erotica images portray an unclothed, partially[ ] clothed, or clothed child depicted in a sexually explicit manner indicating the child has a willingness to engage in sexual activity. Investigations of child pornography cases have revealed many child pornography collections also include child erotica images. In some cases, only child erotica images are discovered. In such instances, state charges cannot be pursued.

SENATE RESEARCH CTR., *Bill Analysis*, Tex. H.B. 1810, 85th Leg., R.S. (2017).

While the legislative history shows that investigations of criminals with child pornography collections also reveals collections of child erotica, the history is silent as to whether child erotica images, and specifically, visual material depicting the lewd exhibition of the pubic area of a clothed child—not child pornography—is an actual problem causing the sexual abuse or exploitation of children, thus necessitating the prohibition. *See* Brown, 564 U.S. at 799; Lo, 424 S.W.3d at 19 (stating that "the State may not punish speech simply because that speech increases the chance that a 'pervert' might commit an illegal act 'at some indefinite future time.' ").

In *Brown*, the Supreme Court held that California's law banning the sale of violent video games to minors without parental consent did not pass strict scrutiny. *Id.* at 805. The state recognized that it could not "show a direct causal link between violent video games and harm to minors," but argued that strict scrutiny could be satisfied based on the Legislature's "predictive judgment that such a link exists, based on competing psychological studies." *Id.* at 799. The Supreme Court rejected this argument, explaining that, under strict scrutiny, the state "bears the risk of uncertainty" and "ambiguous proof will not suffice." *Id.* at 799–800. Although the state submitted studies of research psychologists "purport[ing] to show a connection between exposure to violent video games and harmful effects on children," the Court held that the studies did not satisfy strict scrutiny because the studies had "been rejected by every court to consider them" and did not "prove that violent video games cause minors to act aggressively." *Id.* at 800.

**\*11**  Here, unlike in *Brown*, the State did not present any evidence or studies to show that the prohibited visual material in section 43.262, which neither encompasses obscenity, nor child pornography, has a direct causal link to the State's compelling interest of preventing the sexual abuse or sexual exploitation of children. [15] If *Brown*'s rejection of competing psychological studies did not suffice, the State's proffer of no evidence to show how child erotica images cause sexual exploitation and sexual abuse of children does not rebut the presumption of the statute's invalidity and thus, the relevant language of the statute at issue here does not meet strict scrutiny. *See id.* at 800; Alvarez, 567 U.S. at 725 (stating that "First Amendment requires that the Government's chosen restriction on the speech at issue be

'actually necessary' to achieve its interest" and "[t]here must be a direct causal link between the restriction imposed and the injury to be prevented"); *see also* Playboy Entm't Grp., 529 U.S. at 819 (concluding that the "First Amendment requires a more careful assessment and characterization of an evil in order to justify a [sweeping] regulation" and emphasizing that government was required to present more than "anecdote and supposition" to prove an "actual problem"); *cf.* Free Speech Coalition, 535 U.S. at 250 ("Virtual child pornography is not 'intrinsically related' to the sexual abuse of children, as were the materials in *Ferber*.").

We hold that the portion of section 43.262 at issue in this habeas appeal is an unconstitutional restriction on speech protected by the First Amendment and that the State has failed to rebut the presumption of the statute's invalidity.

### Overbreadth

Despite our conclusion that the statute is an invalid content-based restriction, we further address the unconstitutional reach of the statute. [16] *See* Thompson, 442 S.W.3d at 349. As we explained above, section 43.262 prohibits a person from possessing visual material depicting the lewd exhibition of the pubic area of a clothed child, that appeals to the prurient interests in sex, and has no serious literary, artistic, political, or scientific value. *See* TEX. PENAL CODE § 43.262.

The overbreadth doctrine is "strong medicine" to be employed with hesitation and only as a last resort. *See* Thompson, 442 S.W.3d at 349 (citing Ferber, 458 U.S. at 769). The overbreadth of a statute not only must "be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." Ferber, 458 U.S. at 770. To be held unconstitutional under the overbreadth doctrine, a statute must be found to "prohibit[ ] a substantial amount of protected expression." Free Speech Coalition, 535 U.S. at 244. The danger that the statute will be unconstitutionally applied must be "realistic." Regan v. Time, Inc., 468 U.S. 641, 651 n.8 (1984). A statute is not rendered overbroad merely because it is possible to conceive of some impermissible applications. Williams, 553 U.S. at 303.

Appellant contends that a number of child Instagram "influencers" are in violation of ⬜ section 43.262 and that the State is attempting to prosecute Netflix for exhibiting a movie that depicted children performing gymnastics. During the writ hearing, the State acknowledged the charges against Netflix, expressed that it could not explain another county's decision to prosecute, and believed Netflix's movie had political, literary, and artistic value.

 **\*12**  We have already concluded that ⬜ section 43.262 does not prohibit obscenity or child pornography. Instead, the statute applies to a person who knowingly possesses visual material depicting the lewd exhibition of the pubic area of a clothed child, otherwise known as child erotica, that previously was not prohibited and is not recognized as unprotected speech. *See* ⬜ TEX. PENAL CODE § 43.262(b); SENATE RESEARCH CTR., *Bill Analysis*, Tex. H.B. 1810, 85th Leg., R.S. (2017).

A statute is likely to be found overbroad if the criminal prohibition it creates is of "alarming breadth." *See* ⬜ *Stevens*, 559 U.S. at 474. Such is the case with the current statute. Even assuming that the visual material prohibited in ⬜ section 43.262 has a direct causal link to the sexual abuse and sexual exploitation of children, it is not difficult to imagine the overbreadth of this statute.

The statute applies to any person—man, woman, teenager, law enforcement, judiciary, or school administrator—as long as the person knowingly possesses visual material depicting the lewd exhibition of the pubic area of a clothed child younger than 18. The statute does not differentiate if a teenager takes the offending photo of themselves, commonly referred to as a "selfie," and posts it publicly for anyone to see. *See* ⬜ TEX. PENAL CODE § 43.262(d) (stating that it is no defense if depicted child consented to creation of visual material). In that instance, and based on the State's proffered compelling interest, if the visual material violates the statute, the teenager is both the victim (of sexual exploitation and sexual abuse) and the offender. And, any other person, whether that person is a collector of child erotica, parent, law enforcement, or educator, who knowingly possesses the visual material posted by the teenager, could also violate the statute.

As pointed out by appellant, at least one prosecutor has indicted Netflix for showing a film that violated the statute.

As currently written, the statute could apply not only to Netflix, but to those persons who viewed the offending visual material.

Although the savings clause exempts visual material having serious literary, artistic, political, or scientific value, such exemptions matter little when a substantial amount of protected speech is still chilled in the process. *See* ⬜ *Free Speech Coalition*, 535 U.S. at 255 (stating that the "overbreadth doctrine prohibits the Government from banning unprotected speech if a substantial amount of protected speech is prohibited or chilled in the process"); ⬜🄰 *Lo*, 424 S.W.3d at 22 (noting that supreme court upholds statutes prohibiting dissemination of material that is obscene for children, but will strike down, as overbroad, statutes that prohibit communication or dissemination of material that is indecent or sexually explicit).

Accordingly, we conclude that the criminal prohibition in ⬜ section 43.262 is of "alarming breadth" that is "real" and "substantial." *See* ⬜ *Stevens*, 559 U.S. at 474; ⬜ *Ferber*, 458 U.S. at 770.

### Conclusion

We hold that the portion of ⬜ section 43.262 of the Texas Penal Code addressed herein is void on its face as it fails strict scrutiny and violates the First Amendment to the U.S. Constitution because it is overbroad. Thus, in appellate cause number 01-20-00859-CR, trial court cause number 1685846, we reverse the trial court's order denying appellant's requested habeas corpus relief and remand the case to the trial court to dismiss the indictment in trial court cause number 1623191.

 **\*13**  In appellate cause number 01-20-00858-CR, trial court cause number 1623191, we grant the State's motion to dismiss for lack of jurisdiction because the record does not contain an appealable order in the underlying proceeding.[17] *See* *Greenwell v. Court of Appeals for the Thirteenth Judicial Dist.*, 159 S.W.3d 645, 649–50 (Tex. Crim. App. 2005); TEX. R. APP. P. 25.2(a)(2), 26.2(a).

### All Citations

--- S.W.3d ----, 2021 WL 4953918

## Footnotes

1    *See* TEX. CONST. art. I, § 12; TEX. CODE CRIM. PROC. arts. 11.01, 11.05.

2    Because appellant makes a facial challenge to Texas Penal Code section 43.262, the specific facts of his case are irrelevant. *See Ex parte Lo*, 424 S.W.3d 10, 14 n.2 (Tex. Crim. App. 2013).

3    *See* TEX. PENAL CODE § 43.26.

4    TEX. PENAL CODE § 43.262.

5    *See Ex parte Thompson*, 442 S.W.3d 325, 333 (Tex. Crim. App. 2014) (acknowledging defendant may file pretrial application for writ of habeas corpus to raise facial challenge to constitutionality of statute that defines offense charged). Appellant did not argue that the statute was unconstitutional as applied to him.

6    Netflix streams the film *Cuties*, a film depicting an 11-year-old Senegalese immigrant who joins a dance group. *See* NETFLIX, http://www.netflix.com/title/81111198 (last visited Sept. 22, 2021).

7    The State's response appears to be a response to the constitutionality of section 43.26 and not section 43.262. The response erroneously refers to (1) a different indictment, (2) section 43.26 in support of its argument that section 43.262 is constitutional, and (3) arguments that appellant did not assert in his habeas application.

8    Appellant informed the trial court that it notified the attorney general's office that it was challenging the statute as unconstitutional and that the attorney general did not file a response. *See* TEX. GOV'T CODE § 402.010 (requiring party to notify attorney general when raising constitutional challenge to statute); TEX. CONST. art. V, § 32 (permitting legislature to require court to provide notice to attorney general of constitutional challenge).

9    Because the record did not contain a signed, written order denying the application for writ of habeas corpus, we abated to the trial court. On October 19, 2021, a supplemental clerk's record containing the trial court's signed, written order denying habeas relief was filed in this Court.

10    Section 43.25 defines "sexual conduct" as "sexual contact, actual or simulated sexual intercourse, deviate sexual intercourse, sexual bestiality, masturbation, sado-masochistic abuse, or lewd exhibition of the genitals, the anus, or any portion of the female breast below the top of the areola." TEX. PENAL CODE § 43.25. Although subsection (a)(1) of section 43.262 states that sexual conduct will have the meaning assigned in section 43.25, the remainder of section 43.262 does not use the term sexual conduct. It appears that "sexual conduct" was used in the introduced version of section 43.262, but was removed prior to its enactment. *Compare* TEX. PENAL CODE § 43.262, *with* HOUSE CRIM. JURISPRUDENCE COMM., *Bill Analysis*, Tex. H.B. 1810, 85th Leg., R.S. (2017).

11    The United States Supreme Court has explained that "[c]hild pornography harms and debases the most defenseless of our citizens." *United States v. Williams*, 553 U.S. 285, 307 (2008). "[T]he materials produced are a permanent record of the children's participation and the harm to the child is exacerbated by their circulation." *New York v. Ferber*, 458 U.S. 747, 759 (1982). Other courts have noted that "[t]he existence of and traffic in child pornography creates the potential for many types of harm in the community" and "presents a clear and present danger to all children." *United States v. White*, 506 F.3d 635, 649 (8th Cir. 2007) (Riley, J., concurring in part, dissenting in part) (quoting CHILD PORNOGRAPHY PREVENTION ACT OF 1996, Pub. L. No. 104-208, § 21, 110 Stat. 3009, 3009-26 (1996)). And, the Texas Court of Criminal Appeals has found that the "integral part of the offense of possession of child pornography" is the harm to each individual child. *Vineyard v. State*, 958 S.W.2d 834, 840 (Tex. Crim. App. 1998) (quoting *Ex parte Crosby*, 703 S.W.2d

683, 685 (Tex. Crim. App. 1986) (orig. proceeding), *overruled on other grounds by* *Ex parte Hawkins*, 6 S.W.3d 554 (Tex. Crim. App. 1999) (orig. proceeding)).

12    "Whether an image falls within the statutorily defined category of child pornography under Texas state law is a question that must be answered on a case by case basis." *State v. Bolles*, 541 S.W.3d 128, 143 (Tex. Crim. App. 2017).

13    At the hearing on the writ of habeas corpus, the State argued that section 43.262 was "an additional child porn prohibition statute" which "works to prevent the sexual abuse or exploitation of children, which is a compelling interest...." The State argued that the elements of the statute "show that the statute's scope is limited to the depictions involving child sexual exploitation and/or abuse and a legitimate application under the First Amendment." The State further argued that "this is not protected speech because it is an obscenity and First Amendment does not protect against obscenity...." In closing, the State argued that the statute is not overbroad and not protected by the First Amendment because "this is obscene material."

14    Citing *Snyder v. Phelps*, 562 U.S. 443, 452 (2011), the State argues that we should apply intermediate scrutiny to section 43.262 because it does not apply to matters of public concern. The State raises its argument that intermediate scrutiny should apply, here, on appeal, in the first instance. Notwithstanding that the State has waived this argument, we decline the State's invitation because *Snyder* addressed whether the First Amendment could prohibit holding the defendant liable from claims of intentional infliction of emotional distress. *Snyder* made no pronouncement that content-based statutes, such as section 43.262, receive intermediate scrutiny.

15    *See* *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 792 (2011) ("But without persuasive evidence that a novel restriction on content is part of a long (if heretofore unrecognized) tradition of proscription, a legislature may not revise the 'judgment [of] the American people,' embodied in the First Amendment, 'that the benefits of its restrictions on the Government outweigh the costs.' ").

16    The State argues that appellant did not preserve an overbreadth challenge. We disagree. Appellant's application for writ of habeas argued that the statute restricts more speech than the constitution permits and that it violated the rights of too many third parties. Likewise, at the hearing on the writ application, appellant argued that section 43.262 was overbroad. At the hearing, the State recognized appellant's overbreadth challenge in closing when it argued that the statute was not overbroad. We conclude that appellant raised both an overbreadth challenge that the statute restricted more speech than the constitution permits and that it violated the rights of too many third parties. *See Thompson*, 443 S.W.3d at 348 (citing *R.A.V. v. City of St. Paul*, 505 U.S. 377, 381 n.3 (contrasting technical "overbreadth" claim—that regulation violated rights of too many third parties—with claim that statute restricted more speech than the constitution permits, even as to the defendant, because it was content based)).

17    Before submission, the State filed a motion to dismiss, arguing that this Court should dismiss appellate cause number 01-20-00858-CR, trial cause number 1623191, which is the underlying criminal prosecution of section 43.262, because appellant's application for writ of habeas corpus was assigned to trial cause number 1685846, appellate cause number 01-20-00859-CR. Appellant did not respond to the motion to dismiss.

**End of Document**                                          © 2021 Thomson Reuters. No claim to original U.S. Government Works.

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Joshua Bennett on behalf of Joshua Bennett
Bar No. 24059444
jbennett@carterarnett.com
Envelope ID: 59161766
Status as of 11/15/2021 1:41 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| E. Leon Carter | | lcarter@carterarnett.com | 11/15/2021 1:23:18 PM | SENT |
| Joshua Bennett | | jbennett@carterarnett.com | 11/15/2021 1:23:18 PM | SENT |
| Linda R.Stahl | | lstahl@carterarnett.com | 11/15/2021 1:23:18 PM | SENT |
| Kathleen Newsome | | knewsome@carterarnett.com | 11/15/2021 1:23:18 PM | SENT |
| Cathryn Hopkins | | chopkins@carterarnett.com | 11/15/2021 1:23:18 PM | SENT |
| Eric Chen | | echen@carterarnett.com | 11/15/2021 1:23:18 PM | SENT |
| Lucas Babin | 24086567 | pgibbs@co.tyler.tx.us | 11/15/2021 1:23:18 PM | SENT |

Associated Case Party: Netflix, Inc.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| E. Leon Carter | | lcarter@carterarnett.com | 11/15/2021 1:23:18 PM | SENT |
| Joshua JBennett | | jbennett@carterarnett.com | 11/15/2021 1:23:18 PM | SENT |

Associated Case Party: State of Texas

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Pat Hardy | | pathawkhardy@co.tyler.tx.us | 11/15/2021 1:23:18 PM | SENT |
| Lucas Babin | | l.babin@co.tyler.tx.us | 11/15/2021 1:23:18 PM | SENT |