**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**LUFKIN DIVISION**

| | | |
|---|---|---|
| NETFLIX, INC. | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 9:22-cv-00031 |
| | § | |
| LUCAS BABIN | § | |
| Defendant. | § | |
| | § | |

**PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND**
**MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 1

STATEMENT OF FACTS ............................................................................................ 2

ARGUMENT .............................................................................................................. 13

I.      Federal Courts Have Power to Enjoin State Officials from Engaging in
        the Conduct in Which Babin Has Engaged: Bad Faith Pursuit of
        Criminal Indictments to Deprive Netflix of Constitutional Rights and
        for Purposes of Harassment and with No Hope of Obtaining a Valid
        Conviction .......................................................................................................... 16

II.     Netflix is Likely to Prevail on the Merits of Its Claims Given the
        Language of the Statutes and the Circumstances Surrounding the
        Indictments. ..................................................................................................... 20

        A.      The "Sexual Performance" and "Lewd Exhibition" Statutes at
                Issue in this Case Must Be Examined in the Context of the Severe
                Limits the Constitution Places on the State's Power to Restrain
                Speech. .................................................................................................. 21

        B.      Although Obscenity and Child pornography Are Excluded from
                the Protections of the First Amendment, Laws that Criminalize
                Unprotected Speech Must Be Narrowly and Precisely Defined or
                Risk Violating the First Amendment. .................................................. 23

        C.      Netflix Is Likely to Prevail on its Challenge to the
                Indictment Under Section 43.25 Because, as Applied to
                Promotion of the Film *Cuties*, the Statute Is an
                Impermissibly Broad Restriction on Speech and Reaches
                Expression that Is Neither Child Pornography nor
                Obscene. ................................................................................................ 28

        D.      Netflix Is Likely to Succeed in Proving that Section 43.262
                Criminalizes Vast Amounts of Conduct Related to Visual
                Materials That Are Neither Obscene Nor Child
                Pornography, and Is Thus a Content- and Viewpoint-Based
                Restriction that Offends the First Amendment and Is
                Vastly Overbroad. ................................................................................. 32

                1.      Section 43.262 Is Facially Unconstitutional Because the
                        State Cannot Justify Section 43.262's Content- and
                        Viewpoint-Based Restrictions. ........................................................ 34

                2.      Besides Being a Content-Based Restriction that Fails
                        Strict Scrutiny, Section 43.262 Criminalizes
                        Substantially More Speech than the First Amendment
                        Tolerates. ........................................................................................... 36

III.   Netflix Will Suffer Irreparable Injury Unless the Court Enjoins Babin from Pursuing His Unconstitutional and Vexatious Indictments. ................ 38

IV.   The Balance of Equities Weighs Heavily in Netflix's Favor. .......................... 40

V.   The Public Interest Favors Granting a TRO and Preliminary Injunction .......... 40

VI.   No Bond, or a Minimal One, Should Be Required. .......................................... 41

CONCLUSION ........................................................................................................ 41

INDEX OF EXHIBITS .......................................................................................... 43

# INTRODUCTION

Lucas Babin, Tyler County District Attorney and the defendant in this case, has indicted Netflix five times for its "promotion" of the film *Cuties*—a timely coming-of-age tale about the dangers of leaving kids unprotected in our image-obsessed and highly sexualized social-media age. Babin claims to have seen the film, and should therefore know that there is no basis for any of his indictments—one for "promotion of lewd visual materials" under Texas Penal Code §43.262, and, more recently, four for promotion of "sexual performance of a child" under Texas Penal Code §43.25.  No reasonable district attorney viewing *Cuties*, which contains nothing obscene and lacks any "sexual conduct" whatsoever, could conclude that there is probable cause to deem the film child pornography.

As described below, Babin's indictments are each unconstitutional, and as the indictments infringe Netflix's First Amendment rights of free speech and petition, Babin should be enjoined from pursuing these prosecutions further.  Injunctive relief is particularly warranted here, because the evidence makes clear that Babin's indictments—particularly the four new indictments under Texas Penal Code §43.25, were brought in bad faith.  Netflix filed a pretrial writ of habeas corpus in November 2021, arguing that, as the First Circuit Court of Appeals had recently held, Texas Penal Code §43.262 was unconstitutional on its face and Babin's original indictment of Netflix under that statute should therefore be dismissed.  Babin chose not to follow the Court of Appeals decision, or even respond to Netflix's petition. Instead, Babin engineered a delay long enough to convene a new grand jury and issue new indictments against Netflix accusing it—and by implication the tens of thousands of Texans who have watched *Cuties*—of the state jail felony of promoting child pornography. Babin issued these indictments not for any valid reason, but to chill Netflix's constitutionally protected speech and to interfere with its right to petition the government.

Babin has grossly abused his prosecutorial discretion and the State's resources to wage an abusive and vexatious campaign against Netflix in violation of the United States Constitution, the rule of law, and in patent bad faith. Babin has watched *Cuties*. He knows the character and content of the film. And, as Tyler County's lead lawyer, Babin *should* know that he has no legal or factual basis for any of his *five* indictments. Netflix therefore seeks a temporary restraining order and preliminary and permanent injunctive relief against the only prosecutor in America who seems to need that kind of constraint on his prosecutorial discretion.

## STATEMENT OF FACTS



This is Amy, age 11. She is smiling because she is happy again. She is back at play, "the work of childhood."[1] *Cuties* ("Mignonnes" in its native French) is Amy's story.

---

[1] Jean Piaget, renowned psychologist, is credited with making this statement.

The film's title derives from the "Cuties" themselves: a self-named dance group of Amy's peers who have their hearts set on trying out for and performing at a big dance competition in town. Like Amy, these girls enjoy almost no parental supervision. Unlike Amy, they also have unfettered and unmonitored access to social media and the internet, which they access through their parent-provided computers and smartphones.[2] The unsupervised "Cuties" wear provocative clothes and makeup intended to make them look older than they are, which they then use unsuccessfully to draw the attention of and seduce much older teenage boys using wiles their immature figures cannot yield.[3] The Cuties also listen to mature and suggestive music to match their mature and suggestive dances, which they practice and perform in the hopes of besting much older and physically more mature dancers.[4]

*Cuties* uses the vast majority of its 91-minute runtime exploring and portraying various relationships (e.g., fraternal,[5] maternal,[6] paternal (or lack thereof),[7] and platonic[8]), while vividly revealing to viewers the dangers and consequences of leaving children unrestrained from—and at the mercy of—the highly sexualized and media-driven culture in which they are now immersed. *Cuties* shows further that the consequences of a child's unfettered consumption of sexualized media will likely lead to more than innocence lost: victimization (including self-victimization), shame, and the assimilation of degrading notions about sexuality may also follow.[9]

---

[2] Exhibit 1 at 00:21:40 to 00:21:49, and 00:38:16 to 00:39:36. Netflix cites to *Cuties* and other "visual materials" throughout this petition by their runtime: e.g., "*Cuties* at HH:MM:SS to HH:MM:SS."
[3] Exhibit 1 at 00:8:20 to 00:9:12, and 00:35:35 to 00:36:06, and 00:38:16 to 00:39:36.
[4] *Id.* at 00:43:00 to 00:44:19, and 00:50:10 to 00:51:20.
[5] *E.g.*, *id.* at 00:06:01 to 00:06:43, and 00:07:42 to 00:08:01, and 00:13:30 to 00:15:11, and 01:00:38 to 1:00:59.
[6] *E.g.*, *id.* at 00:02:39 to 00:04:43, and 00:09:48 to 00:13:16, and 1:27:14 to 1:29:30.
[7] *E.g.*, *id.* at 00:25:24 to 00:26:23, and 00:34:02 to 00:34:40.
[8] *E.g.*, *id.* at 00:13:20 to 00:15:16, and 00:17:40 to 00:18:55, and 00:20:05 to 00:21:00, and 00:40:05 to 00:41:00, and 1:02:02 to 1:03:05.
[9] *Id.* at 1:00:00 to 1:01:50, and 1:08:30 to 01:10:48, and 1:23:10 to 1:30:00.

*Cuties* forcefully explores these themes with unflinching scrutiny. In one scene that lasts less than a minute, Amy performs sexualized dance moves ("twerking") she had seen in music videos on the internet in order to impress the Cuties' leader, Angelica.[10]  In scenes that follow, Angelica, Amy, and the rest of the Cuties teach each other in broad daylight to dance provocatively. No adults are ever present. The girls practice their new moves by twerking and gyrating their hips in plain view, such as beneath an overpass or bridge in broad daylight (roughly 60 seconds).[11] After getting caught sneaking into a laser-tag arena,[12] the Cuties twerk in front of two adult male employees who, amused but repulsed, throw them out of the building (roughly 20 seconds).[13] The Cuties perform their suggestive routine at the try-outs for the big show in front of adults and other attendees (roughly 60 seconds).[14] After receiving notice that they made the cut, the Cuties celebrate by practicing their moves outside in broad daylight on the stairs of a building (roughly 1 minute and 30 seconds),[15] which they video and post to social media without their parents' knowledge.[16]

Toward its conclusion, at the big show held in a public park during daylight hours before dozens of spectators, the pre-teen Cuties perform their very adult routine to the manifest shock and dismay of the men, women, and children in attendance—none of whom try to hide their disgust about what they see (roughly 2 minutes and 40 seconds).[17] And it is in this pivotal scene where Amy, while gyrating on stage, suddenly hears her mother's voice calling her home—back to childhood, back to innocence—and where Amy finally perceives what she has done and what her

---

[10] *Id.* at 00:42:00 to 00:42:40.
[11] *Id.* at 00:42:55 to 00:43:58.
[12] *Id.* at 00:55:37 to 00:56:41.
[13] *Id.* at 00:58:17 to 00:58:39.
[14] *Id.* at 00:50:10 to 00:51:20.
[15] *Id.* at 00:58:59 to 01:00:28.
[16] *Id.* at 01:00:29 to 01:00:55.
[17] *Id.* at 01:23:30 to 01:26:12.

friendships and behavior have cost her: her innocence, her family's trust, her childhood.[18] The dance scenes comprise roughly seven minutes (i.e., 7%) of this 90-minute film. There are no sexually explicit scenes involving any minors (or anyone else for that matter) within *Cuties*.

*Cuties* demands that its viewers see and perceive exactly what these pre-teen girls are doing as they emulate the highly sexualized media they consume unrestrained. The film makes this demand of its viewers through its medium, the camera. The film frames its shots to confront viewers with unmistakable comparisons between the media that Amy and her fellow Cuties romanticize daily and the Cuties' increasingly adult dance routines. No viewer of *Cuties* may remain aloof or distant from the reality of what the Cuties are becoming or where they are likely headed: toward the derision and shame that adults and their peers predictably and ultimately hurl at them while they perform at the big show, and far from the success and fame they see in the media they consume and believe they too will obtain.[19] Nor by the film's conclusion could any of *Cuties*' viewers wonder about the film's unmistakable message: fight to keep children innocent, guard them—especially young girls—against an increasingly sexualized world, teach them that they are more than their bodies and to value relationships, and arm them with the knowledge and support they will need to navigate and contextualize the adult world as it comes to them.[20]

*Cuties*' message to its viewers is timely. Concerns about the hyper-sexualization of children, primarily girls, remain as heightened here as in the world

---

[18] *Id.* at 01:26:30 to 1:27:10.

[19] *Id.* at 01:23:30 to 01:27:10.

[20] Exhibit 6 at 59, Alyssa Rosenberg, "The people freaking out about 'Cuties' should try it. They might find a lot to like." WASH. POST, Sept. 11, 2020, at https://www.washingtonpost.com/opinions /2020/09/11/people-freaking-out-about-cuties-should-try-it-they-might-find-lot-like/; *id.* at 64, Richard Brody, "'Cuties' ('Mignonnes'), the Extraordinary Netflix Début That Became the Target of a Right-Wing Campaign," THE NEW YORKER, Sept. 8, 2020, at https://www.newyorker.com/culture/the-front-row/cuties-mignonnes-the-extraordinary-netflix-debut-that-became-the-target-of-a-right-wing-campaign.

portrayed in *Cuties*. The sheer ubiquitousness of these images makes Babin's declaration that *Cuties* is child pornography particularly troubling. For it confesses a belief that the state has criminalized and thus has the power to prosecute millions of Americans engaged in mainstream forms of expression.

Reality television, for example, has long been accused of sexualizing children as young as four years old purely for entertainment and the pursuit of higher ratings.[21] *Toddlers and Tiaras*, which may be viewed on demand,[22] or through clips available from online content providers like YouTube,[23] has drawn attention for featuring preschoolers performing sexually suggestive dances, including one tot "[w]earning tiny, tiny hot shorts and a cut-off top bearing her midriff."[24] Once a regional phenomenon, child beauty pageants like those described above are now worldwide,[25] and have so pervaded popular culture that it has been the subject of parody in major motion pictures, some of them award-winning.[26] Anyone in Texas with access to the internet—whether by computer or the even more ubiquitous smartphone—may view and access such films and shows at almost any time and in almost any place through any number of "apps" or internet sites.[27]

Criticisms similar to those leveled against child beauty pageants have been leveled against a wide range of media and media outlets for how they depict children. The popular series *Dance Moms*, which began as a cable reality television series on the network Lifetime in 2011, captures the experiences of a group of young

---

[21] *E.g.*, Christine Tamer, Note, "Toddlers, Tiaras, and Pedophilia? The 'Borderline Child Pornography' Embraced by the American Public," 13 Tex. Rev. Ent. & Sports L. 85, 87 (2011) (hereafter "Tamer, Note, 13 Tex. Rev. Ent. & Sports L.").
[22] *See*, *e.g.,* https://www.directv.com/tv/Toddlers-Tiaras-SThkKzRtcWw2R2c9 (last visited November 2, 2021)
[23] Exhibit 6 at 51, Ln. 16, Scenes from *Toddlers & Tiaras*.
[24] Tamer, Note, 13 Tex. Rev. Ent. & Sports L. at 86.
[25] Tamer, Note, 13 Tex. Rev. Ent. & Sports L. at 87.
[26] Exhibit 6 at 49, Ln. 5 (Scenes from *Little Miss Sunshine*); *id.* at Ln. 4 (Scenes from *Jackass: Bad Grandpa*).
[27] Exhibit 6 at 48-58, Lns 1–57.

competitive dancers (all girls) and their titular mothers, and is as (in)famous for its flamboyant dance moves and costumes as it is its flamboyant personalities.

One *Dance Moms* clip available on YouTube ("FANtastic") has, for example, been viewed more than 3.2 million times.[28] The clip features the young dancers in burlesque style glittery bikinis, completed by a large pink feather headdress atop each girl's head, and billowing, pink-feathered hand-fans for each hand of each girl. One competition judge later deemed the outfits "a little naked for [her] taste."[29] As the music starts, the girls engage in what some critics described as "baby burlesque."[30] The girls rhythmically strut and sway to the music, heave their chests out and in, swing their hips from side to side, prance and high-step, purse their lips as if to blow a kiss to the judges (one of them male) or to the crowd, all while rhythmically covering and uncovering themselves—and their tiny costumes—with their feathered-fans in time with the beat, and all while the camera is filming and zooming in on the routine. The routine is designed to be provocative and had its intended effect.  This particular routine made the news, with many outlets replaying many of the routine's more exuberant moments in their coverage;[31] and many users leave comments about their reactions to the routine, calling attention to specific places in the clip that they like or to which they object.[32]

"FANtastic" is hardly *Dance Moms'* only controversial routine. Examples abound in the public record, any one of which is accessible with any computer or smartphone, many of which have been accessed literally *millions* of times, and all of

---

[28] *Id.* at 50, Ln 8.
[29] Exhibit 1 at 00:01:36.
[30] Exhibit 6 at 50, Ln 9.
[31] Id.
[32] Comments may be seen in any of the clips shown in Exhibit 6 at 48-58, Lines 2–19, 22–47.

which include comments from fans and detractors alike praising or condemning what is shown.[33]

Youthful, physical expressions like these are hardly rare in today's media, especially online. Content like—and beyond—that seen in *Cuties* or *Dance Moms* is recreated and streamed tens of millions of times a day across multiple media outlets of more modern vintage, like YouTube and TikTok. Many of TikTok's most popular stars are minors, yet they have amassed millions (and sometimes more than 100 million) followers worldwide. The postings include teens in outfits ranging from baggy sweats to bikinis, performing dance moves to often-explicit lyrics[34] that include twerking, gyrating and thrusting remarkably similar to that depicted in *Cuties*.[35]

While TikTok is relatively new, visual materials capturing sensual expressions of youth are not. Similar expressions of youthful bodies and sexuality have hung in contemporary art galleries throughout the world,[36] sold popular products,[37] and played out in films shown in name-brand movie houses for decades.[38]

After its award-winning release at film festivals abroad and stateside[39], Netflix first made *Cuties* available for streaming and thus accessible in Texas on September 9, 2020. Less than three weeks later, on September 25, 2020, the State indicted Netflix for a felony violation of Texas Penal Code § 43.262,[40] (the "First Indictment") which criminalizes the mere *knowing* possession, access (with intent to view), or "promotion" of "visual material" that "(1) depicts the lewd exhibition of the genitals or pubic area of a[] . . . partially clothed, or clothed child who is younger than 18 years

---

[33] Exhibit 6 at 50-51, Lns 8–15.
[34] Exhibit 6 at 53-58, Lns 40, 35, 28, 46, 28-47.
[35] *Id.*, Lns 27, 28, 30, 31, 33–35, 39–40, 41, 45–47.
[36] *Id.* at 48, Ln 1 (Therese Dreaming).
[37] *Id.* at 52-53, Lns 24–26.
[38] *Id.* at 49, Lns 2, 4–7.
[39] *See* https://www.imdb.com/title/tt9196192/awards/?ref_=tt_awd. Cuties was played at the 2020 Sundance Film Festival, where it won the Grand Jury Prize.
[40] Exhibit 2.

of age at the time the visual material was created; (2) appeals to the prurient interest in sex; and (3) has no serious literary, artistic, political, or scientific value." Tex. Penal Code § 43.262(b). Shortly after serving Netflix, the Tyler County District Attorney's Office issued a press release about the case, which prominently featured a quote from Babin asserting a grave need to prosecute the case and declaring that he "knew there was probable cause" under §43.262.[41]

Netflix waived arraignment on October 23, 2020, after which the case sat idle for 10 months. By order dated August 2, 2021, the case was set for initial hearing in February of 2022. On October 26, 2021, counsel for Netflix advised Babin that the First Court of Appeals, in *Ex Parte Lowry*, had held Section 43.262 unconstitutional and requested that Babin dismiss the indictment.[42] Babin did not respond, and so on November 15, 2021, Netflix served a request for discovery and disclosure of the State's expert witnesses, as well as a request that the State disclose all exculpatory evidence. The State never responded. That same day, Netflix filed a Petition for Habeas Corpus asserting that Section 43.262 is unconstitutionally vague and unduly impinges upon citizens' First Amendment rights.[43]

Netflix sought hearing dates in late November from the Tyler County District Clerk, but could never get a commitment from Babin. The Clerk then requested on December 2, 2021 that Netflix provide alternative dates in a formal letter.[44] Netflix proposed numerous hearing dates in December of 2021 and January of 2022, and was told the court could hear the petition on January 4, 2022. Babin, however, insisted that the petition could not be heard on that date, knowing that Netflix's counsel had trial conflicts through the end of February.[45] Babin's only *stated* reason for refusing

---

[41] Exhibit 3.
[42] Exhibit 5.
[43] Exhibit 6.
[44] Exhibits 7 & 8.
[45] Exhibit 9.

the January 4 date was his (mis)reading of a Texas statute that requires 45-days' notice to the Texas Attorney General before a trial court may enter a *final judgment* invalidating a state statute on constitutional grounds. A statute precluding entry of final judgments with less than 45-days' notice does not precluded a trial court from *hearing* a pre-trial habeas petition on less than 45-days' notice.

In fact, the date the clerk offered—January 4—was *43 days* after the date the Attorney General received notice of Netflix's challenge (November 22, 2021), meaning that even accepting Babin's misapplication of the notice statute, the trial court could have heard the petition on January 4 and then ruled in Netflix's favor just three days later consistent with the statute.

As would later be revealed, once confronted with the strength of Netflix's arguments and the inevitable collapse of the criminal case, Babin determined that he would seek alternate charges from the grand jury set to be impaneled in January, with plans to dismiss the First Indictment before Netflix's petition could ever be heard. Babin's plan was then to hold the indictments until the literal eve of the hearing on Netflix's habeas petition and then announce the New Indictments and his decision to unilaterally dismiss the First Indictment (albeit without prejudice) and thus ensure that Netflix could not seek relief against Section 43.262 while remaining under indictment for state criminal charges under Section 43.25.

And that is precisely what he did. On March 1, 2022, just two days before the argument was to be held on Netflix's habeas petition, Babin notified counsel for Netflix that he intended to dismiss the indictment and that New Indictments had been issued and would be served "within the next few days."[46]  The four New Indictments the grand jury issued at Babin's request were on record with the Tyler County District Clerk's office as early as February 25, 2022,[47] but were not provided

---

[46] Exhibit 15.
[47] Ex. 6 to Ex. 9.

to Netflix until after counsel for Netflix agreed to accept service, on March 2, 2022. Each of the New Indictments alleges sexual performance by a different member of the *Cuties* cast[48] under Texas Penal Code § 43.25. Babin also served his motion to dismiss the original indictment *without prejudice*. The motion continued to assert, contrary to the findings of the First Court of Appeals in *Lowry*, that Section 43.262 is constitutional.[49]

At the time Netflix learned of the New Indictments, the case against it had been pending for more than 500 days. *Cuties*' content never changed during that time. Yet Babin made no effort prior to that time to amend the First Indictment or issue new ones. Babin decided to convene a grand jury only after receiving Netflix's habeas petition and Netflix's arguments exposing not only Section 43.262's serious constitutional issues, but also Babin's complete lack of probable cause for indicting Netflix under that statute.

Faced with new charges that it could not challenge through pre-trial habeas relief, and lacking any *pending* charges under the statute it had challenged in its pretrial habeas petition, Netflix had no choice but to dismiss its habeas action on March 2, 2022, and thus abandon all of the additional rights that petition afforded Netflix, including an immediate right of appeal and the immediate removal of the chill that Babin's First Indictment threatened on Netflix's (and the public's) rights.[50]

One of the New Indictments alleges that a "Jane Doe" with red hair "who was then and there younger than eighteen (18) years of age" exposed her breast below the top of the areola.[51] At the time he sought the indictment, Babin had been informed and thus knew that the actress portraying "Sweety Swaag" was over the age of 18 at

---

[48] Exhibits 11-14.
[49] Exhibit 16.
[50] Ex. 17.
[51] Exhibit 11.

the time of filming, as reflected in a declaration by the actress made prior to hiring.[52] This document was discussed with Babin during in-person meetings with Netflix's counsel after the initial indictment, but he dismissed it as irrelevant and focused his attention instead on the dance scenes involving younger cast members. Thus, with knowledge that a required element of the claim was absent—namely that the performance be by a child—Babin nevertheless presented the grand jury with facts designed to elicit an indictment on charges on which the State can never convict.

The other three New Indictments Babin obtained against Netflix under Section 43.25 also hinge on a charge that has no basis in fact or law: that the cast members, who remain clothed throughout the film, and who nowhere engage in "sexual conduct" as that term is used in and required by Section 43.25, engaged in a "sexual performance". The Cuties do not engage in actual or simulated sex in the film, and at no time are their genitals exposed. Babin nevertheless seeks to prosecute Netflix under Section 43.25, which on its face requires that the state prove minors engaged in sexual conduct during the performance.[53] This last-ditch effort to salvage a case from the wreckage of Section 43.262 after it was held unconstitutional in *Lowry* is vexatious, harassing, and meritless.  Netflix therefore asks that such prosecution be restrained.

### ARGUMENT

Netflix is entitled to a TRO and a preliminary injunction if Netflix establishes

> (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest.

---

[52] Exhibit 4.

[53] *Cuties* was filmed in France. In that country, the child actors are expressly prohibited from working for any entertainment company unless they have the authorization of the child's legal representative and an administrative authority charged with evaluating the "difficulties and the morality of the role which [the child] is called to play." Cod Du Travail, art. R 211-3.

*Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009); *see also Dilworth v. Riner*, 343 F.2d 226, 229 (5th Cir. 1965) (noting that standards for obtaining temporary restraining orders and preliminary injunctions are the same). These elements are not examined in isolation, but are balanced in consideration with all the other factors. Thus, "a showing of *some* likelihood of success on the merits will justify temporary injunctive relief" if evidence supporting the other factors is strong. *Productos Carnic, S.A. v. Cent. Am. Beef and Seafood Trading Co.*, 621 F.2d 683, 686 (5th Cir. 1980) (emphasis in the original).

Although Netflix bears the burden of persuasion on its motion, "the burdens at the preliminary injunction stage track the burdens at trial." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006). This means that Netflix has no duty to disprove any affirmative defenses Babin may raise in response to Netflix's §1983 claim to obtain a TRO or preliminary injunction. *See id*. All that Netflix must do is establish a *prima facie* case on the merits of its own claims. *See id*. If Netflix makes its *prima facie* showing, Netflix "must be deemed likely to prevail" unless Babin makes an adequate showing of the claim or defense on which he bears the burden at trial. *Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656, 666 (2004); *see also Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 336–38 (5th Cir. 1981).

As demonstrated below, Netflix can satisfy each prong of the analysis, and is therefore entitled to a TRO and to preliminary injunctive relief until its claims can be decided on their merits. Netflix is mindful that the restraint of state criminal proceedings is a serious exercise of federal authority. But the request is well-supported and fully within this Court's power under Fifth Circuit and Supreme Court authority. Thus, although Younger abstention is a matter of defense on which Netflix has no burden of proof, it addresses below the legal principles that establish the Court's authority to provide Netflix with equitable relief.

I.  **Federal Courts Have Power to Enjoin State Officials from Engaging in the Conduct in Which Babin Has Engaged: Bad Faith Pursuit of Criminal Indictments to Deprive Netflix of Constitutional Rights and for Purposes of Harassment and with No Hope of Obtaining a Valid Conviction.**

This Court unquestionably has subject-matter jurisdiction over the statutory and constitutional questions Netflix raises in its complaint.  While Babin will likely argue that the Court should abstain from exercising its jurisdiction under *Younger v. Harris*, 401 U.S. 37 (1971), *Younger* abstention does not require dismissal here for at least two reasons.

First, because Babin dismissed the First Indictment under Section 43.262 *without prejudice*, *Younger* abstention poses no obstacle to the Court's enjoining Babin from reindicting Netflix under that statute.   *Younger* abstention rebuts the presumption of mandatory federal jurisdiction only when the party invoking the doctrine shows "(1) an ongoing state judicial proceeding (2) that implicates important state interests *and* (3) offers adequate opportunity to raise constitutional challenges." *Id.* at 156 (cleaned up). Although Babin has brought four more groundless indictments in state court against Netflix (i.e., an ongoing state judicial proceeding), not one of those New Indictments offers Netflix an adequate opportunity to raise its constitutional challenge to Section 43.262. Section 43.262 isn't implicated in any of Babin's New Indictments,[54] leaving Netflix without any opportunity to challenge Section 43.262 in those "ongoing proceedings." *Compare ODonnell v. Harris County*, 892 F.3d 147, 156 (5th Cir. 2018)[55] (holding that because plaintiffs could not obtain review of certain pretrial procedures and practices in their underlying state court criminal cases, *Younger* abstention was improper as a matter of law) *with Steffel v. Thompson*, 415 U.S. 452, 472 (1974) (applying *Yonger* where a state prosecution had been threatened, but as not pending, *Younger* does apply).  "The possibility that a

---

[54] *See* Exs. 11–14.

state proceeding may lead to a future prosecution of the federal plaintiff is not enough to trigger Younger abstention; a federal court need not decline to hear a constitutional case within its jurisdiction merely because a state investigation has begun." *Mulholland v. Marion County Election Bd.*, 746 F.3d 811, 817 (7th Cir. 2014)). The Court's exercise of jurisdiction over Counts I and II of Netflix's Complaint for Injunctive Relief is thus mandatory.

Second, the Court should decline to apply *Younger* abstention to Count III of Netflix's Complaint for Injunctive Relief—Netflix's as-applied constitutional challenge under the First Amendment to the statute charged in the four New Indictments, Texas Penal Code § 43.25—because Babin brought the New Indictments in bad faith.  *Younger* abstention is  an equitable doctrine that operates under the same equitable maxim as any other equitable doctrine: parties who have acted inequitably cannot expect equity. Courts have long recognized that state officials cannot use *Younger* abstention to defeat federal jurisdiction or scrutiny when those officials acted in bad faith during those ongoing proceedings. *E.g.*, *Fitzgerald v. Peek*, 636 F.2d 943, 945 (5th Cir. 1981); *see also Jordan v. Reis*, 169 F. Supp. 2d 664, 669 (S.D. Tex. 2001) (refusing to dismiss plaintiff's complaint on *Younger* abstention grounds where plaintiff's allegations showed that defendants indicted plaintiff in retaliation for raising a Title VII claim); *Nobby Lobby, Inc. v. City of Dallas*, 767 F. Supp. 801, 806 (N.D. Tex. 1991) (collecting cases). *Younger* abstention thus does not apply when the plaintiff can show that the state official's "conduct allegedly retaliated against or sought to be deterred was constitutionally protected, and that the state's bringing of the criminal prosecution was motivated, at least in part, by a purpose to retaliate for or to deter that conduct." *Jordan*, 169 F. Supp. 2d at 669 (citing *Wilson v. Thompson*, 593 F.2d 1375, 1382–83 (5th Cir. 1979)). The burden then shifts to the state officials "to show by a preponderance of the evidence that they would have decided to prosecute even had the impermissible purpose not been considered." *Id*.

In *Torries v. Hebert*, 111 F. Supp. 2d 806 (W.D. La. 2000), for example, the district court held that a district attorney who had prosecuted several individuals for playing music that the district attorney found objectionable could not invoke *Younger* abstention to avoid scrutiny in federal court. *Id*. at 816–17. There could be little doubt, the court held, that the conduct the district attorney sought to deter—the playing of "gangster rap" in public—was entitled to First Amendment protection. *Id*. And the record was clear that the district attorney's decision to indict the plaintiffs "was based in part on the view that 'gangster rap' contributed to the violence which criminally implicated [plaintiffs]." *Id*. (noting the district attorney's assertion that "gangster rap" "is the principal cause of…large gang fights").   The court therefore held that *Younger* abstention would be inappropriate because the district attorney could not show any reason for the indictments other than the plaintiffs exercise of their First Amendment activities. *Id*.

There can be no doubt that the conduct the district attorney in *this* case seeks to deter—the promotion of visual materials protected by the First Amendment and the pursuit of redress in court—is as entitled to First Amendment protection as was the playing of music in *Torries*, and for all the reasons shown in Netflix's Complaint for Injunctive Relief and below. Nor can there be any doubt that Babin's decision to indict Netflix was based, at least in part, on his view that "promoting certain lewd material of children," i.e. *Cuties*, was objectionable and "has destructive consequences"[56]—the very same view that the court in *Torries* cited as justification for finding bad faith against the district attorney in that case.

Moreover, it was only *after*—and because—Netflix exercised its First Amendment right to petition the state court for relief from Babin's First Indictment that Babin obtained the New Indictments without probable cause under Section

---

[56] Ex. 3, Press Release.

43.25—a statute that carries more severe penalties than Section 43.262.[57] Babin
admits to having watched *Cuties* in 2020 and before indicting Netflix in October of
2020 in the First Indictment. Not a second of that film's content changed in the more
than 400 days that elapsed between the date of the First Indictment and the date
Netflix sought redress from the state court. If Babin thought that *Cuties* truly
amounted to child pornography under Section 43.25, he had more than sufficient time
and opportunity to bring those charges either in the first instance or at any other
point during those 400 days.  It strains credulity to think that, when he issued the
First Indictment, Tyler County's chief prosecutor actually thought that *Cuties*
violated Section 43.25 but, for no apparent reason, omitted from the First Indictment
not only *charges* under that statute but any mention of the kinds of facts that give
rise to such serious charges. It is thus clear that Babin forced the delay of the hearing
on Netflix's habeas corpus petition so he could have ample time to convene a grand
jury and bring more severe charges against Netflix under Section 43.25(d), and thus
avoid—and deprive Netflix of a judgment from—the inevitable dismissal of the First
Indictment.

Moreover, Babin obtained the New Indictments without any hope of proving
beyond a reasonable doubt that Netflix actually violated Section 43.25(d) when it
promoted *Cuties*. There can be no conviction under Section 43.25(d) without proof of
"sexual conduct." But, as shown further below, *Cuties*' conspicuously lacks *any*
"sexual conduct." The record therefore establishes that Babin pursued and obtained
the New Indictments *not* for a legitimate law enforcement purpose, but for purposes
of harassment and to ensure Netflix never obtained the favorable final judgment
Netflix sought in state court. *Cf. Ramelli v. Zahn*, No. 20-cv-1482, 2020 WL 3971279,

---

[57] Violation of Section 43.262 carries only a third-degree felony. *Id.* § 43.262(c)(1). But
Babin's New Indictments now charge Netflix with a second-degree felony under
Section 43.25(e), when the child is under 14 years old.

at *8 (E.D. La. July 14, 2020) (refusing to apply *Younger* abstention where the facts showed that the prosecutor brought littering charges against the plaintiff only after the plaintiff's company had filed various claims against the city in court and the prosecutor had no hope of prevailing against the plaintiff on such charges); *Jordan*, 169 F. Supp. 2d at 669 (holding that where allegations showed that the defendants brought criminal charges against the plaintiff only after plaintiff sued for retaliation under Title VII, Younger abstention would be inappropriate).

Finally, whatever he may say in reply, Babin cannot credibly show that he would have decided to prosecute Netflix even had he not considered his impermissible purpose. As already shown above, Babin conceded in the Press Release announcing the First Indictment that he pursued charges against Netflix for an impermissible purpose—the purported "destructive consequences" of "promoting certain lewd material of children,"[58] i.e., *Cuties*, that like "gangster rap" is entitled to First Amendment protection.

The Texas's First Court of Appeals decision in *Lowry* undermines even further any notion that Babin would have decided to prosecute Netflix even had he not considered his impermissible purpose. As *Lowry* expressly noted, the State—like Babin—lacked "evidence or studies to show that the prohibited visual material in section 43.262, which neither encompasses obscenity nor child pornography, has a direct causal link to the State's compelling interest of preventing the sexual abuse or sexual exploitation of children." *Lowry*, 2021 WL 4953918, *11. In other words, the only justification Babin can muster for pursuing these indictments was his impermissible purpose: to deny Netflix its First Amendment rights of speech and petition. Abstaining from Counts III and IV under *Younger* would therefore be inappropriate. *See, e.g.*, *Torries*, 111 F. Supp. 2d at 816–17. The Court should instead

---

[58] Ex. 3, Press Release

adjudicate Netflix's constitutional claims and grant Netflix preliminary and permanent injunctive relief on all such claims against Babin.

## II.   Netflix is Likely to Prevail on the Merits of Its Claims Given the Language of the Statutes and the Circumstances Surrounding the Indictments.

While to grant an injunction, the Court need only consider whether Netflix has shown a likelihood of success on the merits for *one* of its claims, *City of Dallas v. Delta Airlines, Inc.*, 2016 WL 98604, at *7 (N.D. Tex. 2016), *aff'd in part, vac'd in part*, 847 F.3d 279 (5th Cir. 2017), here, Netflix has established it is likely to succeed on *each* of its claims for relief: that §43.25 is unconstitutional as applied to Netflix's promotion of *Cuties* and that the current indictments are retaliatory harassment in response to Netflix's exercise of its rights to petition, and its claim for a declaration that Tex. Penal Code §43.262 is unconstitutional because it is both vague and violates the First Amendment.

### A.   The "Sexual Performance" and "Lewd Exhibition" Statutes at Issue in this Case Must Be Examined in the Context of the Severe Limits the Constitution Places on the State's Power to Restrain Speech.

"[A]s a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002) (*Ashcroft I*). Whether a statute is unconstitutional is a question of law. While in most cases, the party challenging the constitutionality of a statute bears the burden of proof, content-based regulations (i.e., laws that distinguish favored from disfavored speech based on the ideas expressed) are presumptively invalid, which shifts the burden to rebut that presumption to the government. *Id.*; *see also U.S. v. Playboy Ent. Group*, 529 U.S. 803, 818 (2000); *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992). A statute presents a content-based restriction on speech where, in order to determine whether a crime

has been committed, the fact finder must review the substance of the accused visual image or expression. *See Gresham v. Peterson*, 225 F.3d 899, 905 (7th Cir. 2000).

Content-based restrictions on speech are subject to the "most exacting scrutiny." *Turner Broadcasting Sys., Inc. v. FCC*, 512 U.S. 622, 642 (1994).   A law that regulates speech must therefore (1) be necessary to serve a (2) compelling state interest and (3) narrowly drawn. *Sable Communications of California, Inc. v. F.C.C.*, 492 U.S. 115, 126 (1989). There must be "a close nexus" between the government's compelling interest and the restriction, and the statute must employ "the least restrictive means to achieve its goal." *Ashcroft v. ACLU,* 542 U.S. 656, 666 (2004) (*Ashcroft II*).

Challenges to the constitutionality of a content-based restriction can take one of two forms: facial or as-applied. A facial challenge is warranted where the statute "imposes a direct restriction on protected First Amendment activity" that is so imprecise and overly broad "that in all its applications the statute creates an unnecessary risk of chilling free speech." *Sec'y of State of Md. v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 967–68 (1984). An as-applied challenge asserts that a statute, while not constitutionally infirm in all its applications, poses an unreasonable restraint on First Amendment activity as applied by the state to the complainant. "[T]he distinction between facial and as-applied challenges is not so well defined that it has some automatic effect." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010). Rather, the distinction "goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint." *Id.* (citing *United States v. Treasury Employees,* 513 U.S. 454, 477–478 (1995)).

A statute that does not use the least restrictive means and, as a consequence, prohibits a substantial amount of protected speech "judged in relation to the statute's plainly legitimate sweep," is unconstitutionally overbroad. *Virginia v. Hicks*, 539 U.S. 113, 118 (2003). The State may not justify restrictions on constitutionally *protected*

speech on the basis that such restrictions are necessary to effectively suppress constitutionally *unprotected* speech, such as obscenity, child pornography, or the solicitation of minors. *Free Speech Coalition,* 535 U.S. at 355. This rule reflects the judgment that "[t]he possible harm to society in permitting some unprotected speech to go unpunished is outweighed by the possibility that protected speech of others may be muted[.]" *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973).

Overbroad restrictions on speech offend the constitution by fostering self-censorship. *See Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392-93 (1988). This is because "[w]here a prosecution is a likely possibility ... speakers may self-censor rather than risk the perils of trial. There is a potential for extraordinary harm and a serious chill upon protected speech." *Ashcroft II*, 542 U.S. at 670–71; *see also Center for Individual Freedom v. Carmouche*, 449 F.3d 655 (5th Cir. 2006) (discussing unique standing issues raised by laws restricting speech that are subject to facial challenge). This is especially concerning where, as here, the statutes at issue prohibit not just the creation of images, but their transmission, advertising, and promotion.

### B. Although Obscenity and Child Pornography Are Excluded from the Protections of the First Amendment, Laws that Criminalize Unprotected Speech Must Be Narrowly and Precisely Defined or Risk Violating the First Amendment.

While the right of free speech is closely guarded, it is not without limits. Relevant to this case, materials that are "obscene" or that constitute child pornography are not entitled to First Amendment protection, and it is within this narrow zone that Babin has attempted to moor his indictments against Netflix. To understand why he cannot do so, the Court need only consider a few seminal decisions and the language of the statutes underlying the indictments.

Both federal and Texas state law ban—consistent with the federal and state constitutions—two general categories of "visual material": those that are obscene within the meaning of *Miller v. California*, 413 U.S. 15 (1973), e.g., Tex. Penal Code

§ 43.21; and visual materials or performances that depict a minor engaging in "sexual conduct"—i.e., "child pornography." Tex. Penal Code §§ 43.25(a), 43.26(a).

Texas's ban on "obscene" visual material is consistent with *Miller*, which established the constitutional threshold for criminalizing all visual materials that are not child pornography:

(A)  the average person, applying contemporary community standards, would find that taken as a whole appeals to the prurient interest in sex;

(B)  depicts or describes:

(i)  patently offensive representations or descriptions of ultimate sexual acts, normal or perverted, actual or simulated, including sexual intercourse, sodomy, and sexual bestiality; or

(ii) patently offensive representations or descriptions of masturbation, excretory functions, sadism, masochism, lewd exhibition of the genitals, the male or female genitals in a state of sexual stimulation or arousal, covered male genitals in a discernibly turgid state or a device designed and marketed as useful primarily for stimulation of the human genital organs; *and*

(C)  taken as a whole, lacks serious literary, artistic, political, and scientific value.

Tex. Penal Code § 43.21(a)(1) ("obscene"); *see also Ashcroft I,* 535 U.S. at 246 (reaffirming *Miller's* elements as the constitutional threshold for criminalizing most visual materials). A person thus violates Texas's obscenity laws if, "*knowing its content and character*," that person promotes or possesses with intent to promote any "obscene material." *E.g.*, Tex. Penal Code § 43.23(a), (c) (emphasis added).

In *Ferber*, the Supreme Court held that where children were depicted pornographically, the images could be restrained even if not obscene under *Miller*. Fundamental to the Court's reasoning was the belief that the creation of the images themselves was harmful to children, triggering the state's interest in protecting children from abuse. *Ferber* held that child pornography is, in effect, the exploitation it depicts. It is speech treated under the law as action. Child pornography thus

receives unique treatment distinct from traditional notions of free speech, which typically view speech and action as independent.[59] But not every suggestive image of a child is exempted from the First Amendment; thus *Ferber* is limited to "the hardcore of child pornography," typically expressed as "sexual conduct."

Following *Ferber*, Texas enacted three statutes prohibiting the possession and distribution of child pornography: Texas Penal Code Sections 43.25, 43.26, and 43.261. Section 43.25 criminalizes "sexual conduct" in a performance by a minor, *id.* § 43.25(b), while Sections 43.26 and 43.261 criminalize "visual materials" that depict "sexual conduct" involving minors. Tex. Penal Code § 43.25(b), (d); *id.* § 43.26(a)(1), (e); *id.* § 43.261(b). To obtain a felony conviction under Sections 43.25 and 43.26 (Section 43.261 is merely a misdemeanor), the State must prove beyond a reasonable doubt a culpable mental state: that the accused "know[s] the character and content of the material," and that the material actually depicts a child engaged in "sexual conduct." Tex. Penal Code § 43.25(b), (d); *id.* § 43.26(a)(1), (e). Consistent with *Ferber*, each statute defines "sexual conduct" as a laundry-list of prohibited sex acts—"sexual contact, actual or simulated sexual intercourse, deviate sexual intercourse, sexual bestiality, masturbation, [and] sado-masochistic abuse"—and ends with the same catchall used in *Ferber*—i.e., "the lewd exhibition of the genitals . . . ." Tex. Penal Code § 43.25(a)(2), *incorporated by reference in id.* §§ 43.26, 43.261.

---

[59] A similar conflation of speech and action underlies recent efforts to restrict "hate speech" and adult pornography. Thus far, courts have limited the erosion of the distinction between speech and action to child pornography cases, but these opinions set a precedent for treating speech in and of itself as violence against its subject. *Cf., American Booksellers Ass'n v. Hudnut*, 771 F.2d 323 (7th Cir. 1985) (invalidating ordinance prohibiting pornography that depicted violence against or demeaning of women); *Brandenberg v. Ohio*, 395 U.S. 444, 449 (1969) (hate speech at KKK rally protected absent incitement to imminent lawless action). For this reason, courts should be loath to extend the rationale of *Ferber* to additional categories of speech, including through overexpansive interpretation of "lewd exhibition of the genitals" for purposes of Section 43.25 of the child erotica targeted by Section 43.262.

---

That catchall ("lewd exhibition of the genitals") could easily reach protected speech if accorded its plain meaning. *Ferber* expressly recognized that risk and noted that "there are limits on the category of child pornography . . . ." *Id*. at 764. This why *Ferber* admonished states that, in enacting child pornography laws, "the [sexual] conduct to be prohibited must be adequately defined by the applicable state law, as written or authoritatively construed" and "suitably limited and described" to ensure such laws do not "widen the possibly invalid reach of [a child pornography] statute," such as "by giving an expansive construction to the proscription on 'lewd exhibition of the genitals.'" 458 U.S. at 764, 773–74.

By issuing the New Indictments against Netflix under Section 43.25 for promoting *Cuties*, however, Babin has done what *Ferber* held he could not do: stretch the meaning of "lewd exhibition of the genitals" past its constitutional limit. And this is just the latest example of Babin's overreach. Babin's use of Section 43.262 in his First Indictment likewise eschewed the teachings of *Miller* and *Ferber*, because the statute itself—on its face—has no constitutional application to *Cuties* or its promotion.

Section 43.262, passed by the Texas Legislature in 2017, criminalizes the possession, promotion or accessing of a "lewd exhibition of the genitals or pubic area of an unclothed, partially clothed, or clothed child who is younger than 18 years of age." The statute does not require depictions of "sexual conduct" and never uses the term sexual conduct in its operative provisions (although it mentions the term in one of its prefatory sections). While not requiring "sexual conduct"—and thus not restricting child pornography—Section 43.262 only incorporates some, but not all, of the *Miller* elements. The State may, for example, prosecute under Section 43.262 without having to satisfy even the most basic constitutional thresholds, such as proof beyond a reasonable doubt that a work is "patently offensive," or that the State consider the work as a whole before indicting citizens for watching or promoting

offensive "visual materials." Section 43.262 thus "prohibits visual material which neither encompasses obscenity, nor child pornography," *Lowry*, 2021 WL 4953918, *11, and criminalizes a new category of otherwise protected speech. That is why Lowry held Section 43.262 unconstitutional. *Ex Parte Lowry*, No. 01-20-00858-CR, 2021 WL 4953918 (Tex. App.—Houston [1st Dist.] Oct. 26, 2021, no pet. h.). *Lowry* got it right. The Supreme Court has been resolute that only obscenity and actual child pornography are unprotected, and the Court will abet no new exclusions from the protections of the First Amendment. *E.g.*, *Free Speech Coal.*, 535 U.S. at 256; *see also United States v. Stevens*, 559 U.S. 460, 468–69 (2010) (refusing to add "visual depictions of animal cruelty" to the list of visual materials that the First Amendment doesn't protect). Nor should it.

Against this backdrop stands the movie *Cuties*, a film with valuable and timely messages about social media influence on girls in their tweens and the corrosive effect of growing up too fast. But because that film confronts the viewer with an unflinching and (to some) a disconcerting view of adolescence, Babin asked a grand jury to indict Netflix first for promoting "lewd exhibition" under the unconstitutional Section 43.262, and now as full-blown child pornography—even though *Cuties* lacks any signs of "sexual conduct" and no reasonable prosecutor who actually watched the film could believe otherwise.

### C.   Netflix Is Likely to Prevail on its Challenge to the Indictment Under Section 43.25 Because, as Applied to Promotion of the Film *Cuties*, the Statute Is an Impermissibly Broad Restriction on Speech and Reaches Expression that Is Neither Child Pornography nor Obscene.

Section 43.25 is a child pornography statute. It does not require that a performance be "obscene" under the well-established *Miller* factors, but it *does* require actual pornography—in the parlance of the statute, "sexual conduct." *See, e.g.*, *United States v. Williams*, 553 U.S. 285, 297 (2008). The sexual conduct

enumerated in the statute is a laundry list of explicit sex acts—sexual contact, actual or simulated intercourse, bestiality, masturbation, sado-masochistic abuse, or "lewd exhibition of the genitals, the anus, or any portion of the female breast below the top of the areola." Tex. Penal Code §43.25(a)(2).

By including "lewd exhibition of the genitals" at the conclusion of this list, the Texas Legislature limited application of Section 43.25 to displays of the genitals that are sexually explicit in nature. "It is . . . a familiar canon of statutory construction that [catchall] clauses are to be read as bringing within a statute category similar in type to those specifically enumerated." *Paroline v. United States*, 572 U.S. 434, 447 (2014) (cleaned up); *see also United States v. Clark*, 990 F.3d 404, 408 (5th Cir. 2021) ("When confronted with a list of specific terms that ends with a catchall phrase, courts should often limit the catchall phrase to things of the same general kind or class specifically mentioned." (quoting Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 199 (2012)).

Applying this common rule of statutory construction, Section 43.25 only applies where minors are depicted engaging in the enumerated sex acts, or where their genitals, anus, or breasts are open to view or otherwise discernible in a sexually suggestive manner. *Cf. United States v. Hillie*, 14 F.4th 677, 687 (D.C. Cir. 2021) ("Lascivious exhibition of the anus, genitals, or pubic area of any person" in 18 U.S.C. § 2256(2)(A)(v) covers visual depictions in which a minor, or someone interacting with a minor, engages in conduct displaying their anus, genitalia, or pubic area in a lustful manner that connotes the commission of sexual intercourse, bestiality, masturbation, or sadistic or masochistic abuse." (cleaned up)). Other textual clues within the statute confirm the Legislature's intent that depictions of clothed children, however suggestive, do not qualify as "sexual performance" in the absence of sexual conduct or exposure of the enumerated body parts. This is surely the case regarding the "catchall" provision for "lewd exhibition of the genitals, the anus, or any portion of

the female breast below the top of the areola." If fully clothed body parts can be exhibited "lewdly" within the meaning of the statute, then every depiction of the front torso of a female child is potentially a felony – since a fully clothed chest necessarily encompasses that portion of the breast below the top of the areola. But it was plainly intended that the areola be visible, meaning unclothed or otherwise open to view. Likewise the "anus," as opposed to the buttocks, necessarily implies nudity or something akin thereto, as there is no discernible means of exhibiting the anus without it being unclothed. There is no reason to conclude otherwise as to the genitals. Indeed, by distinguishing in Section 43.262 between the "pelvic area" and the "genitals," the Legislature recognized that there is a distinction between the two. Genitals, defined as the sexual or reproductive organs located on the outside of the body, must be unclothed or discernible through clothing to be "exhibited."[60] Finally, Section 43.25 specifically limits "simulated" sexual conduct to depictions where "a person engaging in the conduct exhibits any *uncovered* portion of the breasts, genitals or buttocks." Tex. Penal Code § 43.25(a)(6) (emphasis added).

But that is not the interpretation adopted Babin in the New Indictments. There can be no dispute that none of the *Cuties* cast members are depicted as engaging in any sex acts *at all*. The girls dance suggestively while fully clothed, often in broad daylight, performing moves duplicated by minors on mainstream syndicated TV, TikTok, and YouTube. By bringing the New Indictments, Babin threatens to convert Texas' child pornography statute into a "lewd exhibition" statute—only one even broader that Section 43.262 because it lacks the "prurient interest" and "no serious artistic, literary or journalistic value" elements found in even that constitutionally infirm statute. As  the Supreme Court has expressly recognized—twice—a statute's use of "lewd exhibition" avoids impermissibly chilling speech only

---

[60] Which is why, for example, display of a turgid penis covered by underwear can be actionable. Tex. Penal Code §43.21(a)(1) (obscenity statute).

when narrowly defined, such as when serving as a catchall. *United States v. Williams*, 553 U.S. 285, 296 (2008); *Ferber*, 458 U.S. at 764, 773–74.

Babin's New Indictment of Netflix attempts to apply Section 43.25 to a mainstream film in which minors are not engaged in sexual conduct of any kind and are fully clothed—casting suggestive dance moves while wearing short-shorts as a "lewd exhibition of the genitals"—even though the genitals are not "exhibited" in any common understanding of that word and certainly not in any way that "connotes the commission of sexual intercourse, bestiality, masturbation, or sadistic or masochistic abuse." *Hillie*, 14 F.4th at 687.

There can be no doubt that enforcement of Section 43.25 against Netflix for promoting *Cuties* is a content-based restriction on Netflix's speech, since whether a crime has been committed turns on the substance of the movie underlying the charge. *See Gresham v. Peterson*, 225 F.3d 899, 905 (7th Cir. 2000). When the content of speech is the crime, strict scrutiny applies because, "as a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft*, 535 U.S. at 573.

Babin's overreach is even more troublesome when extended to Netflix as a "promoter" of *Cuties*. Indeed, when construing federal law in *Williams*, the Supreme Court condemned Babin's apparent view of "promotion" as a far-fetched application of the statute:

> *Amici* contend that some advertisements for mainstream Hollywood movies that depict underage characters having sex violate the statute. Brief for Free Speech Coalition et al. as *Amici Curiae* 9–18. We think it implausible that a reputable distributor of Hollywood movies, such as Amazon.com, believes that one of these films contains *actual* children engaging in *actual or simulated* sex on camera; and even more implausible that Amazon.com would *intend* to make its customers believe such a thing. The average person understands that sex scenes in mainstream movies use nonchild actors, ***depict sexual activity in a way that would not rise to the explicit level necessary under the statute***, or, in most cases, both.

*Williams*, 553 U.S. at 301–02 (emphasis added).

By purporting to criminalize the promotion of mainstream movies that depict conduct that is not sexually explicit, but that Babin personally finds offensive, Babin has stretched Section 43.25 beyond constitutional bounds and infringed Netflix's protected speech. For a digital movie distributor like Netflix, criminal charges like those in the New Indictments has sweeping and wide-reaching effect. It is unreasonable to expect Netflix to prevent streaming of particular movies to persons located in particular states. The practical result is that, in order to protect itself from felony prosecution, Netflix must deprive customers in the 49 other states of access to films that are neither child pornography nor obscene, just because one district attorney in Texas—out of 241 of them—says so. *See Reno v. Am. Civil Liberties Union,* 521 U.S. 844, 877–78 (1997) (holding Community Decency Act unconstitutional in part because "the 'community standards' criterion as applied to the Internet means that any communication available to a nation-wide audience will be judged by the standards of the community most likely to be offended by the message"). The criminal proceedings thus compel Netflix to impinge on the rights of non-residents of Texas by forcing it to comply with the most restrictive state-law limitation on expression, even though its customers elsewhere have a constitutional right to receive these films. *See Laird v. Tatum*, 408 U.S. 1, 11 (1972) (holding constitutional violations may arise from the "chilling" effect of governmental regulations that fall short of a direct prohibition against the exercise of first amendment rights).

Mischaracterizing *Cuties*—a film with no sexual conduct and no nudity involving minors—as child pornography is an overbroad and unconstitutional application of Section 43.25. Netflix has demonstrated a likelihood of prevailing on its declaratory judgment challenging the constitutionality of the statute as applied by Babin, and given the presumption of irreparable harm that follows any bad faith prosecution like Babin's, Netflix is entitled to injunctive relief.

**D.  Netflix Is Likely to Succeed in Proving that Section 43.262 Criminalizes Vast Amounts of Conduct Related to Visual Materials That Are Neither Obscene Nor Child Pornography, and Is Thus a Content- and Viewpoint-Based Restriction that Offends the First Amendment and Is Vastly Overbroad.**

Section 43.262 is a deeply flawed and hopelessly indiscriminate statute that cannot withstand constitutional scrutiny for a multitude of reasons.  For purposes of demonstrating its right to injunctive relief, however, Netflix need only demonstrate a right to success on one of those many potential grounds.[61] Among those grounds is the statute's vastly overbroad infringement on the right to free speech.

Section 43.262 deprives citizens of their free speech rights under the First Amendment for two main reasons. First, Section 43.262 is an impermissible content- and viewpoint-based restriction that is not narrowly tailored to serve a compelling state interest. *Lowry*, 2021 WL 4953918, at *9–*11. Second, Section 43.262 is a "criminal prohibition of alarming breadth that is real and substantial" and that offends the First Amendment. *Id.* *12 (cleaned up).[62]

**1.  Section 43.262 Is Facially Unconstitutional Because the State Cannot Justify Section 43.262's Content- and Viewpoint-Based Restrictions.**

Because Section 43.262 criminalizes activity based not only on the content of "visual material," but also the viewpoints expressed when "promoting" such material, the statute must fall. Indeed, where a statute discriminates on the basis of viewpoint, the government is *incapable* of rebutting the presumption of invalidity discussed

---

[61] As Netflix set out in detail in its Petition for Habeas Corpus, several material elements of the statute—its mere "knowing" standard for culpability, its undefined use of "lewd exhibition," and its seemingly futile or incoherent use of *Miller*'s "appeals to the prurient interest in sex" test—render the statute hopelessly indiscriminate and vague, and thus facially unconstitutional in all of its applications. *See generally*, Exhibit 6. Netflix therefore commends these additional grounds for invalidating Section 43.262 to the Court to further justify granting Netflix's motion.

[62] For reasons further noted in *Lowry*, because the State's indictment of Netflix is limited to the promotion of visual material depicting clothed or partially clothed children, this portion of Netflix's challenge is limited to the charged portion of the statute only. 2021 WL 4953918, at *5. Netflix's vagueness challenge, however, extends to the entire statute and in all of its applications.

---

above because the government is *always* barred from engaging in viewpoint discrimination. *E.g.*, *Iancu v. Brunetti*, 139 S. Ct. 2294, 2299 (2019); *see also R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 383–84 (1992). Section 43.262 is therefore facially unconstitutional because (1) its prohibition on the "promotion" of visual materials that are neither obscene nor child pornography amounts to viewpoint discrimination, and (2) applied more broadly, the statute is a content-based restriction that the State cannot justify under strict scrutiny.

First, by criminalizing the "promotion" of visual material that is neither obscene nor child pornography—and is thus presumptively entitled to First Amendment protection—Section 43.262 is a viewpoint-based restriction. "If there is a bedrock principle underlying the First Amendment, it is that the Government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989). "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995). By criminalizing the "promotion" of accused visual materials, Section 43.262 is that kind of blatant First Amendment violation because it makes felons only of those who advocate in favor of accessing (i.e., "advertise" or "promote") "visual materials" that fall within its vast scope. Tex. Penal Code § 43.262(b).

As noted in *Williams*, it is only speech that recommends accused visual material to another person for viewing that "promotes" such material. 553 U.S. at 295. Thus, a citizen who posts on Facebook a message like "Everyone should watch *Cuties* on Netflix because it has a great message. You can find the film here: [link]," is subject to felony indictment for "promotion," while a critical post—"Netflix has *Cuties* but no one should watch it because of its lewd dancing."—is not. *See, e.g.*, *Brunetti*, 139 S. Ct. at 2299 (holding that the government engaged in viewpoint-based

discrimination where it penalized citizens who sought trademarks that used objectionable terms or expressed "immoral" ideas but granted such rights to citizens who sought trademarks with positive messages and "moral" ideas).[63]

Second, "[b]y limiting [Section 43.262's] prohibition to visual material depicting the lewd exhibition of the pubic area of a clothed [or partially clothed] child, the statute is a content-based restriction" that is invalid unless the State can prove that the statute is narrowly tailored to serve a compelling state interest. *Lowry*, 2021 WL 4953918, at \*9 (cleaned up). And, for all of the reasons *Lowry* identified, the State cannot meet its burden.

Section 43.262 lacks any legislative findings about the risks associated with so-called "child erotica images" (if any). And the State has no "evidence or studies to show that the prohibited visual material in section 43.262, which neither encompasses obscenity nor child pornography, has a direct causal link to the State's compelling interest of preventing the sexual abuse or sexual exploitation of children," or that "child erotica images cause sexual exploitation and sexual abuse of children." *Id*. at \*11. Section 43.262 is thus facially unconstitutional under the First Amendment.

> **2.    Besides Being a Content-Based Restriction that Fails Strict Scrutiny, Section 43.262 Criminalizes Substantially More Speech than the First Amendment Tolerates.**

A statute that does not use the least restrictive means and, as a consequence, prohibits a substantial amount of protected speech "judged in relation to the statute's

---

[63] This is not to suggest that laws criminalizing the promotion of *actual* child pornography are inconsistent with the First Amendment. Such prohibitions are based "on the principle that offers to give or receive what it is unlawful to possess have no social value and thus, like obscenity, enjoy no First Amendment protection." *Williams*, 553 U.S. at 298. But where, as here, the material at issue is neither obscene nor child pornography, that principle simply does not apply. *E.g.*, *Brunetti*, 139 S. Ct. at 2299. Section 43.262's prohibition on "promotion" is therefore a viewpoint-based restriction that the State is prohibited from enforcing and should be struck.

---

plainly legitimate sweep," is unconstitutionally overbroad. *Virginia v. Hicks*, 539 U.S. 113, 118 (2003).

As the materials included in Netflix's habeas petition show,[64] and as *Lowry* already concluded, "it is not difficult to imagine the overbreadth of this statute":

> The statute applies to any person—man, woman, teenager, law enforcement, judiciary, or school administrator—as long as the person knowingly possesses visual material depicting the lewd exhibition of the pubic area of a clothed child younger than 18. The statute does not differentiate if a teenager takes the offending photo of themselves, commonly referred to as a "selfie," and posts it publicly for anyone to see. In that instance, and based on the State's proffered compelling interest, if the visual material violates the statute, the teenager is both the victim (of sexual exploitation and sexual abuse) and the offender. And, any other person, whether that person is a collector of child erotica, parent, law enforcement, or educator, who knowingly possesses the visual material posted by the teenager, could also violate the statute.

2021 WL 4953918, at *12.

*Lowry*'s point about "selfies" is hardly academic. Section 43.262 makes a felon out of anyone who accesses with intent to view, or shares with friends via text or social media posts (i.e. "promotes"), the tens of thousands of photographs[65] and videos[66] *voluntarily* created by teens and tweens with no coercion or abuse of any kind, and which have enjoyed *millions* of views on multiple online media outlets (e.g., YouTube, TikTok, Instagram, etc.). So too with anyone who accesses or promotes *numerous* paintings,[67] films,[68] or television shows[69] that depict young bodies in ways some may view as provocative (i.e., "lewd").

"Although the savings clause [in Section 43.262(b)(3)] exempts visual material having *serious* literary, artistic, political, or scientific value, such exemptions matter little when a substantial amount of protected speech is still chilled in the process."

---

[64] Exhibit 6 at 48-58.
[65] Exhibit 6 at 57-58, Lns 50–57.
[66] *Id.* at 53-57, Lns 27–49.
[67] *Id.* at 48, Ln 1.
[68] *Id.* at 49-50, Lns 2, 4–7.
[69] *Id.* at 49-51, Lns 3, 8–19.

*Lowry*, 2021 WL 4953918, at *12. Indeed, *Lowry* itself is proof of how little the savings clause actually matters. In *Lowry*, **the State conceded that it "believed Netflix's movie *had* political, literary, and artistic value**," *id.* at *11, while, in *this* case, the State's First Indictment claimed *Cuties* lacks any such value.[70]

Moreover, when "the text says 'serious' value, 'serious' should be taken seriously." *Stevens*, 559 U.S. at 479. "Serious" means to be of "significant and of great import." *Id.* It is difficult to understand how, for example, any single 20-second clip of minors dancing vigorously in bikinis (or, for many boys, shirtless) to lewd music would *ever* be of "significant and of great import" to literature, the arts, politics, or science.[71] But "the protection of the First Amendment presumptively extends to many forms of speech that do not qualify for the serious-value exception of [Section 43.262(b)], but nonetheless fall within the broad reach of [Section 43.262]." *Id.* at 480. Section 43.262 is therefore substantially overbroad and invalid under the First Amendment for this additional reason and should be declared unconstitutional.

## III. Netflix Will Suffer Irreparable Injury Unless the Court Enjoins Babin from Pursuing His Unconstitutional and Vexatious Indictments.

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 295 (5th Cir. 2012) (citing cases). Indeed, in the majority of courts, just the allegation of a deprivation of a constitutional right satisfies this element. *Id.* But, here Netflix has far more than just an allegation. The record before the Court demonstrates that Babin took direct action both to deprive Netflix of its right to meaningful redress through habeas corpus, and to expose it to multiple prosecutions for a film that no reasonable prosecutor could conclude qualifies as child pornography.

---

[70] Exhibit 2.
[71] *See* Exhibit 6 at 53-58, Lns 29, 37–38, 44, 47–49.

Babin's bad faith is further demonstrated by his pursuit of the four new baseless indictments against Netflix for sexual performance by a child—including one based on performance by an actress who was not a child. Babin charges Netflix with "lewd exhibition of the female breast" of a child in Cause No. 13,969, even though he had previously been informed that the "Jane Doe" at issue was, in fact, more than eighteen-years old at the time the movie was filmed.[72] Although the violation of Netflix's First Amendment rights is sufficient alone, Babin's bad faith conduct is an independent basis on which the Court can find threat of irreparable injury. *See Wilson v. Thompson*, 593 F.2d 1375, 1382–83 (5th Cir.1979) (directly equating a showing of bad faith or harassment with a showing of irreparable injury when construing Younger and its progeny).

Finally, Netflix has demonstrated risk of irreparable injury by its continued exposure to reindictment under the patently unconstitutional Section 43.262. *Younger. Shaw v. Garrison*, 467 F.2d 113, 122 n. 11 (5th Cir. 1972) (noting that under *Younger*, the threat of "repeated prosecutions" also justifies an injunction). While Babin dismissed the First Indictment, he did so *without prejudice* and thus purposely left open the possibility of future criminal indictments against Netflix under that statute—the one Babin precluded Netflix from challenging in court when he dismissed the charges on the eve of Netflix's hearing. Indeed, Babin *still* has not acknowledged the import of the First Court of Appeals' holding in *Lowry*, and argued instead that "the State believes the charged portion of Texas Penal Code 43.262 is constitutional."[73] Thus Netflix faces a real risk of reindictment and further vexatious prosecution that only an injunction may prevent.

---

[72] Doc. 1, Compl. For Inj. Relief ¶¶34–36.
[73] Ex. 16.

**IV.     The Balance of Equities Weighs Heavily in Netflix's Favor.**

In evaluating whether the injury that Babin's conduct threatens against Netflix outweighs any harm that may result if a TRO or injunction is granted, courts weigh "the severity of the impact on the nonmovant if the preliminary injunction is granted, against the hardship that would occur to the movant if the injunction were denied." *Senderra RX Partners, LLC v. Spud Software Co., Inc.*, No. 3:15-CV-1911-M, 2015 WL 4617179, at *7 (N.D. Tex. Aug. 3, 2015) (citing *Cherokee Pump & Equip. Inc. v. Aurora Pump*, 38 F.3d 246, 249 (5th Cir. 1994)). Here, the balance of equities tips heavily in Netflix's favor.

Because Netflix's harm is irreparable as a matter of law, "[Babin] would need to present powerful evidence of harm to his interests to prevent [Netflix] from meeting this requirement." *Opulent*, at 297. This is particularly true where, as here, the injunction would prevent criminal prosecution under an unconstitutional statute. *De Leon v. Perry*, 975 F. Supp. 2d 632, 664 (W.D. Tex. 2014), *aff'd sub nom. De Leon v. Abbott*, 791 F.3d 619 (5th Cir. 2015) ("There is no harm from issuing a preliminary injunction that prevents the enforcement of a likely unconstitutional statute."). Babin's interest in avoiding the exercise of federal power over his would-be state prosecutions are already adequately protected through the *Younger* Abstention doctrine. But for the reasons set forth in Section I, *Younger* abstention doesn't apply: either Netflix's claims are ineligible as a matter of law for such abstention (e.g., Counts I and II); or Babin's own inequitable conduct disqualifies him from pursuing that defense. The balance of equities therefore weighs in Netflix's favor.

**V.     The Public Interest Favors Granting a TRO and Preliminary Injunction.**

"Injunctions protecting First Amendment freedoms are always in the public interest." *Opulent*, 697 F.3d at 298 (cleaned up); *De Leon*, 975 F. Supp. 2d at 665. ("The public interest is promoted by the robust enforcement of constitutional rights.").

The public interest is particularly served where, as here, the injunction sought "prevent[s] enforcement of an unconstitutional law." *De Leon*, 975 F. Supp. 2d at 665. Similarly, when, as here, there is evidence of bad-faith prosecution violating constitutional rights, impartial review by a federal court further serves the public interest. *See id.* The public interest would be served by an injunction and federal adjudication because Babin's broad, and far-fetched application of the Texas Penal Code would label thousands, if not millions, of American citizens as felons subject to criminal prosecution. *See* Section II.

## VI.   No Bond, or a Minimal One, Should Be Required.

Although Federal Rule of Civil Procedure 65(c) provides that a preliminary injunction can issue "only if movant gives security in an amount the court considers proper," Fed. R. Civ. P. 65(c), "the amount of security required pursuant to Rule 65(c) is a matter for the discretion of the trial court," such that the trial court "may elect to require no security at all." *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996) (internal quotation marks omitted). The bond's purpose is to prevent damages that an enjoined party may incur from a wrongful injunction. See Fed. R. Civ. P. 65(c).

Given the important constitutional rights at issue, the strength of Netflix's legal arguments, and the lack of harm to the State in having to delay prosecution, the Court should not require a bond. If, however, such a bond is required, it should be for no more than $1,500. *See SPBS, Inc. v. Mobley,* No. 4:18-CV-00391, 2018 WL 4185522, at *15 (E.D. Tex. Aug. 31, 2018).

## CONCLUSION

Based on the foregoing, Netflix has shown itself entitled to a temporary restraining order and preliminary injunction. Netflix therefore asks that the Court enter a TRO, and later a preliminary injunction, enjoining Babin, his agents, servants, employees, and attorneys, and all other persons who are in active concert

or participation with Babin (or with any of his agents, servants, employees or attorneys) from prosecuting Netflix under the New Indictments, or from seeking to reindict Netflix or otherwise pursue charges against Netflix under Section 43.262 of the Texas Penal Code in connection with the motion picture *Cuties*. The Court should also waive the bond requirement for Netflix and set a hearing for preliminary injunction. Netflix's showing of its likelihood of success and the other injunctive elements, coupled with Babin's conduct, warrants that kind of relief.

Date: <u>March 4, 2022</u>                            Respectfully submitted,

<u>/s/ Joshua J. Bennett</u>
E. Leon Carter
Texas Bar No. 03914300
lcarter@carterarnett.com
Linda R. Stahl
Texas Bar No. 00798525
lstahl@carterarnett.com
Joshua J. Bennett
Texas Bar No. 24059444
jbennett@carterarnett.com
**CARTER ARNETT PLLC**
8150 N. Central Expy, Suite 500
Dallas, Texas 75206
Telephone: 214-550-8188
Facsimile: 214-550-8185

and

David M. Prichard
State Bar No: 16317900
Direct Line: (210) 477-7401
E-mail: dprichard@prichardyoungllp.com
**PRICHARD YOUNG, L.L.P.**
10101 Reunion Place, Suite 600
San Antonio, Texas 78216
(210) 477-7400 – Telephone
(210) 477-7450 – Facsimile

**ATTORNEYS FOR PLAINTIFF**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I delivered a copy of this document to the defendant, Lucas Babin, and to Pat "Hawk" Hardy and other members of Mr. Babin's staff by email on March 4, 2022.

*/s/ Joshua J. Bennett*
Joshua J. Bennett

## INDEX OF EXHIBITS

| Exhibit No. | Description |
|:---:|:---|
| 1 | The motion picture *Cuties* (2020) |
| 2 | Original indictment (Sept. 25, 2020) |
| 3 | *Press Release*, Lucas Babin, Tyler County Criminal District Attorney (Oct. 6, 2020) |
| 4 | Information Sheet (actress Manola Aillaud) |
| 5 | Oct. 26, 2021 email from J. Bennett to L. Babin re *Ex Parte Lowry* |
| 6 | *Netflix, Inc.'s Petition for a Pretrial Writ of Habeas Corpus*, Cause No. 25,842, in the 1A District Court, Tyler County, Texas (filed Nov. 15, 2021) |
| 7 | Letter from J. Bennett to District Clerk re request for hearing dates (Dec. 3, 2021) |
| 8 | Email chain regarding proposed hearing dates for Netflix's Petition for a Pretrial Writ of Habeas Corpus |
| 9 | Email from L. Babin to J. Bennett regarding proposed hearing dates for Netflix's Petition for a Pretrial Writ of Habeas Corpus |
| 10 | Email chain regarding proposed March 2021 hearing dates for Netflix's Petition for a Pretrial Writ of Habeas Corpus |
| 11 | Indictment, Cause No. 13,969, in the 1A District Court of Tyler County, Texas (re Jane Doe) (filed February 25, 2022) |
| 12 | Indictment, Cause No. 13,968, in the 1A District Court of Tyler County, Texas (re Ilanah Cami-Goursolas) (filed February 25, 2022) |
| 13 | Indictment, Cause No. 13,970, in the 1A District Court of Tyler County, Texas (re Esther Gohourou) (filed February 25, 2022) |
| 14 | Indictment, Cause No. 13,971, in the 1A District Court of Tyler County, Texas (re Fathia Youssouf) (filed February 25, 2022) |
| 15 | Email from L. Babin to J. Bennett re dismissal and new indictments (Mar. 3, 2022) |
| 16 | Motion to Dismiss, Cause No. 13,731, in the 1A District Court, Tyler County, Texas (filed Mar. 2, 2022) |
| 17 | Notice of Nonsuit, Cause No. 25,842 in the 1A District Court, Tyler County, Texas (filed Mar. 2, 2022) |