```
                                                               1
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE EASTERN DISTRICT OF TEXAS
 2                       LUFKIN DIVISION

 3   NETFLIX, INC.,               )
                                  )
 4           Plaintiff,           )  Case Nos.
                                  )  9:22-cv-00031
 5   vs.                          )
                                  )
 6   LUCAS BABIN,                 )  Beaumont, Texas
                                  )
 7           Defendant.           )
     ----------------------------------------------------------
 8      TRANSCRIPT OF PLAINTIFF'S MOTION FOR TEMPORARY
        RESTRAINING ORDER AND MOTION FOR PRELIMINARY
 9                   INJUNCTION HEARING

10                     March 4, 2022

11       BEFORE THE HONORABLE MICHAEL J. TRUNCALE
                UNITED STATES DISTRICT JUDGE
12   ----------------------------------------------------------

13   APPEARANCES:

14   For the Plaintiff:

15           MR. JOSHUA J. BENNETT
             Carter Arnett PLLC
16           8150 North Central Expressway, Suite 500
             Dallas, Texas 75206
17           jbennett@carterarnett.com

18           MR. DAVID M. PRICHARD
             Prichard Hawkins & Young
19           10101 Reunion Place, Suite 600
             San Antonio, Texas 78216
20           dprichard@prichardyoungllp.com

21   For the Defendant:

22           MR. CHRISTOPHER L. LINDSEY
             Office of the Attorney General
23           300 West 15th Street, 7th Floor
             Austin, Texas 78701
24           christopher.lindsey@oag.texas.gov

25
```

2

```
 1            Proceedings reported by stenotype.  Transcript
 2               produced by computer-aided transcription.
 3                            ---O---
 4               (The following proceedings were held in open
 5               court commencing at 10:25 a.m., reported as
 6               follows:)
 7               (Call to Order of the Court.)
 8               THE COURT:  Thank you.  Please be seated.
 9               All right.  The Court calls the case of
10  Netflix, Inc., v. Lucas Babin.  It's Civil Action
11  9:22-cv-31.  This is a Lufkin Division case, but we are
12  sitting for purposes of this temporary restraining --
13  hearing on a temporary restraining order in Beaumont.
14               And I'm going to ask counsel to identify
15  themselves and inform the Court if you're ready to
16  proceed.
17               MR. PRICHARD:  Should I leave this cover on?
18  You can hear me all right, your Honor?
19               THE COURT:  Yes, you can.  And thank you all
20  for being here.  And we have, at least for the reminder
21  of this month, some protocols regarding COVID.  But you
22  all, if you feel comfortable in doing so, may remove
23  your masks in the courtroom.  And we are adequately
24  distanced.  And I also think that it does facilitate
25  better communication to be able to understand what is
```

3

1  being -- everyone is saying.

2          So -- and I would also -- since some of you

3  may not be familiar with this courtroom, the acoustics

4  are not particularly good even for members of the jury.

5  You can hear the sound just dissipates.  So be sure and

6  speak into the microphone so that you can be heard,

7  okay?

8          MR. PRICHARD:  Thank you, your Honor.  And

9  good morning.

10         THE COURT:  Morning.

11         MR. PRICHARD:  On behalf of Netflix, Inc.,

12  my name is David Prichard with the firm of Prichard

13  Young LLP, in San Antonio.  With me today is Mr. Joshua

14  Bennett with the Carter Arnett firm in Dallas and our

15  client Ms. Linda Burrow.  And Ms. Burrow is the director

16  of litigation for Netflix.

17         And with the Court's permission, after

18  counsel introduces themselves, I would turn the rostrum

19  over to Mr. Bennett to make our argument.

20         THE COURT:  All right.  That's very good.

21         MR. LINDSEY:  Good morning, your Honor.

22         THE COURT:  Good morning.

23         MR. LINDSEY:  My name is Christopher Lindsey

24  with the Attorney General's Office, and I'm representing

25  Lucas Babin.

4

1          THE COURT:  All right.  Very fine.

2          Mr. Lindsey, you came in from Austin; is that

3  correct?

4          MR. LINDSEY:  I did.

5          THE COURT:  All right.  It's a bit unusual --

6  in fact, I think this may be the first time in a motion

7  for temporary restraining order that the defendant is

8  here.  Usually, as you know, those -- these matters are

9  legally ex parte -- legally done, but I'm glad to have

10 you here.

11         And since we're ready to proceed,

12 Mr. Bennett, I'll turn the floor over to you.

13         MR. BENNETT:  Thank you, your Honor.

14         May it please the Court.

15         THE COURT:  Yes.

16         I apologize to everyone for being a little

17 late, but we had some late filings in this case, which,

18 candidly, have not been fully absorbed yet.  It's not a

19 criticism at all, but normally we at least have 24 hours

20 to absorb the pleadings before one of these type of

21 hearings.  And we had the complaint that was filed, but

22 I didn't see the actual motion as well as the reply

23 until this morning.

24         And I recognize that everyone's probably

25 operating on gas fumes right now and probably -- you all

1  haven't had much sleep in putting this together, but --

2  and so I appreciate that.  And we will want to give

3  serious consideration to all of the pleadings that have

4  been filed.

5          I do not anticipate a ruling from the bench

6  because we have a lot to absorb, but I think we're

7  ready, at least enough, to proceed.

8          So go ahead, Mr. Bennett.

9          MR. BENNETT:  Thank you, your Honor.

10          I'm going to start my arguments talking about

11  a constitutional principle that's central to our system

12  of government.  And it's not the First or Fifth

13  Amendment.  It's federalism.  The party that's most

14  respected that principle in this room is Netflix.  For

15  400 days, it sat under indictment under Texas Penal Code

16  Section 43.262 before it sought redress in state court

17  to have that statute held unconstitutional and those

18  charges dismissed.

19          In those intervening 400 days as that

20  indictment came down in October of 2020, it was clear

21  that that statute was unconstitutional on its face.  It

22  was clear that the state had no probable cause to ever

23  issue that indictment.  And we show that to your Honor

24  in the record and in our brief.  Two quick examples of

25  the utter lack of probable cause are in two of the three

6

1  substantive elements that fall under Section 43.262.

2  That's 43.262(b)(2) and (b)(3).  Those two elements

3  required, before the indictment could issue, probable

4  cause that the film *Cuties*, a film that contains no

5  sexual conduct or nudity of a child at any point,

6  appealed to the prurient interest in sex.

7          For 50 years, appeals to the prurient

8  interest in sex under the United States Supreme Court's

9  decision in *Miller v. California* has meant one thing:

10  The most hardcore of pornography.  *Jenkins v. Georgia*

11  makes the case.  Mere nudity of the -- even nudity is

12  not enough.  It has to be hardcore.  No one who watched

13  *Cuties* could ever have thought that it appealed to the

14  prurient interest in sex under any conceivable

15  interpretation of that phrase from *Miller*.

16          This (b)(3) requires a showing of no serious

17  literary, artistic, political, or other public value, to

18  paraphrase the rest of the statute.  Not just it lacks.

19  No.  Zero political, literary, or artistic value.  By

20  the time the indictment hit, no reasonable prosecutor

21  could have concluded that the statute met that element.

22          THE COURT:  Under concepts of federalism, why

23  shouldn't the Court simply allow the state courts to

24  handle this matter?  I understand that your client was

25  inconvenienced for 400 days and embarrassed or harmed or

7

1   whatever by being under indictment that long.  And from

2   what I gathered from the complaint, was -- there were

3   issues in terms of even getting before a state district

4   judge to have the matter resolved one way or the other.

5          Why should the -- why should the federal

6   court now intervene?

7          MR. BENNETT:  Because --

8          THE COURT:  I mean, don't we have the Younger

9   abstention doctrine in play here?

10          MR. BENNETT:  And that's exactly where we're

11   headed.

12          At some point, comity and -- and

13   federalism -- the relationship between a national and a

14   state government deference to state governments gives

15   way to supremacy.  Now, that point is high.  And we've

16   been more than candid.  We brought the issue up to the

17   Court.  Not the state.  But the reason that this Court

18   now has jurisdiction to hear this is two reasons.  One,

19   we tried to go to federal court.  What happened was --

20          THE COURT:  No.  You tried --

21          MR. BENNETT:  I'm sorry.  We tried to go to

22   state court.

23          THE COURT:  All right.

24          MR. BENNETT:  We brought our challenge to

25   state court.  The statute was held facially

1 unconstitutional in *Ex Parte Lowry*.  We brought that to

2 the state's attention and asked for the dismissal of the

3 charges.  When the state didn't move on that dismissal,

4 we sought redress from the state court by filing our

5 pretrial habeas petition.

6          THE COURT:  Now, on March 2nd, the *Lowry* --

7 the Court granted petition for -- in that case.  So

8 should the Court still -- should this Court still

9 consider that the law of -- the law of Texas, or should

10 we wait until the higher court in the state system

11 renders an opinion on the true meaning of *Lowry*?

12          MR. BENNETT:  Well, the First Amendment is a

13 federal concern, and the First Amendment is squarely at

14 issue in *Lowry*.  So this Court is well within its

15 jurisdiction -- has mandatory jurisdiction over any

16 First Amendment claim that falls within its federal

17 question jurisdiction subject to Younger.  And

18 we'll get -- and that's where I'm --

19          THE COURT:  Without waiting for what the

20 *Lowry* --

21          MR. BENNETT:  Correct.

22          THE COURT:  Whether or not *Lowry* is

23 something -- a case I should follow or not?

24          MR. BENNETT:  Correct.  Federal law --

25          THE COURT:  Although since it favors your

1  position, you want me to take note of it, I'm sure.

2        MR. BENNETT:  It colors the facts of what

3  happened post-*Lowry*.

4        THE COURT:  Okay.

5        MR. BENNETT:  So we file our petition.  We

6  were more than happy and ready to proceed in state court

7  on those grievances.

8        THE COURT:  Are you saying that you kind of

9  waited for -- you were the attorney of record in *Lowry*,

10  as I recall; is that correct?

11        MR. BENNETT:  I was not, your Honor.  It was

12  a different attorney.

13        THE COURT:  Okay.  But you -- with that in

14  mind, you were thinking that because of *Lowry*, that

15  might change the tune of the district attorney in this

16  case?

17        MR. BENNETT:  Well, we hoped that that would

18  be the case.

19        THE COURT:  Okay.

20        MR. BENNETT:  But even if not, certainly

21  that's a good decision to have when you're going to move

22  in state court --

23        THE COURT:  Right.

24        MR. BENNETT:  -- for a pretrial habeas

25  relief.

1          THE COURT:  I got it.

2          MR. BENNETT:  The outcome of a case that's

3  held the statute under which you're under felony

4  indictment is invalid.

5          THE COURT:  Okay.  Continue.

6          MR. BENNETT:  So we were more than eager to

7  proceed in state court and try.  What happened was

8  instead -- and we saw this this morning in the state's

9  response -- rather than dismiss the charges in October

10  or November or December or the months that ensued until

11  March 2nd when we were alerted to the four new

12  indictments, the state pushed off our hearing.  They

13  didn't want it heard on January 4th when the Court was

14  available, so it could convene a grand jury and garner

15  four new indictments on trumped-up charges of child

16  pornography.

17          Now, a pause here, again, just to talk about

18  the facts.  Let's remember the indictment came down --

19  was issued and published by the state in September

20  of 2020.  *Cuties* had been streaming on Netflix by that

21  point for about three weeks.  Not a second of that

22  footage in that film changed between September of 2020

23  and March 3rd of 2022.  At any time in that intervening

24  period, the state could have -- it could have brought

25  those charges originally, given the fact that Mr. Babin

1  claims to have watched the film.

2          And I think it strains credibility credulity

3  to think that the prosecutor, who watched the film that

4  actually thought in September of 2020 that that

5  constituted child pornography under 43.25 of the Texas

6  Penal Code, wouldn't charge that statute.  You can look

7  at the indictment.  It's Exhibit 2 to both our complaint

8  and our -- our TRO motion.  It doesn't mention 43.25 in

9  the first indictment or any of the facts that would give

10 rise to a 43.25 violation.

11         What was charged there is -- was the lewd

12 exhibition of clothed and partially clothed children.

13 That's what 43.262 talks about.  There's -- that is why

14 the indictment came down as it did, again, setting aside

15 issues of probable cause.  Netflix proceeded to

16 challenge that statute in state court until Mr. Babin

17 embarked on a plan to make sure that we didn't get

18 relief, which was issue the four new indictments and

19 then dismiss the charges under 43.262 to ensure that we

20 couldn't challenge that statute and its facial

21 unconstitutionality in state court.

22         And then they've come this morning to your

23 Honor -- Document 9 that was filed this morning -- to

24 tell this Court that we can't get -- even though they've

25 dismissed those charges under 43.262, this Court can't

1  grant any relief so long as any charges are pending in

2  that underlying state court case.  Because that was the

3  plan all along.  Once it knew that *Lowry* had come down,

4  once it knew it couldn't prevail in justifying

5  Section 43.262 under the First Amendment, that was the

6  plan.  Bring new charges, dismiss the old, keep them --

7  prevent them from getting relief -- prevent Netflix from

8  getting relief under -- relief from under the indictment

9  under 43.262, dismiss the charges without prejudice

10 while vouching for the constitutionality of the -- of

11 the first indictment statute.  That's the motion to

12 dismiss that's attached to the TRO.

13             THE COURT:  Question.

14             MR. BENNETT:  Yes.

15             THE COURT:  Does it -- does the fact that --

16 with regard to the 262 claims for which you are under

17 indictment -- your client was under indictment for for

18 400 days -- those -- that indictment has been dismissed

19 without prejudice, but -- this is a standing question.

20             Is there still some speculation that -- is it

21 more speculative that you might be indicted under --

22 under this statute again?  In other words, are we now

23 just -- should focus on the child pornography charge

24 that you're currently under indictment -- your client is

25 currently under indictment for?

1          MR. BENNETT:  So the answer to that is, no,
2   it's still a live controversy that isn't mooted by the
3   dismissal of the prior charges.  We'll brief this, I'm
4   sure --
5          THE COURT:  Why is this not speculative is my
6   question?
7          MR. BENNETT:  Right.  It's not speculative
8   because once an indictment has come, even if it is
9   voluntarily dismissed --
10         THE COURT:  Right.
11         MR. BENNETT:  -- the -- the chances of
12  re-indictment are not speculative any more under
13  Fifth Circuit cases -- and we're happy to file a letter
14  brief immediately after or a supplemental brief for your
15  Honor immediately after the hearing addressing that.
16  Mootness hasn't been raised, but it's not speculative.
17         THE COURT:  Yes.
18         MR. BENNETT:  Because once you've been under
19  indictment, even if the state voluntarily dismisses it,
20  unless there is some dismissal with prejudice or some
21  stipulation of "we won't re-indict," which is exactly
22  the opposite in this case, then the -- the plaintiff has
23  standing in a live controversy, not a moot one, to
24  proceed in federal court and adjudicate its
25  constitutional rights.  So that's this case.

14

1              The dismissal was without prejudice -- and

2    not just without prejudice -- while also vouching for

3    the constitutionality of the statute -- affirmative

4    assertions that the state really thinks the state --

5    that the statute is constitutional.  And that's where I

6    want to come back to *Ex Parte Lowry*.  It's the state who

7    petitioned for review.  It's taking up for this statute.

8    The Attorney General's Office.  Mr. Babin is the

9    district attorney.  So, apparently, the state still

10   thinks it's constitutional.  And in light of all of the

11   those facts, it's not speculative for Netflix to think

12   that if re-indict is not coming from -- from Mr. Babin,

13   then some other district attorney or state attorney

14   general.

15              THE COURT:  Can this matter be decided by

16   this Court just based upon application of the statute

17   without having to go to a constitutional analysis?

18              MR. BENNETT:  The short answer is no.  The

19   constitutional challenge is --

20              THE COURT:  Well, hold on.

21              MR. BENNETT:  Yes.

22              THE COURT:  Of course, not in a TRO.  But

23   ultimately in an injunctive proceeding, could there be a

24   finding?  I've not seen the film, but a finding that

25   it -- you've made the position that it doesn't violate

1  either one of these two statutes just on its face.

2  There is no act -- no evidence of sexual activity.  I

3  don't know if there is or not, but that's what you've

4  stated.

5          I mean, could it be a determination without

6  even addressing the broader constitutional issues and

7  say, well, those statutes have not been violated?

8          MR. BENNETT:  The short answer is no for two

9  reasons.

10         THE COURT:  Go ahead.

11         MR. BENNETT:  One, the underlying merits of

12  the indictment are a matter of only state law that's not

13  before the Court.

14         THE COURT:  Thank you.  Okay.  That's what I

15  was driving at.

16         Okay.  Go ahead.

17         MR. BENNETT:  But the reason that those facts

18  matter about the utter lack of probable cause for the

19  first indictment or the new ones is because they get

20  back to what -- what we wanted to talk about since we

21  got here, which is Younger abstention.

22         So Younger abstention -- just speaking

23  critically -- just strictly about the law of Younger

24  abstention, it applies in -- when there's three elements

25  present.  One, ongoing state court proceedings.  Two,

1   when the federal action might interfere with those

2   proceedings.  And, three, if the movant or the plaintiff

3   can seek redress in state court.  Counts 1 and 2 of the

4   complaint -- of Netflix's complaint for injunctive

5   relief do not fall under Younger abstention, despite

6   what the state argued this morning in its brief.

7            And the reason for that is because upon

8   dismissal of the charges under 43.262, there is no state

9   court proceeding that involves those charges.  In that

10  case, our invocation of federal question jurisdiction

11  makes the exercise of jurisdiction over Counts 1 and 2

12  mandatory because we have a right to a federal forum to

13  adjudicate federal claims under the United States

14  Constitution.

15           THE COURT:  Okay.

16           MR. BENNETT:  Younger abstention does not

17  apply at all, despite what the state has argued, despite

18  what the state has tried to do to prevent us from

19  getting here.  It doesn't apply to Counts 1 and 2.  So

20  those go forward.  So we get to challenge in this court

21  and adjudicate the constitutionality of Section 43.262

22  because it's a federal question.  It's not barred by

23  Younger abstention, and it is still a live controversy.

24           Counts 3 and 4, even if the Court assumes all

25  of the Younger abstention facts -- the three Younger

17

1   abstention elements applies to those two counts, which

2   is those that arise out of the new -- the four new

3   indictments, this is where we switch from comity to

4   supremacy.  At some point, federal law hold sway.

5   Constitutional law hold sway.  And that point is shown

6   emphatically in this record, and that is where state

7   officials have engaged in bad faith tactics.  And we

8   don't use that term lightly.  That's a well-supported

9   finding under the cases we've cited to this Court;

10  *Fitzgerald v. Peek*, 636 F.2d 943; *Jordan v. Reis*,

11  169 F.Supp 2d 664.  There are others.  *Torries v.*

12  *Hebert*, 111 F.Supp 2d 806.

13         In all of those cases, the federal courts

14  refused to apply Younger abstention, an equitable

15  doctrine, because it had been shown that the state

16  officials acted inequitably toward the plaintiffs in

17  trying to retaliate against them or harass them for

18  exercising their First Amendment rights.  And those

19  facts are present here, and under the law, justify the

20  exercise of this Court's federal question jurisdiction

21  over federal constitutional issues.

22         So, for example, Netflix exercised its

23  First Amendment right to promote the film *Cuties*.  As a

24  result of the exercise, that is protected conduct.  The

25  film *Cuties* -- and we've showed this in our brief -- is

1  not subject to obscenity and under no reasonable

2  construction of a child pornography law could it be

3  considered child pornography.  And, in fact, to stretch

4  child pornography law, such as Texas Penal Code 43.25,

5  to apply to this movie is to stretch them beyond

6  constitutional bounds.  On that point, the state's

7  position apparently is that anyone who not -- not only

8  who watches *Cuties* is guilty of a second degree felony,

9  but anybody who promotes *Cuties* -- and that is an

10  exceedingly broad term as defined in the statute.

11  Promotion could include anyone who posts a positive film

12  review of *Cuties* urging other people to watch it.

13       If this is really child pornography -- real

14  child pornography, nobody can post up on YouTube, "This

15  is a great movie.  You should watch it.  Here's the

16  link."  Or on Internet Movie Database or on any number

17  of social media sites where people exchange these kinds

18  of ideas and communications.  But the state would

19  have -- would construe Section 43.25 to apply to all of

20  that.  Because in the real child pornography context,

21  all of that would be criminal if it were really child

22  pornography.

23       THE COURT:  And none of that is specifically

24  before the Court, but you're just using that for

25  purposes of argument?

1          MR. BENNETT:  It is before the Court in the

2   sense of our as-applied challenge to Section 43.25.  As

3   applied to *Cuties*, all of those facts show why it is

4   unconstitutional as applied to us.  It covers -- it --

5   as applied versus a facial challenge concerns the

6   remedy.  Netflix supports and is not trying to

7   invalidate Section 43.25.  We are cognizant of its good.

8   We support it.  We are very conscientious in making sure

9   nobody violates that certainly from our side in doing

10  our due diligence.  And we've shown that to the Court in

11  Exhibit 4 to our temporary restraining order showing

12  that we did an investigation about the actresses

13  involved in our film and verified that they were of age

14  if the conduct required that that verification be made.

15         THE COURT:  When was this -- when was this

16  film made, and in particular what -- do you know the

17  date that that particular scene with Ms. Aillaud -- I

18  may be not pronouncing it correctly -- Manola I think is

19  her first name.

20         Do you know the date that that particular

21  segment was filmed?

22         MR. BENNETT:  To the best of -- and this is

23  not in the record yet.  To the best of our knowledge, it

24  was no -- no sooner than 2018.  Certainly, it wasn't

25  2017 or 2016 when she would have been underage.

1          THE COURT:  2018?

2          MR. BENNETT:  Correct.  So she was born in

3  1999.  Our best -- to the best of our knowledge, she was

4  probably 19 or 20.

5          THE COURT:  Okay.

6          MR. BENNETT:  We're still trying to run that

7  down.  It certainly wasn't filmed in 2016 when she was

8  17 years old.

9          THE COURT:  You can represent that to the

10 Court?

11         MR. BENNETT:  Yes.

12         THE COURT:  Okay.  Go ahead.

13         MR. BENNETT:  So we are very conscientious

14 and cognizant of that because Netflix streams

15 everywhere.  It has to stream -- it's subject not only

16 to federal laws on this issue, but 50 state laws on this

17 issue.  And it streams *Cuties* into every one of those

18 states.

19         And I just want to step back and pause this

20 just for a moment to think about what that means.

21 Federal child pornography law is overseen by 94

22 United States attorneys and their assistant United

23 States attorneys.  There are 50 state attorney generals

24 and their assistant attorney generals.  And I don't know

25 how many district attorneys there are in the United

21

1  States, but it has to be a few hundred.

2          In Texas, there are 241 district attorneys.

3  *Cuties* has been streaming continuously from September

4  of 2020 until now.  And out of all of those thousands of

5  prosecutors, one -- one has brought indictments against

6  Netflix for the film *Cuties*.  One.  And not just one --

7          THE COURT:  One federal -- one federal

8  prosecutor has, did you say?

9          MR. BENNETT:  No.  One prosecutor out of all

10  federal prosecutors and all state prosecutors in

11  America --

12          THE COURT:  Mr. Babin.

13          MR. BENNETT:  Mr. Babin.  And not just one,

14  but five.  I think, again, that highlights the nature of

15  why 43.25 can't constitutionally be stretched to apply

16  to *Cuties*.  Because it's -- it's too far.

17          THE COURT:  Okay.

18          MR. BENNETT:  And we commend to your Honor

19  the case *U.S. v. Williams*.  We've cited it in our brief

20  about exactly why that's the case.  Justice Scalia in

21  his opinion there rejected as far-fetched the very view

22  Mr. Babin expresses in this court about why 43.25

23  applies.  That -- he shot that down in rejecting a

24  facial challenge but said as-applied challenges could be

25  brought.  And that's why we're here.

1           So when it comes to Younger -- even Younger

2    has limits.  And we have been candid from the start.  We

3    put it in our complaint, and it's, again, in our TRO

4    motion that we understand that Younger's limits are a

5    high bar.  But the sad part is that the law and the

6    facts of this case exceed that bar.  And the cases we've

7    cited to your Honor show it.  *Torries* is a great one.

8    In that case out of a federal court in Louisiana, some

9    plaintiffs had been playing rap music.  Gangster rap

10   music.  They have a First Amendment right to do that.

11          The local district attorney didn't appreciate

12   it.  He was concerned that gangster rap was inciting

13   violence and brought criminal charges against the

14   plaintiffs in that case for playing their music.

15   Younger abstention was asserted there by the district

16   attorney, and the Court rejected the Younger abstention

17   motion because the law and the facts didn't justify it.

18   If the plaintiffs had a First Amendment right to play

19   the gangster rap music, the Court held, and you have no

20   other basis for justifying the indictment other than

21   their exercise of a First Amendment right, then that's a

22   bad faith prosecution, among the other facts that the

23   district attorney couldn't come up with any other

24   justification, other than the exercise of First

25   Amendment rights, to defend the prosecution.

23

1      We have -- our -- before it was dismissed --
2  the charges under 262 were dismissed, our habeas
3  petition had been pending for more than 90 days.  And we
4  have yet to hear any defense from Mr. Babin or anyone
5  else about why that statute isn't unconstitutionally
6  overbroad or unconstitutionally vague on its face.
7      THE COURT:  That habeas motion is now moot
8  because those charges were dismissed, correct?
9      MR. BENNETT:  Correct.  But the point I'm
10  making is there's been -- there has never been a
11  substantive defense to what has happened here.
12      So once we have all those facts in view,
13  Younger abstention either doesn't apply at all under
14  Counts 1 and 2, or if it does apply to Counts 3 and 4,
15  it would be inappropriate to apply Younger abstention
16  given the facts of the case and under the law of Younger
17  abstention exceptions.  I want to also point out, again,
18  another exception to Younger abstention is where the
19  state acts purposely to deprive a plaintiff of a legal
20  right or acts in retaliation of that legal right.
21      And the record shows that happened here.  The
22  legal right that we invoked was the right to petition
23  the government for redress.  We asked for dismissal of
24  charges that couldn't be supported either by the
25  constitution or the facts.  The facts were coming later,

24

1  but we couldn't even get over the constitutional hurdle,

2  which is why we filed the pretrial habeas petition.

3  That petition was filed on November 12th.  By that

4  point, the case had been pending 400 days roughly.  At

5  no point thereafter did a dismissal come until

6  March 3rd.  And the reason the dismissal came that late

7  and -- was because we filed that petition.  Showed

8  ourselves entitled to a judgment.  And not just a

9  judgment that -- that would have got us out of some

10 criminal charges, but a judgment that would have

11 invalidated that statute against Netflix for all time

12 and in memoriam, if successful.  And maybe it would be

13 appealed, but we would defend that on appeal.  But that

14 was the redress we showed ourselves entitled to.

15         It wasn't until after we filed that petition

16 and expressed those views and showed ourselves entitled

17 to that relief that Mr. Babin engaged in the course of

18 conduct that he engaged in; convene a secret grand jury,

19 get four more trumped-up charges, and dismiss those --

20 dismiss the first indictment so we could never get that

21 kind of relief.  *Jordan v. Reis* and some other cases

22 that we've cited show that when you act -- when you file

23 claims -- when you petition the government and that

24 results in further conduct -- prejudicial conduct by the

25 government, that's an exception to Younger abstention

25

1  also.

2          So with Younger abstention out of the way, we

3  can finally get to the merits of why we're here, and

4  that's the state and Mr. Babin's effort to deprive

5  Netflix of its constitutional rights.  At no point in

6  the state's response this morning do they try to engage

7  those arguments on the merits.  They haven't done it in

8  the 90 days that ensued after we filed the petition.

9  They don't even mention the film *Cuties* in the response

10 or provide any analysis to rebut any of the arguments we

11 make about why it is unconstitutional -- why the new

12 indictments are unconstitutional as applied to Netflix

13 and *Cuties*, and they make no effort to defend -- don't

14 even cite Section 43.262 in their response.  And that, I

15 would submit, is because there isn't much of one.

16 Between its unconstitutional vagueness and its clear

17 overbreadth and viewpoint discrimination, as we also

18 point out in our brief, the statute can't survive strict

19 scrutiny on its face.  That being Section 43.262.

20         So Netflix is likely to succeed on the merits

21 of its claims.  And you know that especially because of

22 *Lowry*.  And to your Honor's point about the Texas Court

23 of Criminal Appeals granting the petition for review --

24 something we pointed out in Footnote 1 of our

25 complaint -- I would submit to your Honor that -- and

1  this is just tea leaves.  One of the reasons for that is

2  this is the underlying case in state court.  The Texas

3  Court of Criminal Appeals certainly didn't know that the

4  day it granted review in that case, Mr. Babin

5  indicted -- dismissed that indictment.  But you can look

6  at *Lowry* on Page 11 of the opinion in *Lowry* where that

7  court cites Mr. Babin's indictment of Netflix as grounds

8  for finding the statute that Mr. Lowry challenged,

9  43.262, unconstitutional.

10        It cited the very prosecution that Mr. Babin

11  brought as a reason to find it overbroad and threatening

12  and chilling speech.  And none of that mattered to

13  Mr. Babin.

14        THE COURT:  Now, the *Lowry* decision was not

15  based on Section 43.262, though.

16        MR. BENNETT:  It was not.  That is correct.

17  And that's because -- and this is, again, I think

18  another fact that sort of shades what's really going on

19  here with respect to these four new indictments.  We

20  have attached our habeas petition as Exhibit 5 to our

21  complaint and as Exhibit 6 to our TRO motion.  In that

22  petition, we were very candid with the Court because we

23  take that obligation seriously.  And what we've said was

24  the existing laws on the books of -- the statutes in

25  Texas under child pornography are constitutional on

1  their face.

2          We made that representation to the Court so

3  as to distinguish the newer 43.262, which would -- had

4  been enacted in 2017.  And the reason that fact matters

5  is because once we've told the state court that we can't

6  make a facial challenge to 43.25, we can't get pretrial

7  habeas relief against those charges.  We have to go

8  through all of the pretrial process under any charges

9  under 43.25 because there's no right to pretrial habeas

10 relief under Texas state law unless you have a facial

11 challenge.  And we readily acknowledge we don't.  And so

12 that's why the -- that's why we traded horses.  You can

13 get pretrial relief and a right to immediate appeal on a

14 facial challenge, and we were headed that way to make

15 sure we didn't.  And we had to play his game in state

16 court.  He changed to 43.25.  And in a way -- again,

17 that's lacking probable cause, which goes to bad faith,

18 but more importantly cannot be supported by the

19 constitution --

20          THE COURT:  So you don't have a

21 constitutional attack on Section 43.25?

22          MR. BENNETT:  I do as applied.  So the

23 difference is 43.262 being a facial challenge would

24 invalidate that statute for everyone.  No prosecutor in

25 Texas could ever indict anyone if we were successful

28

1    under 43.262.

2              THE COURT:  Because you're saying it's too

3    vague and that kind of thing?

4              MR. BENNETT:  Exactly.  In substantially all

5    of its applications.

6              THE COURT:  Okay.

7              MR. BENNETT:  So it's too vague for everyone.

8    It's invalid for everyone under the First Amendment.

9              THE COURT:  Okay.

10             MR. BENNETT:  We can't make that challenge

11   under 43.25 because it -- because Texas correctly

12   drafted that statute to comply with *Ferber v. New York*.

13   And we, again, in our habeas petition told Mr. Babin

14   that that was our position because it's true.  It does.

15   It's facially constitutional.  We would never think of

16   trying to bring a facial challenge to a statute that --

17   that's that important to the State of Texas and that

18   many other states have.

19             THE COURT:  All right.  So if the

20   Statute 43.25 is facially valid, then in its

21   application, your position is that it simply doesn't

22   apply here because there is no sexual conduct,

23   essentially, portrayed in the film.  At least that's

24   what you've represented to the Court.

25             MR. BENNETT:  Correct.  So there's --

 1   there's -- for constitutional purposes --

 2           THE COURT:  So then how do I -- it kind of

 3   goes back to my first question.

 4           Do I -- could I on this particular point make

 5   a decision based upon the applicability of the statute

 6   itself as it applies to this film, which I have not

 7   seen.  And if I were to do that, then am I not

 8   interfering with reaching down and basically

 9   invalidating the state process through the state courts

10   before the state courts have even had an opportunity to

11   rule on whether or not there's been a violation of this

12   statute?

13           MR. BENNETT:  So the answer -- the short

14   answer is no.  And let me explain why.  There's --

15   there's two sets of facts here that are important for

16   this case because of it's highly unusual nature, which

17   your Honor alluded to at the start.  So one set of facts

18   concern the constitutional claim.  That's the -- that's

19   the only claim that's before the Court on the merits.

20           Can Section 43.25 be constitutionally

21   applied -- be applied to the film *Cuties* consistent with

22   the First Amendment?  That's the issue we've raised.

23           THE COURT:  Okay.

24           MR. BENNETT:  That's the only issue that's

25   before the Court on that -- under the new indictments

1  under 43.25.  The reason that the merits come into play

2  here is because of the state's anticipated invocation of

3  Younger abstention.  Now, what I mean by that is when

4  a -- when the state or a state official pursues charges

5  under which it has no hope of obtaining a conviction --

6          THE COURT:  Okay.

7          MR. BENNETT:  That's evidence of bad faith

8  that goes to whether the equitable doctrine of the

9  Younger abstention should apply and prevent the Court

10  from reaching issues that it otherwise has original

11  mandatory jurisdiction to reach.  So when we talk about

12  the lack of merit -- the utter lack of merit that 43.25

13  as applied to *Cuties* poses, that doesn't go to the

14  issues necessarily the Court needs to decide in term of

15  the merits.  What it goes to is Mr. Babin's utter bad

16  faith.

17          So because no reasonable prosecutor who

18  watched *Cuties* -- as, again, corroborated by the utter

19  non-indictment by any other prosecutor in America under

20  any form of child pornography law -- that goes to bad

21  faith.  But when we get to the other side, which is

22  the side -- the other side of this issue, which is the

23  merit of it, as applied to *Cuties*, 43.25, that can't

24  go forward because it's unconstitutional under the

25  First Amendment.

1      So your Honor's not invading the state -- you
2  don't need to reach whether -- the issues of whether the
3  statute applies or, you know, would -- do we need to let
4  the state adjudicate the merits of --
5          THE COURT:  And so I'm clear, if, in fact, we
6  had actual sexual conduct of minor children portrayed in
7  the film, then there would you no constitutional -- that
8  would be pornography under the federal constitutional
9  analysis, correct?
10         MR. BENNETT:  If -- yes.  If a film qualifies
11 and actually has real sexual conduct as defined by Texas
12 law and -- again, assuming that that Texas law is
13 construed consistent with *Ferber v. New York*.
14         THE COURT:  Right.
15         MR. BENNETT:  In that case, it would be
16 actual child pornography, and the indictment would be
17 constitutional.  That's correct.
18         THE COURT:  Okay.
19         MR. BENNETT:  But that is not what we have
20 here.
21         THE COURT:  Okay.  And so that's the
22 distinction you're drawing here?
23         MR. BENNETT:  That's right.  And, again, I
24 want -- we've cited some -- some colorful examples of
25 the profound defects in Mr. Babin's theory of applying

32

1  43.25 to *Cuties*.  One of them is a piece that's very

2  critical of *Cuties*, and we've cited this.  It's a piece

3  by a Mr. Naulty.  If Mr. Babin's correct and *Cuties*

4  shows real sexual conduct for purposes of Texas Penal

5  Code law, Mr. Naulty is a felon because he put out a

6  news story that cropped what he viewed as the most

7  objectionable screenshots from the film and pixelated,

8  you know, the most titillating parts -- if you're

9  Mr. Naulty, I guess -- of -- of those screenshots,

10 right, of the scenes from the film.

11       Under Fifth Circuit law, that's a violation

12 of a child pornography statute.  You can't pixelate

13 images that are actually child pornography and have any

14 sort of defense even if it's a journalistic one.  That's

15 *U.S. v. Matthews* out of the Fourth Circuit.  There's no

16 such thing as a bona fide journalistic purpose defense

17 to child pornography laws.  So if Mr. Babin's correct,

18 Mr. Naulty's a felon under Texas Penal Code

19 Section 43.25 or Texas Penal Code Section 43.26, which

20 is related to 43.25.  That can't be the law.  That isn't

21 the law because it -- *Cuties* is not child pornography.

22       So in light of all of that, the clear

23 violation of the First Amendment -- that 43.25 -- would

24 be a stretch to apply to *Cuties*.  And the fact that

25 viewed -- viewed objectively, if it can't ever be

1  construed to meet the four corners of that, the Court

2  can reach the merits because Younger abstention doesn't

3  apply.  And, again, that -- that last part about why

4  Younger abstention doesn't apply hinges on the

5  definition of sexual conduct somewhat, right?  Again, we

6  commend *U.S. v. Williams* to the Court.  There's also a

7  great decision recently out of the -- out of the D.C.

8  Circuit that sort of talks about how you treat

9  catchalls.

10         And I guess I'd have to back up really quick

11  here.  We are making something of an assumption.  If you

12  look at the indictments, Mr. Babin doesn't actually

13  identify what part of 43.25 -- what actually constitutes

14  sexual conduct.  He just says it's in there.  If you

15  look at the definition of sexual conduct, there's a lot

16  of explicit sexual acts listed there.  And none of

17  them -- and I won't repeat them here.  I probably can't

18  remember them all, but there -- they're serious, they're

19  explicit, and none of them are present in the film.

20         Our best guess -- and it literally is a

21  guess -- is that the state thinks that it amounts to the

22  lewd exhibition of the genitals.  And that word means

23  something.  And this is where we go back to 43.262,

24  which is the charges he first brought.  Genitals is not

25  the pubic area.  And the Texas legislature agrees with

34

1  that because it uses distinct terms --

2           THE COURT:  Or --

3           MR. BENNETT:  It uses distinct terms to make

4  that point in Section 262.  So there are no genitals

5  visible at any point in *Cuties*.

6           THE COURT:  What does the word "depict" mean

7  in the statute?

8           MR. BENNETT:  Depict just means show under

9  its plain language.  It's not a defined term, but, you

10 know, you could use the New Oxford International

11 Dictionary.  And that's what it means.  Depict means to

12 show.  To portray.

13          THE COURT:  So if one were to show a

14 photograph of the area of a child, say, below the belt

15 line but clothed -- so of the pubic area -- but that's

16 not depicting or is it depicting the pubic area?  It's

17 the -- do you see what I'm saying?

18          MR. BENNETT:  I do.  There is a distinction

19 between the two terms.  And this is where we would

20 commend *U.S. v. Williams* and --

21          THE COURT:  Especially when that Statute 262

22 talks about clothed or partially clothed.

23          MR. BENNETT:  Right.  Pubic area means pubic

24 area.  It's a more generalized region.  It could be

25 front or back or clothed or unclothed.

1      THE COURT:  But could that, even if clothed,

2  create some sexual interest -- prurient interest just by

3  watching it whether the -- even if it is clothed --

4  perhaps, even depending upon how the clothes are tight

5  on the body or something else?

6      MR. BENNETT:  I don't know whether it could

7  create sexual interest.  I guess it depends on who you

8  are, but that's not the focus of the statute.  The focus

9  of the statute -- when we look at catchall

10  clauses like lewd exhibition -- and this is the point

11  that Justice Scalia drives home in *U.S. v. Williams*.

12  You interpret a catchall by its predecessors, right?

13  You don't take it in isolation.  A catchall is

14  interpreted under the canons of construction by its

15  predecessors.

16      And if you look at those predecessors and how

17  explicit those acts are and then you read "or the lewd

18  exhibition of the genitals" -- and then it continues

19  on -- other anatomical parts.  And it uses those

20  anatomical parts, not in any general sense, but in their

21  anatomical sense, such --

22      THE COURT:  Okay.

23      MR. BENNETT:  -- that you have to show those

24  anatomical parts.

25      THE COURT:  I suppose I ultimately will have

1  to look at the film.  And I know there is an issue

2  involving the exhibition of the -- what is commonly

3  referred to as the areola of a woman's breast.

4            MR. BENNETT:  Correct.

5            THE COURT:  And that's what then makes that

6  potentially a violation of the statute.  Although I

7  understand your position is this lady was over the age

8  of 18 at the time it was filmed and obviously at the

9  time this movie was shown to the public.

10           But is it covered or uncovered?  Is that a

11 bright line that we need to look for when we're looking

12 through this?

13           MR. BENNETT:  It is an uncovered moment.

14 The --

15           THE COURT:  No.  No.  But to define whether

16 or not it would violate either of these two statutes.

17           MR. BENNETT:  So I think -- if I understand

18 your Honor's question correctly, if you're asking does

19 it -- does it -- do child pornography laws require

20 nudity in every case?

21           THE COURT:  That's what I'm asking.

22           MR. BENNETT:  No.  The answer -- the simple

23 answer is no.  But that's not saying that just because

24 clothing is involved that it is child pornography.  And

25 that gets back to what -- the point I was making earlier

1  about what a catchall does.  You have to interpret a

2  catchall by its predecessors.

3          And so if clothing is involved, that's -- if

4  it's present, that doesn't -- you've got to look at in

5  what way.  And this is where we get back to *Williams* and

6  *Hillie*, which is if there is not nudity, it is a very

7  close question.  But whatever the question is, it's got

8  to look like real sexual conduct.  And that's an outlier

9  issue that we don't have to get to, and that's not

10  raised by this case.  And your Honor will have to watch

11  the film to see what I mean by that, but it's not sexual

12  conduct.

13          It doesn't imitate or look like or touch on

14  any of the predecessors in the statute.  And, again, I

15  want to emphasize you know that because this is -- this

16  is an indictment of one.  No federal, no state, or any

17  prosecutor, other than Mr. Babin, has brought these

18  charges despite the fact that for two years it

19  streamed -- for almost two years it streamed

20  continuously on Netflix.

21          We've provided those arguments to your Honor

22  about why it would be unconstitutional to stretch it

23  here.  And, again, that's the part of Justice Scalia's

24  opinion in *U.S. v. Williams* that addresses this issue

25  that just fleeting or, you know -- even if it's lewd is

1   not enough.  It's got to be sexually explicit conduct.

2   And none of that's in this film.

3           So as -- as Mr. Babin tries to pursue these

4   charges in violation of *Cuties'* First Amendment rights,

5   it creates an as-applied First Amendment violation.  And

6   we're likely to prevail on that for all the reasons

7   we've shown in our motion for TRO and preliminary

8   injunction.  So moving beyond the likelihood --

9           THE COURT:  I want to talk a little bit about

10  the irreparable harm.

11          MR. BENNETT:  Sure.

12          THE COURT:  It's a conviction -- it's not a

13  conviction of the specific executives of Netflix that

14  they're seeking.  It's a conviction of a corporation,

15  which admittedly might -- I don't know -- hamper or

16  endanger the reputation of the company or something like

17  that, I suppose.  But, practical matter, what happens if

18  a corporation is found guilty of a crime?

19          MR. BENNETT:  So under --

20          THE COURT:  What is the harm?

21          MR. BENNETT:  So there's the practical piece,

22  which is what actually happens if there's a conviction,

23  and then what's the irreparable harm.  Taking the

24  practical piece first, under Texas law, there's fines

25  involved for a corporation and obviously the label of

39

1   child pornographer and felon, which carries weighty

2   consequences in our society.  And not just for -- to be

3   convicted of that, to be accused of that --

4           THE COURT:  Would it also then, perhaps, be a

5   chilling effect on the company or, for that matter, any

6   of their competitors in deciding whether or not to put a

7   film on their streaming network or maybe a television

8   station from showing a film or something of that nature?

9           MR. BENNETT:  Yeah.  And that gets to the

10  side that I was about to shift to, which is the

11  irreparable harm side.  A company -- it's not just

12  Netflix that suffers irreparable harm.  And this maybe

13  ties in a little bit with the public interest.

14          As Netflix is faced with felony indictment

15  for, first, lewd exhibition of visual materials

16  depicting a child under 262, but now child pornography,

17  it has to make weighty decisions.  And we've pointed

18  this out in our brief under Subsection 2, Part B where

19  it has to weigh can it put these kinds -- it has a

20  First Amendment right to do it.  *Cuties* is protected by

21  the First Amendment because it's neither obscene nor

22  child pornography, again, under any sensible

23  construction consistent with the constitution.

24          So then it has to be put on the horns of a

25  dilemma to sacrifice its First Amendment rights, but

40

1   also the First Amendment rights of Netflix's subscribers

2   to watch and view those kinds of materials.  And if this

3   is -- and this gets to the overbreadth somewhat.  If

4   this production qualifies as child pornography in Texas

5   under 43.25, there's an awful lot of stuff on the

6   internet that immediately qualifies for the same felony

7   label.  YouTube, Instagram, and TikTok.  We have it in

8   an appendix that we provided to the Court.  It's

9   attached to our habeas petition.  It's Exhibit 5 or 6 to

10  the complaint or the TRO.  There is a vast amount of

11  materials that exceed anything shown in *Cuties* but

12  certainly don't encroach the actual line of child

13  pornography that millions of people would suddenly

14  become felons for sharing, viewing, discussing.

15          The irreparable harm is profound.  Any time

16  the government brings criminal charges against any

17  person, whether that person's an individual or a

18  corporation, exceeds its constitutional authority to

19  take that kind of weighty, oppressive action is

20  irreparable harm as a matter of law.

21          THE COURT:  Give me an example of a scene if

22  inserted in this movie that might make it a violation of

23  43.25?  What would it take to push it over the edge?

24          MR. BENNETT:  So -- I mean, the easy ones are

25  if it's something prior to the predecessor -- those are

1  easy, right?  Actual sex, simulated sex.  And that's a

2  very, like, defined -- it is a very defined term that

3  means it looks like two people -- two minors or an adult

4  and a minor having relations.  Those are the easy ones.

5          When it comes to lewd exhibition, it gets a

6  little more spread out.  But any lewd exhibition, such

7  as the one in *Williams,* would -- that actually shows

8  real sexual conduct -- that butts up against but maybe

9  doesn't quite actually go toward lewd exhibition's

10 predecessors would be that kind of thing.  So -- I have

11 to confess that I can't --

12         THE COURT:  Right.

13         MR. BENNETT:  I don't watch, you know, a lot

14 of explicit things, so maybe I lack imagination.  But

15 there are cases out there that your Honor can look at.

16 *Williams* is a good example.

17         THE COURT:  Well, it's been said that

18 pornography is something you know when you see it, but

19 maybe that's not exactly a very clear defined standard.

20         MR. BENNETT:  Well, it's certainly not.  And

21 I think there's a lot of that going on in these

22 underlying indictments.

23         THE COURT:  Right.

24         MR. BENNETT:  But, luckily, that's why we

25 have the supremacy of federal law and the -- and the --

42

1    what the supreme court has said is within bounds and

2    outside of bounds.  And we've discussed this at length

3    in our brief, but *Ferber* provides all of the guidance

4    the Court needs to know what's in and what's out when it

5    comes to child pornography.

6            And that's if you construe a catchall too

7    broadly -- and *Ferber* admonishes against this -- you

8    will exceed -- child pornography is not limitless.  It's

9    not standardless.  It has -- even that category, as

10   broadly as we to need to interpret it to protect

11   children and as broadly as Netflix does interpret it to

12   protect children, even that has limits.  And if you

13   interpret it too broadly, you go outside those limits,

14   and it violates the First Amendment.

15           THE COURT:  You're emphasizing First

16   Amendment, but I believe in your complaint you also make

17   reference to the Fifth and Fourteenth Amendments.

18           Do you want to give me a nutshell

19   articulation of those claims?

20           MR. BENNETT:  Sure.  So we raised a facial

21   challenge to Section 43.262 for being unconstitutionally

22   vague.

23           THE COURT:  Right.

24           MR. BENNETT:  And the reason for that is

25   because the legislature in crafting Section 43.262

1    jumbled a number of distinct areas of law and failed to

2    define essential terms that would give the public notice

3    about what they need to do or not do to avoid felony

4    prosecution by the state of -- state's agents.  So, for

5    example, the Section 43.262 includes the phrase "lewd

6    exhibition of the genitals or pubic area," but that

7    phrase for a lot of textual, structural, and legislative

8    purpose reasons can't be construed to

9    mean the same thing as lewd exhibition under

10   Section 43.25(a).

11           And the reason for that is several.  I'll

12   just give a quick couple, and your Honor can look at our

13   argument in Exhibit 6 if you want to -- all of the

14   reasons, but just a few quick ones.  When it comes to

15   lewd exhibition, it's its own term in 43.262.  And the

16   reason for that is because under 43.262(a,) the

17   legislature cites the definition of sexual conduct of

18   which lewd exhibition is a catchall under 43.262(a).

19   However, if you look at the operative provisions of

20   43.262(b,) the legislature never invokes that term at

21   any point in the criminal elements of the statute.  It

22   doesn't ever use sexual conduct.

23           What it does is it says -- it reduces the

24   element to lewd exhibition.  And we've cited to the

25   cases, your Honor.  But -- but just because words are in

44

1  common across two different statutes doesn't mean they

2  should be construed the same and quite often it means

3  they should not be.  When statutes are enacted like

4  these two have been on a -- forty years apart -- 43.25

5  was originally enacted in 1977, and 43.262 was enacted

6  in 2017.  So, you know, that's a lot of years

7  difference, and the purposes of the two statutes are

8  different.

9          And just a quick example.  Typically, Texas

10 uses at least for -- for photos -- as far as I'm aware,

11 there's not a film case that applies -- what's called

12 the Dost factors, but Texas courts typically apply what

13 are known as the Dost factors to define whether a

14 picture, a still photo, constitutes the lewd exhibition

15 of the genitals for purposes of 43.25 or .262.  Dost

16 can't apply here.  And the reason for that -- to decide

17 what lewd exhibition means for purposes of 43.262.  And

18 the reason for that is a couple of textual clues.  One,

19 the legislature used a completely different kind of

20 wording when it came to lewd exhibition than it did in

21 43.25(a).

22          Two, the legislature in enacting 43.262

23 expressly eschewed Dost.  In the earliest version of

24 43.262 -- the earliest version of that statute actually

25 listed all of what are known as the Dost factors in the

1  statutory language.  There's no floor debate.  We don't

2  know why.  But at some point between its introduction on

3  the house floor and its coming out of committee for

4  passage on the floor, all of those Dost factors were

5  removed.  And there's a really easy textual reason for

6  that.  Under Dost, the presence of clothing -- and this

7  goes to another reason why lewd exhibition isn't present

8  under the Section 43.25 indictments -- but clothing's a

9  mitigating factor.

10         We've cited cases in -- not necessarily in

11  this TRO motion, but certainly in our habeas petition

12  that we've attached -- where the Fifth Circuit's held

13  that you can't convict somebody when clothing is present

14  under the circumstances at least of that case.  Because

15  under Dost, if clothing's present, that cuts against a

16  finding of lewd exhibition.  So clothing is not a

17  mitigating factor under 43.262.  It's an incriminating

18  factor.  And so you can't construe -- given all these

19  textual issues before we even get to the legislative

20  purpose problem, you can't construe lewd exhibition from

21  43.25 to mean the same thing as 43.262.

22         Now, the reason that matters for vagueness

23  reasons is when you use a phrase like "lewd exhibition,"

24  like *Ferber* admonished, like the Texas Court of Criminal

25  Appeals has held at least three times, you've got to

46

1   provide, the public essentially, guidance about what it

2   means.

3         You know, you can't use a phrase like "lewd

4   exhibition" that can be so broadly construed that you

5   don't apply -- also enact and tell executive officials

6   what it means when they enforce it.  So they can't just

7   make it up on the fly and sort of adopt the "I know it

8   when I see it" procedure.  And when -- we've cited the

9   cases in our petition.  But when you look at those

10  words, undefined as they are, not construed consistent

11  with 43.25 because that would be inappropriate and would

12  contradict the legislature's intent, you have no

13  standard.  And that in and of itself would be reason

14  enough to find it unconstitutionally vague, but it gets

15  worse.

16        If you look at 43.262(b)(2,) this is the

17  oddest part of the statute.  Obviously concerned that

18  this new world about -- they were about to embark in --

19  the legislature -- they jettisoned Dost and incorporated

20  only partially *Miller v. California*'s jurisprudential

21  benchmark touchstone requirements.  There are four or

22  five *Miller* requirements.  It has to be patently

23  offensive to the average person under community

24  standards and all these other things.  262 has none of

25  those.  It only has two *Miller* elements, which is

47

1   appeals to the prurient interest in sex, which we've

2   talked about, and lacks -- it has no serious artistic or

3   other public value.

4              When you look at that middle element, (b)(2,)

5   anybody who reads the statute and sees that it -- that

6   it -- it applies to clothed or partially clothed

7   children who lewdly exhibit -- whatever that means --

8   their pubic area, it -- at that point that second

9   element becomes a mystery.  Because, as I've argued

10  previously, if you're looking at that element and you

11  take it on its face -- and when we step back and we look

12  at the canons of construction -- when you have a term

13  like that, appeals to the prurient interest in sex, that

14  for 50 years has meant one thing and only one thing when

15  applied to visual materials, that's presumptively the

16  definition that the Texas legislature intended to apply.

17  But there -- there's no application of a lewd exhibition

18  of clothed children that could ever appeal to the

19  prurient interest in sex given the, again,

20  well-established gloss about what that phrase means.

21             So a member of the public reading the statute

22  about what appeals to the prurient interest in sex would

23  have no clue about what to do to avoid prosecution.

24  Because under any reasonable construction that the

25  standard -- the technical standard construction of that

48

1  term, you cannot as a matter of law appeal to the

2  prurient interest in sex in clothing lewdly exhibiting

3  your pubic area.  And we've cited cases in a footnote

4  about what it takes to show that element of appeals to

5  the prurient interest in sex.  And no one could think --

6              THE COURT:  Let me ask you a question.

7              MR. BENNETT:  Yeah.

8              THE COURT:  I understand that the producer of

9  this movie had a view that this -- this film addresses

10  some issues that she felt needed to be addressed in

11  society and basically kind of suggesting that there's

12  been a decline in moral values.  Children being

13  neglected.  They feel -- Amy, I think, is the name of

14  the character.  She's 11, and she's feeling vulnerable.

15  And she needs the support, and she needs -- and so she,

16  you know, seeks this -- to be part of the crowd, joins

17  up with a dance troop, and it kind of goes on from

18  there.  And from that, I think maybe the producer is

19  trying to say, look, world, this is how far we've come,

20  and it has some consequences.

21              Now, is that -- the question is:  Does

22  that -- does that then, in your mind, qualify at least

23  as, perhaps, either literary or artistic or political

24  value?  And as a subset, let me even say -- I mean, if

25  you want to see nudity, you can go to virtually any

1  major art museum in the world, but it has artistic --

2  it's in an art museum, for crying out loud.  Now,

3  whether or not someone -- you say, well, that exhibits

4  the pubic area of someone.  That's number one, yes.

5  Does it appeal to the prurient interest in sex?  Well,

6  I'll spot you that one maybe.  I mean, I'll just give

7  you that one.  But even if you had one and two, and

8  since the statute uses the word "and," you have to have

9  all three in order for it to be a violation.  I'm kind

10 of surprised you haven't talked more about that and what

11 is the social value -- the literary, artistic, or

12 political value of -- in other words, you might have one

13 and two, but when we get to number three, it may be -- I

14 don't know.  It may have tremendous literary, artistic,

15 or political value as distasteful as it may be.

16          MR. BENNETT:  So three responses.  And I

17 think this gets to where we're trying to walk this

18 tight -- this kind of tightrope between these two worlds

19 of the merits in this case and the reason the merits are

20 implicated in the state court case especially as to that

21 element.

22          So no serious artistic, literary, or --

23          THE COURT:  Political --

24          MR. BENNETT:  -- public value.  Our film

25 certainly -- it -- no one -- no reasonable prosecutor

50

1  could accuse it of having no such value.  That goes to

2  bad faith and why Younger's inappropriate because a

3  prosecutor who watched *Cuties* could never think to get a

4  conviction under that because it's profoundly

5  important -- it has profound value, and it's not for

6  everybody.  We understand.  Netflix knows that.  Not

7  everyone's going to like the film.  But the message that

8  is portrayed in that film are -- is -- we spend the

9  entire first six pages of our fact section in our TRO

10  explaining how profoundly important the film's message

11  is.

12          So the -- for purposes of the merits of the

13  underlying -- and, again, that's not implicated in the

14  pending charges.  That was only for purposes of 262.

15  Because under *Ferber* and consistent with the

16  constitution, if it's really child pornography, you

17  don't have to show it lacks any serious artistic value.

18  That's out.  That's a *Miller* element that does not apply

19  to pornography.  It matters for purposes of 262 because

20  the legislature sort of -- in trying to create and

21  criminalize this new category of banded speech, it's

22  straddled two horses.  Part A or (b)(1) is sort of the

23  *Ferber* horse, and then the other two elements, (b)(2)

24  and (b)(3,) are the *Miller* horse.

25          And you can't straddle both because it just

1  makes everything confused and indecipherable.  So that's

2  where it matters for purposes of the vagueness argument.

3  But for purposes of our facial constitutional challenge,

4  the *Lowry* court already made this point for us.  In

5  trying to prosecute Mr. Lowry, the judge -- and it came

6  up again during oral argument in *Lowry*.  I watched it.

7  The judge asked about the *Netflix* case, Mr. Babin's

8  case.

9              THE COURT:  Yes.

10             MR. BENNETT:  And specifically about no

11 serious literary, et cetera, value.  At that point, the

12 Harris County prosecutor pulled up -- and they did it

13 again in oral argument -- and said, "I can't speak for

14 another district attorney's indictment.  We think it

15 does have artistic, literary, et cetera, value."  In

16 other words, they don't agree with Mr. Babin.  And that

17 gets back to the vagueness problem, which is when a

18 prosecutor without proper guidance from the legislature

19 indicts in -- and pursues felony charges against

20 anyone -- any individual, any corporation -- it confuses

21 what the statute means.  And we're all left to guess,

22 well, geez, if *Cuties* doesn't meet that element, what

23 does?

24             Again, not that the message -- the film's for

25 everyone.  You may really dislike it.  We've cited

1   articles in both our motion here and the habeas petition

2   in the state court where lots of people don't.  And we

3   don't have a problem with that.  People are welcome to

4   their opinions and to discuss them because we hope it

5   will mean that they discussed the profound messages of

6   the film.  But in any event, with the film having such

7   merit and such importance, we find ourselves in -- we

8   found ourselves indicted except -- until it was on the

9   eve of the hearing where that was going to be

10  adjudicated.  And now we're under something else where

11  we can't argue any of that, right?  We can't argue that

12  because under 43.25 in *Ferber*, we don't get to point

13  those facts out anymore.

14          So I think that -- again, that's not a merits

15  issue.  That goes to why this -- why Younger abstention

16  shouldn't apply.  So when we get to irreparable harm, we

17  have that.  It's presumed as a matter of law.  I will

18  also say under the Fifth Circuit's authorities -- we've

19  cited *Thompson* and some others.  If you have bad faith

20  to justify not abstaining under Younger, irreparable

21  harm is presumed again.  So we have presumptive

22  irreparable harm twice over.

23          Balancing the public interest.  And, again,

24  we recognize the extraordinary nature of what we're

25  asking here.  We did not do this lightly.  But it's the

53

1  extraordinary nature of what we face having five

2  indictments that are violative of the constitution.  And

3  that's -- when we weigh the public interest -- it is in

4  the public's interest to ensure that officials are held

5  to the constitution, which they took an oath to support.

6  It's in the public's interest to make sure that persons,

7  citizens, companies vindicate their company -- their

8  First Amendment and other rights -- due process

9  rights -- that's the vagueness issue -- even if there

10 are criminal -- pending criminal charges when they --

11 violations are as serious as the ones that their records

12 shows are present and that the law says entitled Netflix

13 to a federal forum and to federal relief.

14        So it is in the public's interest to proceed

15 with a TRO to enjoin at least for the period that

16 Rule 65 of the federal rules allow, and then we'll come

17 back at an injunction hearing.  But it is always in the

18 public's interest to ensure that state officials,

19 especially those that willed the awesome power of the

20 criminal law and the criminal process, are held at bay

21 and held consistent with what the law requires them to

22 abide by.

23        The last element is bond.  I mean, I'm not

24 going to spend too much time talking about that.  We

25 don't think a bond's necessary here.  The Fifth Circuit

54

1   said you don't have to impose a bond.  I don't know

2   what -- bonds are intended to show if you enjoined

3   something what --

4            THE COURT:  Hurting somebody's financial

5   interest or something --

6            MR. BENNETT:  Right.  And I don't know

7   what -- I can't conceivably think of what that would be

8   here.

9            THE COURT:  Some nominal bond, I suppose.

10           MR. BENNETT:  Yeah.  And we're okay with

11  that.  We've suggested 1,500, which we can do.

12           But what I want to circle back to just to --

13  kind of in closing is some of the other --

14           THE COURT:  That would take that off -- that

15  would take that off the map, and we wouldn't have to

16  worry about that.

17           MR. BENNETT:  Right.  Some of the other

18  arguments that the state raised this morning in its

19  brief -- aside from Younger abstention, it asserted Heck

20  and some others.  Those just don't apply, and it doesn't

21  apply on the face of the state's own brief.  Heck is an

22  abstention doctrine, an exhaustion doctrine that applies

23  only when a conviction's been held.  There's no

24  conviction here.  It also only applies when damages are

25  at issue, and the very title of our complaint is a

1  complaint for injunctive relief.  Netflix isn't

2  seeking damages.  It only wants an injunction to

3  enjoin unlawful prosecution that's inconsistent with the

4  First Amendment.

5          So 1983 affords injunctive relief.

6  Prosecutorial immunity is not in the least invoked when

7  only injunctive relief is sought.  So they've raised

8  that argument, and it's wrong on the law.  And then,

9  again, in terms of Heck exhaustion, it doesn't even

10  apply where there's no conviction.  And, again, no -- no

11  request for money damages, which we haven't asserted.

12          So they have no defense.  Younger abstention,

13  we've already acknowledged and shown that it doesn't

14  apply for all the reasons in cases evident in the fact

15  and the law.  So really it's just a question of

16  likelihood of success, which we've shown, and they've

17  not rebutted.  They have not -- they have not taken any

18  time in the response -- for purposes of the TRO today to

19  show why we wouldn't be entitled to that relief.

20          So we ask for the TRO, that Mr. Babin be

21  enjoined, and all of the people under Rule 65(d) that

22  that would mean, right?  That doesn't mean just

23  Mr. Babin.  His agents, his attorneys, and all those

24  in -- that act in concert with him be prohibited from

25  pursuing any charges under 43.262, re-indictment,

56

1  convening a grand jury for that purpose, whatever it is,

2  or pursuing in the state court the four new indictments

3  under 43.25 because they're profoundly unconstitutional

4  as applied to the film *Cuties* --

5           THE COURT:  Well, let's -- let's talk about

6  that.

7           MR. BENNETT:  Yes.

8           THE COURT:  The indictments exist.  A TRO

9  would be good for 14 days.  I mean, given the history

10  of, should we say, the lack of prosecution for some

11  400 days, abstaining from further criminal action for

12  14 days doesn't seem to be really much of an issue.

13  It's unlikely that you'd be forced to defend a criminal

14  case sometime in the next 14 days, fair?

15           MR. BENNETT:  Certainly not to defend, but

16  there are pre -- so, for example, arraignment

17  typically --

18           THE COURT:  To take -- in other words --

19  because what if at the end of 14 days and we're here

20  again -- and I'm going to ask you what you envision down

21  the road at a hearing on a preliminary injunction, which

22  is sometimes essentially the same facts as a permanent

23  injunction, which sometimes there's not even a need for

24  that subsequent proceeding.  But during these -- if you

25  were unsuccessful at the -- if you were successful with

1  the TRO, but, you know, after more of a production -- I

2  mean, usually for these TROs, the defendant's not even

3  here.  And -- but give them an opportunity for a fuller

4  presentation of the case and, perhaps, give you an

5  opportunity of a fuller presentation of your case.  But

6  if you were unsuccessful at that point, then you

7  wouldn't expect them to have to go back to -- if they

8  were so inclined to re-indict you, correct?  In other

9  words, we'd just hold the current indictments in

10  abeyance.  Now, obviously, if you're successful

11  ultimately, then that's -- that's a different story, but

12  I'm looking at the other end.  At the end of 14 days,

13  where are we?  Are we just basically saying --

14  essentially staying all -- the indictments are still

15  there, but they're not necessarily destroyed.  They're

16  just not being acted upon.  Is that what you're asking

17  for?

18            MR. BENNETT:  So, ultimately, what we're

19  asking for is --

20            THE COURT:  Ultimately.  But I'm talking

21  about over the next 14 days.  I mean, what if you were

22  ultimately -- ultimately unsuccessful?  Would you -- or

23  would you be saying those indictments would no longer

24  have any -- then if he so choose, he'd have to go back

25  and get a new indictment?

58

1          MR. BENNETT:  No.  So the way that the case

2    law comes down on these issues when you're dealing with

3    a 1983 action against --

4          THE COURT:  Right.

5          MR. BENNETT:  -- an individual state

6    official -- we're not enjoining state courts.  Not

7    asking for that.  What we're asking for is an injunction

8    against the official from pursuing -- right --

9    prosecuting -- anyone who acts in concert with him --

10   prosecuting Netflix while the merits of Netflix's

11   constitutional challenges are adjudicated in federal

12   court.

13         THE COURT:  Okay.  And initially that would

14   be for 14 days then, and we come back and do -- now,

15   what do you envision -- and I'm not asking for trial

16   strategy or anything, but -- and I'm -- do you have --

17   do you have more that you want to present today?

18         MR. BENNETT:  No, your Honor.  I think our

19   presentation in terms of showing ourselves likely to

20   succeed and that we're entitled to an injunction --

21   we've made our case, pending whatever they have to say.

22         THE COURT:  All right.  And at some point,

23   we'll need to watch the video, but I suppose -- do we do

24   that here?  Do we do that in chambers privately or

25   however we want to do it?  What do you envision?

1        MR. BENNETT:  Certainly, if your Honor wants

2  to watch the video with us present in court, we have

3  discs, and we can make that happen.  I -- I would be

4  fine if your Honor just watched it in chambers.  I don't

5  think, you know, we need to have a -- we're not afraid

6  to or we're fine to.

7        THE COURT:  No.  I understand.

8        MR. BENNETT:  But we -- but it's certainly up

9  to your Honor's discretion in terms of that.

10        THE COURT:  Okay.  Okay.  All right.  Well,

11  that's fine.

12        Back to my original question.  What do you

13  anticipate in 14 days assuming a TRO is granted?  What

14  do you anticipate the nature of that hearing to be?

15        MR. BENNETT:  And so we think largely

16  98 percent of this case is just a legal issue.  The

17  facts are undisputed, and the facts are the film.  It

18  can't be changed.  The film is the film.  Nothing is

19  going to change about that film.  It is what it is.  The

20  question is:  How does the law apply under the First

21  Amendment or the Fifth Amendment to that film and how do

22  those come out?

23        So it's something of a mixed question in the

24  sense that there are some facts involved, but those

25  facts are not and cannot be disputed in terms of what we

60

1  have to prove.

2  　　　　THE COURT:  Uh-huh.

3  　　　　MR. BENNETT:  Now --

4  　　　　THE COURT:  Well, would you -- would you put

5  on some evidence of, for example, the literary,

6  artistic, political value of the case?

7  　　　　MR. BENNETT:  No.  We don't have to.  That's

8  more to the merits.  So if we were proceeding in state

9  court, certainly we would in that context.  But that --

10  those facts -- although we'd be happy to continue

11  developing that certainly in court, it's not relevant to

12  the First Amendment challenged.  That's a baseline,

13  bottom line constitutional principle.

14  　　　　THE COURT:  Okay.

15  　　　　MR. BENNETT:  And so your Honor can watch

16  the film and make that determination as a -- as a

17  matter of law.  The reason I held out the 2 percent is

18  because of the state's assertion of Younger abstention.

19  That's -- the burdens under a preliminary or even a

20  permanent injunction under the Supreme Court's

21  decision in -- it's a very long name -- it's a

22  Brazilian/Portuguese name.  The burdens of injunctive

23  relief track the burdens of trial.  So for purposes of

24  preliminary injunctive relief, we just have to make our

25  burden and show that our affirmative claims are met.  If

1  they have defenses like Younger abstention, it's their

2  obligation to meet their burden.  But if -- the burden

3  then shifts back to us, we might have to develop some

4  facts to refute some of that.

5          I don't anticipate that's going to be the

6  case.  It could be the case.

7          THE COURT:  Okay.

8          MR. BENNETT:  So that's the only reason why I

9  hung out the 2 percent caveat, but we think largely this

10 is a pure issue of law for the Court to decide because

11 the facts are not and cannot be disputed.

12         THE COURT:  Okay.  All right.  Thank you very

13 much.

14         Let me just -- before I -- well, let me ask

15 the other side:  Do you have a presentation you would

16 like to make today?

17         MR. LINDSEY:  I do, your Honor.

18         THE COURT:  All right.  I've given the

19 plaintiff in this case -- we did start a little bit

20 late -- but at least an hour and a half or more.

21         About how much time do you feel that you

22 need?

23         MR. LINDSEY:  Depending on the questions that

24 are asked --

25         THE COURT:  I understand.

62

1        MR. LINDSEY:  -- not nearly that much.  I

2   think I can probably address everything that has been

3   raised in a half hour or less.

4        THE COURT:  Okay.  I'm sure that -- I mean,

5   the question is -- and maybe it's wise that we do it --

6   take a lunch break and come back and allow you to --

7   we're definitely going to take some sort of a recess

8   because we've had everybody in place for almost two

9   hours.  And I think that's -- we just need to have a

10  comfort break at the very minimum, but -- maybe it might

11  be wise that we go ahead and break.

12        Do you all have a -- break for lunch and come

13  back, say, at 1:00 o'clock.  Let you continue and then,

14  I assume, you would probably have some sort of rebuttal

15  to that.  So we could be here -- if we came back at

16  1:00, we could be here maybe another hour.  I'm not

17  trying to put limits on anybody.  I'm not suggesting

18  that.  We -- the Court has other matters to tend to,

19  including a trial starting -- a six-day trial starting

20  next week, but -- we've already had the pretrial hearing

21  on yesterday, but we'll -- we have a lot to absorb,

22  but -- I don't know.  What do you all want to do?  I can

23  give you a break -- lunch break and then come back and

24  finish.

25        MR. LINDSEY:  I think my vote would be to

63

1  just take a comfort break and -- like maybe 10,

2  15 minutes and then proceed.

3            THE COURT:  What do you want to do?

4            MR. BENNETT:  Yeah.  If that works for your

5  Honor and the staff -- I talk kind of fast, so I might

6  have been overworking some folks.

7            THE COURT:  I understand.  Let me talk to my

8  staff.

9            Let's take about a -- let's go ahead and take

10 a 20-minute break and report back here at about 12:15,

11 okay?

12           (A recess was taken at this time.)

13           THE COURT:  Thank you.  And please be seated.

14           All right.  Mr. Lindsey, are you going to go

15 forth now?

16           MR. LINDSEY:  I am, your Honor, with your

17 indulgence.

18           THE COURT:  Yes, please.

19           MR. LINDSEY:  Would your Honor mind if I

20 stayed right here instead of decamping --

21           THE COURT:  Are you needing to use your

22 computer or --

23           MR. LINDSEY:  I believe I will.  I can move.

24           THE COURT:  And there's -- yeah.  It might be

25 a little better if you can put your computer there.

64

1          MR. LINDSEY:  Yes, sir.  Your Honor, I will

2  make every effort to be as surgical as possible under

3  the circumstances.

4          THE COURT:  Well, I want you to take as much

5  time as you need in order to articulate your defense in

6  this case.

7          MR. LINDSEY:  Yes, sir.

8          First, I wanted to clear something up that

9  opposing counsel said about our response.  There is no

10  suggestion that the Younger doctrine would apply to the

11  charge under -- would apply to the charge under 43.262.

12  I believe I made that clear in the argument.  I titled

13  it as only applying to 43.25.  And also in the

14  conclusion of that section --

15          THE COURT:  So you have no objection to the

16  Court abstaining for any 265 evaluations?  Is that what

17  you're saying?

18          MR. LINDSEY:  Well, what I'm saying is, your

19  Honor, the Younger abstention doctrine does apply to

20  43.25.

21          THE COURT:  Right.

22          MR. LINDSEY:  Because there's an ongoing

23  criminal prosecution.

24          THE COURT:  Okay.

25          MR. LINDSEY:  I believe the state -- the case

1  law is clear that it would not apply currently to 43.262

2  because there is not an ongoing matter.

3          THE COURT:  All right.  So we've got that off

4  the table.  That's good.

5          MR. LINDSEY:  Yes, sir.

6          So tackling 43.25 first, as opposing counsel

7  says, this is a very high burden, and the three elements

8  that you have to meet for Younger are very clearly met

9  here.  We have an ongoing prosecution -- an ongoing

10  state judicial proceeding.  That's admitted.  Important

11  interest subject matter proceeding is implicated.  I

12  don't believe that's at issue.  And the state

13  proceedings must afford an adequate opportunity to raise

14  constitutional challenges.  I don't think that's at

15  issue.  Constitutional challenges can be raised in

16  pretrial motions.  They can be raised in front of the

17  jury.  They can be raised in front of the appellate

18  court.  There are avenues here.

19          So what we have from opposing counsel is a

20  reliance on bad faith tactics.  No hope of conviction.

21  But what we don't have is any actual demonstration of

22  that.  What we are relying on here is speculating

23  Mr. Babin's motives.  It sounded to me that the mere act

24  of withdrawing a charge and filing a different charge in

25  the face of a writ must be retaliation per se.  There is

1   no evidence of causation here.  There is no evidence of

2   what was going on in Mr. Babin's mind.  There's simply a

3   substitution of charges.  There's nothing indicating

4   actual retaliation.  So that doesn't overcome Younger.

5          And then we raised several questions

6   indicating that the Court should find that the statute

7   is unconstitutional on its face.  And so the Court must

8   step in and stop this before it gets started.  The

9   problem is every single aspect of this are jury

10  questions.  Does the conduct fit the statute?  That's a

11  jury question.  And once the jury resolves it, it's a

12  question for the appellate court.  Is this a matter of

13  artistic value?  First of all, it doesn't apply to

14  43.25, but even if it did, this is a matter decided by

15  community standards.  And a jury decides that, and an

16  appellate court decides that.  There's simply nothing

17  that has been raised here that the Court needs -- this

18  Court needs to step in that should not be resolved in a

19  state court.

20         THE COURT:  I want to ask you with regard

21  to -- to the fact that there is still this pending

22  evaluation of 43.262 --

23         MR. LINDSEY:  Yes, sir.

24         THE COURT:  -- for which you've said the

25  Younger abstention doctrine does not apply to prohibit

67

1 me from evaluating that aspect of their complaint,

2 correct?

3              MR. LINDSEY:  Yes.

4              THE COURT:  All right.  Does the state feel

5 that there is any artistic, literary, or political value

6 at all in the movie when taken in its totality?

7              MR. LINDSEY:  I don't believe the state has

8 taken a position on that, and I don't believe it would

9 be appropriate to take a position on that.  It's an

10 undecided issue.  And it's an issue that's fatal to this

11 proceeding because that is something that needs to be

12 decided by a jury.

13              THE COURT:  Okay.

14              MR. LINDSEY:  And, particularly, a jury in

15 Tyler County applying their community standards.

16              THE COURT:  Okay.

17              MR. LINDSEY:  But -- since we're talking

18 about 43.262, going to the elements of what it takes to

19 get relief -- injunctive relief in this court, I'll skip

20 to Section 2 here, the substantial -- I'm sorry -- no.

21 I'll just start from the top.  Substantial likelihood of

22 success on the merits.

23              THE COURT:  Right.

24              MR. LINDSEY:  So as -- as we have discussed,

25 this case -- the *Lowry* case is not concluded.  And so

1   there's no way that this Court can say that Netflix will

2   succeed on the merits when we don't even know what the

3   merits are yet.  It's still in review.

4           THE COURT:  Well --

5           MR. LINDSEY:  Secondly --

6           THE COURT:  Well, the writ has been granted

7   in that case, as I understand it.  It was granted on

8   March 2nd of this year, but -- and we don't know what

9   the higher court will do with it yet.  I suppose at

10  least -- somebody at least wants to re-examine some or

11  all of that opinion, and that's why writ was granted.

12  That doesn't necessarily mean, though, that it's not --

13  that it is going to be overruled or overruled in part.

14          As it stands right now, is that decision, the

15  *Lowry* decision, the case law that would -- that applies

16  to that issue?  To the issues laid out there?  Is there

17  something else I would adopt and apply?

18          MR. LINDSEY:  Negative, your Honor.  The

19  *Lowry* decision does not apply here.

20          THE COURT:  It does not apply?

21          MR. LINDSEY:  No.  The *Lowry* court

22  specifically, and I quote, confined our analysis to the

23  portion of Section 43.262 that prohibits a person from

24  knowingly possessing visual material.  This is not a

25  possession case.  This is a lewd exhibition case.

69

1          THE COURT:  In terms, though, of that court's
2  discussion of your client's case, though, or should --
3  or, perhaps, you might argue that's dicta.  I'm not
4  sure.
5          MR. LINDSEY:  Correct.
6          THE COURT:  But whether it was -- it violated
7  the statute or not, I think there's -- there is a --
8  some indication of the Court's opinion about that.
9  Would you agree?
10          MR. LINDSEY:  I don't know if I could
11  necessarily agree.  There is certainly solid indication
12  on what the Harris County district attorney thinks about
13  it, but the point of the matter is the law is not
14  settled on this.  And so in order for Netflix to proceed
15  here, this Court needs to find that the law is settled,
16  that this is a baseless prosecution, that this is an
17  unconstitutional statute, it could never be brought
18  against them, and therefore they need to be -- Mr. Babin
19  needs to be enjoined.  And that's just not the case.
20          THE COURT:  Well, now for -- now, maybe at
21  the injunctive level, but this is just for temporary
22  restraining order.
23          MR. LINDSEY:  Yes, your Honor.
24          THE COURT:  And so the final -- I'm not here
25  to make a final decision on any of that.  It's just

70

1  whether or not they have -- they've met their threshold

2  of having a probable right of recovery.  Have they

3  articulated that or not?

4           MR. LINDSEY:  No, your Honor.  And, again,

5  this first element, substantial likelihood of success on

6  the merits, we don't know what success on the merits

7  would look like right now.  The law is unsettled.  It

8  could very well be that this statute is upheld and is

9  perfectly constitutional.  It could very well be that it

10 becomes wholly unconstitutional in the future.  The fact

11 of the matter is this has not been given an opportunity

12 to play out in the state court --

13          THE COURT:  Okay.

14          MR. LINDSEY:  -- at the trial level or

15 appellate level.

16          THE COURT:  Okay.

17          MR. LINDSEY:  The second element, substantial

18 threat of irreparable harm.  I know Mr. Bennett touched

19 on this, but I think he mischaracterized a few things.

20 Yes.  There is a substantial threat of irreparable harm

21 to Netflix if they lose this case, if they are

22 convicted.  However, the standard is substantial threat

23 of irreparable harm if the injunction is not granted.

24          THE COURT:  Let me ask you something, and I

25 asked your opposing counsel this -- about, you know,

1  what happens to a corporation that's indicted?  How does

2  it harm them?  I mean, I was told there could be some

3  fines; is that true?

4          MR. LINDSEY:  That is my understanding, yes,

5  your Honor.

6          THE COURT:  Okay.  Which is some harm.  But

7  in a broader sense, I think -- I'm assuming for purposes

8  of this comment or this question -- that corporations do

9  not like to be indicted.  It doesn't do a lot for their

10 corporate image.  They're an indicted corporation.  It

11 sounds -- even though we all recognize the presumption

12 of innocence, it's still they're an indicted

13 corporation.

14          And could it -- and this is the question:  If

15 there is a threat of indictments for one case or

16 another, could that be -- could that then be a chilling

17 effect on what movies, in this case Netflix, chooses to

18 put on their system?  In other words, well, we better

19 not put that on there, somebody -- we might get

20 indicted, you know.  And so they then shy away from --

21 just for fear of being indicted, movies that might --

22 might be less offensive than this particular movie

23 *Cuties*.

24          MR. LINDSEY:  I -- certainly that could be

25 the result of something like this.  However, our

72

1  argument would be there is no threat of prosecution

2  right now.  The one thing that's happened --

3          THE COURT:  Well, wait a minute.  They're

4  indicted, are they not?

5          MR. LINDSEY:  They're indicted under 43.25.

6          THE COURT:  I got that.  And the other was

7  without prejudice.

8          MR. LINDSEY:  That's correct.  And that's the

9  only indication that, perhaps, another charge like that

10 could be brought, but there is no actual threat that

11 such a charge will be brought.  The two charges were

12 simply swapped, and it's my understanding that it's

13 pretty standard practice to dismiss an indictment

14 without prejudice.  There's no implicit threat there

15 that the same charge is going to be brought up again, if

16 that answers your question, your Honor.

17         THE COURT:  Well -- okay.  I accept what you

18 said.

19         MR. LINDSEY:  And, your Honor, I would also

20 point you to precedent where federal courts have stepped

21 in where Younger does not apply.

22         THE COURT:  Right.

23         MR. LINDSEY:  And these are situations --

24 I'll specifically point the Court to *Google v. Hood*,

25 822 F.3d 212, Fifth Circuit 2016.  This case cites many

1   other similar cases.  These are all circumstances where

2   the state was issuing repeated subpoenas and pretrial

3   investigations and overtly threatening a prosecution

4   that had not happened yet.  And so the federal court

5   jurisdiction was invoked in order to deal with that

6   situation.  This is not the same situation.  This is a

7   one charge that has been dismissed as a matter of

8   course.

9            THE COURT:  Right.

10            MR. LINDSEY:  It is simply up to the

11   prosecutor to bring that charge again if more evidence

12   develops, but there's no actual threat that that's going

13   to happen.  There's no request for discovery.  There's

14   no subpoenas.  Nothing like that to Netflix concerning

15   that particular charge.

16            THE COURT:  Okay.  Would the statute of

17   limitations on that just go from the date of the last

18   day of streaming?

19            MR. LINDSEY:  I honestly don't know, your

20   Honor.

21            THE COURT:  Okay.

22            MR. LINDSEY:  I will not insult you by

23   guessing.

24            If I could return to number two, substantial

25   threat of irreparable harm if the injunction is not

1  granted.  As the Court pointed, this injunction would by
2  necessity be temporary.  There is nothing articulated
3  here where some harm would result because this
4  particular injunction is not granted.  Fourteen days are
5  going to lapse, and the indictments are still going to
6  exist.  It's a moot point.
7           There's also, on a broader scale, no
8  assertion of irreparable harm that would not be visited
9  on Netflix by a jury.  There's nothing suggested here
10 that Mr. Babin needs to do that cannot be remedied
11 through the proper court procedures.  And so this
12 injunction is necessary.  Jurisdiction for this Court is
13 necessary.
14          And then I'll address the third and fourth
15 element at the same time.  What we have here is a real
16 public policy issue.  The message this sends to
17 Mr. Babin and every other prosecutor is they cannot find
18 a better charge and substitute it without being dragged
19 into federal court.  There is no evidence that he did
20 not do exactly that for just the reasons of getting a
21 more appropriate charge and judicial efficiency.  And
22 so --
23          THE COURT:  I think he stated that in his --
24 in his withdraw.  That there were -- the facts were more
25 suited -- I don't remember.  I'm paraphrasing it.  A

1  different statute or some words to that effect.

2            MR. LINDSEY:  Yes, your Honor.

3            And so this -- this does -- it causes harm to

4  the defendant, and it does disserve the public interest

5  because now prosecutors have to worry every time that

6  they're faced with potentially being able to cure a

7  charge that isn't the best, but if I do that, well, then

8  I'm going to get dragged into federal court.  So now

9  there's an incentive, if precedent is set in this

10 matter, to keep a bad charge and pursue that.  That

11 certainly disserves the public interest.  I also

12 wanted to --

13           THE COURT:  Yeah.  I think it said the facts

14 of this case are better suited for other statutes.

15           MR. LINDSEY:  Correct.

16           THE COURT:  That's when the state was

17 dropping 43.262.

18           Okay.  Go ahead.

19           MR. LINDSEY:  That would be Mr. Babin's

20 motivation.

21           THE COURT:  Right.

22           MR. LINDSEY:  There's no evidence of any

23 other motivation.

24           THE COURT:  Uh-huh.

25           MR. LINDSEY:  I just wanted to note to clear

76

1  up a couple other things specifically about the Dost

2  factors.  I don't know anything about the legislature

3  jettisoning Dost factors.  But whatever they did, the

4  message did not get to the Court of Criminal Appeals.

5  Because as of 2017, *State v. Bolles*, 541 S.W.3d 128, the

6  Court of Criminal Appeals were applying the Dost factors

7  to the definition of lewd under 43.25 as recently as

8  last year in *Romo v. State*, 629 S.W.3d. 679.  This is

9  the Fourth Court of Appeals out of San Antonio relying

10 on *Bolles* applying the Dost factors.

11         It's also important to note the Dost factors

12 are not dispositive.  And so I'm not sure if Mr. Bennett

13 specifically made this argument, but it was brought up

14 that one of the Dost factors includes clothing --

15 whether they were clothed or not.  That issue is not

16 dispositive.  These are advisory.  These guide the Court

17 on what "lewd" means.  So what we do have is the focal

18 point of visual depiction being on the child's genitalia

19 or pubic area.  Whether the setting of visual depiction

20 is sexually suggestion.  Whether the child is depicted

21 in an unnatural pose.  Then whether the child is fully

22 or partially clothed or nude.  Whether the visual

23 depiction suggests sexual coyness or willingness to

24 engage in sexual activity.  And, finally, whether the

25 visual depiction is intended or designed to elicit a

77

1  sexual response from the viewer.

2           If you read the Court of Criminal Appeals

3  opinion, not qualifying for one of these advisory

4  factors is not dispositive of the whole thing.  This

5  just guides the Court on finding what is lewd and what

6  is not under a particular set of circumstances, which,

7  again, is not in the purview of this Court right now.

8  It's under the purview of, first, a jury and then an

9  appellate court in the Texas state system.

10          I believe I've covered everything that came

11  up, your Honor.

12          THE COURT:  Okay.  Well, I appreciate it.

13          MR. LINDSEY:  Thank you.

14          THE COURT:  Mr. Babin, do you care to address

15  the Court?

16          MR. BABIN:  Well, your Honor, I would just

17  say that -- thank you for your time today.  And the only

18  thing I would add to that, your Honor, is that I believe

19  many, if not most, of the issues that Mr. Bennett raised

20  can be addressed by a jury in the State of Texas.  And I

21  would also just add to that that his representation to

22  this Court about the ruling in the *Lowry* case was not

23  accurate.  The *Lowry* decision did not find that entire

24  statute facially unconstitutional.  As Mr. Lindsey just

25  stated, the *Lowry* court found only the portion of it

78

1  that was charged in the Harris County case

2  unconstitutional.  So that was not accurate.

3          And other than that, Judge, I would just

4  remind the Court that we have only had but a few hours

5  to prepare anything for this morning.  So beyond that --

6          THE COURT:  Same for the Court.

7          MR. BABIN:  Yes, sir.  I understand.  But

8  that's all I have at this time.

9          THE COURT:  All right.  Thank you very much.

10  I appreciate that, Mr. Babin.

11          All right.  Mr. Bennett, do you care to have

12  some more words for us?

13          MR. BENNETT:  Yes, if I may, your Honor.

14  Points in rebuttal.  And I'll make it as quick and talk

15  as slow as I'm capable of.

16          There's ample evidence just -- we're focusing

17  on Younger.  Let's stay with Younger because we like

18  Younger, right?  It showcases the facts about why

19  federal relief is so necessary in this case.  So when it

20  comes -- so I'm glad we agree that the Court can

21  maintain jurisdiction over this case and ought to

22  adjudicate the underlying claim for lack of mootness --

23  that Younger doesn't apply, and there's no mootness here

24  because, A, the state maintains the statute's

25  constitutional.  B, there's been no adjudication that

1  we've asked for, and we can obtain a federal forum for

2  it without worrying about Younger.  And, C, despite what

3  my friend on the other side argued just a moment ago,

4  there's a world of difference -- and the cases that he's

5  alluding to are easily distinguishable.

6           And there's plenty of cases that -- that

7  distinguish them and come out our way.  And that's -- it

8  would be one thing if before the indictment Netflix had

9  run to federal court with no prosecutors having indicted

10  them of a second degree felony under state law for

11  promoting *Cuties*.  But it just ran to federal court and

12  said, well, we don't know of anything, but we just don't

13  like this statute.  So we want a pre-enforcement

14  challenge.

15           It gets a little narrower at that point, but

16  we're 500-plus days beyond a pre-enforcement challenge.

17  We are 500 days post-enforcement.  And under binding

18  Fifth Circuit and Supreme Court law, when you've been

19  indicted and a voluntary dismissal is made and it's not

20  with prejudice and the state stands behind its conduct

21  and the statute at issue, the best predictor of what

22  has -- what will happen in the future is what has

23  happened in the past.  And Court 's hold under all of

24  those circumstances it's a live controversy.  So the

25  Court has mandatory jurisdiction, federal question

1  jurisdiction, to adjudicate Netflix's First Amendment
2  challenge 262.
3          And I want to correct what's being said --
4  I've been accused of mischaracterizing some law on
5  *Lowry*.  Let's be very clear about what *Lowry* said and
6  didn't say.  *Lowry* did not limit itself and can't be
7  credibly read to limit itself to a possession charge.
8  Possession was the charge, that's true.  What the Court
9  said is we're limiting our opinion in Footnote, I
10 believe, 8 -- we're limiting our opinion to clothed and
11 partially clothed.  We're not reaching the issue of
12 unclothed because that's not at issue in the materials
13 at issue in *Lowry*.  That's the carveout.  That's *Cuties*.
14         So I have accurately represented *Lowry*.  I
15 have accurately represented the Court's holding in
16 *Lowry*, and that is that under those two pieces of 262,
17 it's substantially unconstitutional on all of its
18 applications.  And it isn't invalid only as applied to
19 Mr. Lowry but as to everyone.  So it's a facial
20 challenge.  That's why it's ex parte.  It is a pretrial
21 habeas petition.  So we have been very correct and clear
22 about what *Lowry* said.
23         But the other problem with what my friend on
24 the other side said about *Lowry* is -- he seems to imply
25 that a state court decision somehow precludes a federal

1   court from adjudicating a federal constitutional issue.

2   That somehow this Court has to defer to a state court of

3   appeals or even the Texas Court of Criminal Appeals

4   before it can adjudicate a claim before it and over

5   which is has undisputed federal question jurisdiction.

6   That's not the law anywhere.  It's never been the law.

7   It won't be the law.  It's in the constitution that

8   federal courts adjudicate federal issues.  So there's no

9   deference owed to *Lowry* or the Court of Criminal

10  Appeals.  They can reach whatever conclusion they

11  want --

12          THE COURT:  Although to the extent it helps

13  you, you don't mind my reading *Lowry*.

14          MR. BENNETT:  It's definitely persuasive and

15  certainly will do it, but our main reason in citing

16  *Lowry* isn't necessarily even the conclusion it reaches

17  because we just think the conclusion *Lowry* reaches is --

18  to 43.262 is just really obvious under existing law.

19  The reason *Lowry* is so useful to us is what you

20  discussed with -- with my friend on the other side about

21  what's going on with -- what the state is doing here.

22  You asked the state to take a position today on whether

23  the film has artistic merit, and it refused to do it.

24  Meanwhile, it's taking conflicting positions on that

25  very issue in the public sphere.  It says it is and it

1   is not.  We're here because we've been indicted because

2   Mr. Babin doesn't think that it does.  Not just some.

3   Any.

4           And so when we -- we're faced with this as we

5   were trying to stream, not just *Cuties*, but other movies

6   that may touch on or resemble *Cuties* in some way -- we

7   have to make these complex decisions about whether we

8   want to go through this all again in Tyler County.  That

9   is -- that's the definition of irreparable harm.  The

10  state can't give you a straight answer today, but

11  they've told one judge when it helped them in Houston

12  that it does to try to get a conviction for Mr. Lowry.

13  And then when they -- they need to get a conviction on

14  Netflix, they'll say it doesn't.  That is exactly why

15  the statute is unconstitutional on its face, and we want

16  the Court to reach that question.

17          On -- in terms of Younger, it was brought up

18  that these are jury questions that state court juries

19  should reach and that bad faith is not present.

20          THE COURT:  Hold on a second.

21          MR. BENNETT:  Yeah.

22          THE COURT:  You want me to rule that 262 is

23  unconstitutional, but 43.25 -- you're not seeking a

24  constitutional evaluation of that statute, correct?

25          MR. BENNETT:  Yes, we are.  Just a different

1 kind.  So it's a remedial question.  The question is
2 what remedy -- we get different remedies for our
3 challenges.  The remedy for the 262 challenge is this
4 Court says no prosecutor in Texas, whether Mr. Babin or
5 anybody else, can indict anyone for violating 262
6 because it is unconstitutional in substantially all of
7 its applications either because it's hopelessly
8 indeterminate and violates due process, especially
9 because it chills speech, or because it violates the
10 First Amendment, as *Lowry* concluded, because it's
11 substantially overbroad and engages in content-based and
12 viewpoint-based distinctions that the First Amendment
13 doesn't permit.  So that's A.  You can't enforce this
14 against anyone ever challenged.
15           THE COURT:  All right.  That's 262.
16           MR. BENNETT:  Correct.
17           THE COURT:  Go back to 43.25.
18           MR. LINDSEY:  In 43.25, our remedy is
19 different.  We are not telling the State of Texas that
20 it can't pursue 43.25 against actual child pornographers
21 because we want Texas to pursue real child
22 pornographers.  We're not going to step in the state's
23 way of doing great public work when they properly use
24 their resources.  What we're saying is, after
25 recognizing that you have no chance of winning on 262,

84

1   either because it's unconstitutional or you can't ever

2   show it appeals -- that the film *Cuties* satisfies the

3   material elements of appeals to the prurient interest,

4   for example --

5               THE COURT:  Or that it has no artistic

6   value --

7               MR. BENNETT:  Or that it has no artistic

8   value.

9               THE COURT:  Okay.

10              MR. BENNETT:  Including -- because the

11  state's already said so when it served its purposes in a

12  different case.  You want to sweep that under the rug,

13  avoid federal scrutiny, and now just stick with a

14  challenge that we -- we have to wait and go through the

15  entire trial process before we can vindicate our federal

16  constitutional rights.

17              And I will tell you, if we didn't have all of

18  the facts that we have in this record, if Mr. Babin had

19  issued an indictment in October of 2020 for 262 and

20  two days later came back and indicted us under 43.25, we

21  would have probably had something to say about it but

22  not here.  Because that's a different story.  The cases

23  overlaid across these facts paint a very distinct

24  picture.  And that's Mr. Babin watched the film in 2020,

25  thought we violated 262, only 262, charged only 262,

85

1  mentioned only facts relevant to 262 in his indictment,

2  and waited 400 days until we showed him the statute was

3  invalid.  And it wasn't until after and because we filed

4  that challenge to his case suddenly he convenes secretly

5  his grand jury, and we get four more indictments --

6  five -- five times more than any prosecutor in America

7  has brought against Netflix for this film and tries to

8  get us -- deprive us of our pretrial habeas rights and

9  all of the rest.

10              Those facts, among the others that we've

11  cited -- and I don't want to go through them again.

12  They're certainly in our complaint and in our motion --

13  justify the relief we seek under Younger, and it doesn't

14  have anything to do with jury questions.  The reason

15  that we brought up elements -- and I want to make this

16  distinction because I don't think my friend on the other

17  side -- he kind of confused these issues.  The only

18  reason why we talk about the merits -- the underlying

19  merits is because of the issue of probable cause and the

20  way that overlays bad faith for purposes of Younger.

21  It's not an issue of jury question.

22              Probable cause is not a jury question.

23  Probable cause is a due process issue.  When state

24  officials act without probable cause, they violate due

25  process --

1          THE COURT:  That's the Fourteenth Amendment

2    argument, correct?

3          MR. BENNETT:  Exactly.  So that's what

4    happened here.  No reasonable prosecutor -- no one who

5    actually watched this film could have ever thought

6    43.262 ever could have garnered a conviction.  It was

7    hopeless from the moment the indictment issued.  Not

8    only because of the profound constitutional issues, but

9    because Mr. Babin was never going to get the proof he

10   needed to satisfy appeals to the prurient interest or

11   any of the other things.

12         So that doesn't -- that jury question that

13   may exist, if there's probable cause, that's not before

14   the Court.  And it doesn't -- the Court doesn't need to

15   spend any time worrying about that.  The only reason

16   that's implicated in this case is because after

17   indicting us once under -- without probable cause, we

18   dealt with that.  We were ready to go forward with that

19   in state court.  He changed horses 500 days later

20   despite having seen the film, despite having every

21   opportunity to do it before we spent time on the habeas

22   petition pursuing that, defending that case, and he

23   chose to wait until after it.  And it was because --

24   there is causation there.  And, again, I would submit

25   *Jordan* and *Torries* to the Court about why those facts

87

1  preclude any application of Younger.

2          So let's talk about likelihood of success,

3  harm, and then I want to end on the public interest.

4  The -- my friend on the other side wants to talk about

5  unsettled law.  Aren't -- whatever issues may be

6  unsettled in the state court have no bearing on this

7  Court's jurisdiction or power to adjudicate the claims

8  we've raised.  State court doesn't effect, implicate,

9  impact this Court's plenary authority over federal

10 constitutional issues.

11         And the Court can read state law and look at

12 cases.  Certainly, they're informative.  Certainly, they

13 can be persuasive.  But at the end of the day, it is

14 this Court's duty, this Court's power to decide what

15 federal law is.  Not state -- not state courts and

16 certainly not state court juries.

17         Likelihood of success on the merits.  My

18 friend raised Dost.  I want to be clear about why Dost

19 even matters for purposes of this case.  It's only an

20 interpretive aid.  Dost only ever is an interpretive aid

21 to decide when the catchall in real child pornography

22 cases, lewd exhibition applies, and whether the material

23 at issue in those cases amounts to sexual conduct.  The

24 reason we've raised Dost is because it's clear.  The

25 legislature didn't use Dost.  Didn't want Dost used.

1  There are two textual clues before you even get to the

2  legislative history.  And that's the fact that the

3  legislature purposely did not use -- purposely omitted

4  the phrase "sexual conduct" from anywhere in the

5  operative elements of Section 262.

6          And the reason that matters and the reason

7  that implicates Dost is because lewd exhibition in the

8  sexual conduct sense in 43.25, right, is one thing, but

9  when you sever lewd exhibition from sexual conduct and

10 use a different phrase, the canons of construction say

11 it can't mean the same thing or shouldn't mean the same

12 thing and thereafter we don't have to worry about Dost.

13 I guess I'll just correct a couple of things. *Bolles* is

14 not a 262 case. *Bolles* is a 43.25 case.  The *Bolles*

15 court never construed Section 262 because it's a 2017

16 case, and it was before 262 was even effective.  So the

17 Court had no opportunity whatsoever to ever opine on

18 what lewd exhibition meant for purposes of 262.

19          And it certainly hasn't indicated that the

20 legislature intended, despite all of the evidence to the

21 contrary, for lewd exhibition to mean the same thing

22 that it means in 43.25.  Again, there are too many

23 textual clues.  There's too much legislative history to

24 ever reach that conclusion that they're the same

25 meaning.  And in terms of clothing, I thought I was

1  pretty clear, but let me be clearer in case I wasn't.

2  My friend on the other side seems to suggest

3  differently.  I never said clothing -- the presence of

4  clothing was dispositive or at least I never intended

5  to.  It's mitigating.  And that means it lessens -- it

6  doesn't necessarily dispose of, but lessens the

7  likelihood of a finding of sexual conduct.  But the

8  point is -- and this is one of those textual clues about

9  what lewd exhibition for purposes of 262 means -- when

10 you have a statute that makes clothing the incriminating

11 fact, you can't apply Dost.  That would otherwise make

12 it -- right?  That conflicts with the legislature's

13 purpose.

14            The legislature knows about Dost.  It knows

15 it makes clothing a mitigating factor, and yet it uses

16 clothing as an incriminating factor in a different

17 statute further cementing the conclusion that Dost can't

18 apply and lewd exhibition is different.

19            So what I didn't hear ever is any

20 full-throated defense of 262 as not overbroad or any

21 defense of Mr. Babin's effort to stretch 43.25 to the

22 film *Cuties*.  That never came up at any point during my

23 friend on the other side's rebuttal.  And that's because

24 there really isn't any good argument for it.  There's

25 too many cases against it.  There's no facts to support

1    it.  So likelihood of success on the merits, at least

2    for purposes of today, weighs completely in Netflix's

3    favor.

4            I understand concerns about, you know, the

5    harm, and I want to be clear about that.  We've cited

6    the *Opulent* case to your Honor on Page 36 of our motion

7    where the Fifth Circuit says expressly, "Even a minute's

8    loss of a First Amendment right is irreparable harm."

9    We have certainly more than that here.  It's not --

10   *Google* -- *Google* talked about subpoenas.  We have five

11   indictments -- felony indictments in this case that

12   we're now operating under the shadow of.  One dismissed

13   but vouched for and never backed away from, and four

14   currently under a statute that can't possibly apply to

15   this film.  That's far weightier than a request or an

16   order to provide some documents.  Five of them.  And,

17   again, five more than any prosecutor in America has ever

18   issued.

19           Your Honor just asked about statute of

20   limitations, and this, again, goes to the harm issue.

21   That's a weighty issue of -- especially since some of

22   these are facial issues, right?  Because we don't have

23   to show on a facial challenge that it applies always to

24   us.  The implications -- the First Amendment

25   violations -- we can talk about First Amendment

1  violations to all people, right?  So statute of

2  limitations -- maybe Mr. Babin's claim is barred in, I

3  think, six, maybe eight years -- no.  For a child

4  offense, it might be as many as ten in Texas.  So he's

5  got until 2030 -- as long as 2030, I believe, to come

6  after Netflix again or his successor or whomever else,

7  but it's ten years for any user.  So on the last day of

8  however long *Cuties* is on Netflix, it's ten years from

9  that last use that the citizens of Texas have to worry

10 about Mr. Babin or someone else indicting them for

11 watching a film that's publicly available and won awards

12 at film festivals.  That -- that can't be the law, and

13 it's the epitome of irreparable harm.

14         On the issue of the indictments, my friend on

15 the other side talked about, well, the indictments are

16 still going to exist.  Yes, that's true.  But if the

17 Court acts and enjoins Mr. Babin and, again, all of the

18 folks that Rule 65(d) touches, there's a lot of pretrial

19 events still to happen.  We understand, and we've been

20 upfront, candid, and have come honestly that we've made

21 a big request of the Court, but we've made it because

22 the facts and the law justify it.  And the First

23 Amendment requires the vindication of those interests.

24         And it's not going to be a speedy decision

25 even for purposes of a TRO.  What we're up against right

1  now is an arraignment, I think, a week from -- two weeks

2  from this coming Monday.  I don't want to have to appear

3  at that with -- typically, under usual practice under

4  state law, you've got to show up with the individuals

5  named in the indictment.  They've named my CEO and the

6  chief content officer.  I don't want to have to show up

7  with Mr. Hastings at an arraignment in Woodville, Texas,

8  for a charge that should be enjoined under federal law.

9  Now, we -- in all candor, we could waive arraignment and

10  enter not guilty like we did the first time -- a plea of

11  not guilty, but we shouldn't have to do that because it

12  never should have happened to begin with.  And this

13  Court can decide that -- the as-applied constitutional

14  nature --

15              THE COURT:  Well, if the TRO were granted for

16  14 days, then that would stop that arraignment process

17  at least that long.  There's been a lot of talk about

18  having enough time to absorb everything.  These are

19  serious issues for the Court to decide and -- on many

20  different levels.  I mean -- and without making any

21  comment on the merits, the Court certainly sees the

22  damage that child pornography causes.  This Court, as

23  well as virtually every other federal district court in

24  the country, reads the victim's statements when

25  convicting and sending someone to prison for a

93

conviction of child pornography.  And this Court has

seen how preying on children, even to the point of

wanting to cannibalize children after sexual conduct,

and children can get lured into these situations through

the use of social media and what have you.  It's very

dangerous.  And the Court certainly understands the good

natured intent of the legislature to try to curb these

abuses by passing statutes that they think are in the

best interest.

And for that matter, the actions of a

district attorney wants to utilize those statutory tools

to try to curb the abuse of children in this way, and

many people of good intent who want to restore a sense

of values and decency and all would actually applaud

Mr. Babin for taking steps to end, stop child

pornography, but -- so that's -- I can understand --

although Mr. Babin only spoke briefly -- but I can

understand his desire to try to do what he feels is

right.  I can understand the desire of the members of

the legislature to try to do what they think is right.

But ultimately on the other hand, we do have the

constitutional right of freedom of expression.  And

there is some very weighty issues here that the Court is

going to have to work through.

And, you know, 14 days, given the Court's

94

1   schedule -- other trials -- you know, to even really

2   give this for both sides the kind of proper evaluation

3   that it needs, you know, in -- it may take 14 days to

4   even get to that point.  But I suppose at least a

5   temporary restraining order, assuming the Court feels

6   that you've met the threshold requirements, would at

7   least kick the can down the road without your CEO or

8   other top executives having to appear in court for an

9   arraignment.  Although you might do it in another way.

10              I suppose, frankly, that -- I don't know that

11  even the state would object too much to kicking the can

12  down the road for 14 days.  After all, it kind of held

13  the claims for 400 days.  I mean, these are very

14  serious -- this is a very serious case for both sides.

15  You're talking about the unconstitutionality of a

16  statute.  Well, a lot of good natured people came

17  together in Austin to try to come to some sort of

18  statute to try to curb what is a very major problem in

19  the state.  And people can be victimized.  Ironically,

20  if what I've read in some of the pleadings, the actual

21  producer of this movie was, in a sense, in agreement

22  with Mr. Babin that this is such a problem in the world

23  today that this movie was an attempt to try to curb

24  those abuses.  It's kind of an irony of sorts.

25              And, again, perhaps, you would probably argue

95

1  that's the political merit of the case, value of the

2  case.  So this is -- this is a -- in many ways, it

3  almost seems to the Court that the producer of this

4  movie and Mr. Babin are on the same page.  It's just how

5  you express that might be what is difficult.  So I don't

6  know.  I'm just curious about my comment, and I'd ask --

7  not to interrupt your -- I'm just curious, Mr. Lindsey,

8  about what I just said.

9           MR. LINDSEY:  Could I have a couple of

10  minutes to speak with Mr. Babin?

11           THE COURT:  You may.  Do you want to be in

12  recess or just take --

13           MR. LINDSEY:  Yes, sir.

14           THE COURT:  Before you do that, do you want

15  to complete -- come to a conclusion?

16           MR. BENNETT:  Based on your Honor's remark, I

17  just have a couple quick points because -- and I think

18  these dovetail together -- your remarks would be where I

19  finished.

20           And your Honor's concerns about

21  this difficult balance, I think, is expressed best in

22  Chief Justice Robert's opinion in *U.S. v. Stevens*.

23  People can have well-intended desires to protect

24  children.  In the *Stevens* case, it was animals.  But at

25  some -- at some point, as your Honor mentioned, the

96

1   desire to protect can't override or invade what is
2   otherwise protected.  And that's where *Stevens* ran into
3   trouble.  And whatever the legislature's good
4   intentions -- which we're not here to question in 262 --
5   it transcended that -- that balance -- the balance that
6   is mentioned in *Stevens*.  And so we commend the Court --
7   that opinion of the Court sort of wrestles with those
8   issues.
9           But that dovetails in with the last point
10  that I want to make and that my friend on the other side
11  made.  What about the state's prosecutors?  What message
12  does it send to them?  I would submit to your Honor it
13  won't send any message to them other than that this case
14  is the outlier that the record shows that it is.
15  Certainly, we were ready, and we could appreciate a new
16  statute that Mr. Babin raised in the first indictment.
17  And we were ready to go to state court on that, but the
18  record shows what it shows and that it was less about
19  testing new theories and new ways and more about making
20  sure Netflix answers for exercising its First Amendment
21  rights.  Not just of free speech, but to petition for
22  redress in the petition.
23          And at that point, it turned into something
24  else.  Five-hundred days after indicting under the first
25  indictment, bringing all these new charges -- again, I

```
 1  think the biggest factor that weighs against any -- any
 2  notion that your Honor's action in this case would
 3  affect the state's prosecutors in any way is, A, the
 4  state's expressed disclaimer in another case that
 5  Netflix doesn't -- not only is it -- that it doesn't
 6  violate the statute at all, but also that Mr. Babin is
 7  the only -- out of 241 district attorneys and however
 8  many state attorney generals and assistant attorney
 9  generals there are, he's the only one to do what he did.
10  Not just do what he did in terms of indictment, but do
11  what he did in terms of what the record shows he's done.
12              THE COURT:  Okay.
13              MR. BENNETT:  So it won't affect -- it's in
14  the public's interest.  We'd ask the Court to issue the
15  TRO that will last 14 days from whenever the Court's
16  order comes out, being mindful of the arraignment issues
17  we've addressed, the plea that we're going to have to
18  enter by whatever means --
19              THE COURT:  Which is a week from this coming
20  Monday?  Is that what you said?
21              MR. BENNETT:  Correct.  Or it might be the
22  following.  I can double check my calendar.  I think it
23  is actually -- now that I think about it, not two weeks
24  from this Monday, but it'd be three weeks.
25              THE COURT:  I think it's -- well --
```

98

1          MR. BENNETT:  For all those reasons --

2          THE COURT:  It's very important that we get

3     this right.

4          MR. BENNETT:  We agree.

5          THE COURT:  And I typically have been in

6     other situations somewhat liberal when it comes to

7     granting a temporary restraining order, I mean, unless

8     massive financial issues are at stake, and then we have

9     to have bonding for that.  But we understand.  But, you

10    know, at some point, it's like a 14-day cooling off

11    period until everybody can kind of sort through

12    everything and give a more orderly presentation with

13    both sides present.  Here we kind of had -- although --

14    albeit, I saw where you mentioned that you got the

15    notice of this late yesterday.

16         Most of the time when I'm in a TRO, the other

17    side didn't even know it had happened until they

18    received the restraining order.  But I understand that's

19    because under the federal rules, you had to notify the

20    attorney general since the constitutionality of a

21    statute was in effect.  So -- which I appreciate you

22    doing.

23         All right.  There was a request for a brief

24    recess for the defendant to kind of regroup.

25         MR. LINDSEY:  Yes, your Honor.

99

1          THE COURT:  And -- would five minutes be

2   sufficient?

3          MR. LINDSEY:  I believe so.

4          THE COURT:  I'll give you five minutes.

5          We stand in recess.

6          (A recess was taken at this time.)

7          THE COURT:  Please be seated.

8          Yes, Mr. Lindsey.

9          MR. LINDSEY:  Your Honor, I think that we

10  have come to a mutually agreeable solution at least for

11  the meantime, if the Court will agree.

12         THE COURT:  For purposes of, like, a

13  temporary restraining order?

14         MR. LINDSEY:  Yes, your Honor.

15         THE COURT:  Okay.  But not the full case; is

16  that correct?

17         MR. PRICHARD:  Correct.

18         MR. LINDSEY:  Correct.  If I understand

19  correctly, Netflix is going to agree to take down the

20  request for temporary restraining order in exchange for

21  us in the future -- the near future agreeing on a date

22  to set the final hearing.

23         And in the meantime, Mr. Babin will

24  informally commit not to arraign Netflix.

25         MR. PRICHARD:  But I think it's about

1   95 percent correct.  I think the term that I used with

2   counsel was an agreed stay of any proceedings so that we

3   would get outside of the strictures of the temporary

4   restraining order 14 days to give both sides more

5   opportunity to brief, maybe to discuss --

6                 THE COURT:  Depending on whatever evidence

7   you have?

8                 MR. PRICHARD:  And then we wouldn't have to

9   just come back just in 14 days.  Maybe we could find --

10  hopefully, with reasonable people, find a reasonable

11  resolution, so that we would not have to see the Court

12  again.

13                But if we did, we have agreed to sometime

14  around the mid-May portion for a temporary injunction

15  hearing, if necessary.

16                THE COURT:  Right.  Well, I think that's

17  admirable.  I do want to just let -- what I tell all

18  litigants.  I don't ever want to force anyone into any

19  sort of a settlement, and I'm not.  By the same token,

20  I'm not going to stand in the way of people, you know,

21  trying to come to some resolution.

22                My concern is since the issues are pretty

23  involved, shall we say, I want to make sure I get it

24  right.  And -- because that doesn't really --

25  ultimately, I make a decision.  One side or the other

1  may take it up.  But I want it to go up -- if it goes

2  up, certainly with my best efforts on the table and a

3  proper evaluation.  And it's hard to do that in 14 days.

4  It's hard to properly develop and respond.  Of course,

5  under this, it sounds like Netflix, at least, gets a

6  reprieve for a while.  At least probably until the

7  middle of May.

8           And then, you know, I was kind of asking,

9  well, what are we going to do when we meet again in

10  14 days or if we were to extend it another 14 to

11  28 days.  We would be kind of here again, and we could

12  get it all knocked out in one -- I think I have the gist

13  of it.  We will obviously have great interest in this.

14  And with the materials that you've provided us -- both

15  sides -- I know you'll probably supplement in time for

16  the final hearing.  Because really you wouldn't need, it

17  seems to me -- obviously, I'd want to hear otherwise --

18  a need for us to have a hearing on a preliminary

19  injunction and then come back a year later on yet a

20  permanent injunction or anything like that.  I think --

21  I think we -- if we could deal with it at one time, it

22  would probably be wise.  It would probably be wise.  But

23  then, at least, Netflix, from what I'm hearing, is, at

24  least, protected in the -- in the short term; is that

25  correct?

102

1          MR. PRICHARD:  That's my understanding.  I
2  think we've reached that agreement.
3          MR. LINDSEY:  Yes, sir.
4          THE COURT:  Now, there is also many a slip
5  between the cup and the lip, as you know.  And I'm sure
6  you all will have some written agreement to this effect
7  that you all will sign?
8          MR. PRICHARD:  We will endeavor to do that.
9  We'll take the first cut, if you'd like.
10          MR. LINDSEY:  By all means.
11          MR. PRICHARD:  Okay.  I figured that might --
12          THE COURT:  And in the event that committing
13  it to paper is not successful --
14          Mr. Lindsey, you have authority on behalf of
15  the attorney general's office?  I mean, do you need to
16  discuss it with people back at the home office?
17          MR. LINDSEY:  Actually, my understanding is
18  now that I've been deputized as a Tyler County special
19  prosecutor for this matter.  So I have all of the
20  authority.
21          THE COURT:  Well, congratulations to you.
22          MR. LINDSEY:  It was a very formal ceremony.
23          THE COURT:  Yes.
24          MR. PRICHARD:  Badge and all that good stuff?
25          MR. LINDSEY:  I'm working on that.

1          THE COURT:  So you -- okay.  You can enter

2  this agreement?

3          MR. LINDSEY:  Yes.

4          THE COURT:  You don't have to get the

5  attorney general to bless it or anything like that?

6          MR. LINDSEY:  Correct.

7          THE COURT:  Okay.  Well, I suppose if there

8  is some sort of a problem, you all let the Court know.

9  I will -- do you all want to agree -- since we're all

10 here today, can y'all agree on a date?  We have to look

11 at our schedule, too, or do you want to --

12         MR. BENNETT:  So if I can -- if that's all

13 right -- I think what I heard your Honor say is we want

14 to do it one time.

15         Rule 65(a) permits for that, a consolidation

16 of a preliminary injunction hearing and --

17         THE COURT:  That's right.  We've done it.

18         MR. BENNETT:  -- a permanent injunction

19 hearing.  I think it just creates some tricky issues,

20 but I think maybe we could explore that.  So we have

21 this interim agreement --

22         THE COURT:  Because what else would we --

23 would happen?

24         MR. BENNETT:  Right.  I think that's --

25 that's right.  The only -- it's that 2 percent issue I

104

1  alluded to earlier, but I think we can have some

2  conversations about that.  Are there facts?  I mean,

3  there has been some assertions about evidence and bad

4  faith.  We think there's ample evidence already, but --

5  anyway, there might be some other issues to talk

6  through.

7            So my suggestion would be we -- I'm glad we

8  have this order or this agreement.  We'll get that in.

9  Again, if there's a problem, we'll come back.  I don't

10  anticipate there will be.  And then --

11            THE COURT:  You don't anticipate there'll be

12  a problem in reaching the agreement?

13            MR. BENNETT:  I don't anticipate there'll be

14  a problem reaching the agreement for the interim

15  purposes.

16            THE COURT:  That's what I thought -- that's

17  what I thought you said.  Go ahead.

18            MR. BENNETT:  I'm a little tongue tied after

19  having talked as much as I have.  I might have said it

20  wrong.

21            Yes.  To be clear, I think we're in

22  agreement.  We'll paper that over and get an order to

23  your Honor.  If there's an issue, we'll talk.  I do not

24  think there will be.  And then we could have further

25  conversations about this -- the Rule 65(a.)  What do we

1   want to do about that.  We can reach further agreements.

2   If it's not going to be -- obviously, some of that is

3   going to depend on your Honor's calendar to get us --

4   how much time do we need and -- so I guess all that to

5   say, we got the temporary problem solved.  Let us as

6   lawyers go to work and try to reach some agreements to

7   make it efficient for everybody.  I think we can do

8   that.  So that would be my suggestion.

9         Obviously, we need to do formal service and

10   sort of initiate some of these Rule 16(b) kind of

11   procedures, you know, but that would be my preference at

12   least for Netflix.

13         THE COURT:  Is there any discovery that you

14   all are wanting to engage in between now and the final

15   hearing?

16         MR. BENNETT:  I don't want to say no,

17   absolutely not --

18         THE COURT:  Okay.

19         MR. BENNETT:  -- only because of this bad

20   faith issue.  I don't know what their position is going

21   to be on some of this.  Some of that may require some

22   development.  It may come through briefing.  I don't

23   think there will be discovery.  I just don't want to

24   commit and say absolutely not right now.

25         THE COURT:  Hold on just a minute.

1        We won't set it yet, but May 23rd appears to
2  be open on the Court's calendar.  For those of you -- I
3  think this is the first time you all have ever appeared
4  in front of me.  I may be a little different than a lot
5  of federal judges because I was a trial lawyer for
6  34 years.  I'd like to say -- give you what's convenient
7  for the Court, but it's still -- when it comes to
8  scheduling, as long as there aren't any critical issues
9  that are affected by it, it's the lawyers' case.  It's
10  not my case.
11        And I include -- May 23rd is a time of high
12  school and college graduations and things like that.
13  Even weddings and things.  If you have any personal
14  issues as well as professional, I'd kind of like to --
15  we work around things like that.
16        When I was a trial lawyer, I had many
17  vacations destroyed by judges who just didn't seem to
18  understand.  So I try to work with people on that.
19        Mr. Prichard.
20        MR. PRICHARD:  I will let the Court know that
21  I have a week-and-a-half, at least, engagement with
22  Judge Schroeder up in Texarkana.
23        THE COURT:  When does that start?
24        MR. PRICHARD:  May 23.
25        THE COURT:  Okay.  We will honor that.

1           MR. PRICHARD:  There's a lot going on in that

2   case, and it may -- it's been continued now five times.

3   And Judge Schroeder, I don't think, is going to take too

4   kindly, but there are a lot of issues that he's not

5   going to be very happy about to continue it again.  So I

6   want to let the Court know.  But let me say this:  I'm

7   working for my friend Mr. Bennett.  And if that's the

8   date that's agreed upon and works for everybody, I will

9   do my best or he'll have a fill-in for me.  So I don't

10  want to say no to a date because that date might be just

11  perfect for everybody else.

12          THE COURT:  I understand.

13          MR. PRICHARD:  I'm a "low on the totem pole"

14  participant.

15          THE COURT:  I wouldn't say that.  And your

16  comments are very helpful to the process, and I

17  appreciate it.  So maybe we need to look for another

18  date.

19          Yes, Mr. Lindsey.

20          MR. LINDSEY:  I was just going to say the

21  23rd is convenient for us, but if we're looking for

22  another day --

23          THE COURT:  All right.

24          MR. LINDSEY:  -- belay that.

25          THE COURT:  Mr. Bennett.

1          MR. BENNETT:  I have to check.  Obviously,

2  with some of the unknowns with my office and -- we have

3  a trial thereabouts and maybe pretrial --

4          THE COURT:  As an alternative, Tuesday,

5  June 14th.  I think the Court could give that to you.

6          Is that a little better, Mr. Prichard?

7          MR. PRICHARD:  Yes, your Honor.  And it's all

8  right with our client.

9          Is it all right with you, Mr. Bennett?

10          MR. BENNETT:  I'll make it work.

11          MR. LINDSEY:  Was it the 13th or 14th?

12          THE COURT:  14th.

13          MR. LINDSEY:  It's convenient for us, your

14  Honor.

15          THE COURT:  All right.  I think that would be

16  better than -- if that's all right with the parties.  It

17  extends this agreement another month.  But -- and that

18  way we don't have to interfere with your other schedules

19  and what have you.  And that's fine.

20          What else do we need to take care of today?

21          MR. PRICHARD:  What time would the Court like

22  us --

23          THE COURT:  Well, we could go ahead and start

24  at 9:00.  I think that would be fine.  It sounds like

25  you guys -- one of the things -- I went ahead and

1  started at 10:00, and we went a little bit beyond that

2  because we received so many materials late and into the

3  night and early morning that I didn't want to start at

4  9:00 without at least -- at least a cursory review of

5  what the case was about before presiding over this

6  hearing.

7             Obviously, the Court will be better prepared

8  on the 14th.  And I knew people were coming in, and I

9  just wanted to give everybody a little more time.  So --

10 but if -- y'all will probably come in the night before

11 anyway, so we might as well get a full day.

12            Now, this is a Lufkin case.  We like trying

13 cases and having cases in Lufkin.  But since we won't

14 have a jury involved, I don't think there's really an

15 issue of anybody waiving an opportunity to have a Lufkin

16 division jury decide anything at this.  So would you all

17 agree to just do it in Beaumont?  And that would save --

18 save the Court -- not just me.  I don't care.  But we

19 have to bring other people up from Beaumont to man the

20 courthouse there.

21            MR. PRICHARD:  We waive any right to be in

22 Lufkin and agree to do it in Beaumont, your Honor, on

23 behalf of Netflix.

24            THE COURT:  Now, obviously, if there's ever a

25 fact issue that required a jury, we would, absent an

110

1 agreement of the party -- and even that has some

2 implications of our ability to do it -- we would go

3 ahead and have any kind of a jury trial.  Now, I don't

4 think that's an issue here, but we would do that in

5 Lufkin.

6           For a hearing, are you okay with Beaumont?

7           MR. LINDSEY:  Yes, sir.

8           THE COURT:  Okay.  All right.  Anything else?

9           Well, let me know for sure that you've

10 reached an agreement.  We're going to hold June 14th for

11 you.

12           And with that being said, we'll stand

13 adjourned.

14           (Proceedings adjourned at 1:41 p.m.)

15                         *     *     *

16

17           <u>COURT REPORTER'S CERTIFICATION</u>.

18           I hereby certify that on this date,

19 March 25, 2022, the foregoing is a correct transcript of

20 the record of proceedings in the above-entitled case.

21

22 _____

23 APRIL D. HARGETT
Certified Realtime Reporter
Eastern District of Texas

24 Beaumont, Texas

25