IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
LUFKIN DIVISION

| | | |
|---|---|---|
| NETFLIX, INC., | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | CIVIL ACTION NO. 9:22-CV-00031 |
| v. | § | JUDGE MICHAEL J. TRUNCALE |
| | § | |
| LUCAS BABIN, | § | |
| | § | |
| *Defendant*. | § | |

## PRELIMINARY INJUNCTION

Before the Court is Plaintiff Netflix, Inc.'s Amended Motion for Preliminary Injunction [Dkt. 69], as well as supplemental briefing on jurisdictional issues, which the parties provided at the Court's request. [Dkts. 48, 49, 51, 52, 55, 56, 67]. Netflix asks the Court to enter a preliminary injunction enjoining Defendant Lucas Babin, his agents, servants, employees, and attorneys, and all others who are in active concert or participation with Mr. Babin (or with any of his agents, servants, employees, or attorneys) from: (1) continuing to prosecute Netflix under the currently pending charges in Tyler County, Texas under Section 43.25 of the Texas Penal Code, and (2) seeking to reindict Netflix or otherwise pursue charges against Netflix under Section 43.262 of the Texas Penal Code in connection with the motion picture *Cuties*. Netflix also requests that the Court waive the bond requirement for Netflix or set a minimal bond pending trial. On September 14, 2022, the Court held a hearing on Netflix's Amended Motion for Preliminary Injunction. For the reasons outlined below, Netflix's Amended Motion for Preliminary Injunction is hereby **GRANTED**.

## I.    BACKGROUND

"The prevention of sexual exploitation and abuse of children constitutes a government objective of surpassing importance." *New York v. Ferber*, 458 U.S. 747, 757 (1982). With the advent and rise of social media, and the ever-increasing sexualization of society, this sentiment is even more pertinent now than when it was written forty years ago. Admirably, this case involves two parties that both seek to thwart the

increasing sexualization of children. But they disagree on the means that should be used to reach this shared end.

Netflix began streaming *Cuties* on September 9, 2020. *Cuties* ("Mignonnes" in its native French) is the story of Amy, an eleven-year-old Senegalese immigrant caught between cultures: her devoutly Muslim family and the "Cuties"—a self-named dance group of Amy's peers who have their hearts set on trying out for and performing at a big dance competition. The film presents an unflinching view of Amy and the Cuties as they prepare for and compete in that competition. The film also highlights how their unfettered and unmonitored access to social media and the internet influences their behavior. During its 96-minute runtime, *Cuties* depicts and explores various relationships (e.g., fraternal, maternal, paternal (or lack thereof), and platonic), while vividly revealing to viewers the dangers and consequences of leaving children unrestrained from—and at the mercy of—the highly sexualized and media-driven culture in which they are now immersed. The Cuties mimic this culture through provocative dance routines, often performed in public places while wearing cut-off tops and tight, short shorts.

Repulsed by the sexualization of the children in *Cuties*, Defendant Lucas Babin, the District Attorney for Tyler County, Texas, sought and received a grand jury indictment (the "First Indictment") against Netflix within a few weeks of Netflix releasing the film. [Dkt. 1-1]. This First Indictment was issued for the offense of "promotion of lewd visual material depicting child" under Texas Penal Code § 43.262. Shortly thereafter, Mr. Babin issued a press release where he expressed his motivation for seeking the charge:

> After hearing about the movie Cuties and watching it, I knew there was probable cause to believe it was criminal under Section 43.262 of the Texas Penal Code. The legislators of this state believe promoting certain lewd material of children has destructive consequences. If such material is distributed on a grand scale, isn't the need to prosecute more, not less? A grand jury in Tyler [C]ounty found probable cause for this felony, and my job is to uphold the laws of this State and see that justice is done.

[Dkt. 1-2]. On October 23, 2020, Netflix entered a plea of not guilty. The case generally sat idle over the next year. On October 26, 2021, the First Court of Appeals of Texas held in *Ex parte Lowry*, that Section 43.262 violates the First Amendment because it is a content-based restriction of speech, is not an obscenity

or a child pornography statute, and cannot otherwise satisfy strict scrutiny. 639 S.W.3d 151, 162–68 (Tex. App.—Houston [1st Dist.] 2021, *pet. granted* Mar. 2, 2022).[1] In response to *Lowry*, Netflix filed a Petition for a Pretrial Writ of Habeas Corpus (the "Habeas Petition") on November 15, 2021. In the Habeas Petition, Netflix argued that the First Indictment should be dismissed because Section 43.262 is "facially unconstitutional under the First, Fifth, and Fourteenth Amendments of the United States Constitution and Article I Section 8 of the Texas Constitution in several ways." [Dkt. 1-4 at 1]. Netflix requested a November 2021 hearing on the Habeas Petition, but for reasons the parties disagree on, the hearing was set for March 4, 2022.

On March 1, 2022, Mr. Babin sent an e-mail to Netflix's counsel stating:

> Separate indictments will be served on the registered agent within the next few days. Wanted to give you a heads-up. I will dismiss cause number 13,731 (§43.262) and make sure you get a copy of the order by end of the day tomorrow. As a result, I do not see a need for the hearing scheduled for 3/3/22.

[Dkt. 70-14 at 20]. As promised, Mr. Babin dismissed the First Indictment the next day, albeit without prejudice. [Dkt. 1-9] He also issued four new indictments (the "New Indictments") under Texas Penal Code § 43.25(d), for intentionally and knowingly promoting a performance—*Cuties*—that included sexual conduct by a minor. [Dkts. 1-5, 1-6, 1-7, 1-8]. Each indictment involved a different actress. Netflix reacted to the New Indictments by filing this suit against Mr. Babin for injunctive relief the following day. Netflix contends that Section 43.262 is patently unconstitutional under the Fifth Amendment's vagueness doctrine and facially unconstitutional under the First Amendment because it is an impermissible content- and viewpoint-based restriction that is not narrowly tailored to serve a compelling state interest, is overbroad, and threatens to chill Netflix's speech. [Dkt. 97 at 25–27].   As to the New Indictments, Netflix contends: (1) that as applied to Netflix, Section 43.25 is unconstitutional under the First Amendment and threatens to chill Netflix's speech, and (2) that Mr. Babin brought the New Indictments in bad faith and without probable cause to retaliate against Netflix for exercising its rights to free speech and to petition the government for

---

[1] *Ex parte Lowry* is currently pending before Texas's high criminal court: the Texas Court of Criminal Appeals. The court held oral arguments in the case on October 5, 2022.

redress. *Id.* at 27–30. Netflix also contends that Mr. Babin has engaged in selective prosecution in violation of the Equal Protection Clause of the Fourteenth Amendment. *Id.* at 30–32.

On March 15, 2022—twelve days after Netflix filed this suit—Babin issued a policy ("the Policy Change") stating that the Tyler County Criminal District Attorney's Office "shall not prosecute any offense under Texas Penal Code Section 43.262 *unless and until* (1) The Texas Supreme Court has deemed Section 43.262 facially constitutional; (2) the *Lowry* decision has otherwise been abrogated in favor of Section 43.262; or (3) Section 43.262 has been amended by the Texas Legislature." [Dkt. 22-2 at 3] (emphasis added).

## II.    APPLICABLE LAW

Neither Congress, nor the States, may make laws abridging the freedom of speech. *See* U.S. Const. amend. I; *see also Gitlow v. New York*, 268 U.S. 652, 666 (1925) (incorporating the First Amendment against the States through the Fourteenth Amendment). But this prohibition has never conferred an absolute right to speak. *See, e.g.*, *Gitlow*, 268 U.S. at 666–67 (collecting cases); *Miller v. California*, 413 U.S. 15, 23 (1973) (same). "There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem." *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571–72 (1942). Obscene speech is one such class. *See, e.g.*, *id.*; *Roth v. United States*, 354 U.S. 476, 485 (1957) ("We hold that obscenity is not within the area of constitutionally protected speech or press."). "It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." *Chaplinsky*, 315 U.S. at 572. Speech that "depict[s] or describe[s] sexual conduct" and "which, taken as a whole, appeal[s] to the prurient interest in sex, which portray[s] sexual conduct in a patently offensive way, and which, taken as a whole, do[es] not have serious literary, artistic, political, or scientific value" may be regulated as obscene. *Miller*, 413 U.S. at 24. But even so, the "conduct must be specifically defined by the applicable state law, as written or authoritatively construed." *Id.*

Child pornography is another class of speech that is not entitled constitutional protection. *Ferber*, 458 U.S. at 756–65. Child pornography "consists of sexually explicit visual portrayals that feature children." *United States v. Williams*, 553 U.S. 285, 288 (2008). As already noted, "The prevention of sexual exploitation and abuse of children constitutes a government objective of surpassing importance." *Ferber*, 458 U.S. at 757. And this is an objective that the *Miller* obscenity test may not always protect adequately. For starters, "the question under the *Miller* test of whether a work, taken as a whole, appeals to the prurient interest of the average person bears no connection to the issue of whether a child has been physically or psychologically harmed in the production of the work." *Id.* at 761. Second, "a sexually explicit depiction need not be 'patently offensive' in order to have required the sexual exploitation of a child for its production." *Id.* And finally, "a work which, taken on the whole, contains serious literary, artistic, political, or scientific value may nevertheless embody the hardest core of child pornography. It is irrelevant to the child who has been abused whether or not the material has a literary, artistic, political or social value." *Id.* (cleaned up). Therefore, "States are entitled to greater leeway in the regulation of pornographic depictions of children" than in the regulation of otherwise obscene speech. *Id.* at 756. When regulations of child pornography are at issue, "the evil to be restricted so overwhelmingly outweighs the expressive interests, if any, at stake, that no process of case-by-case adjudication is required." *Id.* at 763–64.

Nonetheless, "[a]s with all legislation in this sensitive area, the conduct to be prohibited must be adequately defined by the applicable state law, as written or authoritatively construed." *Id.* at 764. And "the nature of the harm to be combated requires that the state offense be limited to works that *visually* depict sexual conduct by children below a specified age." *Id.*; *see Ashcroft v. Free Speech Coal.*, 35 U.S. 234, 250–51 (2002) (clarifying that "*Ferber*'s judgment about child pornography was based upon how it was made, not on what it communicated" and is therefore limited to works that visually depict sexual conduct by *real* children). "The category of 'sexual conduct' proscribed must also be suitably limited and described." *Id.*

When a statute regulates speech other than speech within the classes that are not entitled constitutional protection—such as obscenity and child pornography—a two-step analysis must be

completed to determine whether the regulation is an unconstitutional restriction on speech. The first step is to determine whether the statute is a content-based or a content-neutral restriction on speech. "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015). "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Id.* Thus, if a restriction on speech is content based, the second step is to determine whether it can satisfy strict scrutiny. Alternatively, "regulations that are unrelated to the content of speech are subject to an intermediate level of scrutiny . . . because in most cases they pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 642 (1994). A restriction on speech may also be challenged facially under the First Amendment overbreadth doctrine and "be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *NetChoice, L.L.C. v. Paxton*, 49 F.4th 439, 450 (5th Cir. 2022) (quoting *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2387 (2021)).

## III.    JURISDICTIONAL ISSUES

### A.   *Netflix's claims under Texas Penal Code § 43.262 are not moot.*

As a preliminary matter, the Court must determine whether it has jurisdiction to consider Netflix's claims regarding the First Indictment. Specifically, the Court must determine whether these claims are moot because Mr. Babin dismissed the First Indictment—albeit without prejudice—and issued the Policy Change.

"The doctrine of mootness arises from Article III of the Constitution, which provides federal courts with jurisdiction over a matter only if there is a live 'case' or 'controversy.'" *Dierlam v. Trump*, 977 F.3d 471, 476 (5th Cir. 2020). "Accordingly, to invoke the jurisdiction of a federal court, a litigant must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." *Chafin v. Chafin*, 568 U.S. 165, 171–72 (2013) (cleaned up). The "actual controversy must exist not only at the time the complaint is filed, but through all stages of the litigation."

*Already, LLC v. Nike, Inc.*, 568 U.S. 85, 90–91 (2013) (internal quotation marks omitted). "A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Id.* at 91. (internal quotation marks omitted).

In general, "'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice,' even in cases in which injunctive relief is sought." *Meza v. Livingston*, 607 F.3d 392, 399–400 (5th Cir. 2010) (quoting *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982)). "If defendants could eject plaintiffs from court on the eve of judgment, then resume the complained of activity without fear of flouting the mandate of a court, plaintiffs would face the hassle, expense, and injustice of constantly relitigating their claims without the possibility of obtaining lasting relief." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 324 (5th Cir. 2009). Therefore, a defendant claiming that its voluntary cessation moots a case "bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000); *see also Knox v. SEIU*, 567 U.S. 298, 307 (2012) ("[M]aneuvers designed to insulate a decision from review by this Court must be viewed with a critical eye.").

The *threat* of prosecution may establish a live controversy; a pending prosecution is not necessarily required. *See Steffel v. Thompson*, 415 U.S. 452, 459 (1974) ("[I]t is not necessary that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights.").

Here, Mr. Babin bears the heavy burden of establishing that the allegedly wrongful behavior—that is, Netflix's prosecution in Tyler County under Section 43.262 for promoting *Cuties*—could not reasonably be expected to recur. Mr. Babin contends that Netflix's Section 43.262 claims are moot because "Netflix is admittedly not subject to any charge thereunder and, due to Mr. Babin's official policy on the subject, Netflix is not reasonably likely to face any such charge in the future." [Dkt. 48 at 5]. Mr. Babin concedes that voluntary cessation only moots a case if the allegedly wrongful behavior could not be reasonably

expected to recur. *Id.* But he contends that a different, lower standard applies to government actors, like himself. *Id.* at 6 (citing *Sossamon*, 560 F.3d at 325).

Indeed, the Fifth Circuit provided in *Sossamon* that "courts are justified in treating a voluntary governmental cessation of possibly wrongful conduct with some solicitude, mooting cases that might have been allowed to proceed had the defendant not been a public entity" and that "[w]ithout evidence to the contrary, we assume that formally announced changes to official government policy are not mere litigation posturing." 560 F.3d at 325. To harmonize this presumption with the Supreme Court's decree that establishing mootness is a "heavy burden," *Friends of the Earth*, 528 U.S. at 189, the *Sossamon* court reasoned that "government actors in their sovereign capacity and in the exercise of their official duties are afforded a presumption of good faith because they are public servants, not self-interested parties." *Sossamon*, 560 F.3d at 325. This carve out is irreconcilable with recent Supreme Court precedent, however. In *West Virginia v. EPA*, the Court reiterated that the burden to establish that a once-live case has become moot is "'heavy' where . . . 'the only conceivable basis for a finding of mootness in the case is the respondent's voluntary conduct.'" 142 S. Ct. 2587, 2607 (2022) (quoting *Friends of the Earth, Inc.*, 528 U.S. at 189). Unlike *Friends of the Earth*, *West Virginia v. EPA* involved a *government actor*'s assertion that its voluntary cessation mooted the plaintiffs' claims. *Id.* Nonetheless, the Court uniformly enforced the heavy burden. *Id.* In holding that the case remained justiciable, the Court highlighted that the Government "nowhere suggest[ed]" that it would not reimpose the challenged regulations if the litigation were resolved in its favor, and "vigorously defend[ed] the legality of such approach." *Id.* (internal quotation marks omitted).

But even assuming that voluntary governmental cessations of allegedly wrongful conduct are still afforded "some solicitude," Netflix's First Indictment claims remain justiciable. The Fifth Circuit's analysis *Speech First, Inc. v. Fenves*, 979 F.3d 319, 327–29 (5th Cir. 2020), is instructive.

*Fenves* involved First Amendment challenges to the University of Texas at Austin's policies governing student speech. *Id.* at 323–24. The University claimed that revisions removing the allegedly wrongful language mooted the corresponding challenges. *Id.* at 327–28. The University's president also

affirmed in his briefs to the court that "the University has no plans to, and will not, reenact the former policies." *Id.* In addressing the mootness claims, the Fifth Circuit acknowledged that, "[i]n some cases this court has treated a voluntary cessation of possibly wrongful conduct with some solicitude . . . but this relaxed standard has not been applied to voluntary cessation by a public university." *Id.* at 328. The court declined to extend the relaxed standard—leaving unanswered the questions of to which government actors, and under what circumstances it applies—but "assume[d] its applicability *arguendo* for purposes of this case." *Id.* The court considered three factors that the Sixth Circuit, in an analogous case, held defeated a presumption "that the same allegedly wrongful conduct by the government is unlikely to recur": (1) the absence of a controlling statement of future intention; (2) the suspicious timing of the change; and (3) the [defendant's] continued defense of the challenged policies. *Id.* (citing *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 767–70 (6th Cir. 2019)).

In the Sixth Circuit analogue, the university advanced sworn testimony, by a person who had control over the policy's reimplementation, that it did not intend to reenact the challenged policies. *Id.* at 328–29. In contrast, the University in *Fenves* did not issue a sworn statement. *Id.* at 328. And the court did not find the president's representations in his brief comparable. *Id.* at 329. Moreover, there was "no evidence" that the president "controls whether the University will restore the challenged definitions during or after his tenure." *Id.* Thus, there was no "controlling statement of future intention." *Id.* at 329. Both the Sixth and Fifth Circuits found the timing of the respective policy changes suspicious: in the former, the changes occurred after the plaintiff filed its complaint; in the latter, they occurred after the district court dismissed the plaintiff's complaint for lack of standing. *Id.* Finally, in his briefing at the district court and the Fifth Circuit, the University president continued to defend the constitutionality of the challenged policy, in its original form. *Id.* Thus, the court found that, "even under the [Sixth Circuit's] relaxed presumption in favor of a university's voluntary cessation (which we apply only *arguendo*), [the University president] has not shown an absolute certainty that the original provisions of [the challenged policies] will not be reinstituted." *Id.*

The Fifth Circuit left unanswered the question of whether the Sixth Circuit's test requires all three factors. *See id.* ("Even if the [Sixth Circuit] required all three bases of its ruling to preclude mootness, all of them obtain here."). But it also included a citation to *DeJohn v. Temple Univ.*, 537 F.3d 301, 311 (3d Cir. 2008), noting that it "reject[ed] mootness by voluntary cessation after considering only the timing of a policy change and continued defense of contested policy." *Id.* at n.4. Regardless, whether all three factors are necessary does not change the outcome here, as all three are present.

First, the Policy is not a controlling statement of future intention to not prosecute Netflix for *Cuties* under Section 43.262. There is no dispute that Mr. Babin controls whether Netflix is prosecuted in Tyler County under Section 43.262. But the Policy simply does not express an intent not to prosecute Netflix under Section 43.262. To the contrary, the Policy only prohibits prosecutions under Section 43.262 *unless and until* one of three enumerated conditions occurs. *See* [Dkt. 22-2 at 3]. If the Texas Court of Criminal Appeals abrogates the Houston First District Court of Appeals' *Ex parte Lowry* decision, the Texas Supreme Court deems Section 43.262 facially constitutional, or the Texas legislature amends Section 43.262, Mr. Babin is free under his policy to bring Section 43.262 charges against Netflix again. Put otherwise, Mr. Babin essentially requests that this Court abstain from addressing the merits of Netflix's constitutional challenges to defer to the Texas courts and legislature on whether Section 43.262 violates the United States Constitution.

The timing of the Policy is at least as suspicious as the timing of the policy changes in the *Speech First* cases. Babin signed the Policy on March 15, 2022, [Dkt. 22-2 at 3], ten days after this Court held the first hearing in this case. [Dkt. 11]. *See Fenves*, 979 F.3d at 329 (finding the timing of a policy change made after litigation commenced suspicious); *Schlissel*, 939 F.3d at 769 (same). Babin's briefing on timing primarily focuses on when he dismissed the Section 43.262 charges. While Babin dismissed the Section 43.262 charges against Netflix before Netflix filed this suit, simply dismissing charges without prejudice does not eliminate the Article III controversy. A threatened prosecution can establish a live controversy. *See Steffel*, 415 U.S. at 459. And because Mr. Babin dismissed the charges *without* prejudice, the threat of prosecution still looms. Thus, the suspicious timing of the Policy is relevant.

10

Finally, Mr. Babin has continued to defend the constitutionality of Section 43.262 on behalf of Texas and in this suit. In his Motion to Dismiss the Section 43.262 charges against Netflix, Mr. Babin stated: "While the State believes that the charged portion of Texas Penal code 43.262 is constitutional, the facts of this case are better suited for other statutes." [Dkt. 1-9]. He reiterated this in his Original Answer filed in this case: "Defendant admits that he moved to dismiss without prejudice, *accurately affirming that the charged portion of Texas Penal Code 43.262 is constitutional* . . . ." [Dkt. 15 at ¶ 6] (emphasis added). Accordingly, even under a relaxed presumption in favor of Mr. Babin's voluntary cessation, Netflix's Section 43.262 claims are not moot.

### B.  *Younger* **Abstention does not bar Netflix's claims challenging the pending charges brought in the New Indictments.**

The Court must also resolve a preliminary jurisdictional issue before addressing Netflix's claims regarding the New Indictments. Generally, federal courts should not interfere with ongoing proceedings in state courts. Indeed, Congress codified this notion with the Anti-Injunction Act: "A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283. Lawsuits brought under 42 U.S.C. § 1983 are excepted from the Anti-Injunction Act, however. *See Mitchum v. Foster*, 407 U.S. 225, 242–43 (1972) ("[W]e conclude that, under the criteria established in our previous decisions construing the anti-injunction statute, [42 U.S.C. § 1983] is an Act of Congress that falls within the 'expressly authorized' exception of that law."). But this does not mean that federal courts have free reign to intrude upon state prosecutions whenever a state criminal defendant files a Section 1983 lawsuit in federal court alleging that a prosecution violates his constitutional rights. Permitting such freewheeling intrusions of state proceedings would offend the notions of comity and federalism that are central to the structure and existence of our Federal Constitution. These notions demand affording state functions "proper respect," recognizing that "the entire country is made up of a Union of separate state governments," and preserving "the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways." *Younger*

*v. Harris*, 401 U.S. 37, 44 (1971). And Section 1983's exception from the Anti-Injunction Act does not "question or qualify in any way [these] principles of equity, comity, and federalism that must restrain a federal court when asked to enjoin a state court proceeding." *Mitchum*, 407 U.S. at 243. Thus, state criminal defendants who seek vindication of their constitutional rights in federal court under § 1983 have a second hurdle to clear: *Younger* abstention.

Under the *Younger* abstention doctrine, federal district courts generally must decline to exercise jurisdiction when: "(1) the federal proceeding would interfere with an 'ongoing state judicial proceeding'; (2) the state has an important interest in regulating the subject matter of the claim; and (3) the plaintiff has 'an adequate opportunity in the state proceedings to raise constitutional challenges.'" *Bice v. La. Pub. Def. Bd.*, 677 F.3d 712, 716 (5th Cir. 2012) (quoting *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982)).

A federal court may nonetheless enjoin a pending state-court criminal proceeding if one of three exceptions to *Younger* abstention applies: (1) "the state-court proceeding was brought in bad faith or to harass the federal plaintiff"; (2) "the federal plaintiff seeks to challenge a state statute that is 'flagrantly and patently violative of express constitutional prohibitions in every clause, sentence, and paragraph, and in whatever manner and against whomever an effort might be made to apply it'"; or (3) "where other 'extraordinary circumstances' threaten 'irreparable loss [that] is both great and immediate.'" *Gates v. Strain*, 885 F.3d 874, 880 (5th Cir. 2018) (quoting *Younger*, 401 U.S. at 45).

Netflix contends that the second indictment was brought in bad faith and to harass Netflix. "A prosecution is taken in bad faith if state officials proceed 'without hope of obtaining a valid conviction.'" *Gates*, 885 F.3d at 881 (quoting *Perez v. Ledesma*, 401 U.S. 82, 85 (1971)). A plaintiff seeking to enjoin a state prosecution bears the burden of establishing actual proof of bad faith. *Id.* A prosecution is also deemed

bad faith if it is brought in retaliation for or to deter the exercise of constitutionally protected rights.[2] *Wilson v. Thompson*, 593 F.2d 1375, 1387 (5th Cir. 1979). Under this basis, the plaintiff bears the burden of establishing: (1) "that the conduct allegedly retaliated against or sought to be deterred was constitutionally protected"; and (2) "that the State's bringing of the criminal prosecution was motivated at least in part by a purpose to retaliate for or to deter that conduct." *Id.* If the plaintiff discharges its burden on both, the burden shifts to the defendant to show by a preponderance of the evidence "that it would have reached the same decision as to whether to prosecute even had the impermissible purpose not been considered." *Id.*

Indeed, an exception to *Younger* applies if "the state-court proceeding was brought in bad faith or to harass the federal plaintiff." *Gates*, 885 F.3d. at 880. But "a suit to enjoin a state criminal prosecution brought in bad faith is of a different breed than a suit to enjoin a prosecution brought lawfully and in good faith." *Wilson*, 593 F.2d at 1382. In reality, *Younger* abstention does not even apply in the first place to bad faith prosecutions because two of the three *Younger* abstention elements fail.

First, when a state criminal defendant seeks an injunction against a bad faith prosecution, "he is seeking to protect his federal right not to be subjected to a bad faith prosecution or a prosecution brought for purposes of harassment, a right that cannot be vindicated by undergoing the prosecution." *Id.* (cleaned

---

[2] Some courts have interpreted these two bases as collectively required to establish bad faith. *See Frampton v. City of Baton Rouge/Par. of E. Baton Rouge*, No. 21-CV-362, 2022 WL 90238, at *12–13 (M.D. La. Jan. 7, 2022) ("When considering the third prong of the *Wilson* test, i.e., whether the State has met its burden to prove that it would have chosen to prosecute even in the absence of the impermissible purpose, the Court should consider: *whether the State prosecution was undertaken with no hope of a valid conviction* . . . and the significance of the alleged criminal activity.") (emphasis added). While this reconciliation of the two standards is understandable, this Court interprets *Gates* and *Wilson* as providing two distinct, and independently sufficient, bases to establish bad faith. First, it is not hard to imagine a scenario where a state initiates a prosecution with no hope of obtaining a valid conviction but not for the purpose of retaliating against or deterring constitutionally protected conduct. Second, in *Perez*—which the Supreme Court handed down the same day as *Younger*—the Court stated: "Only in cases of proven harassment *or prosecutions undertaken by state officials in bad faith without hope of obtaining a valid conviction* and perhaps in other extraordinary circumstances where irreparable injury can be shown is federal injunctive relief against pending state prosecutions appropriate." *Perez v. Ledesma*, 401 U.S. 82, 85 (1971) (emphasis added). Thus, the Supreme Court established "prosecutions undertaken by state officials in bad faith without hope of obtaining a valid conviction" as an independent exception to *Younger* abstention. In *Gates*, the Fifth Circuit expressly interpreted *Perez* to mean that "[a] prosecution is taken in bad faith *if* state officials proceed without hope of obtaining a valid conviction." 885 F.3d at 881 (emphasis added). The Fifth Circuit thus implicitly rejected an alternative plausible interpretation of *Perez* that "in bad faith" and "without hope of obtaining a valid conviction" were meant as two separate requirements necessary to avoid *Younger*. This interpretation is not dispositive here, however, because as discussed *infra*, the Court finds that the prosecution was undertaken with no hope of a valid conviction, *and* in retaliation for Netflix exercising its constitutional rights.

up). "The Younger doctrine presumes that 'the only constitutional issue at stake is the validity of the challenged state law—that being prosecuted under an arguably (or actually) invalid law is not itself a violation.'" *Id.* (quoting *Developments in the Law—Section 1983 and Federalism*, 90 Harv. L. Rev. 1133, 1286 (1977)). "[U]ndergoing a state criminal proceeding brought lawfully and in good faith" generally "does not amount to irreparable injury because there is no reason to assume that a federal court of equity by withdrawing the determination of guilt from the state courts could rightly afford petitioners any protection which they could not secure by prompt trial and appeal . . . ." *Id.* at 1383 (internal quotation marks omitted). This presumption fails, however, "when the prosecution itself effects the constitutional violation." *Id.* at 1383. For example, if the basis of the federal injunction suit is an allegation "that the state proceeding itself creates a chilling effect on speech because the state's legal machinery is being used in bad faith, it is precisely this assumption [that state courts can provide adequate protection] that is challenged . . . . The justification for comity disappears if the allegation is proved true." *Id.*

Second, "[w]ith respect to the interests of the State, it by definition does not have any legitimate interest in pursuing a bad faith prosecution brought to retaliate for or to deter the exercise of constitutionally protected rights." *Id.* at 1383. Nor does the state have a legitimate interest in pursuing a prosecution without hope of obtaining a valid conviction. Thus, whether it is because the second and third *Younger* elements are not met, or because the bad faith *Younger* exception applies, the result is the same: federal courts may enjoin a state court prosecution brought in bad faith.

Netflix contends that both bases apply here: that Mr. Babin "obtained the New Indictments knowing that there is no probable cause—and no hope of proof beyond a reasonable doubt—that *Cuties* qualifies as child pornography subject to Texas Penal Code § 43.25" and that he "sought the New Indictments to harass and deprive Netflix of the ability to exercise its constitutional rights of free speech and to petition." [Dkt. 49 at 14].

1.  **At least one of the New Indictments were brought without hope of obtaining a valid conviction.**

Mr. Babin brought four indictments against Netflix for violations of Texas Penal Code § 43.25(d). [Dkts. 1-5, 1-6, 1-7, 1-8]. Section 43.25(d) provides: "A person commits an offense if, knowing the character and content of the material, he produces, directs, or promotes a performance that includes sexual conduct by a child younger than 18 years of age." Tex. Pen. Code § 43.25(d). "Sexual conduct" is defined as "actual or simulated sexual intercourse, deviate sexual intercourse, sexual bestiality, masturbation, sado-masochistic abuse, or lewd exhibition of the genitals, the anus, or any portion of the female breast below the top of the areola." *Id.* § 43.25(a)(2). The question here is whether *Cuties* contains the "lewd exhibition of the genitals, the anus, or any portion of the female breast below the top of the areola."

Section 43.25 is a child pornography statute; it is nearly identical to the child pornography statute upheld in *Ferber*. The primary differences are: (1) "sexual conduct" in § 43.25(d) includes the lewd exhibition of the anus, or any portion of the female breast below the top of the areola"—not just the lewd exhibition of genitals; (2) § 43.25(d) applies to children under the age of 18, not 16; and (3) § 43.25(d) is violated by producing, directing, or promoting a performance that includes sexual conduct by a child, whereas the statute in *Ferber* is violated by employing, authorizing, or inducing a child to engage in a sexual performance. *Compare* Tex. Pen. Code § 43.25(d), *with Ferber*, 458 U.S. at 750–51; *see also Williams*, 553 U.S. at 289–90, 307 (upholding a statute as constitutional that criminalized, among other actions, promoting child pornography).

Moreover, a violation of § 43.25 does not require that the criminalized speech "taken as a whole, do[es] not have serious literary, artistic, political, or scientific value." *See* Tex. Pen. Code § 43.25. Thus, it is not a constitutional obscenity statute under the *Miller* framework. *See Miller*, 413 U.S. at 24. Section 43.25 is therefore either: (1) a child pornography statute, or (2) a likely facially unconstitutional restriction on speech. Neither party argues that the latter is true, or that the former is false. And regardless, the Court would refuse to adopt the latter interpretation when the former is perfectly plausible. *See Jennings v. Rodriguez*, 138 S. Ct. 830, 836 (2018) ("Under the constitutional-avoidance canon, when statutory language

is susceptible of multiple interpretations, a court may shun an interpretation that raises serious constitutional doubts and instead may adopt an alternative that avoids those problems.").

Section 43.25 is a child pornography statute, but the Court is unconvinced that *Cuties* contains child pornography. In all of *Cuties*, there are no sex scenes and there is only one scene that contains nudity. In that one scene, the Cuties are watching a video on one of their phones when a dancer in the video flashes her breast for a fraction of a second. But that dancer ("Jane Doe") was not a minor. Therefore, her nudity cannot constitute child pornography. *See Ashcroft*, 35 U.S. at 250–51 (clarifying that child pornography must contain real children to be criminalized).

Mr. Babin received notice—well before he sought the New Indictments—that Jane Doe was over eighteen at the time of filming. On October 9, 2020, shortly after Netflix received service of the First Indictment, Netflix's counsel met with Mr. Babin and Mr. Hardy to discuss the case and the indictment. [Dkt. 97 at ¶¶ 61–62]. Trying to determine what specifically prompted the indictment, Netflix's counsel volunteered that "if the issue were the fleeting sight of a woman's breast, that they should know that the woman was over eighteen and thus not a child when that scene was filmed." [Dkts. 97 at ¶ 64; 101 at ¶ 64]. Netflix's counsel also offered to provide proof that Jane Doe was over eighteen when the scene was filmed, but Mr. Babin and Mr. Hardy denied that the indictment involved the exposed breast and expressed no need to see such proof. [Dkts. 97 at ¶¶ 65–67; 101 at ¶¶ 65–67].[3] Despite Netflix volunteering this information, Mr. Babin later obtained the New Indictments under Section 43.25—one of which is for Jane Doe's nudity. [Dkt. 1-5].

In *Williams*, Justice Scalia writing for the Court, assuaged an amici's concern that a statute criminalizing knowingly "advertis[ing], promot[ing], . . . an obscene visual depiction of a minor engaging in sexually explicit conduct; or . . . a visual depiction of an actual minor engaging in sexually explicit

---

[3] In addition to Mr. Babin's admissions in his Second Amended Answer [Dkt. 101], Mr. Hardy confirmed Netflix's offer of proof—and their declination—in his deposition: "Q: 'You knew that they had offered to give proof that she was of age at the time this scene was made, right?' A: 'Yes.' Q: 'And you never asked for that proof?' A: 'No, I never did.' Q: 'And to your knowledge, neither did Mr. Babin?' A: 'Not to my knowledge.'" [Dkt. 70-12 at 65:7–14].

conduct" would criminalize "some advertisements for mainstream Hollywood movies that depict underage

characters having sex":

> We think it implausible that a reputable distributor of Hollywood movies,
> such as Amazon.com, believes that one of these films contains *actual*
> children engaging in *actual or simulated* sex on camera; and even more
> implausible that Amazon.com would *intend* to make its customers believe
> such a thing. The average person understands that sex scenes in
> mainstream movies use nonchild actors, [or] depict sexual activity in a
> way that would not rise to the explicit level necessary under the statute, or,
> in most cases, both.

553 U.S. at 289, 301–02 (citing Br. of the Free Speech Coal. and First Amend. Lawyers Assoc. as Amici

Curiae Supporting Respondent, United States v. Williams, 553 U.S. 285 (2008) (No. 06-694), 2007 WL

2363264, at *9–18.) This discussion in *Williams* is instructive here, as it contemplates a similar child

pornography statute, and Netflix is undoubtedly on the same "reputable movie distributor" playing field as

Amazon.com. The Supreme Court not only considered it implausible that such a distributor would

promote—or want its customers to think it were promoting—a movie including real child pornography, but

also assumed that the average person would understand that sex scenes in mainstream movies do not violate

this statute. If the Supreme Court assumes that average person should understand that a mainstream movie

that includes sex scenes would not include child pornography, this Court thinks it is fair to assume that Mr.

Babin—who has personal experience filming mainstream movies[4]—should have reached the same

conclusion. This assumption is bolstered by the fact that, to the Court's knowledge, not a single other

prosecutor in the country has brought—or even sought—child pornography charges against Netflix for

*Cuties*. And presumably, most prosecutors opted not to prosecute Netflix for *Cuties* without even needing

---

[4] Mr. Babin testified that he has experience on film sets and how that experience weighed into his decision to charge
Netflix: "The experience I've had on film sets is typically scenes are rehearsed before they are shown. Scenes are
blocked before they are shot. And actors and actresses have marks before the takes are -- before the camera rolls. The
clothing that this young child is wearing here, that would be her wardrobe. That would be hanging on a coat hanger
in a wardrobe department in, perhaps, a RV or some location on the set. The scenes in which this particular wardrobe
is used would be labeled on this wardrobe. And all of those things I did think -- think about as I saw this scene." *See*
Hr'g Tr. 123:11–124:2; *see also School of Rock Full Cast & Crew*, IMDB, https://www.imdb.com/title/t
t0332379/fullcredits?ref_=tt_cl_sm (last visited Nov. 8, 2022) (listing actor Lucas Babin as the character "Spider").

to be told by Netflix's counsel that Jane Doe was not a minor when the movie was filmed.[5] In light of the evidence before the Court at this time, and the above-mentioned considerations, the Court finds that at least one of the New Indictments were brought without any hope of obtaining a valid conviction.

### 2.   The New Indictments were brought to retaliate against Netflix for exercising its constitutional right to petition the government, or to deter Netflix from exercising this right.

Netflix also contends that the New Indictment was sought, at least in part, to retaliate against Netflix for invoking its right to petition the government through the habeas proceeding. The Court agrees. Over 400 days passed after bringing the First Indictment before Mr. Babin convened the grand jury to seek the New Indictments under Section 43.25. *Cuties*' content did not change at all during this time. Surely, Mr. Babin was aware of Section 43.25 when he sought the First Indictment. But he chose not to bring charges under Section 43.25—the more serious statute—until *after* Netflix exercised its constitutional right "to petition the Government for a redress of grievances" by filing the habeas petition. *See* U.S. Const. amend I. On March 1, 2022—two days before the scheduled argument on Netflix's petition for habeas relief—Mr. Babin notified Netflix that he would soon be dismissing the First Indictment and serving the New Indictments. [Dkt. 70-14 at 20]. As a result, Netflix had to abandon its Habeas Petition, [Dkt. 70-10], even though Mr. Babin's dismissal "without prejudice" leaves open the possibility he will bring the charges again.

The Court therefore finds that Netflix has met its burden of establishing: (1) "that the conduct allegedly retaliated against or sought to be deterred was constitutionally protected"; and (2) "that the State's bringing of the criminal prosecution was motivated at least in part by a purpose to retaliate for or to deter that conduct." *See Wilson*, 593 F.2d at 1387. The burden therefore shifts to Mr. Babin to show by a preponderance of the evidence that he "would have reached the same decision as to whether to prosecute

---

[5] Despite the Court's satisfaction that Netflix had established that Jane Doe was over eighteen at the time filming, Mr. Babin discounted Netflix's assurances and evidence that Jane Doe was over eighteen at the time of filming because Netflix had not produced Jane Doe's passport. *See* Hr'g Tr. 210:1–213:10. This does not change the Court's analysis here, however, because Mr. Babin did not know the substance of Netflix's evidence of Jane Doe's age when he declined to see it. It was not until *after* he brought the New Indictments, when this case came to this Court, that Netflix presented the proof of Jane Doe's age in its possession at that time. Netflix has since produced Jane Doe's passport. *See* [Dkt. 110].

even had the impermissible purpose not been considered." *See id.* At this point, Mr. Babin has not met this burden. Mr. Babin contends that while he was aware of Section 43.25 and the facts of *Cuties* in September 2020 when he sought the First Indictment, he later sought the Second Indictment under a more appropriate criminal statute, and no longer needed the Section 43.262 charge. [Dkt. 70-11 at 89:12–90:23]. When asked what changed to make Section 43.25 more appropriate in February of 2022 than September of 2020, Mr. Babin testified that he "became aware of . . . some case law that was notably cited in [Netflix's] petition for writ of habeas corpus." *Id.* at 90:24–91:3. He could not remember the specific cases, however, just that "upon reading his petition for writ of habeas corpus and looking into some of the cases that he had cited and then following some of those cases and related cases, it became very clear that there were other statutes that were more appropriate under these facts." *Id.* at 91:4–11. Notably, Mr. Babin emphatically denies that the *Lowry* decision had any impact on his decision to dismiss the First Indictment, and that prior to Netflix filing the writ for habeas corpus, his ultimate decision at the time was to not dismiss the First Indictment. *Id.* at 86:1–89:8. Based on this testimony, the Court is not convinced at this time, beyond the preponderance of the evidence, that Mr. Babin would have reached this decision to prosecute Netflix under the New Indictments had an impermissible purpose not been considered.

### 3. The independent intermediary doctrine likely does not apply.

Mr. Babin also contends that the independent intermediary doctrine protects him from the bad faith exception because a grand jury issued the indictments. [Dkt. 48 at 10–11]. "[I]f facts supporting an arrest are placed before an independent intermediary such as a magistrate or grand jury, the intermediary's decision breaks the chain of causation for false arrest, insulating the initiating party." *Cuadra v. Houston Indep. Sch. Dist.*, 626 F.3d 808, 813 (5th Cir. 2010) (internal citation omitted). But the chain of causation "is broken only where all the facts are presented to the grand jury, or other independent intermediary where the malicious motive of the law enforcement officials does not lead them to withhold any relevant information from the independent intermediary." *Winfrey v. Rogers*, 901 F.3d 483, 497 (5th Cir. 2018).

First, it is not clear that the independent intermediary doctrine even applies to prosecutors seeking indictments from grand juries. But assuming *arguendo* that it applies, it would likely fail here. In *Winfrey*,

the doctrine did not apply because "at best, it [was] not clear whether all the facts were presented the to the grand jury." 901 F.3d at 498 (internal quotation marks omitted). The same is true here: Mr. Babin testified in his deposition on several occasions that he could not remember what he said to or showed either grand jury.[6] Moreover, the record is clear that Mr. Babin did not present *all* facts to the grand jury—it is undisputed that the grand jury did not watch the whole movie. Another example is a scene where Amy partakes in a religious cleansing ritual where her mother and auntie administer water on her body, and she goes into a trance-like state. In context, the scene symbolizes the inner conflict Amy is battling between her spiritual beliefs and societal influences. The clips of this scene that were on Mr. Babin's grand jury thumb drive reveal, however, that he did not provide this relevant information to the grand jury. Instead, at most they saw a young girl in underwear and a tank top, by herself, convulsing on the floor. Mr. Hardy's deposition testimony regarding this scene is also enlightening. He referred to this scene as "a little girl . . . being sprayed and doing all kind of nasty stuff." [Dkt. 70-12 at 21:22–25]. When asked, "What did you think was happening in the scene where she's being sprayed?", Mr. Hardy answered, "She looks like she was humping the ground to me." *Id.* at 21:24–22:2. When asked if he thought anything else occurred in that scene, he simply responded, "No, sir." *Id.* at 22:3–4. The Court is skeptical at best that the grand jury received all of the relevant information regarding that scene if Mr. Babin's First Assistant District Attorney did not. Thus, it is unlikely that the independent intermediary doctrine will insulate Mr. Babin here.

## IV.    PRELIMINARY INJUNCTION

### A.  *Legal Standard*

To obtain a preliminary injunction, the party requesting such relief must show: (1) a substantial likelihood that they will prevail on the merits, (2) a substantial threat that they will suffer irreparable injury if the injunction is not granted, (3) that their substantial injury outweighs the threatened harm to the party whom they seek to enjoin, and (4) that granting the preliminary injunction will not disserve the public interest. *City of El Cenizo, Tex. v. Texas*, 890 F.3d 164, 176 (5th Cir. 2018). "None of the four elements

---

[6] *See* [Dkt. 70-11 at 42:20–43:4, 52:25–53:2, 56:25–57:1, 100:20–101:10, 101:24–102:7, 102:11–20, 102:25–103:16, 104:25–105:5].

have a fixed quantitative value; rather, a sliding scale is utilized, which takes into account the intensity of each in a given calculus." *Hunt v. City of Longview*, 932 F. Supp. 828, 838 (E.D. Tex. 1995) (citing *State of Tex. v. Seatrain Intern., S.A.*, 518 F.2d 175, 180 (5th Cir. 1985)). But nonetheless, each element must be established. *See Medlin v. Palmer*, 874 F.2d 1085, 1091 (5th Cir. 1989) ("The failure of a movant to establish one of the . . . four elements will result in the denial of a motion for temporary injunction.").

**B.   There is a substantial likelihood that Netflix will prevail on the merits.**

### 1.   The First Indictment

Texas Penal Code § 43.262(b) provides:

> A person commits an offense if the person knowingly possesses, accesses with the intent to view, or promotes visual material that: (1) depicts the lewd exhibition of the genitals or pubic area of an unclothed, partially clothed, or clothed child who is younger than 18 years of age at the time the visual material was created; (2) appeals to the prurient interest in sex; and (3) has no serious literary, artistic, political, or scientific value.

The First Indictment indicts Netflix under this provision for "knowingly promoting" *Cuties*. [Dkt. 1-1 at 4]. Netflix claims that enforcement of Texas Penal Code § 43.262: (1) violates Netflix's Fifth Amendment rights because the statute is unconstitutionally vague; and (2) violates Netflix's First Amendment rights because it is an impermissible content- and viewpoint-based restriction that is overbroad and not narrowly tailored to serve a compelling state interest. [Dkt. 97 at 25–26].

One court has already held that Section 43.262 violates the First Amendment because it is a content-based restriction of speech, is not an obscenity or a child pornography statute, and cannot otherwise satisfy strict scrutiny. *See Ex parte Lowry*, 639 S.W.3d at 162–68 ("Because the visual material prohibited by section 43.262 includes visual material that may be lewd but not within *Miller*'s definition of obscenity or considered child pornography, we therefore conclude that section 43.262 attempts to regulate visual material that is inherently expressive and that is protected by the First Amendment.").[7] At this stage of the

---

[7] The court also concluded that Section 43.262 violates the First Amendment because it is overly broad. *Ex parte Lowry*, 639 S.W.3d at 169. The overbreadth analysis and holding, however, was based on a prosecution for "possession" under the statute—not for "promotion" as is the case here.

litigation, the Court finds the *Ex parte Lowry* analysis to be sufficiently thorough and persuasive to find a substantial likelihood that Netflix will prevail on the merits of its First Amendment claim.

### 2.  The New Indictments

"In order to show a likelihood of prevailing on the merits, the plaintiffs must show the likely applicability of the *Younger* bad faith exception and . . . the likely existence of a constitutional violation causally related to the result sought to be enjoined." *Wilson*, 593 F.2d at 1383–84. The Supreme Court in *Wilson* noted that that the "likely applicability of the *Younger* bad faith exception" and the "existence of a constitutional violation causally related to the result sought to be enjoined" "amount to the same thing" under the circumstances of the case. *Id.* This is because, as discussed, the bad faith prosecution in itself likely amounts to a constitutional violation. The same applies here.

Moreover, Netflix will likely succeed on its claim that Section 43.25 is unconstitutional as applied to Netflix's promotion of *Cuties*. First, there is conclusive evidence in the record that Jane Doe was over eighteen at the time of filming. With respect to the other three New Indictments, [Dkts. 1-6, 1-7, 1-8], Mr. Babin and his counsel contend that applying the factors outlined in *United States v. Dost*, 636 F. Supp. 828 (S.D. Cal. 1986)—which the Texas Court of Criminal Appeals applied in *State v. Bolles*, 541 S.W.3d 128 (Tex. Crim. App. 2017)—supports the conclusion that *Cuties* contains "lewd exhibition of genitals" under Section 43.25. *See, e.g.*, Hr'g Tr. 172:20–174:21. In *Dost*, the court addressed whether pictures of *completely nude* minors constituted "lascivious exhibition of the genitals or pubic area" under federal child pornography law. *Dost*, 636 F. Supp. at 832–33. The *Dost* court declared that:

> in determining whether a visual depiction of a minor constitutes a "lascivious exhibition of the genitals or pubic area" . . . the trier of fact should look to the following factors, among any others that may be relevant in the particular case:
>
> 1) whether the focal point of the visual depiction is on the child's genitalia or pubic area;
>
> 2) whether the setting of the visual depiction is sexually suggestive, i.e., in a place or pose generally associated with sexual activity;
>
> 3) whether the child is depicted in an unnatural pose, or in inappropriate attire, considering the age of the child;

4) whether the child is fully or partially clothed, or nude;

5) whether the visual depiction suggests sexual coyness or a willingness to engage in sexual activity;

6) whether the visual depiction is intended or designed to elicit a sexual response in the viewer.

*Dost*, 636 F. Supp. at 832; *see also United States v. Steen*, 634 F.3d 822, 826–28 (5th Cir. 2011) (applying the *Dost* factors to determine whether a video of a *nude* minor getting into a tanning bed, that was taken without her knowledge constituted a "lascivious exhibition" of genitals or pubic area under federal child pornography law); *Bolles*, 542 S.W.3d at 141–42 (citing various Texas courts that have interpreted "lascivious" as used in *Dost* as synonymous with "lewd" as used in Texas Penal Code §§ 43.26 and 43.25). In *Bolles*, the Texas Court of Criminal Appeals applied the *Dost* factors to determine that a picture of a minor's *nude* genitals constituted "lewd exhibition" of the child's genitals under Texas Penal Code §§ 43.26 and 43.25. *Bolles*, 541 S.W.3d at 143–44. The court noted that: "These factors do not define the term 'lewd exhibition.' . . . [T]hey serve only as a guide, and no single factor is dispositive. The term 'lewd exhibition' is capable of being interpreted by a trier of fact using any meaning which is acceptable in common parlance." *Id.* at 142–43.

The Court understands Mr. Babin's position to be that the *Dost* factors apply to clothed and nude genitals alike to determine whether there is "lewd exhibition."[8] Mr. Babin cites *United States v. Knox*, 32 F.3d 733 (3d Cir. 1994), to support his position. *Knox* involved minor subjects "clad only in very tight leotards, panties, or bathing suits . . . shown specifically spreading or extending their legs to make their genital and pubic region entirely visible to the viewer." 32 F.3d at 747. "In some of these poses, the child subject was shown dancing or gyrating in a fashion indicative of adult sexual relations. Nearly all of these

---

[8] "The Court: . . . 'Now, were her genitals being touched in this photograph? . . . Or am I missing something?' [Mr. Babin's Counsel,] Mr. Lindsey: 'They're being exhibited, your Honor.' [Mr. Babin] 'Yes, sir, your Honor.' The Court: Maybe my eyes aren't as good as they used to be, but isn't that a panty as opposed to a genital that we see, or am I missing something?' [Mr. Babin]: 'No, your Honor. That's - - she is wearing - - it looks like these shorts under the - - the analysis would be done under the *Dost* factors . . .' The Court: 'But you're saying that the photograph shows a genital?' [Mr. Babin]: 'I'm saying through the analysis of - - that state court system would do under the *Dost* factors and other relevant factors, it would be up to the jury to determine whether or not that satisfies 43.25.'" Hr'g Tr. 172:20–173:20.

scenes were shot in an outdoor playground or park setting where children are normally found." *Id.* After analyzing the text and legislative history of the applicable federal child pornography statute, as well as the harm Congress intended to eradicate, the court concluded that "lascivious exhibition of the genitals or pubic area . . . does not contain any requirement that the child subject's genitals or pubic area be fully or partially exposed or discernible through his or her opaque clothing." *Id.* at 751. *Knox* seems to be an outlier case, however, and it is not binding on this Court. Moreover, even if Mr. Babin were to ultimately prevail on his claim that "lewd exhibition of genitals" can include clothed genitals, the remaining facts in *Knox* are not analogous to this case. *Knox* involved content that was expressly advertised as child pornography. *Id.* at 737–38. There is a substantial likelihood that *Knox* will not be controlling and Netflix will prevail on the merits.

**C.   There is a substantial threat that Netflix will suffer irreparable injury if the injunction is not granted.**

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Moreover, "[w]hen a significant chilling effect on free speech is created by a bad faith prosecution, the prosecution will thus as a matter of law cause irreparable injury regardless of its outcome, and the federal courts cannot abstain from issuing an injunction." *Wilson*, 593 F.2d at 1383. Both effects have been established above. Therefore, there is a substantial threat that Netflix will suffer irreparable injury if the injunction is not granted

**D.   The threatened injury to Netflix outweighs any harm that may result from the injunction to Mr. Babin.**

"With respect to the interests of the State, it by definition does not have any legitimate interest in pursuing a bad faith prosecution brought to retaliate for or to deter the exercise of constitutionally protected rights." *Wilson*, 593 F.2d at 1383. "To the extent that the State does have legitimate interests at stake in the prosecution, the question becomes whether the prosecution would have been otherwise brought but for the constitutionally impermissible motivation a question of causation." *Id.* at 1383 n.14.

As discussed above, Mr. Babin has expressed that he does not plan to re-indict Netflix under § 43.262 at this time. Thus, any harm to Mr. Babin caused by the injunction would be de minimis,

especially compared to the irreparable harm Netflix could suffer from the loss of its First Amendment freedoms.

**E.  Granting the preliminary injunction will not disserve the public interest.**

"Injunctions protecting First Amendment freedoms are always in the public interest." *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 298 (5th Cir. 2012). Therefore, this factor is satisfied.

## V.   CONCLUSION

It is therefore **ORDERED** that Plaintiff Netflix Inc.'s Amended Motion for Preliminary Injunction [Dkt. 69] is **GRANTED**. The Court **ORDERS** that Defendant Lucas Babin, his agents, servants, employees, and attorneys, and all other persons who are in active concert or participation with Babin or any of his agents, servants, employees or attorneys, are **RESTRAINED AND ENJOINED** from prosecuting or otherwise pursuing the New Indictments against Netflix or from seeking to reindict Netflix or otherwise prosecute Netflix under Section 43.262 of the Texas Penal Code in connection with the motion picture *Cuties*.

This preliminary injunction will expire upon the Court's issuance of a final judgment in this matter. The Court's conclusions and analyses in this opinion are limited to this preliminary injunction. The Court will conduct a bench trial on the merits of a permanent injunction on January 30, 2023. The Court welcomes the State of Texas to submit briefing on the facial constitutionality of Texas Penal Code § 43.262 and the scope of Texas Penal Code § 43.25 prior to the January 30th trial, and to provide oral argument at the trial if deemed necessary.

It is further **ORDERED** that no bond is required given the importance of the constitutional rights at issue.

**SIGNED this 14th day of November, 2022.**

*Michael J. Truncale*
Michael J. Truncale
United States District Judge